**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| WATER ISLAND EVENT-DRIVEN FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>KNOWBE4, INC., SJOERD SJOUWERMAN, JEREMIAH DALY, STEPHEN SHANLEY, KEVIN KLAUSMEYER, SHRIKRISHNA VENKATARAMAN, GERHARD WATZINGER, KARA WILSON, KKR & CO., INC., KKR KNOWLEDGE INVESTORS L.P., ELEPHANT PARTNERS, ELEPHANT PARTNERS I, L.P., ELEPHANT PARTNERS II, L.P., ELEPHANT PARTNERS 2019 SPV-A, L.P., ELEPHANT PARTNERS II-B, L.P. and VISTA EQUITY PARTNERS MANAGEMENT, LLC,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF PROXY AND ANTI-FRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


INTRODUCTION ..... 2

JURISDICTION AND VENUE ..... 8

PARTIES ..... 9

A. Plaintiff ..... 9

B. Defendant KnowBe4 ..... 10

C. The Special Committee Defendants ..... 10

D. The Director Defendants ..... 11

E. Defendant KKR ..... 12

F. Defendant Elephant ..... 13

G. Defendant Vista ..... 14

RELEVANT NON-PARTIES ..... 14

A. Morgan Stanley ..... 14

B. Kevin Mitnick ..... 14

I. FACTUAL BACKGROUND ..... 15

A. Background of KnowBe4, and Elephant and KKR's Substantial Investments in the Company ..... 15

B. Vista Buys a Significant Stake in the Company from KKR and Elephant ..... 17

C. KnowBe4 Goes Public and Accelerates Its International Growth ..... 18

D. After KnowBe4 Posts Record Results and Beats Guidance, Vista, KKR, Elephant and Sjouwerman Launch a Sale Process ..... 21

E. The Board Forms a Conflicted Special Committee, Which Immediately Retains a Conflicted Financial Advisor ..... 23

F. The Special Committee Allowed Vista to Retain Its Existing Advantage over Other Potential Buyers ....25

G. The Special Committee Allowed Shanley and Other Control Group Representatives to Stay Involved in the Sales Process Despite KKR's Desire To Roll Over Equity ....27

H. As KnowBe4 Announces Record Second Quarter Financial Results, the Special Committee Continues Full-Speed Ahead to Pursue a Sale to Vista, But Based the Sale on a Management Plan that Undervalued the Company ....28

I. The Special Committee Continued to Give Vista a Timing Advantage and Event Revealed Its Pricing Views to Vista ....30

J. The Special Committee and Morgan Stanley Continue to Facilitate Vista's Pre-Offer Diligence While Also Complying with Vista's Request to Confirm the Control Group's Rollover Intentions ....32

K. The Special Committee Sets a $25/share Floor for a Transaction ....33

L. Vista Proposes to Buy KnowBe4 for $24 Per Share, Well Below the Mutually Understood Mid-to-Upper $20s Pricing Guidance and Below the Special Committee's $25 Price Floor ....34

M. KKR Decides to Increase Its Rollover Given the Committee's Failure to Negotiate a Fair Deal Price ....35

N. Vista Proposes a Down-Convert to Ensure Stockholder Approval of the Disparate Treatment of Class A and Class B Stockholders in the Merger ....36

O. The Special Committee and Board Approve the Merger and KnowBe4 Continues Issuing Positive Business News ....38

P. The Stockholder Vote Was Not Fully Informed Because the Proxy Included Material Misstatements and Omissions of Material Facts ....41

II. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ....43

A. False or Misleading Statements or Omissions of Material Facts in the October 2022 Merger Press Release ....................................... 44

B. False or Misleading Statements or Omissions of Material Facts in the December 22, 2022 Definitive Proxy and a Proxy Amendment on January 18, 2023 ..................................................... 45

1. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee Members' Conflicts of Interest and Evaluation of the Same ....................................................................... 46

2. False and Misleading Statements or Omissions of Material Facts Concerning KKR's Decision to Significantly Increase Its Rollover Participation After the Low Merger Price Was Established .......................... 47

3. False and Misleading Statements or Omissions of Material Facts Concerning the Committee's Favoritism of Vista................................................................. 49

4. False and Misleading Statements or Omissions of Material Facts Concerning the Scope of the Special Committee's Consideration of Alternatives to the Merger .................................................................. 51

C. False or Misleading Statements or Omissions of Material Facts in the December 22, 2022 Schedule 13E-3 by KnowBe4, Elephant Partners, KKR and Vista .................................................... 52

III. ADDITIONAL ALLEGATIONS OF SCIENTER ...................................... 53

IV. LOSS CAUSATION ............................................................................... 54

V. INAPPLICABILITY OF STATUTORY SAFE HARBOR.......................... 57

VI. CLASS ACTION ALLEGATIONS........................................................... 58

VII. PRESUMPTION OF RELIANCE ........................................................... 60

COUNT I Against Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder ........................................................... 64

COUNT II Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ........................................................66

COUNT III Against the Director Defendants, the Control Group and Vista for Violations of Section 20(a) of the Exchange Act ....................................................68

VIII. PRAYER FOR RELIEF .........................................................................70

IX. JURY DEMAND...............................................................................71

Water Island Event-Driven Fund ("Plaintiff") brings this class action (the "Class Action" or "Action") for violations of:

(i) Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of itself and other public holders of KnowBe4, Inc. ("KnowBe4" or the "Company") common stock (the "Unaffiliated Stockholders") as of the December 7, 2022 record date (the "Record Date") that were entitled to vote on the "take-private" acquisition (the "Merger") by Vista Equity Partners Management, LLC and its affiliates (collectively, "Vista");[1] and

(ii) Sections 10(b) and 20(a) of the Exchange Act, on behalf of itself and all other persons or entities (excluding Defendants, defined more fully below) that sold shares of KnowBe4 common stock from the October 12, 2022 announcement date through the February 1, 2023 close of the Merger (the "Class Period"), including those who sold shares into the Merger, and were damaged thereby (together with the Unaffiliated Stockholders, the "Class" or "Class Members").[2]

Plaintiff's allegations are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based upon an investigation comprised of, among other things, consultation with one or more experts and review and analysis of: (i) public filings by KnowBe4; (ii) press releases and other public statements; (iii) media and analyst reports about the Company; and (iv) publicly filed pleadings in other proceedings, including the actions for breach of fiduciary duty brought by shareholders in the Delaware Court of Chancery.

---

[1] 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 promulgated thereunder

[2] §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

## INTRODUCTION

1. This Class Action arises from misstatements and omissions of material fact in the Proxy (as defined below) for KnowBe4's February 2023 take-private Merger with Vista and other public filings that concealed the self-interested, conflicted and tainted sales process that robbed Class Members of the true value of their shares.

2. The Merger was structured to allow controlling shareholders KKR & Co. Inc. and its affiliate (together "KKR"), Elephant Partners and its affiliates (collectively "Elephant"), and KnowBe4's founder Sjoerd Sjouwerman (collectively with KKR and Elephant, the "Control Group" or "Rollover Stockholders") to have their cake and eat it too. Through the Merger, the members of the Control Group both (i) monetized a portion of their respective stakes in KnowBe4 by selling interests to Vista, and (ii) at the same time rolled over (or purchased) nearly $800 million in equity to maintain an upside benefit in the Company's future. By contrast, unwitting Unaffiliated Stockholders were cashed out at $24.90 per share, a price significantly lower than the undisclosed valuation conducted by the conflicted financial advisors engaged by the Special Committee (as defined below).

3. KnowBe4 and Vista announced the Merger on October 12, 2022, the beginning of the Class Period. From the beginning, KnowBe4, Vista and the

Director Defendants (as defined below) represented that the Merger and its terms were the result of a fair and robust sales process. For example:

- The October 12, 2022 press release announcing the Merger, filed with the U.S. Securities and Exchange Commission ("SEC") on Form 8-K and incorporated by reference into the Proxy (the "October 2022 Merger Press Release"), represented that the Merger was the result of "a robust process" under the supervision of an "independent" Special Committee and its "independent" financial advisors. The release assured investors that "[f]ollowing this process, the Special Committee and KnowBe4's Board of Directors [("Board" or "Board of Directors")] ***each unanimously determined that the transaction with Vista is in the best interests of KnowBe4 and its stockholders***."

- On December 22, 2022, KnowBe4 filed the *Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934* (together, with a subsequent amendment on January 18, 2023, the "Proxy"), which likewise represented that the Merger was "***advisable, fair to and in the best interests of KnowBe4 and its stockholders, including the Unaffiliated Stockholders***" and "***the best value*** that KnowBe4 could reasonably obtain from Vista for the shares of KnowBe4 common stock."

- The Proxy also contained a conclusion and recommendation by the Director Defendants "that the Merger is ***fair to KnowBe4's unaffiliated security holders***" based on the "procedural fairness of the Merger, including that [] it was negotiated by the Special Committee consisting solely of independent (for purposes of serving on the Special Committee) and disinterested directors" and represented by "***independent financial and legal advisors***."

4. The Proxy contained a similar representation by the Control Group and Vista that they "believe that the Merger is substantively and procedurally fair to KnowBe4's 'unaffiliated security holders,'" based largely on a recitation of the same

putative bases of the recommendations by the Special Committee and Board of Directors.

5. The truth was far different than the above representations. Unbeknownst to the Unaffiliated Stockholders (and other Class Members), the Merger was driven and dominated by the Control Group—and assisted by conflicted financial advisors retained by the Special Committee and Board—that wholly poisoned the merger process. Specifically, as set forth in more detail herein, the facts recited in the Proxy concerning the sales process that purportedly justified the Merger were self-serving, misrepresented the truth and omitted material details, including, among other things, that:

(i) the Special Committee lacked independence from its own self-interest and domination by the Control Group;

(ii) the conflicted Special Committee favored Vista over other potential bidders;

(iii) the sales process was historically and structurally advantageous to Vista to the point that other interested parties were unable to realistically succeed in the fixed "bidding" process;

(iv) the Special Committee did not adequately consider strategic alternatives other than the sale of KnowBe4; and

(v) KKR increased its planned rollover or reinvestment into the post-close KnowBe4 by 50-100% after it learned of the deal price.

