**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-22574-ALTONAGA/Reid**

**WATER ISLAND**
**EVENT-DRIVEN FUND**,

     Plaintiff,

v.

**KNOWBE4, INC.**, *et al.*,

     Defendants.

_____/

**DECLARATION OF BENJAMIN J. WIDLANSKI IN SUPPORT OF**
**PLAINTIFFS' OBJECTION TO STAY**

I, Benjamin J. Widlanski, declare as follows:

1.      I am a member in good standing of the bar of the State of Florida and of this Court. I am a partner at the law firm of Kozyak Tropin & Throckmorton LLP ("KTT"). I submit this Declaration in support of Plaintiffs' *Objection to Stay*.

2.      Attached hereto are true and correct copies of the following exhibits:

Exhibit 1:      Verified Amended Class Action Complaint, *LeClair, et al. v. KnowBe4, Inc., et al.*, C.A. No. 2024-1143-KSJM (Del. Ch. Mar. 18, 2025) (Trans. ID 75874700);

Exhibit 2:      Order Granting Plaintiffs' Motion for Prompt Class Certification, *LeClair, et al. v. KnowBe4, Inc., et al.*, C.A. No. 2024-1143-KSJM (Del. Ch. Aug. 20, 2025) (Trans. ID 76896945);

Exhibit 3:      KnowBe4, Inc. Historical Stock Prices, *Bloomberg*;

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of August 2025.

/s/ Benjamin  J. Widlanski
Benjamin J. Widlanski
Florida Bar No. 1010644

1

# EXHIBIT 1

EFiled:  Mar 18 2025 09:04AM EDT
Transaction ID 75874700
Case No. 2024-1143-KSJM

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| BILL LE CLAIR and JOSEPH POSPISIL, on behalf of themselves and all other similarly situated former stockholders of KNOWBE4, INC.,<br><br>    Plaintiffs,<br><br>  v.<br><br>KNOWBE4, INC. SJOERD SJOUWERMAN, JEREMIAH DALY, STEPHEN SHANLEY, KEVIN KLAUSMEYER, SHRIKRISHNA VENKATARAMAN, GERHARD WATZINGER, KARA WILSON, KKR & CO. INC., KKR KNOWLEDGE INVESTORS L.P., ELEPHANT PARTNERS, ELEPHANT PARTNERS I, L.P., ELEPHANT PARTNERS II, L.P., ELEPHANT PARTNERS 2019 SPV-A, L.P., and ELEPHANT PARTNERS II-B, L.P.,<br><br>    Defendants. | C.A. No. 2024-1143-KSJM<br>**Public Version Dated: March 18, 2025** |

**<u>VERIFIED AMENDED CLASS ACTION COMPLAINT</u>**

Plaintiffs Bill Le Clair and Joseph Pospisil (together, "Plaintiffs"), on behalf of themselves and all other similarly situated former stockholders of KnowBe4, Inc. ("KnowBe4" or the "Company"), bring this Verified Amended Class Action Complaint (the "Complaint") against Defendants KKR & Co. Inc. and KKR Knowledge Investors L.P. (collectively, "KKR"); Elephant Partners, Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P., and

Elephant Partners II-B, L.P. (collectively, "Elephant"); Sjoerd Sjouwerman ("Sjouwerman"); Jeremiah Daly ("Daly"); Stephen Shanley ("Shanley"); Kevin Klausmeyer ("Klausmeyer"); Shrikrishna Venkataraman ("Venkataraman"); Gerhard Watzinger ("Watzinger"); and Kara Wilson ("Wilson"). The allegations herein are based on Plaintiffs' knowledge as to themselves and, as to all other matters, on information and belief, including counsel's investigation, review of publicly available information, and review of certain books and records produced by KnowBe4 in response to Plaintiffs' demands and subsequent lawsuits pursuant to 8 *Del. C.* § 220.

### INTRODUCTION

1.  This action challenges Vista Equity Partners' ("Vista") unfair take-private of KnowBe4, whereby the Company's controlling stockholders—Sjouwerman, KKR, and Elephant (the "Control Group" or the "Rollover Stockholders")—rolled over (or purchased) nearly $800 million of equity into the post-close entity while public stockholders were cashed out for $24.90 per share (the "Merger").

2.  Sjouwerman founded KnowBe4 in 2010 and partnered with convicted felon and notorious hacker Kevin Mitnick ("Mitnick") to develop a suite of security awareness training products. KKR and Elephant invested in then-private KnowBe4 through several fundraising rounds that enabled Sjouwerman and his management

2

team (including Mitnick) to cash out hundreds of millions of dollars in stock and secured Elephant and KKR multiple seats on KnowBe4's board of directors (the "Board").

3.      Shortly before KnowBe4's April 2021 initial public offering (the "IPO"), Vista expressed interest in acquiring KnowBe4, and, after executing a confidentiality agreement, gained access to the Company's non-public information. But Vista did not acquire KnowBe4 at that time. Instead, KKR and Elephant cut a deal to sell some of their shares to Vista. Following the IPO, the Control Group collectively held a majority of KnowBe4's voting power through its ownership of most of the Company's super-voting Class B shares, with Vista holding 10.36% voting power.

4.      KnowBe4 flourished after its IPO, continually beating management and analyst guidance while posting record results. The Company was the unquestioned leader in the burgeoning new security awareness market, with immense untapped domestic and international potential.

5.      By May 2022, Vista renewed its interest in a takeover. Vista first contacted KKR's Board designee Shanley, then Board member and former CFO Venkataraman (who interfaced with Vista through its 2021 investment), and then Elephant's Board designee Daly, after which Vista met with the Control Group to

3

gauge their interest in a take-private transaction that would allow the Control Group to realize liquidity *and* roll over equity.

6.     The Control Group was eager to pursue such a transaction with Vista and promptly gathered the Board to discuss.  The Board formed a three-member committee comprising Venkataraman, Klausmeyer, and Watzinger (the "Special Committee") even though all three Special Committee members harbored conflicts of interest and lacked independence from the Control Group and Vista.  The conflicted Committee, in turn, selected Morgan Stanley & Co. LLC ("Morgan Stanley") as its financial advisor despite its own numerous conflicts.  Morgan Stanley had extensive and ongoing engagements with Vista and several of its portfolio companies, as well with KKR, and one of the Committee member's spouses was a Morgan Stanley managing director who had worked there for decades.

7.     The conflicted Special Committee ran a truncated process that favored Vista at every turn.  Morgan Stanley acknowledged that Vista began with decided "advantages" over other potential buyers, which the Committee and its advisors consciously enhanced.  Vista said at the outset that it needed approximately six weeks to conduct due diligence, and then just three weeks to advance from initial offer (which would have required a public, Schedule 13D disclosure) to signing.  The Special Committee accommodated Vista's desire to negotiate covertly and defer its Schedule 13D obligations, thus concealing from other active suitors the timing

4

considerations for a potential takeover proposal. After limiting its market check and repeatedly refusing to allow other bidders to catch up to Vista in the process, the Special Committee and Morgan Stanley feigned that other buyers could simply catch up during that final three-week period despite having previously been shut out of the diligence process.

8. The Special Committee favored Vista in myriad other ways. Unlike other prospective buyers operating under a non-disclosure agreement, the Special Committee did not require that Vista agree to a standstill. The Special Committee also preemptively provided pricing guidance to Vista—before any offer was submitted—but not to anyone else. Vista alone received access to a virtual data room and was the only party to receive KnowBe4's financial projections. Vista also received earlier and more frequent access to management in connection with its due diligence than other buyers.

9. Meanwhile, the Special Committee and Morgan Stanley regularly updated KKR and Elephant on the status of the process and discussed pricing guidance and rollover plans, recognizing that KKR and Elephant effectively launched the process and that their collective voting control afforded them veto power over any transaction that did not benefit them.

10. The rushed, conflicted, and pro-Vista and Control Group process resulted in an agreement by which Vista and the Control Group acquired KnowBe4

5

at an unfair price and at a time when the Company was poised for significant growth. The $24.90 per share Merger price was below what the Special Committee had previously decided was "[n]ot [in] the right zone for a transaction" and "not worth sending in a letter [proposal.]" Morgan Stanley's financial analyses valued KnowBe4 at between $25.05 and $37.52 per share based on projections that excluded even underway growth initiatives. Recognizing that the Merger was underpriced, KKR significantly increased its rollover commitment from its initial rollover plans.

11. KnowBe4 stockholders were also asked to approve the Merger based on a materially false and misleading proxy statement and supplement (together, the "Proxy"). Among other things, the Proxy failed to disclose: (i) the Special Committee lacked independence; (ii) that KKR increased its planned rollover or reinvestment into the post-close KnowBe4 by 50-100% after it learned of the deal price; (iii) facts demonstrating that the Special Committee favored Vista over other potential bidders; (iv) the Special Committee did not consider strategic alternatives other than a sale of KnowBe4; and (v) the Company's largest non-Rollover Stockholder who signed an agreement to vote in support of the Merger (a "Support Agreement"), Mitnick, who owed his personal fortune and professional legitimacy to Sjouwerman, was not independent from members of the Control Group.

6

12. Plaintiffs seek to recover damages on behalf of all public stockholders who received unfair Merger consideration as a result of Defendants' breaches of fiduciary duty and other misconduct.

## PARTIES

13. **Plaintiff Bill Le Clair** beneficially owned shares of KnowBe4 Class A common stock at the time of the Merger and received $24.90 per share in cash for those shares when the Merger closed.

14. **Plaintiff Joseph Pospisil** beneficially owned shares of KnowBe4 Class A common stock at the time of the Merger and received $24.90 per share in cash for those shares when the Merger closed.

15. **Defendant KnowBe4, Inc.** (previously defined as "KnowBe4" or the "Company"), a Delaware corporation, provides the world's largest security awareness training and simulated phishing platform. KnowBe4 was founded in 2010 and conducted its IPO in April 2021. Upon closing of the Merger, KnowBe4 merged with Oranje Merger Sub, Inc., with KnowBe4 continuing as a wholly owned subsidiary of Oranje Holdco, LLC.

16. **Defendant Sjoerd Sjouwerman** (previously defined as "Sjouwerman") founded KnowBe4 and has served as its CEO and as a director since the Company's inception. At the outset of the sale process, Sjouwerman owned or controlled 125,010 Class A shares of KnowBe4 stock ("Class A shares")

7

representing a negligible percentage of Class A shares, and 4,378,242 Class B shares of KnowBe4 stock ("Class B shares") representing 4.3% of the aggregate outstanding Class B shares.  Sjouwerman's holdings provided him with 4.0% total voting power at KnowBe4.  As of the record date for the Merger (the "Record Date"), after down-converting some of his Class B shares, Sjouwerman owned 2,311,889 Class A shares (1.7% of that class) and 2,189,121 Class B shares (4.9% of that class), representing 4.2% of KnowBe4's total voting power.  Sjouwerman rolled over $55 million of equity in the Merger and has continued to lead KnowBe4 since closing.

17.     **Defendant Jeremiah Daly** (previously defined as "Daly") served as a director of KnowBe4 from January 2016 through the closing of the Merger.  Daly is a co-founder and General Partner of Elephant, which was a pre-IPO investor and rolled over $425 million of equity in the Merger.

18.     **Defendant Stephen Shanley** (previously defined as "Shanley") served as a director of KnowBe4 from March 2019 through the closing of the Merger.  Shanley is the Head of Tech Growth and a Partner at KKR, which was a pre-IPO investor in KnowBe4 and rolled over $300 million of equity in the Merger.

19.     **Defendant Kevin Klausmeyer** (previously defined as "Klausmeyer") served as a director of KnowBe4 from August 2020 through the closing of the Merger.  Klausmeyer has not been employed since 2011 in a non-director capacity.

8

20.     Klausmeyer has received a fortune in compensation as a KnowBe4 director.  Upon his appointment to the Board in August 2020, Klausmeyer received 17,149 Class B options with an exercise price of $5.71 per share.  Eight months later, in April 2021, those options converted to 696,760 Class B options (with the same $5.71 per share exercise price), which were worth $7,169,660 based on the $16 IPO price.  Starting almost immediately after the IPO through December 1, 2023 (*i.e.*, immediately before KnowBe4 issued the Proxy), Klausmeyer cashed in approximately 350,000 options for approximately $6.2 million in profit, and then received an additional $6.94 million from cashing in options and shares in the Merger he received as director compensation.  Klausmeyer ultimately earned total compensation worth over $13 million for serving as a KnowBe4 director for barely two years.

21.     Klausmeyer's director compensation incentivized him to approve the Merger.  According KnowBe4's S-1, "25% of the shares subject to each option [Klausmeyer received upon joining the Board] . . . is scheduled to vest on August 3, 2021 in the case of Mr. Klausmeyer [with] . . . the remaining number of shares subject to the option award vesting in equal monthly installments over the ensuing thirty-six (36) months."  Thus, at the time Klausmeyer approved the Merger, he had approximately $6.1 million worth of options that he received for his service as a KnowBe4 director that had not yet vested.  Had Klausmeyer been fired or resigned

from the Board, he almost certainly would have lost those options. However, the Proxy stated that, subject to a "letter agreement amendment[]" between Klausmeyer and KnowBe4, Klausmeyer would (and did) receive accelerated vesting of all his options upon a "change of control" such as the Merger. Thus, Klausmeyer's approval of the Merger ensured that he would receive an additional $6.1 million.

22.    Additionally, since 2019, Klausmeyer has served as a Vista appointee to the board of directors of Jamf Holding Corp ("Jamf"), which has been controlled by Vista since 2017. Vista appointed Klausmeyer to the Jamf Board prior to its 2020 IPO pursuant to an Amended and Restated Director Nomination Agreement, dated September 1, 2020, and Klausmeyer's continued service is only by Vista's consent. Klausmeyer received over $1.2 million in director fees from Jamf between 2019 and 2023. Klausmeyer has also been a director of privately held Ivalua since October 2019. KKR invested $70 million in Ivalua in April 2017 and Shanley served on the Ivalua Board from April 2017 through August 2020.

23.    In summary, Klausmeyer's only public source of compensation at the time of the Merger was from companies affiliated with the Control Group (*i.e.*, KnowBe4) or Vista (*i.e.*, Jamf), and the vast majority of his publicly disclosed compensation was from KnowBe4, from which he received a fortune. At the time of the Merger process and approval, Klausmeyer's only other source of potential

10

compensation was as a director of two smaller private companies (*i.e.*, ComboCurve, Inc., and Ivalua),[1] one of which (Ivalua) was affiliated with Vista.[2]

24.    **Defendant Shrikrishna Venkataraman** (previously defined as "Venkataraman") served as a director of KnowBe4 from March 4, 2022 through the closing of the Merger.  Immediately before his Board appointment, Venkataraman served as KnowBe4's Co-President and CFO from September 2018 to March 2022 and agreed to support his replacement after stepping down.  KnowBe4's 2022 annual proxy statement acknowledged that Venkataraman was not an independent director due to his service as Co-President and CFO of the Company.

25.    Venkataraman owes his fortune to KnowBe4, which provided him so much income over the short period of his employment that he was able to retire as a KnowBe4 executive at 45 years old.  In 2020 alone, in addition to about $1 million in salary and bonus, KnowBe4 issued Venkataraman 696,840 Class B options—(i) 348,360 options on February 26, 2020 with an exercise price of $4.97, (ii) 254,040

---

[1] Klausmeyer was also an advisory board member at Kaseya and Gympass, private companies in New York, but in his D&O Questionnaire he requested those companies be removed from his Board biography because they were "NOT board positions." (capitalization in original).

[2] Directorships at public companies carry more prestige and average roughly double the compensation than private company directorships.  *See* James F. Reda, et al., *Private vs. Public Director Pay: Is There a Difference?*, J. OF COMP. & BENEFITS (2017), at 71, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3020226; https://humancapital.aon.com/insights/articles/2020/exploring-key-differences-in-private-vs-public-board-of-director-pay-as-the-market-turns.

options on June 1, 2020 with an exercise price of $5.60 and (iii) 94,440 options on October 27, 2020 with an exercise price of $5.85. In the IPO just a few months later, those options were worth approximately $7.5 million at the $16 IPO price. Moreover, pursuant to his employment agreement, all the options issued to Venkataraman as compensation for his KnowBe4 employment from 2018 to 2020 (which had been subjected to lengthy vesting period) immediately vested in the IPO. Thus, after the IPO, Venkataraman held fully vested Class B options worth $20 million. Additionally, in 2021, Venkataraman received almost $600,000 in salary and bonus, another $1.1 million in "non equity incentive plan compensation" and restricted stock units ("RSUs") worth $13.3 million, consisting of an approximately $10 million grant that vested immediately upon the IPO and a $3.3 million in RSUs that were subject to either time or performance vesting, for total 2021 compensation of $15.1 million.

26.    Although his total 2022 compensation from KnowBe4 is not publicly available, Venkataraman received a pro rata amount of his $577,500 base salary for the two months he worked as CFO in 2022 (*i.e.*, approximately $100,000) and $36,000 per month, or $216,000 in aggregate, for serving as a member of the Special Committee in 2022. When Venkataraman retired in March 2022, the terms of his at-will employment afforded him no further benefits. However, the Board approved providing him a RSU grant worth $3 million—roughly six times Venkataraman's

12

base salary while he was a KnowBe4 director—with $1 million to vest almost immediately and the remaining $2 million to vest over a two-year period.  The grant contemplated that the remaining $2 million would vest immediately upon a change of control, such as the Merger.  Those and other unvested RSUs incentivized Venkataraman to approve the Merger.  Indeed, according to the Proxy, in the aggregate Venkataraman held $4.6 million in RSUs that were unvested and at risk if he was fired or stepped down from the Board, but those stock units were accelerated and cashed out in the Merger.

27.    Beginning in the IPO and through the Merger, Venkataraman sold shares or options worth over $14 million, then cashed out additional shares in the Merger worth over $37 million.  All told, for his approximately four years of KnowBe4 employment, Venkataraman received compensation worth approximately $55 million or more.  Venkataraman admitted to the Committee before the Merger that his shares in the Company—all of which he received from KnowBe4 as compensation—"represented a material portion of his overall wealth."

28.    **Defendant Gerhard Watzinger** (previously defined as "Watzinger") served as a director of KnowBe4 from October 2019 through the closing of the Merger.  Upon his appointment to the Board in October 2019, Watzinger received 17,149 Class B options with an exercise price of $3.29 per share.  In April 2021, those options converted to 696,760 Class B options (with the same $3.29 per share

13

exercise price), which were worth $8,855,820 based on the $16 IPO price. Watzinger did not sell any shares after the IPO, and (including approximately $300,000 worth of shares he received as director compensation over 2021 and 2022), received approximately $15.4 million in the Merger for the shares he received from KnowBe4 as director compensation for just three years of service.

29.    Watzinger's director compensation incentivized him to approve the Merger. According to the S-1, "25% of the shares subject to each option vested [on] . . . October 1, 2020 in the case of Mr. Watzinger [with] . . . the remaining number of shares subject to the option award vesting in equal monthly installments over the ensuing thirty-six (36) months." Thus, at the time he approved the Merger, Watzinger had ~$3.8 million worth of options that he received for his service as KnowBe4 director that had not vested. Had Watzinger been fired or resigned from the Board, he almost certainly would have lost those options. However, the Proxy stated that, subject to a "letter agreement amendment[]" between Watzinger and KnowBe4, Watzinger would (and did) receive "accelerated vesting upon a 'change of control'" such as the Merger. Thus, Klausmeyer's approval of the Merger ensured that he would receive an additional $3.8 million.

30.    Watzinger's only other publicly reported compensation over the three years before the Merger is from three other Boards (Absolute Software, CrowdStrike, and Mastech Digital, Inc.) from which he has earned in total

approximately $1.8 million—*i.e.*, merely a fraction of the total value of his director compensation from KnowBe4 over almost the same period.