6. Vista's historical competitive advantage in merger negotiations and the other Defendants' preference for a transaction with Vista began even prior to KnowBe4's April 2021 initial public offering (the "IPO"). Prior to the IPO, Vista

expressed interest in acquiring KnowBe4, and, after executing a confidentiality agreement, gained access to the Company's non-public information. While Vista did not acquire KnowBe4 at that time, Vista reached an agreement with KKR and Elephant to purchase certain of their shares of the Company. Specifically, following the IPO, the Control Group collectively held a majority of KnowBe4's voting power through its ownership of most of the Company's super-voting Class B shares, with Vista holding 10.36% voting power.

7. By May 2022, Vista renewed its interest in a takeover. Vista first contacted KKR's board designee, Director Defendant Stephen Shanley, then Board member and former Chief Financial Officer ("CFO") Shrikrishna Venkataraman (who interfaced with Vista through its 2021 investment), and Elephant's Board designee, Director Defendant Jeremiah Daly, after which Vista met with the Control Group to gauge its interest in a take-private transaction that would allow the Control Group to realize liquidity and rollover equity.

8. As a result, the Board formed the so-called independent Special Committee, which the Board staffed with three members that harbored conflicts of interest and lacked independence from the Control Group and Vista. The conflicted Special Committee, in turn, selected Morgan Stanley as its financial advisor despite Morgan Stanley's numerous conflicts, including extensive and ongoing

engagements with Vista and several of its portfolio companies, as well as other engagements with KKR.

9. The Special Committee met on September 8, 2022. By that time, Vista had completed a total of thirteen due diligence meetings. Morgan Stanley acknowledged that there were ***two*** potential alternative bidders remaining (from the limited group to which it chose to reach out) but nonetheless recommended the Committee focus on Vista.

10. At the September 8, 2022 meeting, the Special Committee also inexplicably agreed to not include a go-shop in any future merger agreement with Vista.

11. The rushed, conflicted and pro-Vista and Control Group process resulted in an agreement by which Vista acquired KnowBe4 at an unfairly discounted price. Indeed, the $24.90 per share Merger price was below the $25.00 per share floor the Special Committee had previously agreed on, and well below the target zone. Indeed, Morgan Stanley's financial analyses valued KnowBe4 at between $25.05 and $37.52 per share based on projections that excluded even underway growth initiatives.

12. Recognizing that the Merger was underpriced, KKR significantly increased its rollover commitment from its initial rollover plans.

13. For its part, Vista was able to parlay its knowledge of the sales process, limited bidders and the Control Group's motive to shape the transaction in its favor versus the interests of Unaffiliated Stockholders, including minimizing the price it paid in the Merger.

14. The Proxy and other public filings concealed these facts through a self-serving recitation of the history of the sales process that consistently omitted or shaded the truth. The material misstatements and omissions of material facts in the Proxy prevented Plaintiff and other Unaffiliated Stockholders from properly evaluating the Merger and caused them to accept Merger consideration that failed to adequately value KnowBe4 common stock, and for which they could have received higher consideration in a fair and impartial sales process. Likewise, the Defendants' materially false and misleading statements and omissions of material facts in the Proxy and related filings caused Class Members to sell their stock into the Merger at a price that failed to adequately reflect the true value of KnowBe4 common stock.

15. Through this Action, Plaintiff seeks to hold Defendants liable for their misrepresentations and to recover damages for the harm shareholders incurred as a result thereof under:

(i) <u>Count I</u> against KnowBe4, the Director Defendants and Vista for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9) for material misstatements and omissions of material facts in the Proxy;

(ii) Count II against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § § 240.10b-5) for untrue statements of a material facts and omissions of material facts in the Proxy and other related filings set forth herein; and

(ii) Count III against KnowBe4, the Director Defendants and the Control Group under Section 20(a) of the Exchange Act as control persons for the violations of the Exchange Act.

16. Plaintiff seeks to recover damages on behalf of Unaffiliated Stockholders that received unfair Merger consideration and all other Class Members that sold shares prior to the Merger at depressed prices based on misstatements and omissions by KnowBe4, the Director Defendants and Vista.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 2401.10b-5 and 17 C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18. Personal jurisdiction exists over each Defendant either because: (i) the Defendant conducts business in or maintains operations in the State of Florida; or (ii) is an individual who is either present in the State of Florida for jurisdictional purposes or has sufficient minimum contacts with the State of Florida to render the

exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice. Defendants' contacts with the State of Florida are further detailed below.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements to, in and from this District.

20. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A. Plaintiff

21. Plaintiff Water Island Event-Driven Fund is an investment fund managed by Water Island Capital, LLC. As set forth in the attached certification, Plaintiff held and was a beneficial owner of KnowBe4 common stock as of the Record Date for the Merger and was entitled to vote on the Merger. The Founder and Co-Chief Investment Officer of Water Island Capital, LLC resides in Miami-

Dade County and participates in decision making from the Southern District of Florida.

**B. Defendant KnowBe4**

22. KnowBe4, Inc. is a Delaware corporation headquartered in Clearwater, Florida. KnowBe4, which prior to the Merger traded on the Nasdaq National Market System ("NASDAQ"), provides the world's largest security awareness training and simulated phishing platform. KnowBe4 was founded in 2010 and conducted its IPO in April 2021. Upon closing of the Merger, KnowBe4 merged with Oranje Merger Sub, Inc., with KnowBe4 continuing as a wholly owned subsidiary of Oranje Holdco, LLC.

**C. The Special Committee Defendants**

23. Defendant Shrikrishna Venkataraman served as a director of KnowBe4 from March 4, 2022 through the closing of the Merger. Immediately before his board appointment, Venkataraman served as KnowBe4's Co-President and CFO from September 2018 to March 2022 and agreed to support his replacement after stepping down. KnowBe4's 2022 annual proxy statement acknowledged that Venkataraman was not an independent director due to his service as Co-President and CFO of the Company.

24. Defendant Kevin Klausmeyer served as a director of KnowBe4 from August 2020 through the closing of the Merger. Klausmeyer has not been employed

since 2011 in a non-director capacity, but has served on other boards of companies that have received investments from Vista or KKR. Klausmeyer has also served on the board of directors of Kaseya, a cybersecurity company with headquarters in Miami, Florida.

25. Defendant Gerhard Watzinger served as a director of KnowBe4 from October 2019 through the closing of the Merger.

26. Defendants Klausmeyer, Venkataraman, and Watzinger are referred to herein as the "Special Committee," "Committee" or "Special Committee Defendants."

**D. The Director Defendants**

27. Defendant Sjoerd Sjouwerman founded KnowBe4 and has served as its CEO and as a director since the Company's inception. At the outset of the sales process, Sjouwerman owned or controlled 4,378,242 Class B shares of KnowBe4 stock representing 4.3% of the aggregate outstanding Class B shares. Sjouwerman's holdings provided him with 4.0% total voting power at KnowBe4. Sjouwerman rolled over $55 million of equity in the Merger and has continued to lead KnowBe4 since closing.

28. Defendant Jeremiah Daly served as a director of KnowBe4 from January 2016 through the closing of the Merger. Daly is a co-founder and General

Partner of Elephant, which was a pre-IPO investor and rolled over $425 million of equity in the Merger.

29. Defendant Stephen Shanley served as a director of KnowBe4 from March 2019 through the closing of the Merger. Shanley is the Head of Tech Growth and a Partner at KKR, which was a pre-IPO investor in KnowBe4 and rolled over $300 million of equity in the Merger.

30. Defendant Kara Wilson served as a director of KnowBe4 from January 2020 through the closing of the Merger. Wilson has served as a Senior Advisor to KKR since October 2019 and as a director for numerous other KKR portfolio companies.

31. Defendants Sjouwerman, Daly, Shanley, and Wilson, together with the Special Committee Defendants, are referred to herein as the "Board of Directors," "Directors" or "Director Defendants."

**E. Defendant KKR**

32. Defendant KKR & Co. Inc. is a global private equity and investment firm with operations in Miami, Florida.

33. Defendant KKR Knowledge Investors L.P. was an affiliate of KKR and the direct owner of shares of KnowBe4 common stock. Defendants KKR & Co. Inc. and KKR Knowledge Investors L.P. are collectively referred to herein as "KKR."

34. At the outset of the sale process, KKR owned 26,115,895 Class B shares (25.6% of that class), representing 23.9% total voting power. As of the Record Date, after down- converting some of its Class B shares, KKR owned 12,048,193 Class A shares (9.1% of the class) and 14,067,702 Class B shares (31.6% of the class), representing 26.4% total voting power. KKR committed $300 million in connection with the Merger, with the discretion to structure its commitment by either rolling over its existing interest or cashing out and reinvesting the proceeds through an equity financing transaction.

**F. Defendant Elephant**

35. Defendant Elephant Partners is a venture capital firm focused on enterprise software, consumer internet, and mobile markets. At the outset of the sales process, Elephant owned zero Class A shares and 37,069,823 Class B shares (36.4% of the class), representing 33.9% total voting power. As of the Record Date, after down-converting some of its Class B shares, Elephant owned 17,069,823 Class A shares (12.9% of the class) and 20,000,000 Class B shares (44.9% of the class), representing 37.5% total voting power. Elephant rolled over $425 million of equity in the Merger.

36. Defendants Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P. and Elephant Partners II-B, L.P. are all affiliates of Elephant Partners and directly held shares of KnowBe4 common stock.

**G. Defendant Vista**

37. Defendant Vista Equity Partners Management, LLC is a global private equity and investment firm. At the outset of the sale process, Vista owned 1,875,000 Class A shares (2.6% of the class) and 14,557,960 Class B shares (14.3% of the class), representing 13.5% total voting power. As of the Record Date, after down-converting some of its Class B shares, Vista owned 16,432,960 Class A shares (12.4% of the class) and zero Class B shares, representing 2.8% total voting power.