31.     **Defendant Kara Wilson** (previously defined as "Wilson") served as a director of KnowBe4 from January 2020 through the closing of the Merger.  Wilson also serves as a Senior Advisor to KKR since October 2019 and as a director for numerous other KKR portfolio companies.  Upon her appointment to the Board in January 2021, Wilson received 17,149 Class B options with an exercise price of $3.38 per share.  In April 2021, those options converted to 696,760 Class B options (with the same $3.38 per share exercise price) worth $8,793,111 based on the $16 IPO price.  Wilson did not sell any shares after the IPO, and, including approximately $300,000 worth of shares she received as director compensation over 2021 and 2022, received approximately $15.3 million in the Merger for the shares she received from KnowBe4 as director compensation.

32.     Wilson's stock options, like Klausmeyer's and Watzinger's, incentivized her to approve the Merger.  According to the S-1, "25% of the shares subject to each option vested [on] . . . January 1, 2021 in the case of Ms. Wilson, [with]. . . the remaining number of shares subject to the option award vesting in equal monthly installments over the ensuing thirty-six (36) months."  Thus, at the time she approved the Merger, Wilson had approximately $4.7 million worth of Class B options that she received for her service as KnowBe4 director that had not vested.

15

Had Wilson been fired or resigned from the Board, she almost certainly would have lost those options. However, the Proxy stated that, subject to a "letter agreement amendment[]" between Wilson and KnowBe4, Wilson would receive "accelerated vesting upon a 'change of control'" such as the Merger, which she did. Thus, Wilson's approval of the Merger ensured that he would receive $4.7 million.

33. **Defendant KKR & Co. Inc.** (together with KKR Knowledge Investors L.P., "KKR") is a global private equity and investment firm. At the outset of the sale process, KKR owned 26,115,895 Class B shares (25.6% of that class), representing 23.9% total voting power. As of the Record Date, after down-converting some of its Class B shares, KKR owned 12,048,193 Class A shares (9.1% of the class) and 14,067,702 Class B shares (31.6% of the class), representing 26.4% total voting power. KKR committed $300 million in connection with the Merger, with the discretion to structure its commitment by either rolling over its existing interest or cashing out and reinvesting the proceeds through an equity financing transaction.

34. **Defendant KKR Knowledge Investors L.P.** was an affiliate of KKR & Co. Inc. and the direct owner of shares of KnowBe4 common stock.

35. **Defendant Elephant Partners** (together with its below-identified affiliates, "Elephant") is a venture capital firm focused on the enterprise software, consumer internet, and mobile markets. At the outset of the sale process, Elephant

16

owned zero Class A shares and 37,069,823 Class B shares (36.4% of the class), representing 33.9% total voting power. As of the Record Date, after down-converting some of its Class B shares, Elephant owned 17,069,823 Class A shares (12.9% of the class) and 20,000,000 Class B shares (44.9% of the class), representing 37.5% total voting power. Elephant rolled over $425 million of equity in the Merger.

36. **Defendants Elephant Partners I, L.P.**, **Elephant Partners II, L.P.**, **Elephant Partners 2019 SPV-A, L.P.**, and **Elephant Partners II-B, L.P.** are all affiliates of Elephant Partners, and directly held shares of KnowBe4 common stock.

37. Together, Defendants Sjouwerman, Daly, Klausmeyer, Shanley, Venkataraman, Watzinger, and Wilson are referred to herein as the "Director Defendants."

<u>**RELEVANT NON-PARTIES**</u>

38. **Vista Equity Partners Management, LLC** ("Vista") is a global private equity and investment firm. At the outset of the sale process, Vista owned 1,875,000 Class A shares (2.6% of the class) and 14,557,960 Class B shares (14.3% of the class), representing 13.5% total voting power. As of the Record Date, after down-converting some of its Class B shares, Vista owned 16,432,960 Class A shares (12.4% of the class) and zero Class B shares, representing 2.8% total voting power.

39. **Morgan Stanley** served as the Special Committee's financial advisor. Morgan Stanley has a long history with KnowBe4, Vista, and KKR. In just the two

17

years before it issued its fairness opinion in connection with the Merger, Morgan Stanley received: (i) $5 to $10 million in fees from KnowBe4; (ii) $120 to $140 million in fees from Vista-related entities; and (iii) $80 to $105 million from KKR related entities. Additionally, at the time of the Merger, Morgan Stanley had around $550 million of investments in KKR and its affiliates.

40. As discussed below, Morgan Stanley did not disclose to the Special Committee approximately $80 million in the fees it earned from Vista until a month *after* the parties agreed to the Merger and KnowBe4 filed the preliminary proxy statement seeking stockholder approval of the Merger. As further discussed below, while Morgan Stanley was advising the Special Committee, it was concurrently mandated on multiple financial advisory assignments and financing assignments for both Vista and KKR worth tens of billions of dollars in transaction value. Morgan Stanley never disclosed its investment interest in KKR and its affiliates.

41. **Kevin Mitnick** (previously defined as "Mitnick") was KnowBe4's "Chief Hacking Officer" from just after KnowBe4's inception through the closing of the Merger. Mitnick was not independent for purposes of the Merger. Mitnick became Sjouwerman's "business partner" in 2011 when he joined Sjouwerman in running KnowBe4 and served as a KnowBe4 director from January 2016 to March 2021. In addition, Mitnick maintained a consulting agreement with the Company through at least 2022. In 2021, KnowBe4 paid Mitnick: (i) $154,420 for consulting

18

fees, (ii) $24,576 for healthcare and insurance premiums, (iii) $22,276 for car payments, and (iv) $6,498 in computer equipment.  As of the December 7, 2022, the Record Date, Mitnick owned 4,222,593 Class A shares and 4,902,647 Class B shares representing 9.2% of the of the overall voting power of KnowBe4's outstanding common shares.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of KnowBe4

42.    KnowBe4's business focuses on security awareness training, used by organizations around the world to help manage human-based cybersecurity risks such as phishing and related attacks.

43.    Sjouwerman founded KnowBe4 in 2010.

44.    Shortly thereafter, a friend of Sjouwerman suggested during a social outing that Sjouwerman talk with her cousin, Mitnick, a twice-conflicted felon and notorious hacker.

45.    Sjouwerman contacted Mitnick and offered him an ownership stake in newly-formed KnowBe4 in exchange for Mitnick's name and expertise. Accordingly, in November 2011, Mitnick became KnowBe4's Chief Hacking Officer and partial owner of KnowBe4.  Sjouwerman's invitation gave Mitnick a once-in-a-lifetime chance to rebrand himself—from criminal to corporate officer— and led to Mitnick's accumulation of generational levels of wealth.

19

46.     Mitnick served as the Chief Hacking Officer pursuant to a consulting agreement under which the Company paid Mitnick in cash and covered Mitnick's car, computer equipment, and healthcare costs.  Mitnick also licensed to KnowBe4 the right to use his name as a brand.

47.     In June 2012, KnowBe4 launched its first training module, the "Kevin Mitnick Security Awareness Training" ("KMSAT") program.  KMSAT remains KnowBe4's flagship product.  KnowBe4 launched additional Mitnick-branded training modules, including the "Kevin Mitnick Home Internet Security Course" and he "Kevin Mitnick VST Scenario."

48.     In addition to his ownership interest in KnowBe4 and role as the Company's Chief Hacking Officer, Mitnick served on KnowBe4's Board from January 2016 until March 19, 2021, the day KnowBe4 filed its IPO registration statement with the SEC.

49.     Outside of KnowBe4, Sjouwerman and Mitnick maintained a close friendship.   Sjouwerman publicly referred Mitnick not only as his "business partner," but also as a "close friend" and a "dear friend."

**B.     KnowBe4 Experiences Tremendous Growth, Attracting Sizeable Investments from Outside Investors**

50.     KnowBe4 grew significantly in its earlier years and garnered interest from additional investors, particularly Elephant and KKR.

20

51. On January 19, 2016, Elephant invested approximately $8 million in KnowBe4 through a Series A-1 Preferred Stock financing. Elephant was a nascent firm at the time, and its KnowBe4 investment was its second-ever investment.

52. In an article concerning the investment, Sjouwerman professed that the deal went smoothly because he got along so well with Elephant co-founders Andy Hunt and Daly.

53. As a result of the investment, Elephant's Daly secured a seat on KnowBe4's Board.

54. Over the following years, Elephant and Sjouwerman, and later KKR, engineered a series of transactions whereby KKR and Elephant would invest further in KnowBe4 and the Company would use those proceeds to repurchase equity from Sjouwerman and other insiders.

55. In February and March 2017, Elephant acquired additional shares of KnowBe4's Series A-1 Preferred Stock for approximately $5.5 million. Most of the proceeds from the February and March 2017 financings were used to repurchase shares from Sjouwerman, Mitnick, and KnowBe4 Chief Revenue Officer Lars Letonoff ("Letonoff").

56. In October 2017, KnowBe4 closed a $30 million Series B Preferred Stock financing, with Elephant investing another $2.5 million and new investor Goldman Sachs investing the remaining ~$27.5 million. As before, some of the

proceeds from this financing were used to repurchase shares from Sjouwerman and Mitnick.

57.     In March 2019, KKR invested approximately $31.6 million into KnowBe4 through a Series C Preferred Stock financing, which valued the Company at over $800 million.  In the press release announcing KKR's investment, KKR said that KnowBe4's early participants had "position[ed] the business for scale" and signaled it would take an active role in the Company.  More than $10 million in proceeds from this financing were used to repurchase shares from Venkataraman and Letonoff.  Venkataraman received $2.7 million.

58.     In a press release announcing KKR's initial investment, a representative of KKR said it was "thrilled" to be working with KnowBe4's management team as well as the company's existing investors- specifically Elephant.

59.     In connection with the March 2019 investment, KnowBe4 entered into an investors' rights agreement with Elephant and KKR, among others.

60.     Just three months later, in June 2019, KKR and Elephant jointly invested an additional $309.4 million into the Company, valuing the Company at $1 billion.  In a press release announcing the investment from KKR and Elephant, Sjouwerman touted that "[t]he relationship we started with KKR earlier this year has been fruitful for both of us."  That relationship certainly bore Company insiders

22

fruit—virtually all the proceeds from KKR's and Elephant's investment were used to repurchase shares from Sjouwerman, Mitnick, Venkataraman, and Letonoff. Sjouwerman and Mitnick were paid approximately $150 million each. Venkataraman received $2.8 million.

61.     Following the June 2019 financing, KnowBe4 entered into an amended and restated investors rights agreement which afforded Elephant and KKR registration rights, information and inspection rights, Board observer rights, rights to participate in future stock issuances, and shared consent rights over various corporate acts including the hiring, termination, and compensation of the Company's executive officers, strategic alternatives, financing activities, and the nature of the Company's business.

62.     Elephant and KKR were also party to an Amended and Restated Right of First Refusal and Co-Sale Agreement (the "ROFR Agreement"), which entitled them to purchase from KnowBe4 any shares the Company repurchased from an existing stockholder for the same price as the repurchase price.  The Right of First Refusal and Co-Sale Agreement also gave Elephant and KKR the right to participate in any sale of KnowBe4 shares by an existing stockholder to a third party, thus reducing the amount the other selling stockholder could dispose and effectively deterring significant shareholders from selling their stock.  In short, the ROFR Agreement ensured that Elephant and KKR would at least preserve, and potentially

increase, their ownership stakes in the Company while simultaneously discouraging others from attempting to cash out.

63. KKR and Elephant thereafter continued to acquire KnowBe4 stock. In November 2020, the Company repurchased 731,760 shares of common stock from a former employee at a purchase price of $5.84 per share. The Company subsequently sold those shares to KKR and Elephant in December 2020 at the same price pursuant to the ROFR Agreement.

### C. After Considering an Acquisition of KnowBe4, Vista Buys a Significant Stake in the Company from KKR and Elephant

64. KnowBe4 continued its growth into 2020, despite challenges posed by the Covid-19 pandemic. Around this time, Vista and KnowBe4 discussed a variety of potential transactions including the possible acquisition of KnowBe4 by Vista.

65. Vista is one of the largest U.S. investment firms and focuses exclusively on enterprise software, data, and technology-enabled businesses. Vista is widely known for being founder-friendly and is consistently included in *Inc*'s annual List of Founder-Friendly Investors.

66. Vista's founder-friendly approach is one of its selling points in pursuing mergers and acquisitions: Vista touts "creat[ing] significant value for founders" and "excellent outcomes for the founders and their teams." According to Vista's own statistics, 90% of all founders in companies that Vista acquires remain involved in some capacity post-acquisition. Those founders who do not remain with the

24

companies they founded often find lucrative employment opportunities at other Vista's portfolio companies. As Vista's founder and CEO Robert F. Smith stated, "[Vista has] created an ecosystem where if an individual wants to accelerate their career, they don't have to move outside of the Vista family[.]"

67.    This Court has also observed that "Vista ha[s] a history of retaining management in take-private transactions and offering them compensation packages with significant upside."[3]

68.    On March 12, 2020, KnowBe4 and Vista entered into a non-disclosure agreement ("NDA"). The NDA, which Venkataraman signed on KnowBe4's behalf, provided for the Company to share with Vista confidential and proprietary information "in connection with [Vista's] evaluating, entering into, conducting, and/or consummating a potential negotiated transaction" with KnowBe4. The NDA had a term of three years.

69.    On July 30, 2020, KnowBe4 engaged Morgan Stanley as the Company's "exclusive financial advisor in connection with the proposed sale, transfer or other disposition of 50% or more of the voting stock or assets of the Company."

---

[3] *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *4 (Del. Ch. Oct. 2, 2020) (further noting allegations in that case that Vista retained senior management at 85% of companies acquired over a two-year period, and provided buy-side equity that positioned a target entity's CEO with the opportunity to receive nearly $1 billion).

25

70. Morgan Stanley's engagement letter, formally executed on September 17, 2020, provided that, in the event of a consummated transaction, the bank would receive a fee ranging from 0.8% to 1.2% of the total transaction value but "in no event" less than $18 million. The engagement letter also provided that it would terminate after one-year, unless extended by mutual agreement, and that Morgan Stanley's fee would be paid if an agreement to effect a transaction were executed within 12 months of such termination. Accordingly, KnowBe4 would owe Morgan Stanley fees for any deal agreed to on or before September 17, 2022.

71. According to the Proxy, prior to becoming an investor in KnowBe4, "Vista and KnowBe4 discussed, in general terms, a variety of different transactions, including the possible acquisition of KnowBe4 by Vista."

72. After entering into the NDA and engaging in discussions with KnowBe4, Vista deferred engaging in a transaction with KnowBe4 and, instead, reached an agreement on March 5, 2021, to acquire KnowBe4 preferred shares from KKR, Elephant, and Goldman Sachs for $300 million. On an as-converted basis, Vista's purchase valued KnowBe4 at $20.61 per share.

**D.     KnowBe4 Goes Public to Accelerate Its International Growth Plans**

73. On April 22, 2021, KnowBe4 completed its IPO of 10,925,000 Class A shares of its common stock, at $16 per share, with Morgan Stanley serving as the lead underwriter. Following the IPO, KnowBe4 had two classes of common stock

outstanding: Class A shares, with one vote per share, and Class B shares, with ten votes per share. Class B shares were never publicly traded but were convertible at the option of the holder into single-vote, publicly traded Class A shares.

74. KnowBe4's Amended and Restated Certificate of Incorporation (the "Charter" contained important protections for public Class A stockholders. Most relevant here, Article IV, § C(d) required all Class A and Class B shares to be treated equally, identically, and ratably in any merger unless unequal treatment is approved by separate class votes of the Class and Class B shares (the "Equal Treatment Provision").

75. Furthermore, Class B shares would automatically convert into Class A shares if transferred to a third-party. Therefore, the Control Group negotiated away any ability to receive a unique control premium in a sale of control.

76. According to the IPO prospectus, the ownership of KnowBe4 shares by key individuals and entities immediately following the IPO was as follows:

| Name | Class A Shares | Class B Shares | Voting Power |
|---|---|---|---|
| Elephant | N/A | 45,453,480 (28.83%) | 28.65% |
| KKR | N/A | 31,152,880 (19.76%) | 19.63% |
| Vista[4] | N/A | 16,432,960 (10.42%) | 10.36% |
| Sjouwerman | N/A | 6,414,640 (4.07%) | 4.04% |
| Mitnick | N/A | 12,398,160 (7.86%) | 7.81% |
| Venkataraman | 314,704 (1.43%) | 1,604,680 (1.07%) | 1.09% |

---

[4] In the IPO, Vista also purchased an additional 1,875,000 shares at the IPO price.

77.     As a result, KKR, Elephant, and Sjouwerman (*i.e.*, the Control Group) collectively controlled KnowBe4 following the IPO.

78.     Additionally, pursuant to the IPO, all Class B options granted to Venkataraman and Letonoff—which were subject to lengthy and conditional vesting schedules—immediately vested, entitling those executives to millions of dollars in liquid KnowBe4 common shares.  The IPO also permitted KnowBe4 directors and officers—including Venkataraman, Letonoff, Klausmeyer, Watzinger, and Wilson—a substantial windfall, as options they were granted before the IPO had exercise prices of less than $6 per share (and substantially less in some cases), and the IPO price was $16 per share.  And in the case of Klausmeyer, Watzinger and Wilson, the approximately 17,000 Class B options they were granted immediately before the IPO converted into almost 700,000 Class B options in the public Company worth many millions of dollars.

79.     Armed with $144 million in additional funding from the IPO, KnowBe4 continued its rapid growth and expansion, both organically and through bolt-on acquisitions.

80.     The Company also developed aggressive international expansion plans.  According to the IPO prospectus, one of the "key elements" of KnowBe4's growth strategy was to rapidly expand internationally: "The international market represents a clear expansion opportunity for us. . . ."  On April 23, 2021, Sjouwerman added in

28

an interview with *SC Media* that "[t]he main reason [for the IPO] is international expansion."

81. When the Merger was announced, KnowBe4's international expansion efforts were already yielding steady gains.  In 2019, KnowBe4's customers outside of North America provided 9.7% of the Company's revenues, but by September 30, 2021, they provided 16.8% of the Company revenues.  And the Company's international expansion was just in its initial stage, as Sjouwerman said the Middle East and Japan were only beginning to see the rapid rise in demand that KnowBe4 experienced in North America a half-decade before.

82. KnowBe4 was also expanding beyond cybersecurity training and education.  In December 2018, the Company introduced a new product called PhishER that prioritizes reported suspect emails.  As Sjouwerman told *SC Media* on April 23, 2021, KnowBe4 was "increasing the capabilities of the security awareness platform with AI recommended phishing templates, training models . . . the whole platform is going to be AI-driven ultimately" and "there's lots of development still possible and enormous opportunity" in this segment.  KnowBe4 told investors that, despite a negative impact on profitability in the short term, its growth strategy would pay off in the long term.

83. In November 2021, pursuant to its acquisition-based growth pillar, KnowBe4 acquired SecurityAdvisor, which had more than fifty integrations to

leading cybersecurity products including Crowdstrike, Zscaler, Okta, and Netskope. In the press release announcing its completion, Sjouwerman called the acquisition "a significant leap forward in enabling [] users to defend against the ongoing problem of social engineering attacks[.]"

84. During a conference call with investors and analysts to discuss KnowBe4's financial and operational results for the third quarter of 2021, analysts expressed their excitement over SecurityAdvisor's $5 billion total addressable market—bringing KnowBe4's company-wide total addressable market to $23 billion—and inquired as to the anticipated timeline to recognize revenue from the SecurityAdvisor acquisition. Sjouwerman projected that the fruits of this acquisition would not be immediate and said the Company did not "expect revenue until the second half next year and it might even be Q4."

85. The Company continued to grow significantly through the third and fourth quarters of 2021, regarding strong growth in both revenue and customer base. In the third quarter earnings call, held on November 3, 2021, Sjouwerman boasted that KnowBe4 had "established a market leading position in the human centric cybersecurity space." Sjouwerman lauded KnowBe4's "greenfield" wins, which refer to the Company's expansion into the still relatively new and untapped security awareness market, as well as "competitive displacements."

86.     As to the future, Sjouwerman discussed the "huge potential for the next 5 years or 10 years.  This is only—really only the very early days."  Sjouwerman echoed these thoughts during the fourth quarter and full-year earnings call, held on February 16, 2022, again highlighting both greenfield and competitive displacement wins, exceptional cross-selling results, extraordinary retention rates, and strong free cash flows which will be reinvested into domestic and international growth efforts.