## RELEVANT NON-PARTIES

**A. Morgan Stanley**

38. Morgan Stanley served as the Special Committee's financial advisor. Morgan Stanley has a long history with KnowBe4, Vista and KKR. In just the two years before it issued its fairness opinion in connection with the Merger, Morgan Stanley received: (i) $5 to $10 million in fees from KnowBe4; (ii) $120 to $140 million in fees from Vista-related entities; and (iii) $80 to $105 million from KKR related entities. Additionally, at the time of the Merger, Morgan Stanley had around $550 million of investments in KKR and its affiliates.

**B. Kevin Mitnick**

39. Kevin Mitnick was KnowBe4's "Chief Hacking Officer" from just after KnowBe4's inception through the closing of the Merger. Mitnick was not independent for purposes of the Merger. Mitnick became Sjouwerman's "business partner" in 2011 when he joined Sjouwerman in running KnowBe4 and served as a

KnowBe4 director from January 2016 to March 2021. In addition, Mitnick maintained a consulting agreement with the Company through at least 2022. In 2021, KnowBe4 paid Mitnick: (i) $154,420 for consulting fees, (ii) $24,576 for healthcare and insurance premiums, (iii) $22,276 for car payments, and (iv) $6,498 in computer equipment. As of the December 7, 2022, the Record Date, Mitnick owned 4,222,593 Class A shares and 4,902,647 Class B shares representing 9.2% of the of the overall voting power of KnowBe4's outstanding common shares.

## I. FACTUAL BACKGROUND

### A. Background of KnowBe4, and Elephant and KKR's Substantial Investments in the Company

40. Defendant Sjouwerman founded KnowBe4 in 2010. KnowBe4's business focuses on providing security awareness training. The Company's trainings are used by organizations around the world to help manage human-based cybersecurity risks such as phishing and related attacks.

41. On January 19, 2016, Defendant Elephant invested approximately $8 million in KnowBe4 through a Series A-1 Preferred Stock financing. Elephant was a new firm at the time, and its KnowBe4 investment was only its second investment. As a result of the investment, Defendant Daly was appointed to the KnowBe4 Board.

42. Over the following years, Elephant and Sjouwerman, and later KKR, conducted a series of transactions whereby KKR and Elephant invested further in KnowBe4 and the Company.

43. *First*, in February and March 2017, Elephant acquired additional shares of KnowBe4's Series A-1 Preferred Stock for approximately $5.5 million.

44. *Second*, in October 2017, KnowBe4 closed a $30 million Series B Preferred Stock financing, with Elephant investing another $2.5 million.

45. *Third,* in March 2019, KKR invested approximately $31.6 million into KnowBe4 through a Series C Preferred Stock financing, which valued the Company at over $800 million. In the press release announcing KKR's investment, KKR said that it would take an active role in the Company.

46. *Fourth*, just three months later, in June 2019, KKR and Elephant jointly invested an additional $309.4 million into the Company, valuing the Company at $1 billion.

47. Following the June 2019 financing, KnowBe4 entered into an amended and restated investors' rights agreement which afforded Elephant and KKR registration rights, information and inspection rights, board observer rights, rights to participate in future stock issuances and shared consent rights over various corporate acts including the hiring, termination and compensation of the Company's executive officers, strategic alternatives, financing activities and the nature of the Company's business.

48. Elephant and KKR were also party to an Amended and Restated Right of First Refusal and Co-Sale Agreement (the "<u>ROFR Agreement</u>"), which entitled

them to purchase from KnowBe4 any shares the Company repurchased from an existing stockholder for the same price as the repurchase price. The ROFR Agreement also gave Elephant and KKR the right to participate in any sale of KnowBe4 shares by an existing stockholder to a third party, thus reducing the amount the other selling stockholder could divest and effectively deterring significant shareholders from selling their stock. In short, the ROFR Agreement ensured that Elephant and KKR would at least preserve, and potentially increase, their ownership stakes in the Company while simultaneously discouraging others from attempting to cash out.

49. KKR and Elephant thereafter continued to acquire KnowBe4 stock. In November 2020, the Company repurchased 731,760 shares of common stock from a former employee at a purchase price of $5.84 per share. The Company subsequently sold those shares to KKR and Elephant in December 2020 at the same price pursuant to the ROFR Agreement.

**B. Vista Buys a Significant Stake in the Company from KKR and Elephant**

50. KnowBe4 continued its growth into 2020. Around that time, Vista and KnowBe4 discussed a variety of potential transactions including the possible acquisition of KnowBe4 by Vista.

51. Vista is one of the largest U.S private equity investment firms and is widely known for being founder-friendly. Naturally, Vista's founder-friendly

approach is one of its selling points in pursuing mergers and acquisitions. Indeed, the Delaware Court of Chancery has observed that "Vista ha[s] a history of retaining management in take-private transactions and offering them compensation packages with significant upside."[3]

52. On July 30, 2020, KnowBe4 engaged Morgan Stanley as its financial advisor in connection with the potential sale of equity to Vista.

53. According to the Proxy, prior to becoming an investor in KnowBe4, "Vista and KnowBe4 discussed, in general terms, a variety of different transactions, including the possible acquisition of KnowBe4 by Vista."

54. On March 5, 2021, Vista agreed to acquire KnowBe4 preferred shares from KKR, Elephant and Goldman Sachs for $300 million, or approximately $20.61 per share.

### C. KnowBe4 Goes Public and Accelerates Its International Growth

55. On April 22, 2021, KnowBe4 completed its IPO of 10,925,000 Class A shares of its common stock at an offering price of $16 per share, raising approximately $174 million.

---

[3] *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *4 (Del. Ch. Oct. 2, 2020) (further noting allegations in that case that Vista retained senior management at 85% of companies acquired over a two-year period, and provided buy-side equity that positioned a target entity's CEO with the opportunity to receive nearly $1 billion).

56. Following the IPO, KnowBe4 had a dual class share structure where Class A shares had one vote per share and Class B shares had ten votes per share. Class B shares were never publicly traded but were convertible at the option of the holder into single-vote, publicly traded Class A shares.

57. KnowBe4's Amended and Restated Certificate of Incorporation (the "Charter") contained important protections for public Class A stockholders. Most relevant here, Article IV, § C(d) required all Class A and Class B shares to be treated equally, identically, and ratably in any merger unless unequal treatment is approved by separate class votes of the Class A and Class B shares (the "Equal Treatment Provision").

58. In addition, Class B shares would automatically convert into Class A shares if transferred to a third party. Therefore, the Control Group negotiated away any ability to receive a unique control premium in a sale of control.

59. KnowBe4 continued its rapid growth and expansion, both organically and through bolt-on acquisitions, using the funds raised from its IPO. The Company also developed aggressive international expansion plans. According to the IPO prospectus, one of the "key elements" of KnowBe4's growth strategy was to rapidly expand internationally: "The international market represents a clear expansion opportunity for us. . . ." On April 23, 2021, Defendant Sjouwerman stated in an

interview with *SC Media* that "[t]he main reason [for the IPO] is international expansion."

60. When the Merger was announced, KnowBe4's international expansion efforts were already succeeding. In 2019, KnowBe4's customers outside of North America provided 9.7% of the Company's revenues, but by September 30, 2021, they provided 16.8% of the Company revenues.

61. KnowBe4 was also expanding to related product offerings and in December 2018 the Company introduced a new product called PhishER that prioritizes reported suspect emails. KnowBe4 told investors that, despite a negative impact on profitability in the short term, its growth strategy would pay off in the long term.

62. In November 2021, KnowBe4 acquired SecurityAdvisor, which had more than fifty integrations to leading cybersecurity products including Crowdstrike, Zscaler, Okta, and Netskope. In the press release announcing its completion, Defendant Sjouwerman called the acquisition "a significant leap forward in enabling [] users to defend against the ongoing problem of social engineering attacks[.]"

63. During a conference call with investors and analysts to discuss KnowBe4's financial and operational results for the third quarter of 2021, analysts expressed their excitement over SecurityAdvisor's $5 billion total addressable

market—bringing KnowBe4's company-wide total addressable market to $23 billion—and inquired as to the anticipated timeline to recognize revenue from the SecurityAdvisor acquisition. Defendant Sjouwerman projected that the fruits of this acquisition would not be immediate and said the Company did not "expect revenue until the second half next year and it might even be Q4."

64. Sjouwerman acknowledged that KnowBe4's stock was undervalued throughout its entire public existence. In January 2023, after the Merger was announced but before it closed, Sjouwerman commented: "As a public company, we didn't get credit for the very high-quality stock that we really are . . . . And so we saw our stock price go up and down, and we didn't necessarily feel we had much control over that. For us at our stage, where we are still growing very rapidly, we felt going private was actually the better choice."

### D. After KnowBe4 Posts Record Results and Beats Guidance, Vista, KKR, Elephant and Sjouwerman Launch a Sale Process

65. Vista had a clear advantage in any sales process from its pre-IPO negotiations and dealings with Elephant, KKR, and Defendant Sjouwerman. Vista leveraged its advantage to kickstart takeover negotiations with the same trio—each of whom were interested in rolling over equity in connection with sale of KnowBe4 to Vista. The result was a transaction that benefitted Vista, KKR, Elephant, and

Defendant Sjouwerman, at the expense of KnowBe4's public stockholders (*i.e.* the Class here).

66. On May 10, 2022, KnowBe4 reported its first quarter results. The results included record revenue and annual recurring revenue, and beating previously announced guidance "across the board."

67. Vista—already one of KnowBe4's largest stockholders after executing an NDA with the Company and acquiring shares from Elephant and KKR prior to the IPO— reconvened takeover discussions in light of KnowBe4's growing success.

68. On May 20, 2022, representatives of Vista approached KKR partner and Board Defendant Shanley to discuss the Company's business and KKR's interest in a potential sale. Shanley recommended that Vista meet with Defendant Sjouwerman.

69. On May 26, 2022, representatives of Vista approached former KnowBe4 Co-President and CFO and future Special Committee member Venkataraman to discuss KnowBe4's business.