87.     Despite KnowBe4's ascendency, the Company's stock was undervalued throughout its entire public existence.  In January 2023, after the Merger was announced but before it closed, Sjouwerman lamented: "As a public company, we didn't get credit for the very high-quality stock that we really are . . . . And so we saw our stock price go up and down, and we didn't necessarily feel we had much control over that.  For us at our stage, where we are still growing very rapidly, we felt going private was actually the better choice."  Notably, KnowBe4 still traded significantly higher than the Merger price on numerous days during 2022.

E.      **After KnowBe4 Posts Record Results and Beats Guidance, Vista, KKR, Elephant, and Sjouwerman Launch a Sale Process**

88.     The Vista playbook is well known—not only in the industry, but to this Court.  As the Court explained in *In re Mindbody, Inc., Stockholder Litigation*:

> Vista is a pro at acquiring companies . . . . Vista's advantage is speed. Vista likes to engage "in significant background work" and is "[p]ro-active in making friendly unsolicited approaches and prefer[s] to kick-off processes vs. reacting to outreach."  Vista then capitalizes on its ability to "move very quickly through both business and confirmatory

31

diligence" and leverages its early analysis "to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line[.][5]

89.    In this case, Vista had a recognized advantage from its pre-IPO negotiations and dealings with Elephant, KKR, and Sjouwerman during the pre-IPO negotiations.  Vista leveraged its advantage to kickstart takeover negotiations with the same trio—each of whom were interested in rolling over equity in connection with sale of KnowBe4 to Vista.  At all times, Vista remained in pole position through the truncated, tilted process that followed.

90.    The result was a transaction that benefitted Vista, KKR, Elephant, and Sjouwerman, at the expense of KnowBe4's public stockholders.  This, too, was consistent with Vista's playbook:

> For a target company seeking to maximize stockholder value, however, a truncated timeline can present challenges.  It takes time to develop alternatives to promote competition and extract the best price.  By sprinting to the finish line, Vista seeks to prevent a target company from doing that.[6]

---

[5] 2023 WL 2518149, at *14 (Del. Ch. Mar. 15, 2023) (alterations in original); *see also id.* at *1 ("Vista's *modus operandi* is speed.  Vista leverages its ability to move quickly from an expression of interest, through confirmatory diligence, to a firm offer, thereby truncating the process and reducing interloper risk.  Vista calls it 'sprinting,' and for Vista, that's good business.").

[6] *Id.* at *1.

32

91.     According to KnowBe4's 2022 annual proxy statement, as of March 15, 2022—shortly before the commencement of the sale process—the holdings and voting power of key stockholders was as follows:

| Name | Class A Shares | Class B Shares | Voting Power |
|---|---|---|---|
| Elephant | 0 | 37,069,823 (36.4%) | 33.9% |
| KKR | 0 | 26,115,895 (25.6%) | 23.9% |
| Vista | 1,875,000 (2.6%) | 14,557,960 (14.3%) | 13.5% |
| Sjouwerman | 125,010 (<1%) | 4,378,242 (4.3%) | 4.0% |
| Mitnick | 2,477,182 (3.4%) | 6,902,647 (6.8%) | 6.5% |
| Venkataraman | 230,935 (<1%) | 1,604,680 (1.6%) | 1.5% |

92.     On May 10, 2022, KnowBe4 reported its first quarter results, posting record revenue and annual recurring revenue and beating previously announced guidance "across the board."   The Company also performed well—if not exceedingly so, in the case of free cash flow—against consensus expectations and the Company's internal budget and forecasts.

93.     On May 17, 2022, the Board met to discuss the first quarter results.  The materials for that meeting showed that the Company's quarterly bookings had increased for the prior ten straight quarters, its customer base had grown in every quarter since 2017, and it had beat consensus estimates for every major financial category for Q1 2022.  Sjouwerman stated in his "CEO Overview":  "First quarter revenue and ARR increased year-over-year by 40.1% and 37.6%, respectively.  Our significant growth is driven by continued expansion of our customer base,

33

introduction of new products and features leading to strong multi-product adoption trends and further penetration into international markets."

94.     Vista—already one of KnowBe4's largest stockholders after executing an NDA with the Company and acquiring shares from Elephant and KKR prior to the IPO—took note of the Company's accelerating growth and reconvened takeover discussions.

95.     On May 20, 2022, representatives of Vista approached KKR partner and Board member Shanley to discuss the Company's business and KKR's interest in a potential sale.  Without advising or consulting with the Board, Shanley recommended that Vista meet with Sjouwerman.

96.     On May 26, 2022, representatives of Vista approached former KnowBe4 Co-President and CFO and future Special Committee member Venkataraman—who, according to the minutes of the Special Committee's July 13, 2022 meeting, previously "r[a]n the due diligence and investment process on the Company side in connection with Vista's [initial KnowBe4] investment," and, according to an unrelated post-Merger press release, would go on to "guid[e] KnowBe4 in its privatization through a $4.6 billion acquisition by Vista"—to discuss KnowBe4's business.

34

97.     On June 1, 2022, representatives of Vista and KKR's Shanley had another discussion concerning the Company's business and Vista's interest in a potential sale.

98.     On June 8, 2022, representatives of Vista approached Elephant founder and Board member Daly to discuss the Company's business and interest in a potential sale.  Like KKR, without advising or consulting with the Board, Daly recommended that Vista meet with Sjouwerman.

99.     On June 16, 2022, Daly, Shanley, and Sjouwerman met together with representatives of Vista to discuss the Company's business and a potential sale transaction.

100. On June 22, 2022, Sjouwerman and Daly met again with representatives of Vista, this time in person, to further discuss "Vista's existing investment in the Company" and a potential sale transaction.  "During this conversation, representatives of Vista expressed their confidence in KnowBe4's business and indicated that if KnowBe4 were ever to be interested in a transaction, Vista would want to be included."

101. Following Sjouwerman, Elephant, and KKR's discussions with representatives of Vista about a potential sale of the Company, the Board convened a special meeting on June 28, 2022.

102.   At the meeting, which Board member and eventual Special Committee member Watzinger failed to attend, Daly advised the Board that "a potential acquiror had approached him and [] Shanley about a sale of the Company" and "had a conversation with each of Mr. Daly and Mr. Shanley, and then subsequently met with Messrs. Daly, Shanley and Sjouwerman to discuss the Company's business." Venkataraman did not disclose to the Board that he had met with Vista on May 26, 2022.

103.   Shanley and Daly also said that KKR and Elephant "might seek to not sell some or all of their ownership of the Company or to otherwise participate on the buy-side of a potential transaction."   Sjouwerman said he and "members of management might also not sell all of their equity interests" in the transaction. This coordinated rollover discussion at the June 28, 2022 Board meeting suggests that Vista had already discussed KKR, Elephant, and Sjouwerman's rolling over equity as part of any transaction.

104.   During the June 28, 2022 Board meeting, future Special Committee member Klausmeyer "disclosed that among the board of directors he served on was one company affiliated with the potential acquiror that had approached the Company." Klausmeyer has served on the board of Jamf as a Vista appointee since 2019. There, Klausmeyer sat alongside numerous Vista executives, including Senior

36

Managing Director Michael Fosnaugh, who led Vista's acquisition of KnowBe4 and serves as Jamf's Chairman.

105.   At the June 28, 2022 meeting, the Board "discussed the merits of the formation of a special committee to oversee any efforts by the Company to explore or pursue a potential transaction" and "the merits of retaining a financial advisor," but left that decision to the committee (if formed).  The Board did not form the Special Committee at that time.  Instead, according to the minutes, the Board requested that the Company's outside counsel at Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini") compile "information regarding the various Board members and any actual, potential or perceived conflicts for each Board member to report back to the Board regarding the potential constitution of a special committee to consider a potential sale of the Company."  The Board concluded that it would reconvene once Wilson Sonsini "compiled such information and recommendations."

F.     **The Board Purportedly Forms the Conflicted Special Committee**

106.   The Board next met on July 5, 2022.  At this juncture, Vista had not submitted a formal indication of interest, and there is no indication that, aside from soliciting Sjouwerman's, Shanley's, Daly's, and Venkataraman's views on a merger and seemingly their interest in rolling over shares, Vista had taken any other concrete steps in furtherance of a potential takeover.  Nevertheless, the Board forged ahead to accommodate Vista's potential overture.

107.   According to the minutes from the July 5 meeting—although none of the Board members volunteered any further information indicating potential conflicts of interest, and the Board did not actually make any determinations regarding any directors' disinterestedness and independence—the full Board "recommended appointing Watzinger, Klausmeyer and Venkataraman" to the Special Committee "for purposes of managing and overseeing a potential transaction process."

108.   Had the Board and its advisors actually investigated those conflicts, they would have discovered that Watzinger, Klausmeyer, and Venkataraman all harbored conflicts of interest with respect to the Merger and the Rollover Stockholders.

109.   Venkataraman was the Company's Co-President and CFO working directly for Sjouwerman and dependent on the goodwill of the Control Group from September 2018 to March 2022, only three months before Vista commenced merger discussions.  Venkataraman acquired generational wealth a (*i.e.*, over $55 million) from KnowBe4 in just the few years he was employed as a KnowBe4 executive, which enabled him to retire as a KnowBe4 executive at 45 years old.  Because of his role as an officer until March 2022, per its 2022 annual proxy statement, the Company itself did not consider Venkataraman an independent director during the sale process.  Upon his resignation, Venkataraman received a gratuitous $3 million

38

RSU grant, and the Merger resulted in the accelerated vesting of $4.6 million worth of RSUs to Venkataraman (including those received in connection with his resignation just months prior). Venkataraman's brother-in-law also worked at KnowBe4 as West Regional Account manager.

110. Further, Venkataraman and his wife were both invested in separate funds managed by KKR and Elephant. Those investments in Elephant are remarkable given that it is an ultra-exclusive venture capital firm. Media coverage on the "secretive VC house" is scant, Elephant's website lists no contact information for prospective investors, and LinkedIn states that it has less than 10 employees. Investing in Elephant's funds—like with similar VC funds—almost certainly is an invite-only opportunity, and Venkataraman's insider access suggests a special relationship with Elephant.

111. Indeed, despite Elephant's secretive nature and small public footprint, it has raised billions of dollars in recent years from a small group of investors. For example, in 2019, Elephant raised $132 million from just 24 investors for an average investment of $5.5 million. For its most recent fund in 2023, Elephant raised nearly $800 million from just 178 investors, for an average investment of $4.5 million. And high minimum investments are typical of Venture capital funds, particularly of Elephant's size, which solicit large contributions from a small group of institutional investors. Individual investors in such funds are rare—when permitted, typically an

39

individual investor (i) has a special relationship with the fund and (ii) is required to commit a sizable amount of capital.[7]  Thus, it is inferable that Venkataraman and his wife not only have a special relationship with Elephant, but that Elephant controls a significant amount of their capital.

112.  Additionally, Venkataraman's wife had worked for more than two decades at Morgan Stanley.  At the time the Special Committee retained Morgan Stanley to advise it on the Merger, Venkataraman's wife was Managing Director and Co-Head of Morgan Stanley's Americas Securities Lending division.

113.  The director fees Klausmeyer has received from KnowBe4 and from Vista-affiliated Jamf are material to him.  Indeed, those fees make up all of Klausmeyer's publicly reported income, and he earned a fortune as a KnowBe4 director.  Watzinger has also received a fortune from his KnowBe4 directorship.  He is also invested in funds managed by KKR and he is friends with several Vista partners.

114.  As at the June 28 meeting, the Board did not actually form the Special Committee at the July 5, 2022 meeting.  Rather, the Board "requested additional time for consideration and review" of the formation of the Special Committee.

---

[7] *See, e.g.*, *Minimum Investment into a VC Fund*, GOVCLAB, https://govclab.com/2023/12/04/minimum-investment-into-a-vc-fund/; Matt Preuss, *25 Limited Partners Backing Ventur Capital Funds + What They Look For*, VISIBLE (Apr. 17, 2023) https://visible.vc/blog/limited-partners-list/.

115.   The Proxy states that the yet-to-be-formed Special Committee met "immediately" after the Board meeting "to discuss the retention of legal and financial advisors to advise the Special Committee" whereupon the Special Committee determined to contact Potter Anderson & Corroon LLP ("Potter Anderson") and Morgan Stanley to potentially serve as the Committee's legal and financial advisors, respectively.   There are no minutes for this meeting, but according to the Proxy: "The Special Committee did not seek to interview any other advisors at this time."

116.   The Special Committee, which still was not yet formally created, met again on July 7, 2022.  At the outset of the meeting, the Special Committee updated Potter Anderson "with certain background information on the events leading up to the formation of the Committee," and the Special Committee confirmed Shanley, Daly, and Sjouwerman's conflicts by reiterating "that certain members of Company management [*i.e.*, Sjouwerman] and the investment funds [*i.e.*, KKR and Elephant] affiliated with certain Board members [*i.e.*, Shanley and Daly] may be interested in rolling some or all of their equity in the Company in a Potential Merger."  The minutes state that "the Company's outside legal advisor had previously determined that each of the Committee members were independent and disinterested for purposes of a Potential Transaction with Vista," but apparently did not determine

41

independence as to any potential rollover investors such as the Control Group members.

117. The Special Committee discussed a monthly fee structure under which each of the Committee's members would be paid for their service.

118. The Special Committee also discussed retaining Morgan Stanley as its financial advisor. The Special Committee noted that KnowBe4 "had a tail fee agreement with Morgan Stanley pursuant to a separate engagement letter," which, as noted, would have entitled Morgan Stanley to fees regardless of the role it played if KnowBe4 entered into a merger agreement on or before September 17, 2022.

119. Representatives of Morgan Stanley then joined the Special Committee meeting. Morgan Stanley asserted that it had cleared its standard conflicts check from an "internal conflicts perspective." In response to a question from representatives of Potter Anderson, representatives of Morgan Stanley said it would "review its prior and existing engagements with the Company," suggesting that it had not already done so. In response to an inquiry from the Special Committee, representatives of Morgan Stanley stated that the bank "did not have any side agreement with KKR, Elephant or Company management with respect to a Potential Transaction," but the Morgan Stanley representatives did not disclose whether the bank had any agreements or engagements with Vista or its affiliates. Morgan

42

Stanley also acknowledged it had a "historical relationship with the Company," *i.e.*, the Control Group.

120. Morgan Stanley's representatives also presented the bank's preliminary views on a transaction with Vista, "including certain advantages that Vista may have given its existing ownership in the Company." However, Morgan Stanley and the Committee noted "that the Company did not have to engage in a sale at this juncture and did not have to sell equity to finance losses and, therefore, the Committee was in a strong position with respect to its consideration of a Potential Transaction."

121. Thereafter, the Special Committee determined to engage Morgan Stanley subject to the receipt of a conflict disclosure memorandum and negotiation of an engagement letter.

122. The Special Committee's decision to retain Morgan Stanley at this time, without even considering any other financial advisors, was tainted by conflict. In addition to Venkataraman's decades-long ties to Morgan Stanley through his wife and Morgan Stanley's prior relationship with the controlled Company, the tail fee provision Venkataraman previously agreed-upon in connection with the pre-IPO process impinged on the Special Committee's authority to select a financial advisor on a merits-only basis. Indeed, to the extent the Special Committee sought any financial advice, the fee tail (which the Proxy did not disclose) clouded the Special Committee's consideration of which financial advisor to retain.

123.   At the conclusion of the July 7 meeting, the Committee delegated to the conflicted Venkataraman the responsibility to review the Company's forecasting model alongside "certain members of Company management."

### G.   The Special Committee Is Formally Established

124.   On July 11, 2022, the Board formally established the Special Committee consisting of Venkataraman, Klausmeyer, and Watzinger by unanimous written consent (the "UWC").

125.   The UWC provided that the (i) Board would not approve a "Strategic Transaction" (*i.e.*, a transaction involving a change of control or delisting of the Company) or "Specified Strategic Transaction" (*i.e.*, a Strategic Transaction "in which one or more significant stockholders of the Company may have an interest that is in addition to, and/or different from, the interests of the Company's stockholders as a whole") without the Special Committee's prior favorable recommendation, and (ii) Company would not effectuate a Specified Strategic Transaction unless it had first been approved or recommended by the Special Committee and approved by the holders of a majority of the voting power of the outstanding shares of KnowBe4 held by the disinterested stockholders (as determined by the Special Committee).

126. The UWC provided that the two non-chair Special Committee members would each receive a monthly fee of $36,000, and the Special Committee chair—Watzinger—would receive $39,000 per month.

127. The UWC contained numerous misrepresentations (or, at best, inconsistencies with the Section 220 production) regarding the formation of the Special Committee and the Board's evaluation of the Special Committee's independence and disinterestedness.  For example:

- The UWC states that, on June 28, 2022, the Board "deemed it advisable and in the best interests of the Company and its stockholders to form a special committee," and that, "at the June Meeting, the Board established the Special Committee[.]"  However, according to the meeting minutes, the Board did not decide to form the Special Committee until at least July 5, 2022, when the Board "recommended appointing a special committee" but still did not formally do so to allow for "additional time for consideration and review . . . ."

- The UWC states that, at the June 28, 2022 meeting, "the Board determined to defer the formal delineation of the scope of the delegation of authority to the Special Committee until such time as the Board could further consider the scope of such delegation . . . ."  Per the minutes, the decision to defer delineating the Special Committee's duties did not occur at the June 28 meeting but, rather, the July 5 Board meeting.

- The UWC states that, at the June 28, 2022 meeting, the Board "considered all facts relevant to the independence and disinterestedness of each of Gerhard Watzinger, Kevin Klausmeyer and Krish Venkataraman" and deemed each member disinterested and independent.  But the minutes for the June 28 meeting state that the Board directed Wilson Sonsini to collect information on potential conflicts and reflect no such determination regarding Venkataraman's, Klausmeyer's, or Watzinger's independence.  Moreover, Watzinger did not even attend the June 28 Board meeting.  The Board then met again on July 5 and purportedly discussed potential conflicts of interest (albeit

45

still without reflecting any independence determination), further belying the assertion in the UWC concerning the June 28 meeting.

- The UWC states that "the members of the Board have discussed with counsel other potential conflicts of interests which might affect one or more members of the Board[.]" But as alleged below in ¶¶117-19, the Special Committee members never disclosed to the full Board or to KnowBe4's outside counsel numerous potential conflicts involving Vista, KKR, or Elephant.

128. The Committee met again on July 13. Seemingly acknowledging the Control Group's control over the Company, Potter Anderson discussed the standard review for "controlling stockholder transactions under Delaware law" and the application of "the *MFW* framework."

129. The minutes also explain that KnowBe4's outside counsel, Wilson Sonsini, had conducted an undefined, "initial review" of the Special Committee members' disinterestedness and independence, but Potter Anderson thought it was "important" to hold a similar discussion, during which numerous material conflicts were belatedly disclosed for the first time.

130. Watzinger first disclosed that he had relationships with "a few Vista partners." Watzinger also disclosed for the first time that "he had a passive investment in KKR funds." Watzinger's belated disclosure concerning both his friendship with multiple Vista partners and his interest in certain KKR funds also meant that he had falsified his Directors' Questionnaire submitted on February 22, 2022, wherein Watzinger certified that had no relationship with or investment

46

interests in any of KnowBe4's 5% or greater stockholders, which included Vista and KKR. The Committee failed to acknowledge that Watzinger's exorbitant KnowBe4 director compensation was the vast majority of his income over the past three years, that his options were worth around $10 million at that time, and that he stood to receive millions of dollars from unvested options that would automatically vest in the event of a merger. Watzinger tersely waived away that obvious conflict, merely stating that the options he currently held "were not material to [his] . . . overall wealth."

131. Klausmeyer again disclosed that he served on the board of directors of an unidentified Vista portfolio company (presumably Vista-controlled Jamf, discussed *supra*). Klausmeyer also "disclosed that he serves on the board of directors of a small private company" in which Shanley also served (presumably Ivalua) and that "KKR had exited its investment in that private company."[8] Klausmeyer also indicated that he was hand selected by the Control Group to join the Board, stating that he had met with Sjouwerman and Daly from Elephant immediately prior to joining the Board.