70. Representatives of Vista held several additional meetings with Daly, Shanley and Sjouwerman in June 2022 regarding a potential sale.

71. Following Sjouwerman, Elephant, and KKR's discussions with representatives of Vista about a potential sale of the Company, the Board convened a special meeting on June 28, 2022. At the meeting, Daly advised the Board that

Vista was interested in an acquisition. Also at the meeting, representatives of KKR and Elephant advised that they may not sell all of their ownership in the Company.

### E. The Board Forms a Conflicted Special Committee, Which Immediately Retains a Conflicted Financial Advisor

72. The Board next met on July 5, 2022. At the meeting, the Board recommended appointing Watzinger, Klausmeyer and Venkataraman to an independent Special Committee to evaluate a potential transaction. However, Watzinger, Klausmeyer, and Venkataraman all harbored conflicts of interest with respect to the Merger and the Control Group.

73. Venkataraman was the Company's Co-President and CFO working directly for Sjouwerman and dependent on the goodwill of the Control Group from September 2018 to March 2022, only three months before Vista commenced merger discussions. Venkataraman acquired generational wealth (*i.e.*, over $55 million) from KnowBe4 in just the few years he was employed as a KnowBe4 executive, which enabled him to retire as a KnowBe4 executive at 45 years old.

74. Shanley, Daly and Sjouwerman were each conflicted because of their affiliations with Elephant and KKR. This was particularly problematic because KKR and Elephant had already expressed an interest in rolling some or all of their equity in the Company.

75. The Special Committee then retained Morgan Stanley as its financial advisor. Morgan Stanley was also conflicted. Among other conflicts, Venkataraman

had decades-long ties to Morgan Stanley through his wife and Morgan Stanley's prior relationship with the controlled Company. Further, the Special Committee was "forced" to choose Morgan Stanley because it would receive a fee in any transaction with Vista regardless based on its prior engagement by the Company years prior.

76. On July 11, 2022, the Board formally established the Special Committee consisting of Venkataraman, Klausmeyer, and Watzinger. The unanimous written consent ("UWC") establishing the Special Committee provided that (i) the Board would not approve a "Strategic Transaction" (*i.e.*, a transaction involving a change of control or delisting of the Company) or "Specified Strategic Transaction" (*i.e.*, a Strategic Transaction "in which one or more significant stockholders of the Company may have an interest that is in addition to, and/or different from, the interests of the Company's stockholders as a whole") without the Special Committee's prior favorable recommendation, and (ii) the Company would not effectuate a Specified Strategic Transaction unless it had first been approved or recommended by the Special Committee and approved by the holders of a majority of the voting power of the outstanding shares of KnowBe4 held by the disinterested stockholders (as determined by the Special Committee).

77. The UWC also provided that the two non-chair Special Committee members would each receive a monthly fee of $36,000, and the Special Committee chair— Watzinger—would receive $39,000 per month.On July 15, 2022, the Special

Committee and Morgan Stanley formally signed an engagement letter. The letter provided an "Announcement Fee" payable to Morgan Stanley if KnowBe4 entered into a definitive agreement for a sale of KnowBe4 or Morgan Stanley issued a fairness opinion related thereto, as well as a sliding scale "Transaction Fee" structure with a guarantee of $25 million in the event of any sale transaction, and escalating fee percentages starting at a floor price of $23 per share and rising up to a ceiling of $30 per share (with a midpoint of $26.50 per share).

78. Pursuant to this engagement letter, Morgan Stanley received $51 million in fees in connection with the Merger, 20% of which were payable on announcement and 80% of which were payable upon completion of the Merger. Morgan Stanley would not have received these fees if the Company determined to pursue any strategic option other than a sale

### F. The Special Committee Allowed Vista to Retain Its Existing Advantage over Other Potential Buyers

79. From the outset of the merger process, the Special Committee and Morgan Stanley allowed Vista to get ahead of alternative bidders and succeed in its bid to take the Company private.

80. On July 14, 2024, the Committee met with representatives of Morgan Stanley and Potter Anderson to discuss a potential merger of KnowBe4 and Vista. Morgan Stanley also informed the Special Committee that they had identified 21 potential financial sponsors and 11 strategic buyers that could be interested in

acquiring or participating in a transaction for KnowBe4, and 12 other parties that could be interested in partnering in a transaction by providing capital.

81. Despite the expansive field of potential buyers, the Special Committee and Morgan Stanley focused exclusively on proceeding with Vista. Among other issues, Morgan Stanely provided Vista with unfair advantages including holding extensive talks with Vista before contacting other potentially interested parties. Representatives of Morgan Stanley also provided the Committee with Vista's highly detailed six-week diligence timeline, which was slated to conclude at the end of August.

82. The Special Committee also authorized outreach to certain additional financial sponsors, but all of them would have a significant disadvantage because of Vista's timing advantage and that Vista had already lined up co-investors in the Rollover Stockholders. Specifically, the Special Committee authorized Morgan Stanley to contact (i) Thoma Bravo, L.P. ("Thoma Bravo"), (ii) Permira Advisers LLC ("Permira"), (iii) Clearlake Capital Group, L.P. ("Clearlake") and (iv) Blackstone Management Partners L.L.C. ("Blackstone").

83. Certain bidders were dissuaded from engaging because of the limited time to work on a transaction and Vista's clear advantage. For example, on July 26, 2022, Clearlake advised Morgan Stanley that it would not be proceeding at that time,

but it was interested and that "[p]ost Labor Day if nothing happens in your process they'd like to reconnect[.]"

84. Similarly, at one point the Committee discussed reaching out to CrowdStrike—a well-positioned strategic buyer—and noted that Watzinger served as Chairman of that company. Rather than reaching out to CrowdStrike and requiring Watzinger to recuse himself, the Committee determined not to contact that potential acquirer.

85. The Committee and Morgan Stanley regularly "slow played" meetings and information flow to all non-Vista potential bidders.

### G. The Special Committee Allowed Shanley and Other Control Group Representatives to Stay Involved in the Sales Process Despite KKR's Desire to Roll Over Equity

86. On July 21, 2022, representatives of Morgan Stanley met with KKR's Board designee, Shanley, who indicated that KKR was not interested in buying KnowBe4 but would consider rolling over some of its equity.

87. Compounding the disadvantage that other buyers faced described above, Morgan Stanley also confirmed to the Committee in its presentation materials that KKR was interested in a rollover transaction with only a "very select set of partners," thus further diminishing the chance that any of KKR's disfavored buyers might have had.

88. The Committee frequently discussed its upcoming negotiations with KKR's Shanley and Elephant's Daly to update them on the strategic review process.

### H. As KnowBe4 Announces Record Second Quarter Financial Results, the Special Committee Continues Full-Speed Ahead to Pursue a Sale to Vista, But Based the Sale on a Management Plan that Undervalued the Company

89. On August 4, 2022, KnowBe4 announced its second quarter results. In the earnings release, Sjouwerman boasted, "we are continuing on our high-growth trajectory." During the earnings conference call, Sjouwerman started his presentation by touting the "second quarter results exceeding our guidance," with over 36% year-over-year annual recurring revenue ("ARR") growth and a strong 23.7% free cash flow margin. Sjouwerman also reemphasized the "greenfield" nature of the market, adding that the international market is an "even larger greenfield" with a total addressable market of "6x to 7x larger than U.S. domestic."

90. On August 5, 2022, KnowBe4's Sjouwerman-led management provided the Special Committee with its newly created long-range projections (the "Management Plan"), which the Committee continued to discuss and review with management informally. Those plans only projected out to three years.

91. On August 8, 2022, the Special Committee, and subsequently the full Board (including conflicted directors Sjouwerman, Daly and Shanley, but excluding Venkataraman and Wilson, who were absent), approved the Management Plan.

92. The Management Plan understated the Company's long-term growth prospects, including by omitting publicly touted growth avenues and excluding projections for the soon-to-be released SecurityCoach. The Management Plan also assumed minimal growth from KnowBe4's international business and zero revenue from KnowBe4's venture capital arm, KnowBe4 Ventures.

93. Using the incomplete Management Plan, Morgan Stanley calculated share price sensitivities ranging from $16.36 to $73.83 per KnowBe4 share (with a mid-point of over $45 per share price) and revenue and FCF sensitivities ranging from $14.74 to $41.21 per share (with a mid-point of almost $28 per share). These all compared favorably to KnowBe4's then-current $20.21 trading price and the Merger's $24.90 per share consideration despite the material omissions from the Management Plan.

94. On August 8, 2022, Vista and KnowBe4 entered into an amended NDA allowing Vista to move forward with its due diligence.

95. On August 11, 2022, the Special Committee met to discuss a sale of the Company to Vista.

96. On August 17, 2022, the Special Committee met again to discuss a sale of the Company to Vista. Recognizing that Vista started off with a timing advantage, the Committee considered pausing talks with Vista to allow other bidders

to catch up. Despite this consideration, the Committee agreed to let the process move forward unabated, allowing Vista to hold onto its significant timing advantage.

### I. The Special Committee Continued to Give Vista a Timing Advantage and Even Revealed Its Pricing Views to Vista

97. Despite Vista's obvious head start, Morgan Stanley's process timeline for *all* bidders contemplated (i) for diligence sessions to continue through August 30, (ii) an initial bid date of August 31, (iii) confirmatory diligence and transaction negotiations for September 1-9, and (iv) an estimated deal signing by September 12. No bidder other than Vista could have proceeded on that timeline. Indeed, none of those alternative bidders had even commenced due diligence as of August 19.

98. Around this time, the Special Committee determined that it was targeting a transaction in the mid-to-high $20s. This implied that anything below $25 per share was not acceptable.

99. The Committee authorized representatives of Morgan Stanley to convey the Committee's views on valuation to Vista. Other bidders were not provided this information because they had not sufficiently evaluated a potential transaction – of course, this was because the Committee intentionally facilitated Vista's timing advantage and refused to give other bidders a chance to catch up. Incredibly, despite the fact that Vista had been fast-tracked by the Committee to the detriment of a full market check and engagement with a full range of potential bidders, the Proxy states that "no other potential bidder received the Special

Committee's view and message on valuation at this time" because "no other potential bidder had shown the level of engagement that Vista had shown at this time."