132. Like with Watzinger, the Committee failed to acknowledge that Klausmeyer's exorbitant KnowBe4 director compensation was the vast majority of

---

[8] Like Watzinger, Klausmeyer's belated disclosures meant that he falsified his Directors' Questionnaire, wherein he also certified that he had no relationship with Vista or KKR.

47

his income, that he had cashed in options for many millions of dollars in profit in recent months, and that he stood to receive millions of dollars from unvested options that would automatically vest in the event of a merger.  Klausmeyer, like Watzinger, waived away that conflict by stating that the options he currently held—at that time in the mid to high nine figures—"were not material to [his] . . . overall wealth."

133.  Venkataraman disclosed that he was invested in KKR and Elephant funds, which he did not discuss with the Board prior to the formation of the Special Committee.  Venkataraman also reacknowledged (i) his role as the Company's former CFO, during which time he reported to Sjouwerman and "r[a]n the due diligence and investment process" when Vista originally invested in KnowBe4, and (ii) his wife's employment with Morgan Stanley (but without revealing her tenure or seniority).  Venkataraman also admitted that the income he received from KnowBe4 for serving as its CFO was "material" to his overall wealth. Venkataraman did not advise Potter Anderson about his recent $3 million separation RSU award (which pre-dated Potter Anderson's engagement) or his total equity holdings, including that approximately $4.6 million remained unvested and would accelerate upon a change of control, such as the proposed transaction with Vista.

134. Each Special Committee member dismissed or downplayed their conflicts, and the Special Committee reaffirmed its purported independence at the

48

end of the meeting without any further investigation by the Special Committee or its counsel.

**H.      The Special Committee Engages Conflicted Morgan Stanley**

135.  At the same July 13 Special Committee meeting, the Committee determined to retain Morgan Stanley.  At the time, the Special Committee considered only the potential conflicts of interest Morgan Stanley disclosed in a July 12, 2022 memorandum (the "July 12 Memo").

136.  The July 12 Memo stated that Morgan Stanley, in the prior two years, had received: (i) $5-10 million for financing services provided to KnowBe4; (ii) $40-$65 million for financial advisory and financing services provided to Vista and its affiliates; (iii) $80-105 million for financial advisory and financing services provided to KKR and its affiliates.  The July 12 Memo also stated that Morgan Stanley: (i) served as a lender to a litany of related parties without providing the fees it had earned from such arrangements; (ii) was then-currently mandated on unspecified financial advisor and financing assignments for Vista, KKR, and their affiliates without providing any specifics; and (iii) held less than 2% of the equity in various entities affiliated with Vista and/or the Rollover Stockholders.

137.  The July 12 Memo did not disclose an additional $80 million in fees Morgan Stanley had earned from entities in which Vista held a minority stake, or

49

transactions in which Vista acquired a minority stake.  Moreover, the July 12 Memo did not disclose the following then recent or ongoing engagements:

- Morgan Stanley advising Vista on its 2021 acquisition of Ellucian Company L.P. with Blackstone Inc.

- Morgan Stanley selection as the lead underwriter for Vista's planned IPO of portfolio company iCIMS Holding LLC.  The IPO was planned for the 2021-2022 timeframe but was shelved.

- Morgan Stanley advising Vista-owned Infoblox Inc. in a 2020 transaction whereby Warburg Pincus acquired half of the company, with Vista continuing as a co-owner.

- Morgan Stanley's leadership on a debt financing transaction in 2023 involving Vista portfolio company Trintech Inc., with negotiations likely underway well before the Merger closed.

138.   Given his service as a director for Jamf, in which Vista held a 45.4% interest at that time, Klausmeyer already knew that Morgan Stanley had performed work for companies in which Vista held a substantial minority interest.  Indeed, Morgan Stanley advised Vista on its initial investment in Jamf as well as a subsequent secondary offering.

139.   The July 12 Memo also did not disclose the full extent of Morgan Stanley engagements with KKR, including Morgan Stanley's concurrent representation of:

- KKR and another entity, Global Infrastructure Partners, on their acquisition of up to half of Vodafone's 81.7% stake in Vantage Towers AG in a transaction that valued Vantage Towers at €16.2 billion.  News reports of a potential transaction arose no later than March 2022, when

50

*Reuters* reported that GIP submitted a proposal "in recent weeks[.]" The parties announced the transaction in early November 2022.

- KKR on its acquisition of Telecom Italia's ("TIM") fixed-line network in a transaction valued at €19 billion and which the parties announced in November 2023. The transaction followed a multi-year process in which KKR initially attempted to acquire TIM in its entirety in late November 2021.

- KKR on the 2024 IPO of Onestream—a majority-controlled entity identified in the memorandum. Onestream retained Morgan Stanley to lead the IPO by no later than November 2021.

140. Finally, Morgan Stanley failed to disclose that, in total, it had more than $550 million of investments in KKR and its affiliates, including an over $200 million investment directly in KKR's parent entity.

141. On July 15, 2022, the Special Committee and Morgan Stanley signed Morgan Stanley's engagement letter. The letter provided an "Announcement Fee" payable to Morgan Stanley if KnowBe4 entered into a definitive agreement for a sale of KnowBe4 or Morgan Stanley issued a fairness opinion related thereto, as well as a sliding scale "Transaction Fee" structure with a guarantee of $25 million in the event of any sale transaction, and escalating fee percentages starting at a floor price of $23 per share and rising up to a ceiling of $30 per share (with a midpoint of $26.50 per share).

142. Pursuant to this engagement letter, Morgan Stanley received $51 million in fees in connection with the Merger, 20% of which were payable on announcement and 80% of which were payable upon completion of the Merger.

51

Morgan Stanley would not have received these fees if the Company determined to pursue any strategic option other than a sale.

### I. The Special Committee Commences a Process That Allows Vista to Retain Its Existing Advantage over Other Potential Buyers

143. From the outset of the Merger process, the Special Committee and Morgan Stanley allowed Vista, the Control Group's preferred partner and Morgan Stanley's client on other concurrent matters, to get ahead of alternative bidders and succeed in its bid to take the Company private.

144. On July 14, 2024, the Committee met with representatives of Morgan Stanley and Potter Anderson to discuss "a potential strategic transaction between the Company and Vista . . . ." Confirming that the Control Group's members were set to roll over their shares in the Merger, Morgan Stanley's process discussion focused on obtaining value for "the unaffiliated stockholders of the Company that would sell their shares" in the Merger, *i.e.*, everyone but the Control Group. Potter Anderson also discussed during this meeting "certain considerations relating to the *MFW* framework under Delaware law."

145. Morgan Stanley's representatives highlighted to the Special Committee that "[KnowBe4] Would Be a Highly Strategic Asset to a Number of Parties," and also that there was "Potential Interest From Large Number of Sponsors." Morgan Stanley's materials initially identified 21 potential financial sponsors and 11 strategic buyers that could be interested in acquiring or participating in a transaction

for KnowBe4, and 12 other parties that could be interested in partnering in a transaction by providing capital.

146.   Despite the expansive field of potential buyers, the Special Committee and Morgan Stanley focused exclusively on proceeding with Vista, which representatives of Morgan Stanley said had the "advantage[]" over other potential buyers.

147.   Morgan Stanley representatives stated that the Special Committee could allow Morgan Stanley to "listen to Vista's viewpoints . . . and also provide Vista with a process update[.]" Morgan Stanley also proposed contacting Vista "*before* contacting other potentially interested parties."  Morgan Stanley said the outreach would be to "understand Vista's intentions and its pathway to a proposal for a Potential Transaction."  The Special Committee also discussed "conveying a message to Vista regarding its expectations for a proposal," even though the minutes reflect no such discussion regarding the Special Committee's "expectations."  The Special Committee also discussed Vista's Schedule 13D filing obligations as well as the potential need to update Vista's existing and still operative NDA with the Company.  The Special Committee authorized Morgan Stanley to contact Vista to discuss the Merger.

148. Later that day, representatives of Morgan Stanley met with representatives of Vista to solicit its interest in acquiring KnowBe4, focusing on the

Special Committee's desire "to understand Vista's path towards a proposal," Vista's Schedule 13D disclosure obligations, and the effect that amending Vista's NDA might have on Vista's disclosure obligations.

149.   On July 18, 2022, KKR's outside counsel at Gibson Dunn & Crutcher LLP ("Gibson Dunn") met with Potter Anderson.  During that meeting, Gibson Dunn confirmed KKR's support for a sale transaction in which KKR would retain a stake in the post-closing company.  According to minutes from a subsequent Special Committee meeting, Gibson Dunn conveyed to Potter Anderson that "KKR would primarily be a seller . . . but that . . . they would consider providing equity financing for Vista . . . ."

150.   Gibson Dunn added that the equity financing would come from a new KKR fund than the one currently invested in KnowBe4, thus allowing KKR to manufacture a liquidity event in its first Next Generation Technology Growth Fund ("NGTG I"), a seven year old fund that was firmly in the "harvest" period (and no longer eligible for further investment).  Indeed, KKR's own website explains that private equity funds typically have a 10-12 year lifespan and that investment activity typically occurs only in the first five to six years, with the concluding years devoted to exiting positions and returning capital to investors.  Accordingly, KKR was already looking for an opportunity to exit NGTG I's position in KnowBe4, in whole or in part, especially as it was actively raising funds for its third Next Generation

Technology Growth Fund ("NGTG III").  But KKR likewise wanted to retain an interest in the Company due to its tremendous potential for growth.

151.  At the same meeting, Gibson Dunn acknowledged that there may be other sponsors with whom KKR might consider participating in an acquisition, and Gibson Dunn said that Shanley wanted to advise the Special Committee on who it should contact as alternative potential buyers.  No one went back to check any potential conflicts between Morgan Stanley and KKR after this meeting.

152.  Also on July 18, 2022, representatives of Vista and Morgan Stanley met again during which Vista—in response to the Committee's request to understand "Vista's path to a proposal"—conveyed its need for six weeks of diligence before it could submit a formal proposal.  Vista's representatives also said it had already "engaged outside advisors" and "indicated that it would be sending Morgan Stanley a proposed work plan for its diligence during the six-week period."

153.  Later on July 18, 2022, the Special Committee met again to discuss the "potential strategic transaction between the Company and Vista . . . ." Representatives of Morgan Stanley reported on its discussions with Vista, including that Vista said it would need to conduct six weeks of diligence before submitting a formal proposal and that Vista was open to a potential rollover.  Morgan Stanley said it believed Vista's interest in the Merger was "serious," that Vista had already

retained outside advisors, and that Vista would be submitting a "proposed work plan" to Morgan Stanley.

154. During the meeting, Potter Anderson also relayed KKR's interest in providing equity financing for Vista (and possibly others) and explained that KKR's equity financing would come from a new KKR fund.

155. The Committee also discussed Vista's Schedule 13D disclosure obligations and the impact amending Vista's existing NDA would have on those obligations. Among other things, requiring Vista to execute an amended NDA with a standstill provision would have triggered its 13D filing obligations and, thus, alerted other potential buyers that KnowBe4 was considering a sale, ensuring a more level playing field. Conversely, allowing Vista to conduct due diligence in secret would have allowed it to extend its previously noted "advantage[]" over other potential buyers.

156. The Special Committee never considered the positive ramifications of such a disclosure, such as an increase in KnowBe4's stock price, which could have required Vista and the Rollover Stockholders to pay more, or the benefit of obtaining price discovery based on the market reaction or putting other potential buyers on equal footing. It also would have prevented Vista from getting as far out ahead of other potential bidders.

157. After discussing Vista's demand for six weeks of diligence, the Committee then discussed proposed outreach to potential counterparties. Despite its prior representation about KnowBe4 being attractive to "a number" of strategic buyers and a "Large Number" of financial sponsors—and initially identifying 6 "Tier 1" strategic buyers and 23 potential sponsors (11 of which it considered Tier 1[]" prospects, six of which it considered "Tier 1A" prospects)—Morgan Stanley "proposed an initial limited outreach to just four potential private equity counterparties." The Special Committee authorized Morgan Stanley to contact (i) Thoma Bravo, L.P. ("Thoma Bravo"), (ii) Permira Advisers LLC ("Permira"), (iii) Clearlake Capital Group, L.P. ("Clearlake"), and (iv) Blackstone Management Partners L.L.C. (Blackstone").

158. The Special Committee also discussed the status of KnowBe4's long-range financial projections. Only a few months before, Wilson Sonsini, the Company's outside counsel, reminded the full Board that the Company "maintains" long-term financial projections "for projecting future results and operating the business over the long term" and those projections would serve as "the foundation of the standalone valuation work done as part of an acquisition." But the minutes from the July 18, 2022 Special Committee meeting indicate that KnowBe4's management needed to "prepar[e]" a set of projections "for use in connection with a Potential Transaction . . . ."

159.   At the conclusion of the meeting, the Special Committee authorized representatives of Morgan Stanley to contact Shanley to discuss KKR's position on a potential transaction and "whether there were any set of circumstances where KKR envisioned itself as a potential buyer."

160.   On July 21, 2022, representatives of Morgan Stanley met with Shanley, who indicated that KKR was "not interested in being a bidder . . . and would likely only consider rolling over a portion of its equity in the Company in a [p]otential [t]ransaction involving Vista," making clear that KKR favored Vista as the Company's buyer.  Shanley noted that such a rollover would be approximately $150-$200 million from a new KKR investment fund (*i.e.*, the NGTG III).  Shanley reiterated his "interest in becoming more involved in the Committee's process and in getting more frequent updates from the Committee regarding its process."

161.   On July 24, the Committee met and discussed its desire to understand further Vista's preliminary view on a potential transaction, "including whether Vista would be able to be competitive on pricing."  The Committee also questioned Wilson Sonsini's role advising the Committee, given that Wilson Sonsini was the Control Group's longtime advisor, including with regard to KnowBe4's IPO a year earlier. The Committee determined to continue to allow Wilson Sonsini to advise the Committee on the process.

58

162.   On July 26, 2022, representatives of Potter Anderson and Wilson Sonsini met with Gibson Dunn and Elephant's outside counsel at Latham & Watkins LLP ("Latham") to discuss the Special Committee's process.   Gibson Dunn and Latham requested that Potter Anderson and Wilson Sonsini provide them with periodic updates on the Special Committee's process.

163.   Also on July 26, 2022, Vista "[p]rovided initial diligence requests and sent [a] detailed diligence plan for the next couple weeks."

164.   Also on July 26, 2022, reflecting the poor timing of the rushed sale process, Clearlake advised Morgan Stanley that it would not be proceeding at that time, but that "[p]ost Labor Day if nothing happens in your process they'd like to reconnect[.]"   Clearlake was interested in KnowBe4 but was in the closing stages of wrapping up numerous other transactions at the time, including through some of its portfolio companies.

165.   According to the Proxy, on July 27, 2022, Potter Anderson and Wilson Sonsini met with Vista's outside counsel at Kirkland & Ellis LLP ("Kirkland") to discuss "the process and timeline for Vista's exploration of a potential acquisition of KnowBe4."   Counsel discussed, among other things, "implications of NDA on [Vista's] 13D obligation[.]"

166.   The Special Committee met again on July 28, 2022 to discuss the "potential strategic transaction between the Company and Vista . . . ."   At the

59

meeting, representatives of Morgan Stanley made clear that Vista's approach came at an opportunistic time and a nadir in the Company's stock price:



Morgan Stanley's materials also highlighted that KnowBe4 (i) was "currently trading at a discount on a growth-adjusted and growth plus profitability-adjusted basis" and (ii) "consistently beat[] and rais[ed] consensus estimates and demonstrat[ed] reacceleration since going public."

167.   After representatives of Morgan Stanley outlined Vista's proposed transaction timeline, the Committee discussed how it "may signal to Vista its view

on pricing without prematurely triggering any Schedule 13D disclosure obligations for Vista," again reflecting the Special Committee's willingness to cater to Vista's desire to forge ahead in secret.

168.   Underscoring KKR's and Elephant's control over KnowBe4, the Committee also discussed how it could solicit the views of KKR and Elephant "regarding potential pricing[.]"  The Committee also thought it should keep KKR and Elephant apprised of the process—because, as the Proxy stated, they were "the two largest stockholders of KnowBe4 who collectively owned a majority of the voting power of the Company"—and authorized Potter Anderson to provide biweekly updates to Gibson Dunn and Latham.

169.   At the meeting, representatives of Morgan Stanley provided an update on its limited outreach.  Blackstone and Permira had requested to sign NDAs.  While the Committee and its advisors had yet to even start preparing a form NDA for Blackstone and Permira, Vista's NDA amendment was "[a]waiting finalized view from [Kirkland] before executing[.]"  The Committee discussed reaching out to CrowdStrike—a well-positioned strategic buyer—and noted that Watzinger served as Chairman of that company.  Rather than reaching out to CrowdStrike and requiring Watzinger to recuse himself, the Committee determined not to contact that potential acquirer.

170.   Representatives of Morgan Stanley also provided the Committee with Vista's highly detailed six-week diligence timeline, which was slated to conclude at the end of August.  At the time of the meeting, Vista had already provided initial diligence requests and requested to "schedule initial Accounting & Tax and Legal calls[.]"

171.   At the meeting, the Special Committee also authorized outreach to certain additional financial sponsors, all of which would have been operating at a severe disadvantage versus Vista given their delayed involvement in the process and the fact that Vista had already lined up co-investors in the Rollover Stockholders.

172.   Compounding the disadvantage that other buyers faced, Morgan Stanley also confirmed to the Committee in its presentation materials that KKR was interested in a rollover transaction with only a "very select set of partners," thus further diminishing the chance that any of KKR's disfavored buyers might have had.

173.   On July 29, 2022, the Committee met to discuss an upcoming meeting with Sjouwerman to solicit his views on a potential transaction.  The Committee determined to fully update Sjouwerman on the ongoing Committee process, reviewing with him the financial sponsors and strategic buyers that Morgan Stanley had identified as possible acquirers and discussing with him the transaction timeline.

**J.      As KnowBe4 Announces Record Second Quarter Financial Results, the Special Committee Continues Full-Speed Ahead to Pursue a Sale to Vista**

174.    On August 4, 2022, KnowBe4 announced its second quarter results, which built even further on the Company's successes.  In the earnings release, Sjouwerman boasted, "we are continuing on our high-growth trajectory."  During the earnings conference call, Sjouwerman started his presentation by touting the "second quarter results exceeding our guidance," with over 36% year-over-year annual recurring revenue ("ARR") growth and a strong 23.7% free cash flow margin. Sjouwerman also reemphasized the "greenfield" nature of the market, adding that the international market is an "even larger greenfield" with a total addressable market of "6x to 7x larger than U.S. domestic."  In conjunction with its earnings release, KnowBe4 also announced the launch of KnowBe4 Ventures, a fund that would "make early stage investments in organizations that are committed to integrating with [the Company's] platform and bringing innovation to [its] customer base."  KnowBe4's stock price jumped over 17% in the days following its earnings announcement.

175.    Also on August 4, 2022, the Special Committee met again to discuss a sale of the KnowBe4 to Vista.  Representatives of Potter Anderson and Wilson Sonsini reported on a recent discussion with Vista regarding "certain methods for conveying the Committee's pricing expectations for any potential bid from Vista

63

without triggering Vista's 13D disclosure obligations," and "whether there would be an appropriate time period during Vista's due diligence to convey the Committee's pricing expectations."

176.   During the meeting, Wilson Sonsini, which was leading negotiations with Vista at that time, conveyed Kirkland's views that entering into a new or amended NDA would not trigger Vista's 13D obligations, and that Vista preferred to amend its existing NDA.   As noted, however, requiring Vista to enter into a standstill agreement would have triggered Vista's disclosure obligations.   Wilson Sonsini also conveyed Kirkland's statement "if the Committee desired to enter into pricing discussions, Vista expected that such discussions would occur over a short time period."

177.   At the meeting, the Special Committee determined to amend Vista's NDA "promptly" so that it could provide diligence to Vista.   This reflects the Committee's specific determination to allow Vista to maintain its head start over other bidders.