100. The Committee's decision to preemptively convey its view on the appropriate merger consideration—and effectively open price negotiations with Vista—unreasonably set a ceiling on the final price negotiations. The purported basis for allowing Vista (or any other bidder) to conduct diligence was so that Vista (or any other bidder) could submit an initial proposal to the Committee. The Committee's decision to convey its views on valuation upended that entire process. The Special Committee was singularly focused on a transaction with Vista and did not share its pricing views with any other bidders at any point in the transaction process.

101. According to the Proxy, Morgan Stanley conveyed the Committee's valuation views to Vista on August 19, 2022. So as to avoid triggering any Schedule 13D disclosure obligations in advance of Vista completing its due diligence, the Proxy claims that "Vista did not respond to the view and message on valuation delivered by Morgan Stanley on behalf of the Special Committee and noted that they would need to continue to conduct diligence to determine if they were interested in pursuing an acquisition of KnowBe4."

102. But Vista remained well ahead of other bidders, which Morgan Stanley and the Committee helped perpetuate. As reflected in Morgan Stanley's process calendar, Vista had already coordinated with Morgan Stanley to conduct seven due diligence meetings and Vista held additional meetings with Daly, Shanley, Sjouwerman, and Venkataraman.

103. By contrast, Morgan Stanley held only a single due diligence meeting with another bidder (Advent International, on August 23), and only one other bidder (Hellman & Friedman) had been given the green light to begin due diligence.

104. Morgan Stanley's presentation contemplated that Vista would submit a formal acquisition proposal by September 9, 2022, but for other parties Morgan Stanley opted against setting a formal first round bid deadline. This approach clearly favored Vista.

### J. The Special Committee and Morgan Stanley Continue to Facilitate Vista's Pre-Offer Diligence While Also Complying with Vista's Request to Confirm the Control Group's Rollover Intentions

105. The Special Committee met on September 8, 2022. At the meeting, Morgan Stanley acknowledged that there were two potential alternative bidders remaining but nonetheless recommended, consistent with its prior advice and the Committee's prior determinations, that the Committee proceed with Vista. Also at that meeting, the Committee inexplicably agreed to not include a go-shop in any future merger agreement with Vista.

106. On September 13, 2022, Morgan Stanley met with KKR and Elephant to discuss their respective rollover percentages in a potential transaction. Elephant suggested that it would sell 20 million of its KnowBe4 shares in exchange for the Merger consideration and roll over the rest (*i.e.*, nearly 50% of its stake worth $427 million). KKR said it would sell all the shares owned by its NGTG I fund and reinvest $200 million in the post-close entity through its NGTG III fund. Thus, KKR would essentially rollover 31% of its KnowBe4 stake. At that time, Sjouwerman contemplated rolling over 50% of his stake.

107. Later that day, Morgan Stanley conveyed to Vista the magnitude of KKR's and Elephant's planned rollover, which Morgan Stanley calculated in aggregate at around $695 million using a $25 price for KnowBe4 (despite not having yet received Vista's offer).

**K. The Special Committee Sets a $25 per share Floor for a Transaction**

108. On September 15, 2022, the Special Committee met. The Special Committee and Morgan Stanley discussed potential responses to Vista's forthcoming proposal. The Committee and Morgan Stanley agreed that anything below $25 per share was unacceptable and that $25 to $26.99 was at the low end of guidance.

109. During the meeting, Morgan Stanley advised that—although there were more than a dozen identified potential bidders Morgan Stanley had not

contacted about a transaction—the Committee should nonetheless conclude its market outreach because the most likely bidders had purportedly already been contacted. Morgan Stanley again justified its refusal to conduct additional outreach on the basis that these parties could contact the Company directly once Vista's proposal became public.

110. Morgan Stanley also updated the Committee on KKR and Elephant's expected rollover investments, and Morgan Stanley's subsequent conversation with Vista regarding the same. In addition to conveying Elephant's, KKR's and Sjouwerman's intended rollover positions assuming a floor deal price of $25 per share, Morgan Stanley also emphasized that the price Vista would pay in any transaction could affect the amount of equity Vista asked investors to roll over.

111. Morgan Stanley also presented certain financial analyses, including a discounted equity value analysis based on the Management Plan that implied a per share price range between $25.09 and $33.42 (with a midpoint of $29.25), further supporting that the $24.90 per share Merger price was unfair.

### L. Vista Proposes to Buy KnowBe4 for $24 Per Share, Well Below the Mutually Understood Mid-to-Upper $20s Pricing Guidance and Below the Special Committee's $25 Price Floor

112. According to the Proxy, on September 16, 2022, Vista offered to acquire KnowBe4 for $24 per share and indicated that it "was open to certain of KnowBe4's significant stockholders rolling over a portion of their current

investment" and, if so, "Vista would expect the transaction to be expressly conditioned on the *MFW* framework." According to the Proxy, Morgan Stanley informed Vista that its offer fell below the pricing guidance it previously conveyed to Vista.

113. The Special Committee met to discuss Vista's offer, which it rejected as too low, countering at $26.50 per share. This counter was made despite that – according to the Special Committee's own pricing guidance – the $26.50 per share counteroffer was at the "low end" of their internal guidance.

114. The Committee met again on September 18, 2022, when it discussed Morgan Stanley's conversation with KKR the previous day. The Special Committee also discussed Vista's reiterated request to speak with KKR and Elephant about the potential transaction and determined that Vista could speak with KKR and Elephant if accompanied by conflicted Morgan Stanley.

### M. KKR Decides to Increase Its Rollover Given the Committee's Failure to Negotiate a Fair Deal Price

115. On September 28, 2022, Vista submitted its revised proposal in response to the Special Committee's $26.50 counterproposal, offering to acquire KnowBe4 for $24.60 per share with the expectation that certain of KnowBe4's significant stockholders would rollover an aggregate amount of $675 million in equity, based on a $24.60 transaction price. Morgan Stanley later clarified that Vista's proposal "[r]equire[d] at least $675MM rollover from Elephant/KKR/Stu[.]"

116. The Special Committee met to discuss Vista's counteroffer on September 29, 2022. The Special Committee determined to submit another counteroffer for $25.75 per share to Vista.

117. Shortly thereafter, Vista submitted another revised proposal, this time for $24.80 per share. Vista told Morgan Stanley that it would not significantly increase its offer. Indeed, by this point, Vista already had the support of the Control Group and did not need to make any more concessions.

118. The Special Committee reconvened the September 29, 2022 meeting to discuss Vista's latest proposal. The Committee determined to submit a counteroffer for $24.90 per share but authorized Morgan Stanley to accept any bid that was $24.80 or higher per share.

119. Representatives of Morgan Stanley conveyed the Special Committee's $24.90 counteroffer, which Vista accepted. Vista's acceptance was conditioned upon KKR, Elephant, and Sjouwerman collectively rolling over equity worth $682 million at the deal price.

### N. Vista Proposes a Down-Convert to Ensure Stockholder Approval of the Disparate Treatment of Class A and Class B Stockholders in the Merger

120. KnowBe4's Charter required equal treatment of Class A and Class B stockholders in any transaction like the Merger *unless* such disparate treatment receives approval from both the Class A and Class B stockholders. However,

because the price being negotiated fell below KnowBe4's intrinsic value, Vista and the Control Group needed a solution.

121. On October 9, 2022, Vista proposed that it, along with the Rollover Stockholders, down-convert all of their Class B shares into shares of Class A common stock so that the conflicted Rollover Stockholders and Vista itself could dictate the outcome of the Class A vote and Mitnick—who held a significant amount of Class B shares and 31% of the voting power of unaffiliated stockholders—could dictate the outcome of the Class B and majority-of-the-minority votes as a purportedly "unaffiliated" stockholder. This illustrated that Vista was willing to game the required stockholder votes and disregard the Equal Treatment Provision's purpose of empowering minority stockholders to reject conflicted transactions.

122. The Committee met the next day on October 10, 2022. Despite its obligation to represent and protect minority stockholders and the clear leverage that the Special Committee possessed, the Committee agreed to Vista's approach.

123. During that same October 10, 2022 meeting, the Special Committee discussed that KKR now intended to rollover or reinvest $300 million (or 46% of its KnowBe4 equity) in the Merger—nearly double its initial planned $150-$200 million—further corroborating that public stockholders received an unfair price as the rollover was significantly more advantageous than the Merger consideration. The Proxy does not disclose KKR's change in plans.

124. As a result, according to Morgan Stanley's October 10 presentation, the combined rollover amount increased to $783 million. This was far more than the $675 million Vista previously requested.

125. Morgan Stanley's October 10 presentation also reiterated its analysis that, under a discounted equity value analysis, KnowBe4's common stock was valued between $25.05-$37.52 per share based on projected 2025 leveraged free cash flows (which valuation range was reduced from the September 15 range only because Morgan Stanley applied a greater cost of equity discount)—still in excess of the $24.90 per share consideration. Morgan Stanley's materials also demonstrated that the Merger price was significantly below precedent transaction premia as measured from the unaffected 30-day trading average, which implied a midpoint of nearly $26 per share for KnowBe4.

### O. The Special Committee and Board Approve the Merger and KnowBe4 Continues Issuing Positive Business News

126. On October 11, 2022, the Special Committee met and determined to recommend the Merger to the full Board. The full Board, including all those directly affiliated with the Rollover Stockholders directors, then immediately convened to consider the Special Committee's recommendation and unanimously approved the Merger. The parties signed the transaction documents that night.

127. Pursuant to the Merger, Vista agreed to acquire KnowBe4 for $24.90 per share in cash, reflecting a total equity value of $4.6 billion.

128. Although all public stockholders were completely cashed out in connection with the Merger, KnowBe4's controlling stockholders—Sjouwerman, KKR and Elephant—entered into Support Agreements where they committed to vote in favor of the Merger and received the right to roll over a significant amount of equity into the post-closing entity.