178.   The Committee also instructed Potter Anderson and Wilson Sonsini "to convey that the Committee was not willing to commit *at the outset* to having pricing discussions over a short time period."   However, as demonstrated by later events, the Special Committee not only preemptively conveyed its pricing views to Vista—

before Vista even submitted any take-private proposal—but it was also willing to (and did) negotiate price over a truncated period.

179. The Committee discussed its upcoming meeting with KKR's Shanley and Elephant's Daly to update them on the strategic review process, including "an overview of the expected timeline for a Potential Transaction and the scope of parties that Morgan Stanley had contacted for a Potential Transaction," because—as the Committee acknowledged—"KKR and Elephant . . . controlled a majority of the Company's voting power and, therefore, the Company would not be able to consummate a Potential Transaction without their consent."

180. At the meeting, representatives of Morgan Stanley discussed its outreach to date, and the Special Committee authorized Morgan Stanley to contact four additional "Tier 1B" sponsors that had still not been contacted. According to Morgan Stanley's materials for that meeting, Morgan Stanley had reached out to six of twelve potential financial sponsors, excluding Vista—the Committee still had not contacted two parties from "Tier 1A." Four of those six bidders requested NDAs: Thoma Bravo, Permira, Blackstone, and Bain Capital. However, despite the passage of time, the Special Committee and Morgan Stanley appear to have made no progress in putting together form NDAs for any of the non-Vista counterparties. According to its materials, Morgan Stanley had not yet reached out to any of the 11 strategic bidders it had initially identified in mid-July.

65

181. In addition, while Vista would eventually receive access to the full virtual data room and the Company's Management Plan, Morgan Stanley indicated that the management presentations to all "Non-Violet Parties" would be limited to "IPO roadshow / public investor presentations" which were created before KnowBe4's streak of beating its own guidance when management was less optimistic about its prospects.

182. In its accompanying presentation materials, Morgan Stanley conceded that KnowBe4 still did not yet have any projections to assist the Special Committee in evaluating the Merger.

183. The following day, on August 5, 2022, the Special Committee and Morgan Stanley met with Shanley and Daly to update them on the Special Committee's process and expected timeline for such process.

184. Also on August 5, 2022, KnowBe4's Sjouwerman-led management provided the Special Committee with its newly created long-range projections (the "Management Plan"), which the Committee continued to discuss and review with management informally (*i.e.*, not in connection with a recorded meeting). Those plans only projected out to three years. On August 8, 2022, the Special Committee, and subsequently the full Board (including conflicted directors Sjouwerman, Daly, and Shanley, but excluding Venkataraman and Wilson, who were absent), approved the Management Plan.

185.   The Management Plan understated the Company's long-term growth prospects, including by omitting publicly touted growth avenues.  The incomplete Management Plan excluded projections for the soon-to-be released SecurityCoach, which Sjouwerman publicly described as "one of the most impactful products that [the Company] ha[d] ever introduced."  The Management Plan also assumed minimal growth from KnowBe4's international business even though Sjouwerman had recently estimated that the international market was "6x to 7x larger" than the domestic market.  The Management Plan also assumed zero revenue from the KnowBe4's venture capital arm, KnowBe4 Ventures.

186.   On August 8, 2022, Vista and KnowBe4 entered into an amended NDA allowing Vista to move forward with its due diligence.  The amended NDA revised the original NDA's definition of "Confidential Information" to preclude disclosure of the fact that the Company was in discussions concerning a potential transaction.  But as with the original NDA, the amended NDA did not include any "standstill" provision restricting Vista's ability to increase its KnowBe4 holdings, make a public proposal to acquire the Company, or otherwise engage in hostile behavior.

187.   On August 11, 2022 the Special Committee met to discuss a sale of the Company to Vista.  Representatives of Morgan Stanley advised the Committee that "Vista was fully engaged in due diligence on the Company[,]" while Morgan Stanley and Company management had just begun to schedule management meetings with

67

potential financial sponsors over the next two weeks and had contacted no strategic bidders.

188.   On August 17, 2022, the Special Committee met again to discuss a sale of the Company to Vista.  Recognizing that Vista started off with the "advantage[]" and since then had gotten so far ahead of other potential bidders, the Committee discussed whether to "pause Vista's due diligence to permit other potential bidders to catch up."  Morgan Stanley advocated against pausing the process, suggesting that other potential counterparties would eventually learn about the impending Merger and could decide then if they wanted to aggressively catch up and make a late bid for the Company.  However, by that time it would be too late for any other potential bidder to catch up to Vista.  The Committee agreed to let the process move forward unabated.

**K.    The Special Committee Reverses Course and Decides to Reveal Its Pricing Views to Vista (and No Other Bidder) Before Vista Even Submits Its Initial Proposal**

189.   On August 19, 2022, the Committee met again to discuss a sale of the Company to Vista.  Morgan Stanley provided an update on its outreach and financial analysis, including upcoming management meetings and the status of Vista's due diligence.

190.   Morgan Stanley's outreach summary highlighted Vista's lead on the pack.  Morgan Stanley's presentation disclosed that several other potential buyers

had executed NDAs, which, unlike with Vista, all contained standstill provisions. Moreover, as of August 19, Vista was the only bidder to have received a data pack and proceed to due diligence.  Unlike other bidders, Vista proceeded immediately into its intensive due diligence process, skipping the management presentation meeting that, for other bidders, was a condition precedent to proceeding to due diligence.  At that point, despite identifying 11 potential strategic bidders that could be interested in acquiring KnowBe4, Morgan Stanley had only reached out to four (Amazon, Microsoft, Google and, Cisco), connected with two, and had signed an NDA with none.

191.  In contrast to its alacrity in facilitating diligence for Vista, Morgan Stanley continued to slow-play the initial management meetings with other buyers. Only four bidders had held management meetings as of August 19; two more were scheduled for the following week; and meetings for two additional potential interested parties had yet to be scheduled.

192.  Exacerbating the Special Committee's refusal to allow other bidders to catch up to Vista, Morgan Stanley's process timeline for *all* bidders contemplated (i) for diligence sessions to continue through August 30, (ii) an initial bid date of August 31, (iii) confirmatory diligence and transaction negotiations for September 1-9, and (iv) an estimated deal signing by September 12.  No bidder other than Vista

could have proceeded on that timeline. Indeed, none of those alternative bidders had even commenced due diligence as of August 19.

193. Morgan Stanley's analyses underscored the immense value of the Company. Using extrapolated projections (through 2032) prepared by Morgan Stanley, which simply perpetuated the incomplete Management Plan, Morgan Stanley calculated share price sensitivities ranging from $16.36 to $73.83 per KnowBe4 share (with a mid-point of over $45 per share price) and revenue and FCF sensitivities ranging from $14.74 to $41.21 per share (with a mid-point of almost $28 per share). These all compared favorably to KnowBe4's then-current $20.21 trading price and the Merger's $24.90 per share consideration despite the material omissions from the Management Plan.

194. Even without extrapolations, Morgan Stanley's analyses yielded high valuations for the Company. Morgan Stanley calculated discounted share prices based on 2025 estimated revenue ranging from $16.20 to $34.54 using consensus expectations (with a mid-point of $25.37) and $19.35 to $41.75 under the Management Projections (with a mid-point of $30.55). Using 2025 estimated leveraged free cash flow, Morgan Stanley calculated discounted share prices ranging from $25.13 to $37.64 (with a mid-point of over $31 per share). Again, these figures compared favorably to the Company's then-current trading price and the Merger consideration.

195. After representatives of Morgan Stanley presented its valuation analysis, the Committee determined that "mid-to-high $20s" was "the right zone" for a potential transaction and "that it did not make sense to proceed with Vista unless it shared a similar view to the Committee on valuation."

196. Morgan Stanley's materials make clear that when the Special Committee conveyed a message of "mid-to-upper $20s," it meant a proposal of at least $25.00 per share with anything below that "[n]ot [being in] the right zone for a transaction" and that $25 to $26 was at the "[l]ow end of guidance" and will "need some work" (*i.e.*, need to be increased):

Morgan Stanley

### 3 Illustrative Response Framework For Potential Offer Prices

| Price | Premium / (Discount) To | | | Fully Diluted EV ($Bn) | Agg. Value ($Bn) | Street Case | | Illustrative Response Per Prior Special Committee Direction |
| | Current | 30 D Avg | 52 Wk. High | | | AV / Revenue CY2023E | P / FCF CY2023E | |
| Metric | $19.41 | $19.37 | $27.40 | $3.6 | $3.3 | $415 | $105 | |
| Growth Rate / Margin | | | | | | 25% | 25% | |
| $19.41 | 0% | 0% | (29%) | $3.6 | $3.3 | 7.9x | 34.3x | |
| $23.00 | 18% | 19% | (16%) | $4.3 | $3.9 | 9.5x | 40.7x | |
| | | | | | | | | Not the right zone for a transaction. Unless you can see your way into the mid-to upper $20s, then it's not worth sending in a letter |
| $24.00 | 24% | 24% | (12%) | $4.5 | $4.1 | 10.0x | 42.5x | |
| $25.00 | 29% | 29% | (9%) | $4.6 | $4.3 | 10.4x | 44.3x | |
| | | | | | | | | Low end of guidance.  Think it will need some work.  It's clear and specific, so we'll take it to the Committee |
| $26.00 | 34% | 34% | (5%) | $4.8 | $4.5 | 10.9x | 46.0x | |
| $27.00 | 39% | 39% | (1%) | $5.0 | $4.7 | 11.3x | 47.8x | It's clear and specific, so we'll take it to the Committee |

197.   The Committee again "reviewed how to message the Committee's views on valuation in light of Vista's Schedule 13D disclosure obligations[.]"

198.   The Committee authorized representatives of Morgan Stanley to convey the Committee's views on valuation to Vista.  With respect to other bidders (who had yet to commence formal due diligence), Morgan Stanley requested—and the Committee authorized—that representatives of Morgan Stanley deliver such valuation messaging "at the appropriate time in such bidder's evaluation of a [p]otential [t]ransaction[.]"   Ignoring that Vista had been fast-tracked by the Committee to the detriment of a full market check and engagement with a full range of potential bidders, the Proxy states that "no other potential bidder received the Special Committee's view and message on valuation at this time" because "no other potential bidder had shown the level of engagement that Vista had shown at this time."

199.   The Committee's decision to preemptively convey its view on the appropriate Merger consideration—and effectively open price negotiations with Vista—unreasonably set a ceiling on the final price negotiations.  The purported basis for allowing Vista (or any other bidder) to conduct diligence was so that *Vista* (or any other bidder) could submit an initial proposal to the Committee.  The Committee's decision to convey its views on valuation upended that entire process.  The end result was a win-win-win for Vista.  Armed with diligence, Vista could

validate its views on a potential transaction (including its valuation of the Company), learn at the outset of negotiations the range at which the Committee would agree to a deal, and conduct price negotiations without fear of having to amend its Schedule 13D and run the risk of a potential run-up in KnowBe4's stock price that could, among other things, force Vista to pay more in a potential transaction (including through a bidding war).

200. The Special Committee's decision to share its pricing views with Vista also conflicts with the Committee's apparent prior reluctance to commit to an expedited price negotiations period. Revealing its hand to Vista weeks before Vista was to submit its initial proposal made no sense if the goal was to maximize Merger consideration.

201. The Special Committee was singularly focused on a transaction with Vista and did not share its pricing views with any other bidders at any point in the transaction process.

202. According to the Proxy, Morgan Stanley conveyed the Committee's valuation views to Vista on August 19, 2022. So as to avoid triggering any Schedule 13D disclosure obligations in advance of Vista completing its due diligence, the Proxy claims that "Vista did not respond to the view and message on valuation delivered by Morgan Stanley on behalf of the Special Committee and noted that they

73

would need to continue to conduct diligence to determine if they were interested in pursuing an acquisition of KnowBe4."

203. On August 26, 2022, representatives of Vista informed representatives of Morgan Stanley that it was comfortable engaging in further due diligence, thus indicating alignment on the Special Committee's pricing views.

204. Also on August 26, 2022, the Special Committee met again to further discuss a sale of the Company to Vista. During the meeting, Morgan Stanley updated the Special Committee on its calls with Vista regarding the Committee's pricing views, including that Vista was aware of the Committee's views and that Vista was comfortable moving ahead with due diligence on that basis.

205. Morgan Stanley's presentation also laid bare its extensive dealings with and commitment to facilitating Vista's progress and its comparatively minimal interest in exploring a transaction with any other potential buyers.

206. Vista remained well ahead of other bidders, which Morgan Stanley and the Committee helped perpetuate. As reflected in Morgan Stanley's process calendar, Vista had already coordinated with Morgan Stanley to conduct seven due diligence meetings: (i) August 12 – accounting/financial due diligence; (ii) August 15 – tax due diligence; (iii) August 17 – legal due diligence; (iv) August 22 – "P&T Review"; (v) August 23 – "GTM" due diligence; (vi) August 24 – "Cyber" due diligence; and (vii) August 26 – marketing due diligence. Of course, this was in

addition to the multiple meetings held with Daly, Shanley, Sjouwerman, and Venkataraman predating Vista's initial outreach in May of 2022. Morgan Stanley was in the process of confirming an eighth meeting with Vista on August 29 to discuss model due diligence. By contrast, Morgan Stanley held a single due diligence meeting with another bidder (Advent International, on August 23), and only one other bidder (Hellman & Friedman) had been given the green light to begin due diligence.

207. Morgan Stanley asserted in its presentation that it was "[f]ocused on responding to high priority diligence request[s] for [Vista.]" Morgan Stanley made no such commitment to assisting with other bidders' due diligence requests.

208. Morgan Stanley was also focused on opening the virtual data room to Vista, which had "requested access to [it] when ready[.]" The Special Committee discussed whether Vista should get early access to the virtual data room, allowing it to extend its lead over the other bidders. The Committee and Morgan Stanley ultimately decided to give Vista access to the data room as soon as it was ready but made no effort to facilitate virtual data room access for any other potential buyers.

209. Morgan Stanley's presentation contemplated that Vista would submit a formal acquisition proposal by September 9, 2022 and in the interim that Morgan Stanley would "[c]ontinue to respond to [Vista] diligence requests." For other parties, however, Morgan Stanley opted against setting a formal first round bid

deadline.  This approach favored Vista, which diligence was nearly complete, and which had already been given price guidance from the Committee.

210.  Morgan Stanley's August 26 presentation to the Special Committee reflected its singular focus on a sale of the Company, which would have yielded a substantial announcement and transaction fee, versus other strategic alternatives, where no fee would have been paid.  Morgan Stanley received no fee for its role advising the Board in connection with Elephant's and KKR's pre-IPO sale of shares to Vista, and it did not want to lose out on tens of millions of dollars in advisory fees a second time.  Specifically, Morgan Stanley reported to the Committee during the August 26 meeting that Sjouwerman "had recently held a meeting with a pension fund with a history of investing in large private equity sponsor companies."  Morgan Stanley's representatives conceded that "it was not clear" whether the pension fund was interested in a "normal course" minority investment, or whether it wanted to participate in an acquisition of KnowBe4.  Nevertheless, Morgan Stanley completely disregarded the former possibility.

211.  Morgan Stanley also downplayed the pension's prospects of acquiring the Company on the purported basis that it "did not usually serve as the lead investor on a potential transaction, but rather served as an equity co-investor in a transaction led by a private equity sponsor."  Representatives of Morgan Stanley recommended that the Committee keep the pension at bay, with the possibility of reaching back to

use the pension "as a potential source of financing for a number of potential bidders."

Thus, rather than inquiring whether the pension fund could serve as a competitor to Vista in the transaction process, Morgan Stanley recommended that the Committee only permit the pension fund to work alongside Vista.

212. At the meeting, Morgan Stanley suggested updating Daly, Shanley, Sjouwerman, and the rest of the Board on the Committee's valuation views, Morgan Stanley's financial analyses, and Vista's plans to submit a proposal. Morgan Stanley also reviewed its messaging to Vista regarding the Control Group rolling over its shares in Vista's acquisition of KnowBe4—there is no indication that Morgan Stanley ever talked to any other bidders about a potential rollover by the Control Group.

213. According to the Proxy, on August 30, 2022, the Special Committee directed KnowBe4 to provide Vista with exclusive access to the Company's virtual data room. The Committee did not offer any other potential bidder access to the virtual data room at any point in the transaction process.

214. On September 1, 2022, KnowBe4 management approved Morgan Stanley's extrapolations to the financial projections—which perpetuated the underbaked Management Plan—and Vista conducted its model due diligence meeting.

215. On September 2, 2022, the Special Committee met again to discuss a sale of the Company to Vista. Morgan Stanley reported that "Vista had engaged an array of advisors to assist it" and "expected to have completed the vast majority of its typical diligence by September 9, 2022." KnowBe4 management agreed to meet Vista the following business day, September 6 (after the Labor Day holiday), and management had various other meetings with Vista planned for the following week.

216. In contrast, Morgan Stanley had made little to no progress with other bidders. Hellman & Friedman submitted diligence requests on August 29 and Permira had a management meeting on August 31. Thoma Bravo was in the process of scheduling a meeting with management for September 7. Morgan Stanley's calendar reflected no other scheduled or to-be-scheduled meetings or discussions with alternative bidders.

217. Despite Clearlake's prior request to be contacted again in early September if no deal were had by then, the Special Committee and Morgan Stanley failed to do so.

218. Since Vista anticipated submitting a public proposal the following week, the Committee "analyzed whether the Committee should seek to expedite the work to be performed by the non-Vista potential bidders in light of the anticipated receipt of a public Vista proposal." Once again, the Special Committee favored

Vista by deciding against informing the other potential buyers of any timing considerations, effectively preventing the others from catching up to Vista.

219. The Committee again discussed Vista's preferred timeline, which required only "three weeks from the delivery of a public proposal to reach a definitive agreement with respect to a Potential Transaction." This prompted the Special Committee to request that KnowBe4's outside counsel, Wilson Sonsini, begin drafting a merger agreement—before it even received a formal proposal from Vista, let alone, additional bidders.

220. The Committee also determined to disclose its views on valuation to KKR and Elephant prior to receiving Vista's proposal, and for Potter Anderson and Wilson Sonsini to meet with KKR's and Elephant's legal advisors.

**L.   The Special Committee and Morgan Stanley Continue to Facilitate Vista's Pre-Offer Diligence While Also Complying with Vista's Request to Confirm the Control Group's Rollover Intentions**

221. On September 6, 2020, Vista met with KnowBe4 management as part of their ongoing due diligence sessions.

222. On September 7, 2022, Vista conducted three additional due diligence meetings with KnowBe4 management, including with respect to modeling, annual recurring revenue ("ARR"), and go-to market ("GTM") strategies.

223. Also on September 7, 2022, Morgan Stanley met with Vista. Vista requested that Morgan Stanley solicit KKR and Elephant's views on the amount they wanted roll over into the post-close company.

224. The Special Committee met on September 8, 2022. By that time, Vista completed a total of thirteen due diligence meetings "across [a] broad range of . . . items," and had been provided a "[b]road range of VDR documentation[.]" Morgan Stanley acknowledged that there were two potential alternative bidders remaining (from the limited group to which it chose to reach out) who "owned strategic competitors of the Company and thus made sense as potential counterparties" but nonetheless recommended, consistent with its prior advice and the Committee's prior determinations, "that the Committee not attempt to expedite the other potential bidders' evaluation of a [p]otential [t]ransaction" under the pretense that those bidders "would be able to review Vista's proposal" once public "and determine whether they wanted to compete on pricing . . . ."

225. At that meeting, the Committee also inexplicably agreed to not include a go-shop in any future merger agreement with Vista, given the supposedly "active pre-signing market check" which was anything but, "and the anticipated passive pre-signing market check between the submission of a Vista proposal and the execution of any definitive agreement for a potential acquisition, if any."

80

226.   At the meeting, Morgan Stanley "provided an update on Vista's process that was expected to lead to a proposal on a [p]otential [t]ransaction."   Morgan Stanley noted its conversation the prior day with Vista and advised the Committee to comply with Vista's request to inquire about KKR's and Elephant's rollover intentions.   Morgan Stanley also discussed ascertaining Sjouwerman's rollover plans.