129. On November 7, 2022, KnowBe4 announced the formal launch of the previously announced SecurityCoach, a real-time security coaching program. Sjouwerman explained, "With SecurityCoach, we are introducing a new product category that automates the delivery of real-time security coaching and advice to help end users enhance their cybersecurity knowledge and strengthen their role in contributing to a strong security culture." Sjouwerman added that the Company "anticipate[d] this to be one of the most impactful products that [the Company] ha[d] ever introduced."

130. On November 14, 2022, KnowBe4 filed its preliminary proxy statement in connection with the Merger.

131. Also on November 14, 2022, KnowBe4 released its results for the third quarter of 2022. Revenues increased 33.9% year- over-year, ARR increased 32.4% year-over-year, KnowBe4's customer base grew to more than 54,200 customers (its 22nd straight quarter of customer growth and its largest quarter to quarter increase ever), and free cash flow was $30.5 million. Sjouwerman stated that "we are pleased

to report another quarter of progress toward our growth goals," and that "[w]e are excited about our progress with new product development, including the highly-anticipated SecurityCoach product, which remains on track for release in November 2022."

132. On December 1, 2022, Vista, Elephant, KKR, and Sjouwerman down-converted their Class B shares into Class A shares as follows: (i) Vista down-converted all 14,557,960 of its Class B shares; (ii) Elephant down-converted 17,069,823 Class B shares; (iii) KKR down-converted 12,048,193 Class B shares; and (iv) Sjouwerman down-converted 2,189,121 Class B shares. By this time, the Rollover Stockholders would have had conversations with certain public stockholders and likely had a rough estimate of how many public shares they could expect to be voted in favor of the Merger.

133. Then on December 5 and 6, 2022, the members of the Special Committee executed a written consent setting the Record Date for the stockholder vote on the Merger as the close of business on December 7, 2022.

134. On December 8, 2022, Mitnick—who, because of his personal circumstances, decided not to rollover shares in the Merger—signed a Support Agreement substantially similar to those signed by the Rollover Stockholders, through which he agreed to vote in favor of the Merger. The Support Agreement did not obligate Mitnick to down-convert any of his Class B common stock, but he had

already down-converted two million of his Class B shares sometime in 2022 (and before the Record Date).

135. On January 24, 2023, KnowBe4 announced its preliminary fourth quarter 2022 results. Among other things, the Company reported a 30% year-over-year increase in revenues, a 29% increase in annual recurring revenues, a 29% increase in gross profit, and a 21% increase in total number of customers.

### P. The Stockholder Vote Was Not Fully Informed Because the Proxy Included Material Misstatements and Omissions of Material Facts

136. As discussed more fully below, KnowBe4 filed a materially false and misleading definitive proxy statement soliciting stockholder approval of the Merger on December 22, 2022 and a proxy amendment on January 18, 2023. As a result of these material misstatements and omissions of material facts, the stockholder vote on January 31, 2023 was not fully informed.

137. KnowBe4 conditioned approval of the Merger on four separate stockholder votes, requiring the affirmative vote of:

a. the holders of a majority of the voting power of the outstanding shares of KnowBe4 common stock (voting together as a single class) entitled to vote on the Merger Agreement;

b. the holders of a majority of the voting power of the outstanding shares of KnowBe4 common stock (voting together as a single

class) held by the Unaffiliated Stockholders[4] and entitled to vote on the Merger Agreement;

c. the holders of at least a majority of the outstanding shares of KnowBe4 Class A common stock entitled to vote in accordance with the DGCL; and

d. the holders of at least a majority of the outstanding shares of KnowBe4 Class B common stock entitled to vote in accordance with the DGCL.

138. On January 31, 2023, KnowBe4 held a virtual special meeting of stockholders in which the affiliated and Unaffiliated Stockholders overwhelmingly voted for the Merger.

139. The Merger closed on February 1, 2023, at which point the Unaffiliated Stockholders received $24.90 per share as Merger consideration and the Company's common stock was delisted from NASDAQ.

[4] The Proxy defines "Unaffiliated Stockholders" as "the holders of KnowBe4 common stock, excluding those shares of KnowBe4 common stock held, directly or indirectly, by or on behalf of (1) Vista, its investment fund affiliates and its portfolio companies majority owned by such investment fund affiliates, (2) KKR & Co., its investment fund affiliates, its portfolio companies majority owned by such investment fund affiliates and those members of the KnowBe4 Board who are employees of KKR & Co. or one of its investment fund affiliates, (3) the Elephant Funds, their investment fund affiliates, the portfolio companies majority owned by such investment fund affiliates and those members of the KnowBe4 Board who are employees of the Elephant Funds or one of their investment fund affiliates, and (4) any person that KnowBe4 has determined to be an "officer" of KnowBe4 within the meaning of Rule 16a-1(f) of the Exchange Act." Proxy at vi-vii. This definition therefore excludes, among others, Mitnick (who held 31% of the unaffiliated voting power) and the members of the Special Committee (who collectively held a significant amount of the unaffiliated voting power through their Class B shares).

## II. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

140. Throughout the Class Period, Defendants issued or caused to be issued SEC filings that contained numerous false or misleading statements or omitted material facts concerning: (i) the unfair sales process that provided distinct advantages to Vista; (ii) the Special Committee's purported independence; (iii) KKR's intention to increase its rollover or reinvestment into the post-close KnowBe4 by 50-100% after learning the deal price; (iv) the Special Committee's favoritism towards Vista over other potential bidders; (v) the Special Committee's failure to consider strategic alternatives other than a sale of KnowBe4; and (vi) the Company's largest non-Rollover Stockholder, Mitnick, owed his personal fortune and professional legitimacy to Sjouwerman, and therefore was not independent from members of the Control Group. These filings contained materially false and misleading statements and omissions, thereby denying stockholders an appropriately informed vote on the Merger and an appropriately informed opportunity to decide whether to accept the Merger consideration or instead exercise their appraisal rights.

### A. False or Misleading Statements or Omissions of Material Facts in the October 2022 Merger Press Release

141. On October 12, 2022, KnowBe4 and Vista issued the joint Merger Press Release, which KnowBe4 filed with the SEC as a "Current Report" on Form 8-K, which was identified as "Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12," and which was incorporated by reference into the Proxy. The October 2022 Merger Press Release stated:

> As previously announced, KnowBe4's Board of Directors (the "Board") formed a Special Committee of the Board ***comprised solely of independent and disinterested directors*** (the "Special Committee") to engage with Vista, to consider other potential value creation opportunities and to take other actions that the Special Committee deemed appropriate, ***with the assistance of its independent financial and legal advisors.***

142. This statement was false and misleading and omitted material facts when made because (i) Morgan Stanely was not independent; and (ii) the Special Committee members were not "independent and disinterested."

143. With respect to the Special Committee, Defendants Watzinger, Klausmeyer and Venkataraman were all conflicted with respect to the Merger and the Rollover Stockholders. Venkataraman and his close family either held positions in KnowBe4 or invested in funds managed by KKR and Elephant. Watzinger similarly benefitted financially from his role as a director of KnowBe4, invested in funds managed by KKR and maintained friendships with several Vista partners. Klausmeyer also received director fees from KnowBe4 and an affiliate of Vista.

144. With respect to Morgan Stanley, while it was advising the Special Committee, it was concurrently mandated on multiple financial advisory assignments and financing assignments for both Vista and KKR worth tens of billions of dollars in transaction value. The statement was also misleading because Morgan Stanley had an investment interest in KKR and its affiliates.

145. The October 2022 Merger Press Release also represented that the Special Committee led the process of negotiations leading to the Merger and that, only after its recommendation, did the Board Defendants approved the Merger:

> The Special Committee believed that, ***after negotiations at the direction of the Special Committee*** and with the assistance of experienced independent legal and financial advisors, the Special Committee obtained the best terms and highest price that Vista was willing to pay for KnowBe4.

146. The above statement was false and misleading and omitted material facts when made. As alleged above, the negotiations were led and driven by Vista and Morgan Stanley for Vista's benefit, and the Special Committee merely rubberstamped the Merger desired by Vista and KnowBe4's conflicted Board.

### B. False or Misleading Statements or Omissions of Material Facts in the December 22, 2022 Definitive Proxy and a Proxy Amendment on January 18, 2023

147. KnowBe4 filed a materially false and misleading proxy statement soliciting stockholder approval of the Merger on December 22, 2022 and a proxy amendment on January 18, 2023. The Proxy was issued "By Order of the Borad of

Directors." The Proxy contained numerous material misrepresentations and omitted various material facts, as described below.

### 1. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee Members' Conflicts of Interest and Evaluation of the Same

148. The Special Committee consisted of Klausmeyer, Watzinger and Venkataraman and the Proxy represented that they were each independent. Specifically,

- The Proxy stated that the Board formed the Special Committee "comprised solely of independent and disinterested directors . . . to engage with Vista, to consider other potential value creation opportunities and take other actions that the Special Committee deemed appropriate."

- When discussing "procedural safeguards," the Proxy stated: " The Special Committee, since its formation, has consisted solely of independent (for purposes of serving on the Special Committee) and disinterested directors that are not affiliated with, and are independent of, any of the potential counterparties to a potential acquisition of KnowBe4 (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole) and were otherwise disinterested and independent with respect to a potential acquisition of KnowBe4 (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole), other than as discussed in the section of this proxy statement captioned "*Special Factors—Interests of KnowBe4's Directors and Executive Officers in the Merger*[.]""

- The Proxy states that at the July 13, 2022 Special Committee meeting, "[r]epresentatives of Potter Anderson conducted an additional

> independence review of the Special Committee members and, after such review, the Special Committee concluded that each member was independent and disinterested for purposes of evaluating a potential acquisition of the Company."