227.   After acknowledging that the disclosure of this information "may impact the pricing for the transaction" (*i.e.*, the Merger consideration), Morgan Stanley informed the Committee of its belief that "Vista needed to know, generally, an approximate value for the combined potential rollovers in connection with submitting its proposal."

228.   The Committee also discussed that Sjouwerman and Vista were scheduled to meet the following day about a potential transaction and presumably Sjouwerman's potential rollover investment.

229.   Morgan Stanley also informed the Committee that it was updating its financial analyses to reflect the final extrapolations it applied to the Company's three-year financial projections.   Morgan Stanley advised that the extrapolations were in part based on feedback from potential buyers who passed purportedly because "they had difficulty understanding Company management's views on the Company's total addressable market over the long term and such extrapolated

81

projections provided a better view of Company management's beliefs."  Despite Morgan Stanley's ostensible reasons for extrapolating the Management Plan, it did not actually provide any prospective buyers *other* than Vista with any projections for KnowBe4, including the Management Plan and Morgan Stanley's extrapolations.

230.  On September 9, 2022, Morgan Stanley met with Vista to discuss Vista's due diligence progress, the timing of next steps, and Vista's upcoming meeting with KnowBe4 management.

231.  On or around September 9, 2022, Vista met with KnowBe4 management, including Sjouwerman.  At or around this time, Sjouwerman likely indicated that he intended to roll over half of his KnowBe4 shares into the post-close entity.

232.  On September 13, 2022, Morgan Stanley met with KKR and Elephant to discuss their respective rollover percentages in a potential transaction.  Elephant suggested that it would sell 20 million of its KnowBe4 shares in exchange for the Merger consideration and roll over the rest (*i.e.*, nearly 50% of its stake worth $427 million).  KKR said it would sell all the shares owned by its NGTG I fund and reinvest $200 million in the post-close entity through its NGTG III fund.  Thus, KKR would essentially rollover 31% of its KnowBe4 stake.  At that time, Sjouwerman contemplated rolling over 50% of his stake.

233.    Later that day, Morgan Stanley conveyed to Vista the magnitude of KKR's and Elephant's planned rollover, which Morgan Stanley calculated in aggregate at around $695 million using a $25 price for KnowBe4 (despite not having yet received Vista's offer).

234.    On September 15, 2022, the Special Committee met.  The Special Committee and Morgan Stanley discussed potential responses to Vista's forthcoming proposal.  The Committee and Morgan Stanley agreed that anything below $25 per share was "[n]ot the right zone for a transaction," and "[u]nless [Vista] can see your way into the mid-to upper $20s, then it's not worth sending in a letter[.]" $25 to $26.99 was at the "[l]ow end of guidance" and "will need some work," but Morgan Stanley would "take it to the Committee."

235.    During the meeting, Morgan Stanley advised that—although there were 15 "Tier 2" potential bidders Morgan Stanley had not contacted about a transaction—the Committee should nonetheless conclude its market outreach because the most likely bidders had purportedly already been contacted.  Morgan Stanley again justified its refusal to conduct additional outreach on the basis that these parties could contact the Company directly once Vista's proposal became public.  Following a question from Potter Anderson, Morgan Stanley acknowledged that certain bidders had not officially passed on a potential transaction, and thus, remained viable options, to which Morgan Stanley responded that it would reach out

83

to those parties following Vista's submission.  This followed the common pattern of decisions guaranteeing that Vista stayed well-ahead of all other potential bidders. Morgan Stanley was (and had been) free to contact those bidders all along but chose not to.

236.   Morgan Stanley also updated the Committee on KKR and Elephant's expected rollover investments, and Morgan Stanley's subsequent conversation with Vista regarding the same.  In addition to conveying Elephant's, KKR's, and Sjouwerman's intended rollover positions (reflected below in the "Mid" scenario) to the Committee, Morgan Stanley also modeled "Low" and "High" rollover scenarios, assuming a floor deal price of $25 per share:

Morgan Stanley

## Illustrative Equity Rollover Impact on Equity Check Required by Sponsor

Illustrative Low, Mid and High Equity Rollover Assumptions [1][2]

Emerald sells 20M and rolls rest, 100% sell and $200M investment from Khaki, 50% roll from Lars, Stu, 100% roll from Violet

ILLUSTRATIVE EXAMPLES ONLY

| | | | Low | | Mid [3] | | High [3] | |
|---|---|---|---|---|---|---|---|---|
| Investor | Shares | Value at $25.00 | Percent Rolled | Amount Rolled | Percent Rolled | Amount Rolled | Percent Rolled | Amount Rolled |
| Emerald | 37,070 | $927 | 0% | $0 | 46% | $427 | 100% | $927 |
| Khaki | 26,116 | $653 | 0% | $0 | 31% | $200 | 100% | $653 |
| Stu | 4,638 | $116 | 50% | $58 | 50% | $58 | 100% | $116 |
| Lars | 836 | $21 | 0% | $0 | 50% | $10 | 100% | $21 |
| Subtotal | 68,660 | $1,717 | 3% | $58 | 40% | $695 | 100% | $1,717 |
| Subtotal Rolled as % Total FD Equity | | | 1% | | 15% | | 37% | |
| Violet | 16,433 | $411 | 100% | $411 | 100% | $411 | 100% | $411 |
| Total | 85,093 | $2,127 | 22% | $469 | 52% | $1,106 | 100% | $2,127 |
| Rolled as % Total FD Equity | | | 10% | | 24% | | 46% | |

Notes
1. In calculating the amount of value that can be rolled over by each individual investor we are only including vested RSUs for Stu and Lars
2. Market Data from CapitalIQ and Estimates from Thomson as of 9/12/22
3. Mid case: Khaki potentially selling 100% of their shares but investing $200MM from a different fund, 31% effective roll; High case: Khaki potentially selling 100% of their shares and reinvesting full value of $653 from a different fund, 100% effective roll

237.   Morgan Stanley also emphasized that the price Vista would pay in any transaction could affect the amount of equity Vista asked investors to roll over.

Morgan Stanley noted that, "if pricing for a Potential Transaction exceeded Vista's expectations on the maximum amount of equity funds that it could commit towards a Potential Transaction, the Committee could consider asking certain stockholders of the Company to consider rolling a greater portion of their equity into the pro forma entity[.]"

238. Morgan Stanley also presented certain financial analyses, including a discounted equity value analysis based on the Management Plan that implied a per share price range between $25.09 and $33.42 (with a midpoint of $29.25), further supporting that the $24.90 per share Merger price was unfair. Morgan Stanley also analyzed "Precedent Transaction Premia" to KnowBe4's unaffected spot price and 30-day trading average, both of which implied a midpoint above $26.

239. The Special Committee then discussed the potential majority-of-the-minority vote in connection with the Merger. It was noted that Chief Hacking Officer and former director Mitnick "controlled a significant percentage" of KnowBe'4 so-called "unaffiliated voting power" (*i.e.*, excluding Vista and the Control Group) and considered whether Mitnick would be supportive of a transaction. According to Morgan Stanley, Mitnick controlled 24.7% of the total voting power of KnowBe4's "unaffiliated" shares. Collectively, Mitnick and the Special Committee members controlled 39% of the "unaffiliated vote." KKR's Kara

Wilson owned an additional 3.3% of the purported "unaffiliated" voting power. The Proxy makes no mention of this discussion.

**M. Vista Proposes to Buy KnowBe4 for $24 Per Share, Well Below the Mutually Understood Mid-to-Upper $20s Pricing Guidance and Below the Special Committee's $25 Price Floor**

240. According to the Proxy, on September 16, 2022, Vista offered to acquire KnowBe4 for $24 per share and indicated that it "was open to certain of KnowBe4's significant stockholders rolling over a portion of their current investment" and if so, "Vista would expect the transaction to be expressly conditioned on the *MFW* framework." According to the Proxy, Morgan Stanley informed Vista that its offer fell below the pricing guidance it previously conveyed to Vista. Vista told Morgan Stanley that Vista "would not be able to move significantly" from its initial offer.

241. On September 17, 2022, Vista provided Morgan Stanley with a list of debt and equity financing sources and requested the Committee's approval to contact Elephant, KKR, and Sjouwerman regarding their rollover.

242. The Special Committee met that day to discuss Vista's offer, which it rejected as too low, countering at $26.50 per share.

243. This was an unreasonable opening counter in a single-bidder negotiation. According to the Special Committee's own pricing guidance, the $26.50 per share counteroffer was at the "low end" of that guidance. Indeed, the

Special Committee previously determined that an offer of $26.50 would "need some work" (*i.e.*, need to be increased).

244.   At the meeting, the Committee considered whether it would be possible to satisfy Vista's rushed three-week timeline between the announcement of the proposal to the execution of a definitive transaction document, which Morgan Stanley acknowledged would be possible "given the amount of due diligence work performed by Vista in advance of delivering its proposal[.]"   Once the parties came to an agreement on price, the only thing left for Vista to arrange was debt financing.

245.   The Committee discussed the due diligence requests received from KKR in connection with its rollover plans.  The Committee agreed to provide KKR the same due diligence materials that it gave to Vista—which was more than any other alternative bidder had been able to obtain.

246.   Committee member Venkataraman then reported that he had received an "in-bound communication from a current stockholder of the Company who had expressed an interest in acquiring a larger stake in the Company."  Just like the public pension that made an unsolicited approach to Sjouwerman the prior month, the Special Committee did not engage in any further discussions with the then-current stockholder, including engaging in any price discovery that would have provided the Committee with additional perspectives on what the Company was worth to existing

87

investors, or financing proposals that might have provided a preferable strategic alternative.

247. The Committee determined to seek the Rollover Stockholders' feedback on Vista's proposal and noted that Elephant's Daly requested to speak with Vista to discuss a potential rollover investment outside the purview of the Special Committee or its advisors. Following discussion, the Committee authorized Morgan Stanley to contact each of Sjouwerman, Daly, and Shanley regarding Vista's proposal and the Committee's discussions with Vista. Klausmeyer indicated he would call KKR's Wilson to advise her of the same.

248. The Committee also bizarrely discussed raising "the concept of a retention bonus pool for certain member of Company management and the timing for raising such concept with Vista." A retention bonus pool for conflicted management was completely counter to the interests of minority stockholders, who would be cashed out in any transaction with Vista and thus would not benefit from any retention of management at the post-closing company. Indeed, that bonus pool would conceivably divert consideration from minority stockholders to conflicted management in any Merger.

249. The Committee revisited Mitnick's impact on the majority-of-the-minority vote and determined that conflicted Sjouwerman and a member of the

88

Committee should meet with Mitnick. Committee member Watzinger agreed to participate in such a discussion.

250. Also on September 17, 2022, Morgan Stanley updated Sjouwerman, Daly, and Shanley, and delivered the Committee's counterproposal to Vista and its request that Vista limit its list of equity financing sources. The Committee also provided its list of approved debt financing sources to Morgan Stanley for transmission to Vista.

251. The Committee met again on September 18, 2022, when it discussed Morgan Stanley's conversation with KKR the previous day. KKR, understanding that the Committee would likely approve a merger that significantly undervalued KnowBe4, told Morgan Stanley that it needed to conduct "additional due diligence on the Company and construct a valuation model before KKR would be in a position to make a [final] decision on a potential equity co-investment with Vista." The Special Committee also discussed Vista's reiterated request to speak with KKR and Elephant about the potential transaction and determined that Vista could speak with KKR and Elephant if accompanied by conflicted Morgan Stanley. Finally, Morgan Stanley informed the Special Committee that Daly and Shanley "expressed an interest in maintaining their respective Board seats if Vista acquired the Company."

252. On September 19, 2022, and after months of diligence and conducting extensive price negotiations, Vista finally amended its Schedule 13D to publicly

89

disclose its initial proposal.  In that filing, Vista stated, "we have been investors in the Company since early 2021 and . . . have a deep understanding . . . of the Company's business."  Vista also admitted the extensive backchanneling it had with Morgan Stanley and the Committee, stating that its proposal was informed by "exploratory discussions about valuation with the [Special Committee] and its advisors about the possibility of a potential transaction."  Vista added that its offer was "supplemented by our deep knowledge of the business over the last 18 months of us being meaningful investors in the Company."  Both hastening the Special Committee and forewarning other potential buyers, Vista added: "We are prepared to move expeditiously to reach a definitive agreement . . . ."  This was a clear signal that Vista was far ahead and that any other suitor should abandon any work they were performing on a proposal.

253.   On September 28, 2022, the Committee met to discuss the draft merger agreement and other outstanding aspects of the transaction negotiations.  Conflicted Wilson Sonsini—the Company's counsel—led the discussions on that agreement as it was leading the drafting process.

254.   For the first time, the Committee acknowledged KnowBe4's Charter's Equal Treatment Provision.  Because the Merger would qualify as a change of control transaction involving disparate treatment of KnowBe4's different classes of stock—*i.e.*, public stockholders receiving $24.90 per share in cash, while Class B

insiders roll over substantial portions of their equity—the Equal Treatment Provision required the Company to hold separate class votes approving the unequal transaction consideration.

255. Because a majority of the Class A shares were held by minority stockholders, the parties feared that the deal could be voted down even if Mitnick were allowed to participate in the minority vote. Indeed, the price being discussed fell well below the Committee's previously discussed "mid-to-high $20's" pricing zone. However, instead of using the leverage that provided to extract additional value and other stockholder protections, the Special Committee conspired with Vista and the Control Group to manipulate the Class A vote as discussed below. As a result, they would all conspire to manipulate the separate class votes through the intentional down-conversion of certain shares held by interested and parties and the non-independent Mitnick.

**N.** **As Negotiations Enter the Home Stretch, KKR Decides to Increase Its Rollover Given the Committee's Failure to Negotiate a Fair Deal Price**

256. On September 28, 2022, Vista submitted its revised proposal in response to the Special Committee's $26.50 counterproposal, offering to acquire KnowBe4 for $24.60 per share with the expectation that certain of KnowBe4's significant stockholders would rollover an aggregate amount of $675 million in

equity, based on a $24.60 transaction price.  Morgan Stanley later clarified that Vista's proposal "[r]equire[d] at least $675MM rollover from Elephant/KKR/Stu[.]"

257.   Vista began to ratchet up the pressure on the Committee, adding that "[w]e are prepared to move expeditiously to reach a definitive agreement by October 7, 2022 and will provide executed debt and equity commitment letters at such time."

258.  The Special Committee met to discuss Vista's counteroffer on September 29, 2022.   The Special Committee determined to submit another counteroffer for $25.75 per share to Vista along with the messaging that Vista should propose a counteroffer "that went as far into the $25.00s as Vista could go."

259.   The Special Committee then turned to the contemplated majority-of-the-minority vote in connection with the proposed transaction and noted that Mitnick "would control a significant portion of" such vote.  The Committee also discussed that, if Mitnick determined not to participate in a rollover, then the Company could ask Mitnick to enter into a Support Agreement to vote his shares in favor of the transaction.  Again, the Committee did not discuss whether Mitnick was actually independent such that it would be proper to include his shares with the minority.  In fact, the Section 220 production makes no reference to any such consideration during the transaction process.  The Committee discussed Sjouwerman and Watzinger's recent discussion with Mitnick and observed that he "appeared supportive of such transaction[,]" thus, moving the improperly structured majority-of-the-minority vote

92

that much closer to a *fait accompli*.   The Proxy makes no reference to these discussions.

260.   At the meeting, representatives of Morgan Stanley reported to the Committee that it disclosed the latest pricing negotiations to Shanley and, in response, KKR—after having conducted further diligence and presumably its own valuation of the Company—indicated that it expected to roll over a larger amount of its equity than initially anticipated.  This indicates that the price being negotiated fell below KKR's valuation for KnowBe4 or prior expectations for a final merger price.

261.   Finally, the Committee again pushed for a retention bonus pool payable to Company management upon consummation of a transaction with Vista, authorizing Morgan Stanley to discuss that concept with Vista.  KnowBe4 CFO Bob Reich and Chief Revenue Officer Letonoff—who in addition to Sjouwerman were involved in preparing the Management Plan—stood to benefit handsomely from this. Indeed, KnowBe4's compensation committee, which included Watzinger, Daly, and Wilson, later awarded Reich and Letonoff $1,375,000 *each* in bonus retention payments, half of which was payable upon completion of the Merger and the remainder of which was payable 90 days later.  For both, the bonus retention payments were more than 2.6 times their annual salary.  As mentioned above, that retention bonus pool extracted value from minority stockholders who were cashed out in the Merger and thus could not conceivably benefit from the retention of

93

management.  Vista could have conceivably been willing to pay a higher price if it understood it would not have to pay retention bonuses, and injecting that concept into negotiations at that time made no sense if the Committee was truly focused only on minority stockholders' interests.

262.  The Special Committee adjourned its September 29, 2022 meeting at approximately 9:30 a.m., after which representatives of Morgan Stanley conveyed the Special Committee's $25.75 per share counterproposal to Vista.  Morgan Stanley also discussed the concept of a retention bonus pool with Vista, with which Vista agreed in principle.

263.  Shortly thereafter, Vista submitted another revised proposal, this time for $24.80 per share.  Vista told Morgan Stanley that it "would not be able to put forward a price per share offer that was in the $25.00s" and that any further movement would be less than their most recent $0.20 per share increase.  By this point, Vista already had the support of the Control Group and did not need to make any more concessions.

264.  The Special Committee reconvened the September 29, 2022 meeting at approximately 11:00 a.m. to discuss Vista's latest proposal.  The Committee determined to submit a counteroffer for $24.90 per share but authorized Morgan Stanley to accept any bid that was $24.80 or higher per share.

265. The Committee also instructed Morgan Stanley that, assuming an agreement on pricing could be reached in the next conversation between Morgan Stanley and Vista, the Committee was supportive of releasing the chaperone restrictions on communications between Vista, KKR, Elephant, and Sjouwerman.

266. Representatives of Morgan Stanley conveyed the Special Committee's $24.90 counteroffer, which Vista accepted. Vista's acceptance was conditioned upon KKR, Elephant, and Sjouwerman collectively rolling over equity worth $682 million at the deal price.

267. On October 3, 2022, Vista requested the Special Committee's permission to discuss Sjouwerman's continued employment with KnowBe4 following its acquisition by Vista, which the Proxy says the Special Committee approved (without a meeting, as there are no minutes) on October 4, 2022.

268. On October 7, 2022, the Special Committee revisited the idea of securing Mitnick's approval for the transaction and how that would affect the majority-of-the-minority vote. The Committee decided "that it was supportive of seeking a commitment from Mr. Mitnick to vote in favor of the Merger Agreement." The Committee discussed that Sjouwerman should reach out to Mitnick, his long-time friend and business partner, about such agreement. The Proxy makes no reference to these discussions.

269. Next, representatives of Morgan Stanley reported that Vista had agreed to a $8 million retention bonus pool for Company management and that it was "comfortable deferring to Company management to make the [retention bonus pool] allocation decisions."

**O.    Fearing Stockholder Rejection, Vista Proposed a Down-Convert to Ensure Stockholder Approval of the Disparate Treatment of Class A and Class B Stockholders in the Merger**

270. KnowBe4's Charter required equal treatment of Class A and Class B stockholders in any transaction like the Merger *unless* such disparate treatment receives approval from both the Class A and Class B stockholders. However, because the price being negotiated fell below KnowBe4's intrinsic value, the Special Committee's pricing guidance conveyed to Vista in August, the price floor the Special Committee discussed in mid-September, and KKR's target exit price, the parties feared that KnowBe4's minority stockholders would reject such unequal treatment. Vista and the Control Group needed a solution.

271. On October 9, 2022, Vista proposed that it, along with the Rollover Stockholders, down-convert all of their Class B shares into shares of Class A common stock so that the conflicted Rollover Stockholders and Vista itself could dictate the outcome of the Class A vote and Mitnick—who held a significant amount of Class B shares and 31% of the voting power of unaffiliated stockholders—could dictate the outcome of the Class B and majority-of-the-minority votes as a

96

Case 1:25-cv-22574-CMA   Document 50-1   Entered on FLSD Docket 08/27/2025   Page 100 of 134

purportedly "unaffiliated" stockholder.  This illustrated that Vista was willing to game the required stockholder votes and disregard the Equal Treatment Provision's purpose of empowering minority stockholders to reject conflicted transactions.