149. These statements were false and misleading and omitted material facts. For example, the Proxy failed to disclose:

- Klausmeyer's directorships at KKR- and Vista-affiliated companies Jamf Holdng Corp. and Ivalua Inc.;
- Venkataraman's and his wife's investments with KKR- and Elephant-affiliated funds and his wife's decades-long tenure at Morgan Stanley; and
- Watzinger's friendship with numerous KKR- and Vista-affiliated individuals and his investments in KKR-affiliated funds.

150. The failure to disclose these conflicts is material because the Proxy repeatedly discussed the Committee's purported independence and disinterestedness.

**2. False and Misleading Statements or Omissions of Material Facts Concerning KKR's Decision to Significantly Increase Its Rollover Participation After the Low Merger Price Was Established**

151. The Proxy made false and misleading statements and omitted material facts regarding KKR's significantly increased planned rollover after learning that the Merger price was much lower than previously expected.

152. The Proxy repeatedly mentions KKR's rollover. For example, the Proxy states the mechanics and details of the rollover shares and the Background of

the Merger section contains certain details regarding negotiations of the rollover shares and agreements. However, the Proxy omits that KKR increased its planned rollover *after* learning of the final agreed deal price.

153. Specifically, in July of 2022, Morgan Stanley advised the Special Committee that KKR expressed that it planned to rollover approximately $150 million to $200 million, structured as an investment from a new fund. At that point, Morgan Stanley and the Special Committee expected that a transaction would be priced in the mid to upper $20s per share (and specifically, above $25 per share).

154. On September 13, 2022, KKR conveyed to representatives of Morgan Stanley that it planned to roll over or reinvest approximately $200 million into the post-close entity. At that point, Morgan Stanley and the Special Committee had already conveyed its mid to upper $20s per share pricing guidance to Vista, which the parties understood meant a price above $25 per share.

155. By late September, when Vista had refused to increase its offer in line with the Special Committee's pricing guidance, KKR realized that the Merger would undervalue KnowBe4. Accordingly, KKR decided to increase its rollover participation to $300 million, 50-100% more than it initially planned to reinvest in post-Merger KnowBe4.

### 3. False and Misleading Statements or Omissions of Material Facts Concerning the Committee's Favoritism of Vista

156. The Proxy made materially false and misleading statements and omitted material facts regarding the Special Committee's preference for a deal with Vista.

157. For example, the Proxy stated that:

- representatives of Morgan Stanley reported on Morgan Stanley's outreach efforts to potential bidders for an acquisition of KnowBe4 and reviewed those potential bidders that remained in the process at this time and those bidders that had passed on pursuing an acquisition of KnowBe4 at this time. Representatives of Morgan Stanley also reported on Vista's due diligence progress, the due diligence progress of the other potential bidders and the status of Vista's due diligence progress relative to other potential bidders. The Special Committee and representatives of Morgan Stanley reviewed the feedback that Morgan Stanley had received from financial sponsors and strategic bidders, including those that had either passed on pursuing an acquisition of KnowBe4 or had not expressed a continuing interest in pursuing an acquisition of KnowBe4. The Special Committee and representatives of Morgan Stanley discussed when in the Special Committee's process it would be appropriate to signal the Special Committee's general views on valuation for a potential acquisition of KnowBe4 to potential bidders, and discussed the timing for seeking bids from potential bidders;

- the Special Committee and representatives of Morgan Stanley discussed the anticipated timeline for the submission of an acquisition proposal by Vista and whether to expedite the work to be performed by the non-Vista potential bidders in light of the fact that Vista had communicated that it would be able to provide feedback on September 9, 2022 as to whether it was interested in pursuing a potential transaction. After discussion of the benefits and considerations, the Special Committee determined that it would continue to allow each potential bidder to proceed at its own pace; and

- on August 26, 2022, "Morgan Stanley [] provided an update on the other potential bidders . . . and noted that no other potential bidder had expressed as much interest, or had been as active, as Vista." However, the meeting minutes state that one other potential bidder had begun additional due diligence and management meetings were being scheduled with others. Morgan Stanley's presentation from that meeting states that "17 parties called, 7 had introductory management meetings, 3 additional management meetings are scheduled, 2 have submitted high priority diligence questions and undertaken additional diligence meetings."

158. The above statements were materially false and misleading and omitted material facts because they failed to disclose the Committee's preference for Vista, including:

- At its August 17 meeting, the Committee considered whether to "pause Vista's due diligence to permit other potential bidders to catch up" but ultimately decided not to do so upon the recommendation of Morgan Stanley "that it appeared advantageous to the Committee to permit each potential bidder to proceed at its own pace;"

- At the Special Committee's July 14, 2022 meeting, Venkataraman discussed that certain potential bidders "had previously interacted with Company management regarding such strategic' s or sponsor's interest, or lack thereof, in the Company;"

- Similarly, in September 17, Venkataraman was contacted by another current stockholder "who had expressed interest in acquiring a larger stake in the Company;" and

- The Committee and Morgan Stanley regularly slow-played information flow to other potential bidders.

159. As detailed herein, all of the Proxy's statements about the merger process were misleading because they obscured the advantage given to Vista and the short shrift given to other bidders that may have paid more to acquire the Company.

#### 4. False and Misleading Statements or Omissions of Material Facts Concerning the Scope of the Special Committee's Consideration of Alternatives to the Merger

160. The Proxy also contains materially false and misleading statements and omits material facts regarding the nature of the Special Committee's (lack of) consideration of KnowBe4's potential strategic alternatives.

161. For example, the Proxy states:

- The Board formed the Special Committee in part "to consider other potential value creation opportunities;"
- As one of the "Reasons for the Merger" the Special Committee's purported consideration of "Potential Strategic Alternatives," and suggests that the Committee actually considered "possible alternatives to the Merger (including continuing to operate KnowBe4 as an independent company or pursuing a different transaction[;]"
- The purported breadth of the Special Committee's "Negotiating Authority," allegedly included the ability "to consider and evaluate any strategic alternatives;" and
- "The Special Committee considered the other potential alternative strategies available to KnowBe4 as an independent company."

162. These statements were materially false and misleading when made and omitted important facts, such as that:

- The Special Committee was formed via the UWC solely to consider a transaction involving a "change of control or delisting of the Company"- not to consider any other transactions;
- Every meeting of the Special Committee was convened to consider a sale of the Company to Vista, and only secondarily to consider a sale of the Company to another buyer;

- Not once did the Special Committee convene for the express purpose of considering an alternative to a sale or delisting of the Company; and

- A representative of Morgan Stanley immediately rejected any potential transaction involving the public pension fund that purportedly only makes minority investments, preferring instead to stash the fund on the sidelines in case Vista sought any outside investors down the line.

### C. False or Misleading Statements or Omissions of Material Facts in the December 22, 2022 Schedule 13E-3 by KnowBe4, Elephant Partners, KKR and Vista

163. On December 22, 2022, KnowBe4, Elephant, KKR and Vista jointly issued a Schedule 13E-3 for the Merger, signed by Defendant Sjouwerman on behalf of KnowBe4 as well as Vista's Managing Member, Robert Smith, KKR's Vice President, Stephen Shanley, and Elephant Partners' Managing Member, Jeremiah Daly. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto, is expressly incorporated by reference herein in its ***entirety***."

164. Thus, the Schedule 13E-3 included the same false and misleading statements described in Sections II.A and II.B, *supra*, which were materially false and misleading for the same reasons.

## III. ADDITIONAL ALLEGATIONS OF SCIENTER

165. For purposes of Count II below, as alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of KnowBe4 during the Class Period and detailed in Section II above were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

166. As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding KnowBe4 and the sales process leading to the Merger, their control over, receipt and/or modification of KnowBe4's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning KnowBe4 and the KnowBe4 sales process, participated in the fraudulent scheme alleged herein.

167. In their roles as directors and officers of the Company during the sales process and Class Period, Defendants directly participated in the management of KnowBe4's operations and, because of their positions at KnowBe4, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power

and authority to control the contents of KnowBe4 press releases and Proxy in connection with the Merger.

## IV. LOSS CAUSATION

168. As described herein, Defendants made or caused to be made materially false and misleading statements and omissions of material facts in the Proxy. These materially false and misleading statements and omissions as set forth above caused Plaintiffs and other members of the Class to vote in favor of the Merger and/or accept Merger consideration that failed to adequately value KnowBe4 common stock. As a result, Plaintiffs and other Class Members suffered damages under Section 14(a) of the Exchange Act.

169. The false and misleading statements alleged herein deflated the market price members of the Class received for their KnowBe4 shares in the Merger and in open-market sales, by concealing facts indicating that the shares were more valuable than the Merger price, and that a higher price could be obtained.

170. As described above, KnowBe4 was far more valuable than the Merger price. *First*, the $24.90 per share Merger price was below what the Special Committee had previously decided was "[n]ot [in] the right zone for a transaction" and "not worth sending in a letter [proposal.]" *Second*, Morgan Stanley's financial analyses valued KnowBe4 at between $25.05 and $37.52 per share based on projections that excluded even underway growth initiatives. *Third*, recognizing that

the Merger was underpriced, KKR significantly increased its rollover commitment from its initial rollover plans.

171. During the Class Period, Defendants also made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Plaintiffs and the Class, and induced Plaintiffs and the Class to sell KnowBe4 shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration. In addition, had Plaintiffs and members of the Class not been induced to sell at deflated prices, they could have secured fair value of their shares through appraisal. Plaintiffs and the Class suffered economic harm as a result of their sales of KnowBe4 common stock during the Class Period, *i.e.*, damages under Section 10(b) of the Exchange Act.

172. Had the truth been known to the market, KnowBe4 shares would have traded at higher prices throughout the Class Period. Members of the Class who sold their shares during the Class Period would therefore have obtained a higher price for their shares.

173. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and would have obtained a higher price per share. Alternatively, stockholders would have voted down the

Merger, and no transaction would have been effectuated, such that members of the Class who retained their shares would not have been deprived of the fair value of their shares in a forced sale. In addition, had Plaintiffs and members of the Class been informed of the truth they could have secured fair value of their shares through exercising their statutory appraisal rights.