272.   The Committee met the next day on October 10, 2022.  Despite its obligation to represent and protect minority stockholders and the clear leverage that Special Committee possessed, including the "market perception and transaction optics" this would create, the Committee nonetheless "indicated that it was comfortable with Vista's approach on this point and with proceeding with this proposed solution."

273.   During that same October 10, 2022 meeting, the Special Committee discussed that KKR now intended to rollover or reinvest $300 million (or 46% of its KnowBe4 equity) in the Merger—nearly double its initial planned $150-$200 million—further corroborating that public stockholders received an unfair price as the rollover was significantly more advantageous than the Merger consideration. The Proxy does not disclose KKR's change in plans.

274.   As a result, according to Morgan Stanley's October 10 presentation, the combined rollover amount increased to $783 million.  This was far more than the $675 million Vista previously requested.

275.   Morgan Stanley's October 10 presentation also reiterated its analysis that, under a discounted equity value analysis, KnowBe4's common stock was

valued between $25.05-$37.52 per share based on projected 2025 levered free cash flows (which valuation range was reduced from the September 15 range only because Morgan Stanley applied a greater cost of equity discount)—still in excess of the $24.90 per share consideration.   Morgan Stanley's materials also demonstrated that the Merger price was significantly below precedent transaction premia as measured from the unaffected 30-day trading average, which implied a midpoint of nearly $26 per share for KnowBe4.

**P.     The Special Committee and Board Approve the Merger and Begin to Solicit Stockholder Approval**

276.   On October 11, 2022, the Special Committee met and determined to recommend the Merger to the full Board.  During the meeting, representatives of Morgan Stanley "confirmed" that it had no material updates to its prior conflict disclosure.  Morgan Stanley's representatives also reported that Sjouwerman had begun discussions with Mitnick about a potential Support Agreement.  According to Sjouwerman, Mitnick said he did not want to rollover his stake into the post-close Company, which was the deciding factor for the Committee in its determination as to whether Mitnick was an "unaffiliated" shareholder for purposes of the majority-of-the-minority vote.

277.   At the time, Mitnick, who would regrettably pass away in July 2023, was in the middle of a long battle with pancreatic cancer, which may explain why he did choose not to rollover any equity.  The Special Committee never considered

whether Mitnick should have been excluded from the majority-of-the-minority vote because of his close friendship with Sjouwerman or his otherwise lack of independence from the Rollover Stockholders.  And the Proxy does not reference those discussions.

278.   The full Board, including all those directly affiliated with the Rollover Stockholders directors, then immediately convened to consider the Special Committee's recommendation and unanimously approved the Merger.  The parties signed the transaction documents that night.

279.   Pursuant to the Merger, Vista agreed to acquire KnowBe4 for $24.90 per share in cash, reflecting a total equity value of $4.6 billion.  Outstanding vested equity awards were cashed out based on the Merger price and unvested equity awards were converted into cash awards based on the Merger price and retained their time passed vesting schedule (except for options held by Watzinger, Klausmeyer and Wilson, whose unvested awards accelerated and vested upon the Merger's closing, per their respective letter agreements with the Company).  Performance based stock units were deemed to have vested at 100% of their target.

280.   Although all public stockholders were completely cashed out in connection with the Merger, KnowBe4's controlling stockholders—Sjouwerman, KKR, and Elephant (previously defined as the "Rollover Stockholders" or the "Control Group")—entered into Support Agreements where they committed to vote

in favor of the Merger and received the right to roll over a significant amount of equity into the post-closing entity.

281. The Rollover Stockholders' Support Agreements specified the number of shares each held, the number they would roll over. Pursuant to the Support Agreements: (i) Elephant rolled over 17,069,823 shares worth $425 million at the Merger price; (ii) KKR rolled over (or reinvested, at its discretion) 12,048,193 shares worth $300 million at the Merger price; and (iii) Sjouwerman rolled over 2,189,121 shares worth $55 million at the Merger price.

282. In the Support Agreements, Vista agreed to convert all of its Class B shares, and the Control Group agreed to convert the amount of Class B shares they were planning to roll over into Class A shares at least ten days prior to the record date for the stockholder vote on the Merger.

283. On November 7, 2022, KnowBe4 announced the formal launch of the previously announced SecurityCoach, a real-time security coaching program. Sjouwerman explained, "With SecurityCoach, we are introducing a new product category that automates the delivery of real-time security coaching and advice to help end users enhance their cybersecurity knowledge and strengthen their role in contributing to a strong security culture." Sjouwerman added that the Company "anticipate[d] this to be one of the most impactful products that [the Company] ha[d] ever introduced . . . ."

100

284. On November 14, 2022, KnowBe4 filed its preliminary proxy statement in connection with the Merger. Also on November 14, 2022, KnowBe4 released its results for the third quarter of 2022. Revenues increased 33.9% year-over-year, ARR increased 32.4% year-over-year, KnowBe4's customer base grew to more than 54,200 customers (its 22nd straight quarter of customer growth and its largest quarter to quarter increase ever), and free cash flow was $30.5 million. Sjouwerman stated that "we are pleased to report another quarter of progress toward our growth goals," and that "[w]e are excited about our progress with new product development, including the highly-anticipated SecurityCoach product, which remains on track for release in November 2022."

285. On December 1, 2022, Vista, Elephant, KKR, and Sjouwerman down-converted their Class B shares into Class A shares as follows: (i) Vista down-converted all 14,557,960 of its Class B shares; (ii) Elephant down-converted 17,069,823 Class B shares; (iii) KKR down-converted 12,048,193 Class B shares; and (iv) Sjouwerman down-converted 2,189,121 Class B shares. By this time, the Rollover Stockholders would have had conversations with certain public stockholders and likely had a rough estimate of how many public shares they could expect to be voted in favor of the Merger.

101

286. Then on December 5 and 6, 2022, the members of the Special Committee executed a written consent setting the Record Date for the stockholder vote on the Merger as the close of business on December 7, 2022.

287. On December 8, 2022, Mitnick—who, because of his personal circumstances, decided not to rollover shares in the Merger—signed a Support Agreement substantially similar to those signed by the Rollover Stockholders, through which he agreed to vote in favor of the Merger.  The Support Agreement did not obligate Mitnick to down-convert any of his Class B common stock, but he had already down-converted two million of his Class B shares sometime in 2022 (and before the Record Date).

**Q.    Morgan Stanley Belatedly Discloses the Full Extent of Its Conflicts, and KnowBe4 Continues Its Run of Success**

288. On December 15, 2022, the Special Committee held a meeting at which representatives of Morgan Stanley noted to the Committee that the preliminary proxy statement *filed over one month prior* disclosed that Morgan Stanley had received aggregate fees of approximately *$120 to $140 million* in the preceding two years from Vista-related entities, which was *$80 million higher* than what Morgan Stanley disclosed to the Committee on July 12, 2022 at the outset of its engagement. Representatives of Morgan Stanley explained that the $80 million discrepancy was attributable to the fact that the initial disclosure to the Special Committee did not include fees earned from then-pending transactions or from portfolio companies that

were not majority controlled by Vista at the time.  By this point, there was nothing the Special Committee could do to change its retention of Morgan Stanley or approval of the Merger.

289.   On January 13, 2023, Sjouwerman sat for an interview with technology journalist Michael Novinson, during which Sjouwerman covered numerous topics underlying the Company's value:

- Regarding the market's failure to adequately value the Company's stock: "Well, listen, what we felt as a public company, we didn't really get credit for the very high quality stock that we really are. And so we saw the stock price go up and down, and we didn't necessarily feel we had much control over that.  So for us at our stage, where we are still growing very rapidly, we felt going private was actually the better choice."

- Regarding the recently launched SecurityCoach: "We are going to promote SecurityCoach big time during Q1 2023.  However, the first results, the first feedback has been very, very positive.  And we're very happy that we were able to get that release roughly a year after the acquisition.  It's fully integrated, it's fully part of the KnowBe4 platform, looks the same feels the same and provides some very exciting new functionality."

- Regarding KnowBe4's "top priority" for 2023: "International expansion."   Sjouwerman added: "We have been extremely successful in the U.S.  And now the rest of the world should benefit from the same feature set we have heavily invested in international expansion in translating our management console in hundreds and hundreds of translated modules.  You can, for instance, run the whole platform in Japanese, which is the management console, all the phishing tests, all the phishing emails, all the reporting.  So that

103

is just an example of the investment we have made in those international markets."[9]

290.    On January 24, 2023, KnowBe4 announced its preliminary fourth quarter 2022 results.  Among other things, the Company reported a 30% year-over-year increase in revenues, a 29% increase in annual recurring revenues, a 29% increase in gross profit, and a 21% increase in total number of customers.

### R.    The Stockholder Vote Was Not Fully Informed

291.    KnowBe4 filed the definitive proxy soliciting stockholder approval of the Merger on December 22, 2022 and a proxy amendment on January 18, 2023 (previously defined together as the "Proxy").  KnowBe4 held its stockholder vote on January 31, 2023.  The Merger closed the next day.

292.    KnowBe4 conditioned approval of the Merger on four separate stockholder votes, requiring the affirmative vote of:

      a.    the holders of a majority of the voting power of the outstanding shares of KnowBe4 common stock (voting together as a single class) entitled to vote on the Merger Agreement;

      b.    the holders of a majority of the voting power of the outstanding shares of KnowBe4 common stock (voting together as a single

---

[9] Following the closing of the Merger, KnowBe4 opened up several new international offices, including in India, the Netherlands, and the United Kingdom.

104

class) held by the Unaffiliated Stockholders[10] and entitled to vote on the Merger Agreement;

    c.    the holders of at least a majority of the outstanding shares of KnowBe4 Class A common stock entitled to vote in accordance with the DGCL; and

    d.    the holders of at least a majority of the outstanding shares of KnowBe4 Class B common stock entitled to vote in accordance with the DGCL.

293.  KnowBe4 claims it received all appropriate stockholder approvals.

294.  However, because the Proxy was materially misleading, the stockholder vote was not fully informed and has no cleansing effect on the Merger.

---

[10] The Proxy defines "Unaffiliated Stockholders" as "the holders of KnowBe4 common stock, excluding those shares of KnowBe4 common stock held, directly or indirectly, by or on behalf of (1) Vista, its investment fund affiliates and its portfolio companies majority owned by such investment fund affiliates, (2) KKR & Co., its investment fund affiliates, its portfolio companies majority owned by such investment fund affiliates and those members of the KnowBe4 Board who are employees of KKR & Co. or one of its investment fund affiliates, (3) the Elephant Funds, their investment fund affiliates, the portfolio companies majority owned by such investment fund affiliates and those members of the KnowBe4 Board who are employees of the Elephant Funds or one of their investment fund affiliates, and (4) any person that KnowBe4 has determined to be an "officer" of KnowBe4 within the meaning of Rule 16a-1(f) of the Exchange Act." Proxy at vi-vii. This definition therefore excludes, among others, Mitnick (who held 31% of the unaffiliated voting power) and the members of the Special Committee (who collectively held a significant amount of the unaffiliated voting power through their Class B shares).

**1.**    *The Proxy Failed to Disclose the Special Committee Members' Conflicts of Interest and Evaluation of the Same*

295. The Special Committee consisted of Klausmeyer, Watzinger, and Venkataraman and the Proxy represented that they were each independent. However, as set forth in more detail above, each of these members faced significant conflicts of interest that stockholders were entitled to know about when voting on the Merger. The Proxy failed to disclose: (a) Klausmeyer's directorships at KKR- and Vista-affiliated companies Jamf and Ivalua; (b) Venkataraman's and his wife's investments with KKR- and Elephant-affiliated funds and his wife's decades-long tenure at Morgan Stanley; and (c) Watzinger's friendship with numerous KKR- and Vista-affiliated individuals and his investments in KKR-affiliated funds.

296. The failure to disclose these conflicts is particularly problematic because the Proxy touts the Committee's purported independence and disinterestedness as an indicator of fairness that stockholders should have considered when voting on the Merger. The Proxy asserts that the Board formed the Special Committee "comprised solely of independent and disinterested directors . . . to engage with Vista, to consider other potential value creation opportunities and take other actions that the Special Committee deemed appropriate." Elsewhere, when discussing "procedural safeguards that [the Special Committee] believes were and are present to ensure the fairness of the Merger and to permit the Special Committee

106

to represent effectively the interests of the Unaffiliated Stockholders and the unaffiliated security holders of KnowBe4," the Proxy touts as point number one:

> *Independence.*   The Special Committee, since its formation, has consisted solely of independent (for purposes of serving on the Special Committee) and disinterested directors that are not affiliated with, and are independent of, any of the potential counterparties to a potential acquisition of KnowBe4 (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole) and were otherwise disinterested and independent with respect to a potential acquisition of KnowBe4 (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole), other than as discussed in the section of this proxy statement captioned "*Special Factors—Interests of KnowBe4's Directors and Executive Officers in the Merger*[.]"

297.   Relatedly, the Proxy contains misleading partial disclosures about the evaluation of the Special Committee's independence and disinterestedness in connection with the Merger.

298.   The Proxy discloses that at the July 13, 2022 Special Committee meeting, "[r]epresentatives of Potter Anderson conducted an additional independence review of the Special Committee members and, after such review, the Special Committee concluded that each member was independent and disinterested for purposes of evaluating a potential acquisition of the Company."

299.   This partial disclosure is misleading for at least two reasons. *First*, the Proxy provides no information about the independence review that preceded Potter

Anderson's "additional . . . review" or the reasons why Potter Anderson decided to conduct this "additional . . . review." *Second*, the Proxy fails to include material information about Potter Anderson's "additional . . . review," as reflected in the minutes for that meeting. As discussed *supra*, those minutes revealed that: (i) Venkataraman had investments in KKR and Elephant funds, had facilitated Vista's initial investment in the Company, and that his wife had worked for Morgan Stanley for decades; (ii) Watzinger had investments in KKR funds and relationships with "a few" Vista partners; and (iii) Klausmeyer served on the Board of a private company that was formerly a KKR portfolio company with Shanley.

300. None of this information is disclosed in the Proxy.

> **2.** **_The Proxy Failed to Disclose KKR's Decision to Significantly Increase Its Rollover Participation After the Low Merger Price Was Established_**

301. The Proxy failed to disclose that KKR significantly increased its planned rollover after learning that the Merger price was much lower than previously expected.

302. In July of 2022, Morgan Stanley advised the Special Committee that KKR expressed that it planned to rollover approximately $150 million to $200 million, structured as an investment from a new fund. At that point, Morgan Stanley and the Special Committee expected that a transaction would be priced in the mid to upper $20s per share (and specifically, above $25 per share).

303.   On September 13, 2022, KKR conveyed to representatives of Morgan Stanley that it planned to roll over or reinvest approximately $200 million into the post-close entity.   At that point, Morgan Stanley and the Special Committee had already conveyed its mid to upper $20s per share pricing guidance to Vista, which the parties understood meant a price above $25 per share.

304.   By late September, when Vista had refused to increase its offer in line with the Special Committee's pricing guidance, KKR realized that the Merger would undervalue KnowBe4.   Accordingly, KKR decided to increase its rollover participation to $300 million, 50-100% more than it initially planned to reinvest in post-Merger KnowBe4.

305.   The Proxy did not disclose any of this information, which if disclosed would have informed KnowBe4 stockholders that at least one member of the Control Group believed the Merger underpriced KnowBe4.

### 3.   *The Proxy Failed to Disclose Facts Demonstrating the Committee's Favoritism of Vista*

306.   At its August 17 meeting, the Committee considered whether to "pause Vista's due diligence to permit other potential bidders to catch up" but ultimately decided not to do so upon the recommendation of Morgan Stanley "that it appeared advantageous to the Committee to permit each potential bidder to proceed at its own pace[,]"  The Proxy makes no reference to the Committee's discussion of potentially

"pausing Vista's due diligence to permit other potential bidders to catch up."

Instead, the Proxy discloses that:

> Representatives of Morgan Stanley reported on Morgan Stanley's outreach efforts to potential bidders for an acquisition of KnowBe4 and reviewed those potential bidders that remained in the process at this time and those bidders that had passed on pursuing an acquisition of KnowBe4 at this time.  Representatives of Morgan Stanley also reported on Vista's due diligence progress, the due diligence progress of the other potential bidders and the status of Vista's due diligence progress relative to other potential bidders.  The Special Committee and representatives of Morgan Stanley reviewed the feedback that Morgan Stanley had received from financial sponsors and strategic bidders, including those that had either passed on pursuing an acquisition of KnowBe4 or had not expressed a continuing interest in pursuing an acquisition of KnowBe4.  The Special Committee and representatives of Morgan Stanley discussed when in the Special Committee's process it would be appropriate to signal the Special Committee's general views on valuation for a potential acquisition of KnowBe4 to potential bidders, and discussed the timing for seeking bids from potential bidders.

307.   The Proxy's omission of this discussion is particularly glaring since the Proxy elsewhere discloses similar discussions that occurred later in the transaction process.  For example, in connection with its disclosure regarding the September 2, 2022 Committee meeting, the Proxy states that:

> The Special Committee and representatives of Morgan Stanley discussed the anticipated timeline for the submission of an acquisition proposal by Vista and whether to expedite the work to be performed by the non-Vista potential bidders in light of the fact that Vista had communicated that it would be able to provide feedback on September 9, 2022 as to whether it was interested in pursuing a potential transaction.  After discussion of the benefits and considerations, the Special Committee determined that it would continue to allow each potential bidder to proceed at its own pace.

308.  Similarly, the Proxy misrepresents and downplays the level of interest potential alternate bidders had in the Company.

309.  The Proxy states that on August 26, 2022, "Morgan Stanley [] provided an update on the other potential bidders . . . and noted that no other potential bidder had expressed as much interest, or had been as active, as Vista."  However, the meeting minutes state that one other potential bidder had begun additional due diligence and management meetings were being scheduled with others.  Morgan Stanley's presentation from that meeting states that "17 parties called, 7 had introductory management meetings, 3 additional management meetings are scheduled, 2 have submitted high priority diligence questions and undertaken additional diligence meetings."

310.  Moreover, at the Special Committee's July 14, 2022 meeting, Venkataraman discussed that certain potential bidders "had previously interacted with Company management regarding such strategic' s or sponsor's interest, or lack thereof, in the Company."  Similarly, in September 17, Venkataraman was contacted by another current stockholder "who had expressed interest in acquiring a larger stake in the Company."  However, the Proxy failed to disclose any of this interest.

### 4.  *The Proxy Misrepresents the Scope of the Special Committee's Consideration of Alternatives to the Merger*

311.  The Proxy misrepresents the nature of the Special Committee's consideration of KnowBe4's potential strategic alternatives.  Specifically, the

111

Proxy's misled KnowBe4 stockholders into believing that the Special Committee considered a panoply of strategic alternatives—mergers with another party, equity financing transactions, debt financing transactions, other strategic transactions, or continuing as a standalone entity—when, in fact, there was no such consideration given to alternatives.

312. The Proxy touts that the Board formed the Special Committee in part "to consider other potential value creation opportunities[.]"

313. The Proxy also touts as one of the "Reasons for the Merger" the Special Committee's purported consideration of "Potential Strategic Alternatives," and suggests that the Committee actually considered "possible alternatives to the Merger (including continuing to operate KnowBe4 as an independent company or pursuing a different transaction[).]" The Proxy further highlights the purported breadth of the Special Committee's "Negotiating Authority," which allegedly included the ability "to consider and evaluate any strategic alternatives." The Proxy further adds, "The Special Committee considered the other potential alternative strategies available to KnowBe4 as an independent company . . . ."

314. However, in reality the Special Committee was formed via the UWC solely to consider a transaction involving a "change of control or delisting of the Company"- not to consider any other transactions. The Board resolution approving the Merger confirm the Special Committee's charge. In addition, every meeting of

the Special Committee was convened to consider a sale of the Company to Vista, and only secondarily to consider a sale of the Company to another buyer. Not once did the Special Committee convene for the express purpose of considering an alternative to a sale or delisting of the Company. And a representative of Morgan Stanley immediately rejected any potential transaction involving the public pension fund that purportedly only makes minority investments, preferring instead to stash the fund on the sidelines in case Vista sought any outside investors down the line.