174. Based on Defendants' misrepresentations, KnowBe4's stock price became tethered to the underpriced Merger Consideration, as indicated in the following chart:




175. As the market price was artificially depressed, members of the Class who sold their shares during the Class Period obtained a lower value for their shares.

176. Members of the Class who held KnowBe4 shares on the Record Date were deprived of the information necessary to exercise a fully informed vote, as well

as a fully informed decision whether to dissent and seek appraisal for the fair value of their KnowBe4 shares, and other available relief. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and Plaintiffs would have obtained a higher price per share. Alternatively, stockholders would have voted down the Merger and no transaction would have been effectuated.

## V. INAPPLICABILITY OF STATUTORY SAFE HARBOR

177. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement

was authorized or approved by a director or officer of the Company who knew that the statement was false when made.

## VI. CLASS ACTION ALLEGATIONS

178. Plaintiff brings this Action on its own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of Unaffiliated Stockholders entitled to vote on the Merger and the Class consisting of sellers of KnowBe4 common stock from October 12, 2022 through the close of the Merger on February 1, 2023, including those stockholders who sold shares in the Merger. Excluded from the Class are the Defendants and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

179. This Action is properly maintainable as a class action.

180. The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there were 132,747,542 shares of KnowBe4 common stock outstanding as of the Record Date. Upon information and belief, there are hundreds or thousands of members of the Class.

181. There are questions of law and fact that are common to the Class, including, among others:

(a) Whether Defendants violated Section 14(a) of the Exchange Act and/or Rule 14a-9 promulgated thereunder;

(b) Whether Defendants violated Section 10(b) of the Exchange Act and/or Rule 10b-5 promulgated thereunder;

(c) Whether the Director Defendants, Control Group and Vista violated Section 20(a) of the Exchange Act;

(d) Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants knew, recklessly and/or negligently disregarded that their statements and/or omissions were false and misleading;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class Members and the appropriate measure of damages.

182. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class have been damaged by Defendants' wrongful conduct.

183. Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class. All members of the Class have suffered the same harm.

184. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class. Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

185. The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## VII. PRESUMPTION OF RELIANCE

186. Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose. Because this Action involves Defendants' failure to disclose information regarding KnowBe4's business and sales process, among other things, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions of material facts set forth above, that requirement is satisfied here.

187. In the alternative, Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions of material facts pursuant to the fraud-on-the market doctrine because, at all relevant times, the

market for KnowBe4 securities was open, efficient and well developed for the following reasons, among others:

(a) KnowBe4 was listed and actively traded on the NASDAQ, a highly efficient market;

(b) As a regulated issuer, KnowBe4 filed periodic public reports with the SEC and/or the NASDAQ;

(c) The price of KnowBe4 common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

(d) KnowBe4 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e) KnowBe4 was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

188. Because the market for KnowBe4 was efficient, it is assumed that: (1) any misrepresentations were incorporated into the market price; (2) Plaintiff and Class members relied on that market price when deciding when to buy or sell, and; therefore, (3) Plaintiff and Class members indirectly relied on any misrepresentations when deciding to sell KnowBe4 common stock, including the decision to tender shares into the Merger, rather than seeking appraisal.

189. The stock price strongly reacted to the announcement of the Merger and Merger related news. Furthermore, during the period after the announcement of the Merger, it is clear that the stock price was influenced by the Merger price. These facts strongly support a presumption of market efficiency because they show the market reacted efficiently to information, and the Merger is obviously important information that would be reflected in the stock price.

190. In addition, while a merger is pending, a vital right affecting share ownership is the right to seek appraisal. Market participants often buy or sell the stock based on their valuation of an appraisal claim. Trading based on the value of the right to seek appraisal affects the overall market price of the stock. Indeed, if information is disclosed that causes investors to perceive an appraisal claim as more valuable, investors interested in seeking appraisal will consequently value the shares at a higher level, placing upward pressure on the stock price. If information is disclosed showing that appraisal would be less valuable, the share price could experience downward pressure. Other investors who are not interested in seeking appraisal may adjust their own valuation of the shares based on their perception of what other investors are willing to pay due to the possibility of appraisal. Accordingly, the possibility of appraisal ties information relating to the Company to the value of its shares even in instances where a merger is likely to close.

191. The relationship between the right to appraisal and the market price for a company's shares was explained in a University of Washington Law Review Article:

> In a developed appraisal market, appraisal arbitrageurs will seek to accumulate a position in the target company following the announcement of a transaction, and will continue to purchase shares until the market price has been driven to the risk-adjusted expected present value of an appraisal claim. . . . Minority shareholders would thus share in the expected gains from appraisal without having to file a petition themselves, just as the benefits from the market for corporate control accrue to ordinary shareholders. Indeed, minority shareholders could be better off by sharing in these gains than if they had sought appraisal themselves because professional arbitrageurs, as sophisticated repeat players, may be able to reduce overall costs in pressing claims or achieve better results in appraisal than individual investors could on their own.

*See* Charles R. Korsmo, Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U.L. Rev. 1551 (2015).

192. Aside from appraisal, investors rely on Company-specific information during the pendency of a merger. Often referred to as "merger arbitrage," investors often buy shares below a proposed merger price and either sell those shares in the merger or at a higher value as new information pertaining to the merger emerges. These investors may often make a purchase based on the prospect of a higher offer arising before the merger closes or based on the "fallback" value of the company should the merger fail, both of which are based on and tied to information about company fundamentals. Accordingly, information relating to the company would

be relevant to the valuation of the security and the price at which the security trades while a merger is pending.

193. During the Class Period, many sophisticated investors specializing in investing during the pendency of a merger made investments in KnowBe4, thereby enhancing the market efficiency of KnowBe4.

## COUNT I
## Against KnowBe4, the Director Defendants and Vista for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

194. Plaintiff repeats and re-alleges all allegations contained above as if fully set forth herein, except those sounding in fraud.

195. Defendants KnowBe4 and the Director Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

196. The Proxy was prepared, reviewed, and/or disseminated by Defendants KnowBe4 and the Director Defendants. Each of these Defendants authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sales process leading up to the closing of the Merger. By virtue of their positions within KnowBe4 and/or access to Company and Merger information, these Defendants were aware of the misstated and omitted information

alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

197. Plaintiff, while reserving all rights, expressly disclaims and disavows at this time any allegation that could be construed as alleging that this claim sounds in fraud against Defendants KnowBe4 and the Director Defendants in connection with this Count. This claim sounds in negligence and is based on these Defendants' failure to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

198. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to KnowBe4 shareholders.

199. In addition, KnowBe4, the Control Group and Vista jointly issued a Schedule 13E-3 for the Merger. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***."

200. The Proxy was an essential link in causing KnowBe4 shareholders to approve the Merger and to forego their appraisal rights.

201. By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

202. Because of the false and misleading statements in the Proxy, Plaintiff and the Class were harmed by an uninformed shareholder vote approving the Merger.

## COUNT II
## Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

203. Plaintiff repeats and re-alleges all allegations contained above as if fully set forth herein.

204. During the Class Period, Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for KnowBe4 securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

205. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to disseminate the misleading statements and concealed material information about the Company, its operations and prospects, as well as material information concerning the Merger and the sales process.

206. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

207. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein and/or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent KnowBe4's true financial condition and material information regarding the Merger and the sales process from the investing public and to support the artificially low prices of the Company's securities.

208. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

209. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT III**
**Against the Director Defendants, the Control Group and Vista for Violations of Section 20(a) of the Exchange Act**

210. Plaintiff repeats and re-alleges all allegations contained above as if fully set forth herein.

211. As alleged in Count I and II above, Defendants disseminated false and misleading statements and a false and misleading in violation of Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, promulgated thereunder.

212. The Director Defendants, Control Group and Vista had the ability to control, and did control, KnowBe4 at all relevant times through its majority equity stake and voting power and by appointing a majority of its directors. In addition to controlling the composition of the Board, the Director Defendants, Control Group and Vista were entitled to exercise control over significant transactions. Further, these Defendants controlled the sales process by appointing its own conflicted banker, Morgan Stanley, ostensibly to advise KnowBe4, and participated in concealing this and other facts through the Board Members it appointed and controlled. These Defendants refused to allow the Special Committee to solicit offers for anything other than a minority investment in KnowBe4 that would cash out public stockholders, provide significant liquidity to these Defendants, and keep them in control. Defendants Sjouwerman, Daly and Shanley signed the December 22, 2022 Schedule 13E-3, which incorporated the Proxy.

213. The Director Defendants, Control Group and Vista acted as controlling persons of KnowBe4 and culpably participated in the Exchange Act violations within the meaning of Section 20(a) of the Exchange Act as alleged herein. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of KnowBe4, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same. These Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The statements and the Proxy purport to describe the various issues and information that these Defendants reviewed and considered before recommending the Merger to the Class.

214. These Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Proxy also expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Sjouwerman as Chairman of the Board of Directors.

215. The Director Defendants, Control Group and Vista had the ability to exercise control over and did control a person(s) who has violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, by their acts and

omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act..

216. By virtue of the foregoing, the Director Defendants, Control Group and Vista have violated Section 20(a) of the Exchange Act.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief:

A. Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Determining that all Defendants violated Section 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C. Determining that all Defendants violated Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

D. Determining that the Director Defendants, Control Group and Vista violated Section 20(a) of the Exchange Act;

E. Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

F. Granting such other and further relief as this Court may deem just and proper.

## IX. JURY DEMAND

217. Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 5, 2025

**KOZYAK TROPIN & THROCKMORTON LLP**

By: /s/ *Jorge L. Piedra*
Jorge L. Piedra
Florida Bar No. 88315
Brandon M. Sadowsky
Florida Bar No. 1052643
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
jpiedra@kttlaw.com
bsadowsky@kttlaw.com

***Liaison Counsel for Plaintiff Water Island Event-Driven Fund***

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice forthcoming*)
Robert N. Cappucci (*pro hac vice forthcoming*)
Brendan Brodeur (*pro hac vice forthcoming*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com

***Counsel for Plaintiff Water Island Event-Driven Fund***