315. Accordingly, contrary to the Proxy, the Merger did not result from the Special Committee's broad consideration of any strategic alternatives, only the Committee's consideration of a change of control.

### 5.   *The Proxy Was Materially Misleading in Disclosing the Mitnick Support Agreement*

316. As discussed *supra*, Mitnick was a long-time Company insider who was close friends with Sjouwerman. Mitnick and Sjouwerman partnered in November 2011 and built KnowBe4 together. According to Sjouwerman's own public statements, they maintained a very close relationship until Mitnick's death. Moreover, at the time of the Merger, Mitnick had resigned from KnowBe4 and was battling cancer. Mitnick's close relationship with Sjouwerman along with his health battles suggest that Mitnick would not take any action to undermine Sjouwerman's plans to sell KnowBe4 and that he would not be interested in rolling over his equity.

113

317.    In contrast, the Proxy misleadingly portrays Mitnick as the Company's largest independent investor who made a pure business decision to sell his shares at the deal price and not rollover equity.  The Proxy, which tells stockholders Mitnick was an "Unaffiliated Stockholder" for purposes of the vote, makes no reference to his ties to or prior history with the Company or the Rollover Stockholders, including his long-time friend and business partner, Sjouwerman.

318.    The Proxy discusses the Mitnick Support Agreement in the same section where it discusses the "Rollover Stockholder Support Agreements" and states that Mitnick's agreement did not provide for any rollover.  This misleadingly suggests Mitnick made an independent decision to support the Merger and not roll-over his shares instead of a decision based on his relationship with Sjouwerman and personal health situation.

319.    The Proxy also failed to disclose anything about the discussions that led to Mitnick signing a Support Agreement that are discussed above, including his discussions with Sjouwerman about signing a Support Agreement and the Special Committee's and advisors' multiple discussion on the impact he could have if they included him in the minority vote.

### 6. *The Proxy Failed to Fully Disclose Morgan Stanley's Potential Conflicts with the Control Group*

320. At the time Morgan Stanley advised the Special Committee on the Merger, Morgan Stanley held over $550 million of investments in KKR and its related entities. That information was not disclosed in the Proxy.

321. Indeed, the Proxy merely states that "Morgan Stanley, its affiliates, directors and officers may at any time invest . . . in debt or equity securities or loans of" or "may have committed and may commit in the future to invest in private equity funds managed by" KKR and its related entities. In reality, Morgan Stanley had over a half-billion dollars invested in KKR and its related entities, including over $200 million invested in KKR's parent entity, KKR & Co. Inc. Much, if not substantially all of those investments, Morgan Stanley appeared to hold for its own account. That information was critical for stockholders to fully understand Morgan Stanley's potential conflicts, particularly given Morgan Stanley's other potential conflicts, including the substantial fees that Morgan Stanley had earned from KKR in the prior two years.

### CLASS ACTION ALLEGATIONS

322. Plaintiffs bring this action on behalf of themselves and on behalf of a class of former Class A stockholders of KnowBe4 (the "Class"). Excluded from the Class are Defendants, their officers, directors, and affiliates, and any directors or officers of KnowBe4, as well as members of their immediate families, and any entity

115

in which any of them has a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

323. This action is properly maintainable as a class action.

324. The members of the Class are so numerous that joinder of all members is impracticable. According to the Proxy, as of the Record Date, KnowBe4 had 132,747,542 Class A shares outstanding, including approximately 85 million Class A shares held by minority stockholders.

325. There are common questions of fact and law including, among other things the following:

  a.    Whether the members of the Control Group breached their fiduciary duties;

  b.    Whether the Director Defendants breached their fiduciary duties;

  c.    Whether the Charter was breached; and

  d.    Whether Plaintiffs and the other members of the Class are entitled to damages or other relief.

326. Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs do not have any interests adverse to the Class.

327. Plaintiffs are committed to prosecuting this Action and have retained competent counsel experienced in litigation of this nature. Accordingly, Plaintiffs

116

are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

328. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

329. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBJECT-MATTER JURISDICTION

330. This Court has subject-matter jurisdiction over this Action, which asserts claims for breaches of fiduciary duty, pursuant to 10 Del. C. § 341, which provides that this Court "shall have jurisdiction to hear and determine all matters and causes in equity."

## CAUSES OF ACTION

## COUNT I

**Breach of Fiduciary Duty Against the Control Group**

331. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

332. Since KnowBe4's time as a private Company, the Control Group worked together to operate and grow the Company. In connection with the Merger,

the Control Group jointly determined to rollover their equity and receive disparate consideration than public stockholders. At all relevant times, the Control Group held majority voting power and exercised control over KnowBe4.

333. As controllers, the Control Group owed the Plaintiffs and the Class fiduciary duties of loyalty, good faith, care, and candor. The Control Group was also obligated to act loyally to the Company and its stockholders, to act in their best interests, and to avoid self-interested transactions in which its own interests would be placed above theirs.

334. In taking the actions described herein, the members of the Control Group breached their fiduciary duties.

335. For example, the Control Group caused the Company to enter into the Merger which provided them unique non-ratable benefits and which was unfair to public stockholders. The members of the Control Group also conspired to down-convert a sufficient number of their Class B supervoting shares to manipulate the separate Class vote required by the Charter's Equal Treatment Provision.

336. The Support Agreements signed by the Members of the Control Group entitled them to comment on the Proxy and related filings and obligated them to ensure the information they provided was accurate. However, the Proxy was materially false and misleading.

337. Furthermore, because the Proxy was materially false and misleading, and through their scheme to game the vote required by the Equal Treatment Provision, the members of the Control Group caused a breach of the Charter.

338. As a result, Plaintiffs and the Class have been harmed. Plaintiffs have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty Against the Director Defendants

339. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

340. As directors of KnowBe4, the Director Defendants owed Plaintiffs and the Class fiduciary duties of loyalty, good faith, care, and candor. The Director Defendants were also obligated to act with due care and loyalty to the Company and its stockholders, to act in their best interests, and to avoid self-interested transactions in which the Director Defendants' own interests would be placed above theirs.

341. Each of the Director Defendants had a duty to ensure the Merger was fair to public stockholders, that stockholders were accurately provided all material information, and that the Company complied with the Charter.

342. However, the Merger was unfair to stockholders, the Proxy was materially false and misleading, and the Company breached the Charter. Therefore, the Director Defendants breached their fiduciary duties.

119

343.   As a result, Plaintiffs and the Class have been harmed.  Plaintiffs have no adequate remedy at law.

## COUNT III

### Breach of Contract Against KnowBe4

344.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

345.   The Charter is a contract between the Company and its stockholders. Every contract has an implied covenant of good faith and fair dealing.

346.   The Equal Treatment Provision in KnowBe4's Charter required all Class A and Class B shares to receive the same consideration in any merger unless different consideration was approved by a separate vote of the Class A and Class B shares.  Inherent in this provision is an implied covenant that such votes be fully informed and that the parties seeking disparate treatment do not take steps to artificially manipulate such votes.

347.   The stockholder vote was not fully informed and the Rollover Stockholders and Vista affirmatively influenced the separate votes by strategically down-converting a number of their Class B shares such that they were confident they would receive the necessary votes as a technical matter.

348.   As a result, the Merger breached the Charter and Plaintiffs and the Class have been harmed.

120

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying the Class;

B.      Declaring that the members of the Control Group breached their fiduciary duties

C.      Declaring that the Director Defendants breached their fiduciary duties;

D.      Declaring that the Merger violates the Charter;

E.      Awarding damages to the Class, including rescissory damages, including pre- and post-judgment interest;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, consultants' fees, experts' fees, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

LABATON KELLER SUCHAROW LLP

*/s/ Ned Weinberger*

*Of Counsel*:

John Vielandi
LABATON KELLER SUCHAROW
LLP
140 Broadway
New York, NY 10005
(212) 907-0700

Jeremy Friedman
David Tejtel
Christopher Windover
Lindsay La Marca
FRIEDMAN OSTER & TEJTEL
PLLC
493 Bedford Center Rd
Bedford Hills, NY 10507
(888) 529-1108

Douglas E. Julie
W. Scott Holleman
JULIE & HOLLEMAN LLP
157 E. 86th St., 4th Floor
New York, NY 10028
(929) 415-1020

D. Seamus Kaskela
Adrienne Bell
KASKELA LAW LLC
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
(484) 258-1585

*Counsel for Plaintiffs*

Dated: March 10, 2025
**Public Version Dated:**
**March 18, 2025**

Ned Weinberger (Bar No. 5256)
Michael C. Wagner (Bar No. 6955)
222 Delaware Avenue, Suite 1510
Wilmington, DE 19801
(302) 573-2540
nweinberger@labaton.com
mwagner@labaton.com

*Counsel for Plaintiffs*

122

# EXHIBIT 2

GRANTED

EFiled: Aug 20 2025 10:13AM EDT
Transaction ID 76896945
Case No. 2024-1143-KSJM

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BILL LE CLAIR and JOSEPH POSPISIL, on behalf of themselves and all other similarly situated former stockholders of KNOWBE4, INC., <br><br> Plaintiffs, <br><br> v. <br><br> KNOWBE4, INC. SJOERD SJOUWERMAN, JEREMIAH DALY, STEPHEN SHANLEY, KEVIN KLAUSMEYER, SHRIKRISHNA VENKATARAMAN, GERHARD WATZINGER, KARA WILSON, KKR & CO. INC., KKR KNOWLEDGE INVESTORS L.P., ELEPHANT PARTNERS, ELEPHANT PARTNERS I, L.P., ELEPHANT PARTNERS II, L.P., ELEPHANT PARTNERS 2019 SPV-A, L.P., and ELEPHANT PARTNERS II-B, L.P., <br><br> Defendants. | C.A. No. 2024-1143-KSJM |

## [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PROMPT CLASS CERTIFICATION

WHEREAS, Plaintiffs Bill Le Clair and Joseph Pospisil ("Plaintiffs") have moved pursuant to Court of Chancery Rule 23 for prompt certification of a non-opt-out class of all record and beneficial holders of KnowBe4, Inc. (the "Company") who received $24.90 per share in cash (the "Transaction Consideration") in exchange for their Company shares on February 1, 2023 (the "Closing"), excluding

Defendants, anyone who was a director or officer of the Company at Closing, and any of their affiliates (the "Class");

WHEREAS, the Court finds that the Class satisfies the requirements of Court of Chancery Rules 23(a), 23(b)(1), and 23(b)(2), because: (i) the Class is so numerous that joinder of all members is impracticable; (ii) there are questions of law and fact common to the Class; (iii) Plaintiffs' claims are typical of the claims of the Class; (iv) Plaintiffs will fairly and adequately represent the interests of the Class; (v) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class; and (vi) Defendants have acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief or other equitable relief with respect to the Class as a whole;

IT IS HEREBY ORDERED this _____day of _____, 2025, that:

1.      Pursuant to Court of Chancery Rules 23(a), 23(b)(1), and 23(b)(2), the class shall be certified as a non-opt-out class consisting of all record and beneficial holders of the Company who received the Transaction Consideration in exchange for their Company shares, excluding Defendants and anyone who was a director or officer of the Company at Closing, and any of their affiliates.

2.      Plaintiffs shall be certified as the representatives of the Class.

3. Labaton Keller Sucharow LLP, Friedman Oster & Tejtel PLLC, and Julie & Holleman LLP are appointed as Class Counsel, and Kaskela Law is appointed as Additional Counsel for the Class.

4. Pursuant to Court of Chancery Rule 23(c)(1), the parties retain the right to move to alter or amend the definition of the Class before a final determination on the merits of this action.

_____

Chancellor Kathleen St. Jude McCormick

3

| | |
|---|---|
| **This document constitutes a ruling of the court and should be treated as such.** | |
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Kathaleen St Jude McCormick |
| **File & Serve Transaction ID:** | 76736823 |
| **Current Date:** | Aug 20, 2025 |
| **Case Number:** | 2024-1143-KSJM |
| **Case Name:** | CONF/REQ - Bill Le Clair v. KnowBe4, Inc., et al. |
| **Court Authorizer:** | Kathaleen St Jude McCormick |

**/s/ Judge Kathaleen St Jude McCormick**

# EXHIBIT 3

Case 1:25-cv-22574-CMA   Document 50-1   Entered on FLSD Docket 08/27/2025   Page 132 of 134

# Table View  × ← →    ☆ Favorite

## Market Information

RETURN TO CHART VIEW

| Date | Open | High | Low | Close | Volume |
|---|---|---|---|---|---|
| KNBE US Equity: Historical Values | | | | | |
| 01/31/23 | 24.90 | 24.90 | 24.89 | 24.89 | 9.08M |
| 01/30/23 | 24.89 | 24.91 | 24.89 | 24.89 | 2.42M |
| 01/27/23 | 24.86 | 24.87 | 24.84 | 24.86 | 565,017 |
| 01/26/23 | 24.85 | 24.88 | 24.84 | 24.87 | 735,578 |
| 01/25/23 | 24.84 | 24.85 | 24.83 | 24.85 | 566,000 |
| 01/24/23 | 24.86 | 24.88 | 24.82 | 24.83 | 926,290 |
| 01/23/23 | 24.84 | 24.87 | 24.84 | 24.84 | 815,865 |
| 01/20/23 | 24.86 | 24.87 | 24.83 | 24.83 | 1.28M |
| 01/19/23 | 24.84 | 24.84 | 24.83 | 24.84 | 642,885 |
| 01/18/23 | 24.86 | 24.86 | 24.83 | 24.83 | 864,421 |
| 01/17/23 | 24.82 | 24.85 | 24.82 | 24.84 | 996,333 |
| 01/13/23 | 24.82 | 24.83 | 24.81 | 24.83 | 993,360 |
| 01/12/23 | 24.81 | 24.84 | 24.80 | 24.82 | 780,013 |
| 01/11/23 | 24.81 | 24.84 | 24.79 | 24.81 | 737,366 |
| 01/10/23 | 24.79 | 24.86 | 24.76 | 24.84 | 1.08M |
| 01/09/23 | 24.82 | 24.82 | 24.75 | 24.75 | 1.06M |
| 01/06/23 | 24.82 | 24.82 | 24.77 | 24.81 | 675,684 |
| 01/05/23 | 24.77 | 24.80 | 24.77 | 24.80 | 1.40M |
| 01/04/23 | 24.78 | 24.78 | 24.765 | 24.77 | 721,372 |
| 01/03/23 | 24.79 | 24.79 | 24.77 | 24.78 | 548,095 |
| 12/30/22 | 24.77 | 24.80 | 24.76 | 24.78 | 585,071 |
| 12/29/22 | 24.78 | 24.79 | 24.76 | 24.77 | 778,352 |
| 12/28/22 | 24.78 | 24.79 | 24.755 | 24.77 | 596,887 |
| 12/27/22 | 24.77 | 24.80 | 24.75 | 24.78 | 659,336 |
| 12/23/22 | 24.75 | 24.79 | 24.75 | 24.79 | 533,378 |
| 12/22/22 | 24.75 | 24.79 | 24.75 | 24.75 | 519,508 |
| 12/21/22 | 24.74 | 24.77 | 24.73 | 24.76 | 553,786 |
| 12/20/22 | 24.74 | 24.77 | 24.73 | 24.75 | 608,370 |

| Date | Open | High | Low | Close | Volume |
|---|---|---|---|---|---|
| 12/19/22 | 24.75 | 24.77 | 24.73 | 24.75 | 703,565 |
| 12/16/22 | 24.72 | 24.79 | 24.72 | 24.79 | 3.96M |
| 12/15/22 | 24.75 | 24.77 | 24.72 | 24.72 | 1.21M |
| 12/14/22 | 24.80 | 24.80 | 24.745 | 24.75 | 620,017 |
| 12/13/22 | 24.79 | 24.82 | 24.75 | 24.78 | 1.03M |
| 12/12/22 | 24.79 | 24.81 | 24.735 | 24.75 | 1.01M |
| 12/09/22 | 24.71 | 24.81 | 24.69 | 24.77 | 1.85M |
| 12/08/22 | 24.65 | 24.68 | 24.64 | 24.67 | 564,876 |
| 12/07/22 | 24.65 | 24.68 | 24.64 | 24.66 | 519,294 |
| 12/06/22 | 24.65 | 24.67 | 24.62 | 24.64 | 859,960 |
| 12/05/22 | 24.67 | 24.68 | 24.635 | 24.65 | 800,219 |
| 12/02/22 | 24.63 | 24.675 | 24.62 | 24.64 | 1.34M |
| 12/01/22 | 24.66 | 24.68 | 24.61 | 24.62 | 2.74M |
| 11/30/22 | 24.67 | 24.71 | 24.60 | 24.69 | 3.65M |
| 11/29/22 | 24.70 | 24.71 | 24.67 | 24.68 | 989,021 |
| 11/28/22 | 24.68 | 24.73 | 24.63 | 24.69 | 812,826 |
| 11/25/22 | 24.69 | 24.72 | 24.64 | 24.71 | 423,354 |
| 11/23/22 | 24.68 | 24.72 | 24.66 | 24.69 | 533,154 |
| 11/22/22 | 24.68 | 24.74 | 24.64 | 24.68 | 1.25M |
| 11/21/22 | 24.61 | 24.70 | 24.61 | 24.68 | 396,583 |
| 11/18/22 | 24.63 | 24.70 | 24.57 | 24.68 | 2.07M |
| 11/17/22 | 24.56 | 24.61 | 24.54 | 24.58 | 1.29M |
| 11/16/22 | 24.60 | 24.63 | 24.56 | 24.58 | 897,209 |
| 11/15/22 | 24.62 | 24.64 | 24.58 | 24.60 | 673,196 |
| 11/14/22 | 24.60 | 24.64 | 24.54 | 24.58 | 1.84M |
| 11/11/22 | 24.63 | 24.66 | 24.575 | 24.59 | 677,653 |
| 11/10/22 | 24.62 | 24.68 | 24.58 | 24.61 | 1.42M |
| 11/09/22 | 24.58 | 24.61 | 24.55 | 24.61 | 471,039 |
| 11/08/22 | 24.60 | 24.62 | 24.555 | 24.58 | 745,627 |
| 11/07/22 | 24.61 | 24.65 | 24.56 | 24.59 | 858,879 |
| 11/04/22 | 24.69 | 24.70 | 24.53 | 24.56 | 4.40M |
| 11/03/22 | 24.59 | 24.77 | 24.575 | 24.68 | 2.65M |
| 11/02/22 | 24.65 | 24.665 | 24.57 | 24.58 | 1.06M |

Bloomberg Law - Company Performance

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 11/01/22 | 24.66 | 24.68 | 24.58 | 24.66 | 1.43M |
| 10/31/22 | 24.60 | 24.685 | 24.56 | 24.58 | 2.25M |
| 10/28/22 | 24.55 | 24.67 | 24.52 | 24.67 | 2.52M |
| 10/27/22 | 24.58 | 24.71 | 24.48 | 24.52 | 2.49M |
| 10/26/22 | 24.52 | 24.64 | 24.48 | 24.58 | 1.50M |
| 10/25/22 | 24.53 | 24.57 | 24.46 | 24.52 | 1.75M |
| 10/24/22 | 24.431 | 24.59 | 24.43 | 24.49 | 1.16M |
| 10/21/22 | 24.43 | 24.51 | 24.36 | 24.50 | 1.29M |
| 10/20/22 | 24.45 | 24.48 | 24.39 | 24.46 | 1.39M |
| 10/19/22 | 24.40 | 24.48 | 24.38 | 24.48 | 1.29M |
| 10/18/22 | 24.45 | 24.50 | 24.37 | 24.38 | 1.55M |
| 10/17/22 | 24.40 | 24.49 | 24.36 | 24.49 | 2.19M |
| 10/14/22 | 24.40 | 24.51 | 24.36 | 24.37 | 3.96M |
| 10/13/22 | 24.31 | 24.40 | 24.29 | 24.38 | 5.65M |
| 10/12/22 | 24.29 | 24.41 | 24.27 | 24.33 | 26.04M |