**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-22574-CIV-ALTONAGA/Reid**

In re:

**KNOWBE4, INC.
SECURITIES LITIGATION**

_____/

**OPPOSITION TO DEFENDANTS' COMBINED MOTION TO DISMISS**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................... 3

III.    LEGAL STANDARD .......................................................................................... 6

IV.     ARGUMENT....................................................................................................... 7

        A.      The Complaint Alleges Actionable Misstatements and Omissions ........................ 7

        B.      Defendants' State of Mind Argument With Respect to the Section 14(a)
                Claims is Wrong............................................................................................ 16

        C.      The Complaint Alleges a Strong Inference of Scienter for the Section 10(b)
                Claims ........................................................................................................... 18

        D.      The Complaint Adequately Alleges Loss Causation........................................... 23

        E.      Plaintiffs' Section 10(b) Claims are Timely.................................................... 26

        F.      The Complaint Adequately Pleads Section 20(a) Claims .................................... 27

V.      CONCLUSION................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*100079 Can., Inc. v. Stiefel Lab'ys, Inc.*,
    No. 11-22389-Civ-SCOLA, 2011 WL 13116079 (S.D. Fla. Nov. 30, 2011)...................... 7

*A&M Mgmt. Inc. v. Deme*,
    No. 18-63099-CIV-COHN/SELTZER, 2019 WL 7344795 (S.D. Fla. Mar. 14, 2019)..... 16

*Adams v. Standard Knitting Mills, Inc.*,
    623 F.2d 422 (6th Cir. 1980) ...................................................................................... 17

*Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*,
    606 F.2d 602 (5th Cir. 1979) ........................................................................................ 8

*Alaska v. Ryder Sys., Inc.*,
    603 F. Supp. 3d 1229 (S.D. Fla. 2022)................................................................. 12, 28

*Baum v. Harman Int'l Indus., Inc.*,
    408 F. Supp. 3d 70 (D. Conn. 2019) ........................................................................... 24

*Baum v. Harman Int'l Indus., Inc.*,
    575 F. Supp. 3d 289 (D. Conn. 2021)......................................................................... 10

*Beck v. Dobrowski*,
    559 F.3d 680 (7th Cir. 2009) ................................................................................ 17, 25

*Bonner v. City of Prichard*,
    661 F.2d 1206 (11th Cir. 1981) .................................................................................... 8

*Brophy v. Jiangbo Pharms., Inc.*,
    781 F.3d 1296 (11th Cir. 2015) .................................................................................. 22

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) .................................................................................. 13

*City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*,
    314 A.3d 1108 (Del. Mar. 25, 2024)........................................................................... 12

*City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*,
    No. 305, 2024 WL 1896096 (Del. May 1, 2024)......................................................... 12

*Craig v. Target Corp.*,
    No: 2:23-cv-599-JLB-KCD, 2024 WL 4979234 (M.D. Fla. Dec. 4, 2024).......... 16, 18, 23

*Delgado v. Rutledge*,
    No. 22-Cv-23435-Dpg, 2024 WL 3570258 (S.D. Fla. Mar. 29, 2024)........................... 26

*Dura Pharms., Inc. v. Broudo*,
　　544 U.S. 336 (2005)..................................................................................................... 23

*Eastwood Enters., LLC v. Farha*,
　　No. 8:07-CV-1940-T-33EAJ, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009).................. 23

*FindWhat Inv. Grp. v. FindWhat.com*,
　　658 F.3d 1282 (11th Cir. 2011) ...................................................................................... 9

*Fouad v. Isilon Sys., Inc.*,
　　No. C07–1764 MJP., 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ........................... 30

*Friedman v. Hammer*,
　　No. 19-cv-62148-PCH/McALILY, 2020 WL 2559549 (S.D. Fla. May 20, 2020) ........... 27

*Gerstle v. Gamble-Skogmo, Inc.*,
　　478 F.2d 1281 (2d Cir. 1973) ....................................................................................... 17

*Ghandour v. City of Miami*,
　　710 F. Supp. 3d 1188 (S.D. Fla. 2024)............................................................................ 7

*Gnanaraj v. Lilum N.V.*,
　　No. 23-80232-RLR/BER, 2023 WL 9064669 (S.D. Fla. Dec. 18, 2023) ......................... 30

*In re Acuity Brands, Inc. Sec. Litig.*,
　　No. 1:18-CV-2140-MHC, 2019 WL 10246166 (N.D. Ga. Aug. 2, 2019) ........................ 23

*In re Am. Apparel, Inc. S'holder Litig.*,
　　No. CV 10–06352 MMM (RCx), 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ............ 30

*In re Clarus Corp. Sec. Litig.*,
　　201 F. Supp. 2d 1244 (N.D. Ga. 2002) .......................................................................... 20

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
　　No. H–14–3428, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016)........................................ 29

*In re Dell Techs. Inc. Class V S'holders Litig.*,
　　No. 2018-0816-JTL, 2020 WL 3096748 (Del. Ch. June 11, 2020).................................. 9

*In re Exxon Mobil Corp. Sec. Litig.*,
　　500 F.3d 189 (3d Cir. 2007) ........................................................................................ 17

*In re Focus Financial Partners*,
　　No. 23-1466 (MN), 2025 WL 961488 (D. Del. Mar 31, 2025) ...................................7, 11

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
　　843 F.3d 1257 (11th Cir. 2016) ................................................................................... 16

*In re JDN Realty Corp. Sec. Litig.*,
   182 F. Supp. 2d 1230 (N.D. Ga. 2002) .............................................................. 20

*In re KLX, Inc. Sec. Litig.*,
   232 F. Supp. 3d 1269 (S.D. Fla. 2017) .............................................................. 15

*In re Kosmos Energy Ltd. Sec. Litig.*,
   955 F. Supp. 2d 658 (N.D. Tex. 2013) .............................................................. 30

*In re Loral Space & Commc'ns Inc.*,
   No. 2808-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ..........................11

*In re MCI Worldcom, Inc. Sec. Litig.*,
   93 F. Supp. 2d 276 (E.D.N.Y. 2000) ................................................................ 19

*In re Ocera Therapeutics Sec. Litig.*,
   806 F. App'x 603 (9th Cir. 2020) ...................................................................... 25

*In re PainCare Holdings Sec. Litig.*,
   541 F. Supp. 2d 1283 (M.D. Fla. 2008) ............................................................ 18

*In re PLX Tech. Inc. S'holders Litig.*,
   No. 9880-VCL, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018) ........................... 13

*In re Sahlen & Assocs., Inc. Sec. Litig.*,
   773 F. Supp. 342 (S.D. Fla. 1991) .................................................................... 29

*In re Shanda Games Ltd. Sec. Litig.*,
   128 F.4th 26 (2d Cir. 2025) ................................................................... 3, 19, 24

*In re Spear & Jackson Sec. Litig.*,
   399 F. Supp. 2d 1350 (S.D. Fla. 2005) .............................................................. 28

*In re Wells Real Est. Inv. Tr., Inc. Sec. Litig.*,
   No. 1:07-CV-862-CAP, 2010 WL 11468441 (N.D. Ga. Aug. 2, 2010),
   *order clarified*, 2010 WL 11470142 (N.D. Ga. Nov. 1, 2010) ........................ 17

*In re Willis Towers Watson Plc Proxy Litig.*,
   439 F. Supp. 3d 704 (E.D. Va. 2020) ................................................................ 17

*In re Worlds of Wonder Sec. Litig.*,
   721 F. Supp. 1140 (N.D. Cal. 1989) .................................................................. 30

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) .................................................................................... 15, 16

*Karp v. First Conn. Bancorp, Inc.*
   69 F.4th 223 (4th Cir. 2023) .............................................................................. 18

*Kas v. Fin. Gen. Bankshares, Inc.*,
 796 F.2d 508 (D.C. Cir. 1986) ...................................................................................8, 11

*Kinnett v. Strayer Educ., Inc.*,
 501 F. App'x 890 (11th Cir. 2012) ................................................................................ 25

*Lane v. Page*,
 727 F. Supp. 2d 1214 (D.N.M. 2010) ............................................................................ 26

*Laperriere v. Vesta Ins. Grp., Inc.*,
 526 F.3d 715 (11th Cir. 2008) ...................................................................................... 29

*Lee v. Frost*,
 No. 21-20885-CIV-ALTONAGA/Torres, 2021 WL 3912651 (S.D. Fla. Sept. 1, 2021) .. 18

*Lindley v. City of Birmingham*,
 515 F. App'x 813 (11th Cir. 2013) ................................................................................ 27

*Lormand v. US Unwired, Inc.*,
 565 F.3d 228 (5th Cir. 2009) ........................................................................................ 23

*Luczak v. Nat'l Beverage Corp.*,
 812 F. App'x 915 (11th Cir. 2020) .................................................................................. 7

*Marrari v. Med. Staffing Network Holdings, Inc.*,
 395 F. Supp. 2d 1169 (S.D. Fla. 2005) .......................................................................... 28

*Merck & Co., Inc. v. Reynolds*,
 559 U.S. 633 (2010) ...................................................................................................... 26

*Merritt v. Colonial Foods, Inc.*,
 499 F. Supp. 910 (D. Del. 1980) ................................................................................... 24

*Miller v. Dyadic Int'l Inc.*,
 NO. 07-80948-CIV-DIMITROULEAS,
 2009 WL 10697095 (S.D. Fla. Sept. 29, 2009) .............................................................. 28

*Mills v. Elec. Auto-Lite Co.*,
 396 U.S. 375 (1970) .........................................................................................11, 17, 24

*Mills v. Esmark, Inc.*,
 544 F. Supp. 1275 (N.D. Ill. 1982) ................................................................................. 9

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003) ........................................................................................ 29

*Omnicare, Inc. v. Lab. Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015) ......................................................................................... 7, 12, 13

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................... 19

*RBC Cap. Mkts., LLC v. Jervis*,
    129 A.3d 816 (Del. 2015) ....................................................................................... 13

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ................................................................................... 19

*S.E.C. v. Complete Bus. Sols. Grp., Inc.*,
    538 F. Supp. 3d 1309 (S.D. Fla. 2021) ................................................................... 30

*S.E.C. v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) .................................................................................. 9

*S.E.C. v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ................................................................................. 17

*Sapssov v. Health Mgmt. Assocs., Inc.*,
    608 F. App'x 855 (11th Cir. 2015) ......................................................................... 25

*Siegmund v. Xuelian Bian*,
    No. 16-62506-CIV-MORENO, 2018 WL 1611847 (S.D. Fla. Apr. 2, 2018) .............. 8, 24

*Skypoint Advisors, LLC. v. 3 Amigos Prods. LLC.*,
    No. 2:18-cv-356-FtM-29MRM, 2019 WL 4600409 (M.D. Fla. Sept. 23, 2019) ............. 23

*Smykla v. Molinaroli*,
    85 F.4th 1228 (7th Cir. 2023) ................................................................................ 14

*Sulzer v. Associated Madison Cos., Inc.*,
    No. 84-516-CIV-3-12, 1985 WL 5856, at *3 (M.D. Fla. May 10, 1985) ........................ 15

*Swanson v. Am. Consumers Indus., Inc.*,
    475 F.2d 516 (7th Cir. 1973) ................................................................................. 24

*Taylor v. Serv. Corp. Int'l*,
    No. 20-CV-60709-RAR, 2021 WL 5050175 (S.D. Fla. Nov. 1, 2021) ............................. 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................... 18

*Theodore v. Purecycle Techs., Inc.*,
    No: 6:21-cv-809-PGB-RMN, 2023 WL 4035880 (M.D. Fla. June 15, 2023) ................... 6

*Tung v. Dycom Indus. Inc.*,
    454 F. Supp. 3d 1244 (S.D. Fla. 2020) ................................................................... 18

*Vargas v. Citrix Sys., Inc.*,
    716 F. Supp. 3d 1295 (S.D. Fla. 2024) ...................................................................... passim

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988)............................................................................... 9, 10, 17

*Wilson v. Great Am. Indus., Inc.*,
    979 F.2d 924 (2d Cir. 1992) ...................................................................................... 24

**Statutes**

15 U.S.C. § 78u.............................................................................................................. 18

**Regulations**

17 C.F.R. § 240.10b-5(b) ................................................................................................. 9

17 C.F.R. § 240.12 ......................................................................................................... 28

17 C.F.R. § 240.14 ......................................................................................................... 17

Plaintiffs Water Island Event-Driven Fund, The Arbitrage Fund, AltShares Merger Arbitrage ETF, and the Hilary L. Shane Revocable Trust (collectively, "Plaintiffs") hereby oppose Defendants' Combined Motion to Dismiss [ECF No. 79] (the "Motion" or "Mot.").[1]

## I.     INTRODUCTION

This Action arises from material misstatements and omissions of material facts in the proxy statement (the "Proxy") and other public filings related to the $4.6 billion acquisition of KnowBe4 by private equity firm Vista (the "Merger"). The Motion largely ignores that these misstatements allowed the Defendants to obtain the required shareholder approval for a transaction riddled with conflicts and self-dealing to the detriment of KnowBe4's public shareholders. Defendants' interests were adverse to those of the public shareholders because: (i) KnowBe4's acquirer, Vista, who already had a substantial stake in the Company and had a head start on any acquisition from its long-time interest in a KnowBe4 transaction, wanted to acquire the Company as cheaply as possible; (ii) KnowBe4's controlling stockholders KKR, Elephant Partners, and CEO Sjoerd Sjouwerman, rolled over nearly $800 million in equity into the newly private company; and (iii) four of seven directors on KnowBe4's Board were publicly known to be affiliated with KKR, Elephant Partners or Sjouwerman, and the other three directors each harbored undisclosed conflicts of interest. Each Defendant had a direct financial incentive to close the Merger at a depressed price because each was either personally acquiring KnowBe4 equity in the Merger—outright or through rollover—or was loyal to an entity that was doing so.

In order to ensure shareholder support, Defendants repeatedly told Public Stockholders the Merger was negotiated by an "***independent***" Special Committee and with the assistance of an "***independent***" financial advisor. The purported independence of the committee and advisors was critical because of the above-mentioned conflicts. Moreover, Public Stockholders were told in the Proxy and elsewhere that each Defendant believed the Merger was "***in the best interests of KnowBe4 and its stockholders***" or "***fair to KnowBe4's [public] security holders***."

In reality, the Merger was tainted by numerous undisclosed conflicts of interest and resulted in a per-share price the Special Committee knew was "***[n]ot the right zone for a transaction***." These material, undisclosed conflicts included:

---

[1] Capitalized terms undefined herein shall have the same meaning as in the Consolidated Amended Class Action Complaint ("Complaint") [ECF No. 70]. Citations to "¶__" refer to paragraphs in the Complaint. All emphasis is added and internal citations omitted unless otherwise noted.

- Special Committee member Shrikrishna Venkataraman and his wife had investments in KKR- and Elephant Partners-affiliated funds;

- Special Committee member Gerhard Watzinger had investments in KKR-affiliated funds;

- Special Committee member Kevin Klausmeyer served as a director for a company (Jamf Holding Corp.) affiliated with Vista, and served as a director for another company (Ivalua Inc.) affiliated with KKR; and

- Morgan Stanley had more than **$550 million** invested in KKR and its affiliates, including over $200 million directly invested in KKR.

Defendants also **redacted** the portion of a publicly filed Morgan Stanley slide that indicated the Special Committee instructed its bankers to advise Vista that any offer below $25.00 per share was "[n]*ot the right zone for a transaction*" and "*not worth sending*." Defendants further failed to disclose to investors that after learning of the $24.90 Merger per share, Defendant KKR decided to materially **increase** the size of its equity rollover.

The false and misleading statements and omissions of material facts in the Proxy and other public filings caused investors to approve the Merger and forgo receiving fair value for their shares and/or pursue other available remedies such as statutory appraisal rights.

Each of Defendants' arguments seeking dismissal of the Complaint fails:

**First**, Defendants' arguments relating to the false statements fail. Defendants do not challenge all of the alleged false and misleading statements, and for the ones they do challenge, Defendants largely resort to mischaracterizing them as "opinion" statements despite there being no indication they were intended to be the speakers' *belief*. As detailed below, courts regularly find similar statements to the ones alleged here to be actionable. *See* § IV.A, *infra*.

**Second**, Defendants' arguments relating to "state of mind" are wrong. Plaintiffs' Section 14(a) claim requires no showing of scienter—only that the Proxy was negligently prepared, which Plaintiffs have more than adequately alleged. *See* § IV.B, *infra*.

Plaintiffs' Section 10(b) claims plead a strong inference of scienter. As detailed below, each Defendant knew or was severely reckless in not knowing the statements in the Proxy and other public filings were false or misleading. Indeed, many of the Defendants themselves are the subject of the alleged misstatements. Moreover, while not required, Plaintiffs have alleged a textbook motive: Vista, Elephant Partners, KKR, and Sjouwerman—to whom each of the other Director Defendants owed loyalties—were all receiving KnowBe4 equity in the Merger and thus had every

2

incentive to acquire that equity as cheaply as possible and secure shareholder approval of the favorable deal they engineered. *See, e.g.*, *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 52 (2d Cir. 2025) ("The desire of an acquiring entity to save money by acquiring a target company at a lower price is not a motive that every corporate insider has and gives rise to concrete financial gain."). *See* § IV.C, *infra.*

**Third**, the Complaint satisfies the loss causation pleading requirement by alleging that shareholders were harmed by selling or tendering their KnowBe4 shares at an artificially deflated value and/or forgoing available statutory appraisal rights on an uninformed basis. *See* § IV.D, *infra*.

**Fourth**, Defendants' statute of limitations argument for the Section 10(b) claims is wrong because the statute does not start to run until Plaintiffs discovered the fraud. Here, Plaintiffs' allegations are that statements from the October 2022 Merger announcement through the Proxy were *misleading* and induced shareholders to approve the Merger. Plaintiffs did not learn of the truth, and the statute of limitations did not start to run, until November 2024. *See* § IV.E, *infra*.

**Finally**, Defendants' arguments relating to the Section 20(a) control claims are belied by the facts here, including that the vast majority of the Defendants are alleged to have signed the Proxy and/or Schedule 13E-3; KKR and Elephant Partners appointed members to the KnowBe4 Board; and KKR, Elephant Partners and Vista had contractual rights and obligations relating to ensuring the Proxy was accurate. These facts suffice to show control. *See* § IV.F, *infra*.

Accordingly, Defendants' Motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

KnowBe4 is a leading cybersecurity awareness training company. ¶50. Prior to the Merger, the Company was dominated by its early investors: private equity firms KKR and Elephant Partners, and the Company's founder and CEO, Sjouwerman. ¶51. Following the Company's IPO in April 2021, Elephant Partners beneficially owned 28.83% of KnowBe4's total voting power, KKR owned 19.76%, and Sjouwerman owned 4.07%, collectively owning over 50%. ¶52.

KnowBe4 grew rapidly as a public company by aggressively expanding into international markets and consistently reporting impressive financial results. ¶¶59, 62. In May 2022, the Company announced record quarterly revenue, beating all previously announced guidance "across the board," and in August 2022, the Company again beat Wall Street's guidance by reporting over 36% year-over-year annual recurring revenue growth ("ARR"). ¶¶62, 63. Securities analysts at Truist and Cowen set price targets of $28 for KnowBe4's stock. *Id.*

Despite KnowBe4's strong growth trajectory, on October 12, 2022, the Company announced that it would be taken private by private equity firm Vista at a price of $24.90 per share. ¶66. Unlike the Public Stockholders, insiders KKR, Elephant Partners, and Sjouwerman would not be completely cashed out in the Merger, but would be allowed to participate in the Company's future success by rolling over a significant portion of their equity into the private company. *Id.*

As they sought shareholder approval for the Merger, Defendants issued a series of public statements which were materially false and misleading or omitted material facts. For example, the October 12, 2022 Merger Press Release falsely assured shareholders that the deal was negotiated and approved by "an independent Special Committee," with Morgan Stanley as its "independent" financial advisor. ¶68. The next day, KnowBe4 filed an 8-K reiterating these misrepresentations, emphasizing that the Special Committee was "comprised solely of independent and disinterested directors" assisted by its "independent financial . . . advisor[]." ¶¶117-118.

On December 22, 2022, KnowBe4 issued the Proxy seeking Public Shareholder approval for the Merger. ¶¶71-72. The Proxy contained a number of materially false and misleading statements and omitted information necessary to make the statements made not misleading.

*First*, the Proxy repeatedly touted that the Merger process was overseen by a Special Committee "*comprised solely of independent and disinterested members* of the KnowBe4 Board." ¶77. The Proxy acknowledged that the Special Committee was needed due to "potential conflicts of interest involving members of the KnowBe4 Board . . . including if any of the existing significant stockholders of KnowBe4 elected to rollover any portion of their equity." ¶76. Indeed, the influential Harvard Law School Forum on Corporate Governance has emphasized the critical role that special committees play, as these committees are meant to "protect stockholder interests by delegating a decision to a group of independent, disinterested directors in cases where the interests of certain directors . . . differ significantly from those of the public stockholders." ¶69. Accordingly, a special committee is "only effective" if its "members are disinterested and independent" from all parties to the deal and it retains "advice from independent advisors." *Id.* KKR's own counsel has written that "all relevant facts relating to the deal, *including any relationships* [or] *conflicts*" must be "disclosed to the minority stockholders so that they can make an informed decision about whether to approve the transaction." *Id.*

But the Special Committee here was not independent, as *all three* members—Venkataraman, Watzinger, and Klausmeyer—harbored undisclosed conflicts of

interest. ¶¶77-85. Venkataraman had significant investments in both Elephant Partners and KKR, both of whom rolled their equity over and benefitted from a deflated sale price, while his wife was a Managing Director at Morgan Stanley. ¶¶80-83. Watzinger had investments in KKR funds and relationships with several partners of Vista, which purchased KnowBe4 and likewise stood to gain from a depressed price. ¶84. Klausmeyer served as a director of Vista-controlled Jamf, earning over $1.2 million in fees, and also served on the board of KKR-invested Ivalua alongside Defendant Shanley. ¶85. None of these conflicts—which tied each Special Committee member's interests to KKR, Elephant Partners, and/or Vista—were disclosed to the public.

*Second*, while the Proxy touted Morgan Stanley's selection as financial advisor based on its "independence," in reality, Morgan Stanley had over $550 million invested in KKR and its affiliates, including more than $200 million directly invested in the KKR parent company. ¶91. Thus, Morgan Stanley had a significant financial interest in maximizing value for KKR, thereby promoting its own interests. *Id.* Rather than disclosing the full extent of Morgan Stanley's investments in KKR, the Proxy only vaguely stated "Morgan Stanley . . . may have committed and may commit in the future to invest in private equity funds managed by . . . KKR." ¶90.

*Third*, although the Proxy assured stockholders that the Special Committee had determined the $24.90 per share price was "fair" and "in the best interests" of Public Stockholders, internal Morgan Stanley materials presented to the Special Committee tell a different story. ¶92. Specifically, in a September 15, 2022 Morgan Stanley presentation to the Special Committee—partially disclosed by Defendants as an attachment to a Schedule 13E-3 filing with the SEC on December 22—a slide showed that the Special Committee had directed that any price below $25 per share was "[*n*]*ot the right zone for a transaction*" and "*not worth sending*." ¶¶94-95. The slide also indicated that prices from $25-$27 per share were at the "[l]ow end of guidance" and would "need some work." ¶95. Tellingly, Defendants *redacted* this critical information from the public version of the slide, knowingly concealing the Special Committee's views that the $24.90 price fell below their own minimum acceptable threshold. ¶¶94-96, 170-172.

*Fourth*, the Proxy failed to disclose that KKR dramatically increased its equity rollover after learning of the deal price. ¶¶97-98. Initially, KKR planned to roll over only $150 to $200 million in equity into the newly private KnowBe4, but upon discovering the low deal price, KKR decided to roll over $300 million. *Id.* Notably, the Special Committee had specifically recognized the materiality of rollover amounts and timing and "how conveying this information . . . may

5

impact the pricing for the transaction." ¶99. KKR's decision to increase its rollover amount *after* learning the price—indicating it believed the equity was worth more than the cash consideration being paid to Public Stockholders—was omitted entirely from the Proxy. ¶¶100, 156-158.

Beyond these misrepresentations and omissions, the Merger process itself was designed from the outset to favor "founder-friendly" Vista over all other potential bidders. ¶102. Known for its "sprinting" acquisition strategy, Vista was well-positioned to exploit this advantage, leveraging its long-standing relationship with KnowBe4 (Vista owned 10.42% of KnowBe4 after the IPO) and information from prior acquisition discussions to secure an advantageous deal. ¶¶143-149, 168-169. The Special Committee allowed Vista to maintain its timing and informational advantages, refusing to pause Vista's due diligence while other interested parties were engaged in deal discussions. ¶104. With no "go-shop" provision (which would allow for higher bids after announcement of the deal with Vista) and zero price competition, Vista could offer a suboptimal price knowing the conflicted Special Committee would approve. ¶105. Given the skewed process, the false assurances about the Special Committee's independence and the deal's fairness became critical to securing necessary Public Stockholder approval. ¶106.

The Merger closed on February 1, 2023. ¶107. The Public Stockholders had been misled to approve the deal they believed was fair and in their best interests—approval which was further ensured by KKR, Elephant Partners, Sjouwerman, and Vista "down-convert[ing]" 90% of their Class B shares to Class A shares to control the Class A vote. ¶¶173-176. As a result, Public Stockholders received $24.90 per share in cash and KnowBe4's stock was delisted from NASDAQ. ¶107. Notably, KnowBe4 continued its strong performance post-Merger, reporting approximately 30% revenue and ARR growth in both Q3 and Q4 2022. ¶108. Public Stockholders—who forced out at an artificially depressed price—were denied the opportunity to benefit from the Company's continued growth. *Id.*

## III.   LEGAL STANDARD

"To state a claim under § 14(a) of the Exchange Act and Rule 14a-9, Plaintiffs are required to allege that Defendants prepared a proxy statement containing a material misstatement or omission that caused Plaintiffs' injuries." *Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *11 (M.D. Fla. June 15, 2023). The plaintiff must allege "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Id.* (cleaned up).

To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called 'loss causation.'" *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 919 (11th Cir. 2020).

On a motion to dismiss, the Court "must accept the factual allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor." *Taylor v. Serv. Corp. Int'l*, 2021 WL 5050175, at *7 (S.D. Fla. Nov. 1, 2021). "[W]hile Rule 9(b) and the PSLRA impose a stringent pleading standard upon a securities law plaintiff, they do not demand sheer perfection or set the bar so high as to make it near impossible to get beyond the dismissal stage." *100079 Can., Inc. v. Stiefel Lab'ys, Inc.*, 2011 WL 13116079, at *14 (S.D. Fla. Nov. 30, 2011).

## IV.   ARGUMENT

### A.   The Complaint Alleges Actionable Misstatements and Omissions[2]

#### 1.   The Complaint Adequately Alleges Falsity Regarding the Special Committee's Independence

Defendants assert that the challenged statements regarding the Special Committee's independence are opinion statements. Defendants are wrong. In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the Supreme Court explained the difference between facts and opinions, quoting Webster's Dictionary: "A fact is a thing done or existing or an actual happening" while "an opinion is a belief, a view, or a sentiment." *Id.* at 183 (cleaned up). None of the following statements express in any way that it was the Defendants' subjective *belief*, *view* or *sentiment* that the Special Committee was independent;[3] on the contrary,

---

[2] The Motion argues "Plaintiffs Do Not Adequately Allege Falsity" of several statements in the Complaint (Mot. at 12-19), but is silent regarding the falsity of (i) opinion statements by the KnowBe4 Board (¶¶114, 121); (ii) opinion statements by KKR, Elephant Partners and Vista (¶122); and (iii) the statement in the Proxy that "the Special Committee discussed its views on valuation, including that it believed that a transaction with a value in the mid-to-high $20's per share range was appropriate for a potential acquisition" (¶125). Defendants have forfeited any such argument. *See Ghandour v. City of Miami*, 710 F. Supp. 3d 1188, 1200 (S.D. Fla. 2024).

[3] Defendants' citations to *Focus* and *Smylka* are irrelevant because in those cases it was clear the statements were opinions. For example, in *In re Focus Financial Partners*, the proxy stated that the special committee "did not believe that [Goldman's] additional role [in the sale of NKSFB] would present a material conflict of interest for Goldman." 2025 WL 961488, at *10 (D. Del. Mar 31, 2025). Here, there is no such indicia of an opinion statement. *See Omnicare*, 575 U.S. at 183.

they are factual assertions that the Special Committee was, in fact, independent:

- "KnowBe4's Board of Directors (the 'Board') formed a Special Committee of the Board *comprised solely of independent and disinterested directors* (the 'Special Committee') to engage with Vista . . . ." ¶117 (quoting the Oct. 13, 2022 8-K).

- The Board formed the Special Committee "*comprised solely of independent and disinterested directors* . . . to engage with Vista." ¶127 (quoting the Proxy).

- "The Special Committee, since its formation, *has consisted solely of independent (for purposes of serving on the Special Committee) and disinterested directors* that are not affiliated with and are independent of, any of the potential counterparties to a potential acquisition of KnowBe4 (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole) and *were otherwise disinterested and independent* with respect to a potential acquisition of KnowBe4 (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole . . . ." ¶129 (quoting the Proxy).

Courts routinely hold that the failure to properly disclose directors' conflicts of interest in the context of a take-private merger is actionable. For example, in *Siegmund v. Xuelian Bian*, 2018 WL 1611847, at *10 (S.D. Fla. Apr. 2, 2018), the Court denied a motion to dismiss where the plaintiff alleged defendants failed to disclose certain transactions by directors and officers with related parties. Finding that this conduct qualified as "deceptive" for purposes of a Rule 10b-5 action, the Court, quoting binding precedent, held:

> [D]irectors and officers of a corporation are under a duty to disclose their interests in other parties that engage in transactions with the corporation. The existence of such interests in a party to a securities transaction with the corporation is "material" information to the corporation's shareholders or directors; thus, the failure to disclose such information is "deceptive" within the meaning of Rule 10b–5.

*Id.* (quoting *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979));[4] *see also Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("where

---

[4] Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

a proxy statement fails to disclose either that a member of management has a personal stake in the corporate decision being made or that some special relationship exists between a member of management and some other party with interests adverse to the shareholders," the "failure to disclose such facts states a claim under the federal securities laws"); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 994 (2d Cir. 1988) ("long-standing business relationship" between directors of surviving company and director recommending the merger should have been disclosed); *In re Dell Techs. Inc. Class V Stockholders Litig.*, 2020 WL 3096748, at *35–38 (Del. Ch. June 11, 2020) (independence statements actionable when directors had undisclosed conflicts that "compromised [their] ability to engage in hard-nosed bargaining as a member of the Special Committee").

The Proxy's statement that the Special Committee was "comprised solely of independent and disinterested directors" conveyed to shareholders that no committee member had material ties to any interested parties in the Merger, especially KKR and Elephant Partners.[5] By making this representation, Defendants triggered a duty to disclose any facts necessary to prevent their statement from being misleading, including the Special Committee members' financial interests, prior affiliations, and relationships with interested parties Sjouwerman, KKR, Elephant Partners, and Morgan Stanley. "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, once Defendants made public statements about the independence and disinterestedness of the Special Committee, they came under a duty to ensure that those statements were "not so incomplete as to mislead." *Id.*; *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 770–71 (11th Cir. 2007) (holding that a duty to disclose all material information relating to a particular subject arises by voluntarily "touting" the subject to investors).

The October 13, 2022 Form 8-K and the Proxy both stated the Special Committee consisted "***solely*** of independent and disinterested directors," meaning all three members were purportedly independent. Thus, if even one member of the committee was not independent and disinterested,

---

[5] *Mills v. Esmark, Inc.*, 544 F. Supp. 1275, 1295 (N.D. Ill. 1982), is inapposite, as that case involved a board's standing compensation committee tasked with compensation administration, unlike the "independent" Special Committee here, formed on an *ad hoc* basis specifically to cure "the potential conflicts of interest involving members of the KnowBe4 Board . . . if any of the existing significant stockholders of KnowBe4 elected to rollover any portion of their equity." ¶¶76-77.

Defendants' representations would be false and misleading. Here, Plaintiffs have adequately alleged that *all three members* had material undisclosed conflicts of interest.

*Venkataraman*. Venkataraman was not independent as he and his wife held undisclosed investments in funds affiliated with both KKR and Elephant Partners. ¶¶21, 80. These investments were likely substantial, given that Elephant Partners' funds typically require multi-million-dollar commitments. ¶81. Venkataraman's ties to these entities—each of which stood to benefit from the low Merger price because they (unlike Public Stockholders) were rolling over hundreds of millions of equity into the new company—were known to the Board but not disclosed to shareholders. ¶82.

Further heightening this conflict, Venkataraman's wife was a long-time Managing Director at Morgan Stanley, including serving as Co-Head of its Americas Securities Lending division at the time of the Merger. ¶83. This personal connection further undermines the independence of both Morgan Stanley and the Special Committee. Despite Morgan Stanley's role as the "independent" financial advisor to the Special Committee, this relationship was undisclosed in the Proxy. *See Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 301–02 (D. Conn. 2021) ("[T]he failure to disclose even potential conflicts of interest may be actionable under federal securities law . . . . The relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made.") (quoting *Wilson*, 855 F.2d at 994).

*Watzinger.* Watzinger also lacked independence. He held investments in KKR-affiliated funds and maintained personal and professional relationships with individuals affiliated with Vista. ¶¶25, 84. These ties created a direct conflict with his role on the Special Committee, which was tasked with evaluating a transaction involving both KKR and Vista. *Id.* While these conflicts were disclosed internally to the Special Committee, they were never disclosed to shareholders. ¶84. The Proxy instead represented that Watzinger was "independent and disinterested," despite his financial and relational ties to the parties on both sides of the transaction. ¶77. As KnowBe4's second largest shareholder at the time, KKR's intent to roll over a substantial portion of its equity into the new company demonstrates that Defendant Watzinger was anything but independent or disinterested with respect to the interested parties in the Merger.[6]

---

[6] Defendants' cases are distinguishable. In *Vargas v. Citrix Sys., Inc*, 716 F. Supp. 3d 1295, 1308 (S.D. Fla. 2024), the Court found that the complaint, unlike here, lacked "supporting facts that would put a director's loyalty at issue, such as the form of reward or proximity of board

*Klausmeyer.* Klausmeyer was conflicted due to his directorships at two companies affiliated with the interested parties in the Merger—Jamf, a Vista-controlled company; and Ivalua, a KKR-affiliated company. ¶¶23, 85. Vista appointed Klausmeyer to the Jamf board, where he earned over $1.2 million in fees between 2019 and 2023. ¶85. This was significant because, aside from his work as a director, Klausmeyer had not been regularly employed since 2011. *Id.* Additionally, Klausmeyer was appointed by KKR to Ivalua's board in October 2019, where he served alongside Defendant Shanley, a KKR Partner and member of the KnowBe4 Board, until August 2020. *Id.* These affiliations were not disclosed in the Proxy, nor was the fact that Klausmeyer's board positions were arranged by Vista and KKR—two parties interested in the Merger and, particularly, in keeping the Merger price low. *Id.* Defendants disregard that these two board appointments gave Klausmeyer an even greater incentive to appease Vista and KKR by facilitating their scheme to take KnowBe4 private at a steep discount—which is exactly what occurred. *See In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *20–21 (Del. Ch. Sept. 19, 2008) (special committee chairman not independent where he "was on the boards of . . . public companies precisely because of his relationship with" controller). Such conflicts of interest are deemed material facts that should have been disclosed given that "[a]n adequate disclosure of th[ese] relationship[s] would have warned the stockholders to give more careful scrutiny to the terms of the merger than they might to one recommended by an entirely disinterested board." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 n.6 (1970); *Kas*, 796 F.2d at 513.

## 2. The Complaint Adequately Alleges Falsity Regarding Morgan Stanley's Independence

Defendants argue that the Proxy's representations about Morgan Stanley's independence are also inactionable statements of opinion. Again, they are wrong. In fact, Defendants stated in both the October 13, 2022 8-K and the Proxy that Morgan Stanley was an "independent" financial advisor to the Special Committee. *See, e.g.*, ¶86 (the "Special Committee selected Morgan Stanley to act as its financial advisor based on, among other things, Morgan Stanley's *independence*");

---

appointments." In *Focus Financial*, the Court held that allegations that directors had personal relationships with each other "are insufficient, *without more*, to rebut the presumption of independence." 2025 WL 961488, at *7 (emphasis added). Here, Defendants wholly ignore the additional "supporting facts" (beyond personal relationships) that Watzinger had investments in KKR-affiliated funds, creating a conflict of interest—the exact same conflict that the "independent" Special Committee was created to purportedly address. ¶84.

¶131 (the Special Committee "evaluated the Merger, ***with the assistance of its own independent financial and legal advisors***"); ¶117 (same). These statements were not couched as opinions held by the Special Committee—they were factual assertions as to the purported independence of its financial advisor for the Merger and did not contain any qualifying terms regarding the Special Committee's "beliefs" that would make these statements mere opinion.[7] *See* § IV.A.1, *supra*.

Courts have stressed the importance of a full and fair disclosure regarding financial advisor conflicts and compensation agreements "[b]ecause of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives[.]" *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*, 2024 WL 1896096, at *15–21 (Del. May 1, 2024) (reversing dismissal of complaint based on failure to disclose financial advisors' conflicts); *City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, 314 A.3d 1108, 1132 (Del. Mar. 25, 2024) (same).

Here, Morgan Stanley was nowhere near "independent" because it held over $550 million of investments in KKR-affiliated funds, including over $200 million invested directly by KKR itself. ¶¶49, 70, 91, 131-134. These are substantial, material investments that should have been disclosed to investors. While the Proxy disclosed that Morgan Stanley "may have committed" and "may commit in the future" to invest in funds managed by Vista, KKR, or Elephant Partners, that is insufficient where "Morgan Stanley had indeed already invested nearly half a billion dollars." *Brookfield*, 314 A.3d at 1133 (holding that "[t]he use of 'may' in the Proxy is misleading" in an almost identical scenario involving Morgan Stanley and that "[t]his misleading language also makes it less likely that a stockholder would have been prompted to locate Morgan Stanley's [counterparty] holdings in its publicly filed form 13F").

Morgan Stanley's conflicts are particularly significant due to KKR's role in the Merger. *Id.* at 1134 (holding that "an advisor's concurrent engagement with a transaction counterparty can present legitimate concerns regarding the advisor's objectivity"). As alleged in the Complaint, KKR was not aligned with the Public Stockholders—who were being cashed out—because KKR

---

[7] Even if these statements could be considered opinion, they are actionable under *Omnicare*, because they did not "fairly align" with information known to Defendants at the time. 575 U.S. at 188–89 (opinions are actionable, regardless of whether they are sincerely believed, if they did not "fairly align" with known facts); *see also Alaska v. Ryder Sys., Inc.*, 603 F. Supp. 3d 1229, 1238 (S.D. Fla. 2022) (opinion actionable where complaint pleads "facts alleging that Defendants possessed information that did not support Defendants' opinions as articulated to investors").

rolled over a substantial portion of its investment into the new company. ¶¶88, 97-98. Thus, KKR was essentially partnering with Vista in the newly private KnowBe4, as KKR would be a significant investor in the continuing company. ¶¶131-134. An independent financial advisor is intended to protect public stockholders' interests when such conflicts are present. Morgan Stanley's financial investments in KKR compromised its independence, and Defendants' failure to disclose the extent and nature of these investments made their representations about Morgan Stanley's independence materially false and misleading. These allegations are more than sufficient to plead falsity. *See, e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 863 (Del. 2015) (concluding that "RBC's failure to fully disclose its conflicts . . . led to a lack of disclosure in the Proxy Statement"); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *43 (Del. Ch. Oct. 16, 2018) (holding that a financial advisor's undisclosed interest in a transaction undermined its independence and tainted the board's process because "Deutsche Bank's ongoing relationship with Avago gave it a powerful incentive 'to maintain good will and not push too hard' during the negotiations[, and] Deutsche Bank's position on both sides of the deal necessarily colors the court's assessment of the decisions that the directors made").

### 3. Plaintiffs Adequately Alleged That The Special Committee's Opinion About The Fairness Of The Merger Was Materially False And Misleading

*Omnicare* holds that a statement of opinion is actionable in at least two circumstances. First, "a statement of opinion that 'falsely describes the speaker's own state of mind' is an untrue statement of fact—as to what the speaker actually believes—and accordingly will 'subject the issuer to liability.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019) (quoting *Omnicare*, 575 U.S. 184–85). Second, a statement of opinion is actionable due to a material omission where a plaintiff alleges material "facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 194. Here, the Special Committee's opinion about the fairness of the Merger is actionable because it was not genuinely held and it omitted material facts known to the Special Committee that rendered its opinion misleading.

The Proxy stated that the Special Committee unanimously determined the Merger was "advisable, fair to and in the best interests of KnowBe4 and its stockholders, including the [Public] Stockholders." ¶121. The Special Committee's opinion concerning the fairness of the Merger was materially false and misleading because Defendants failed to disclose: (i) the significant conflicts

of interest held by both the Special Committee and Morgan Stanley (which made their opinion regarding the fairness of the Merger less reliable) (¶¶78, 91); (ii) KKR's decision to double its equity rollover upon learning of the agreed-upon Merger price of $24.90 per share (which indicated KKR believed equity in KnowBe4 was more valuable than the $24.90 per share cash) (¶97); and (iii) that the Special Committee had internally concluded that the $24.90 per share price was not a fair merger price (¶95).

Not only did Defendants fail to disclose these material facts, but they also took steps to actively conceal material information by redacting direct evidence of the Special Committee's own views on price from the public version of Morgan Stanley's presentation to the Special Committee. ¶¶94-96, 124. Specifically, Defendants redacted from the presentation that the Special Committee's direction was that anything below $25 per share was "[n]ot the right zone" and that $25-$27 was at the "[l]ow end of guidance" requiring "some work." ¶95.[8] Undisclosed to the Public Stockholders, the Merger price of $24.90 per share fell below the Special Committee's own stated minimum threshold. ¶124. Defendants' omissions demonstrate that the Special Committee could not have held a good faith belief in the fairness of the Merger or the adequacy of the $24.90 per share Merger consideration.[9]

### 4. Plaintiffs Adequately Alleged That The Proxy Omitted Material Facts About KKR's Preliminary Rollover Estimates

The Complaint alleges that in July 2022 and on September 13, 2022, KKR conveyed its plan to roll over approximately $150 million to $200 million—at a time when the expected transaction price was in the mid-to-upper $20s per share. ¶¶137-138. By late September 2022, however, when it was clear the Merger price would be lower than expected, KKR decided to increase its roll over to $300 million. ¶139. This timing is crucial and is not disclosed in the Proxy.

---

[8] Unable to reconcile the Morgan Stanley slide with the alleged false and misleading statements, Defendants' Motion falsely claims the Morgan Stanley slide indicated "$24.00 per share was '[n]ot the right zone for a transaction'" (Mot. at 18). But the chart shows that language applied to a range of $23.00 to $25.00 per share—which, of course, included the $24.90 per share Merger price.

[9] Defendants' citation to *Smykla v. Molinaroli*, 85 F.4th 1228 (7th Cir. 2023), is unavailing. For one thing, *Smykla* conflicts with binding precedent in *Carvelli*. For another, *Smykla* is distinguishable. In *Smykla*, the court held that plaintiffs could not state a claim for "merely alleging that defendants should have given more emphasis to certain facts" where "*the proxy statement contained all required disclosures.*" *Id.* at 1239. Here, Plaintiffs allege the Special Committee's opinion regarding the fairness of the Merger was false and misleading because it omitted and— worse—actively concealed material facts the Special Committee knew.

Defendants attempt to sweep away this inconvenient fact by arguing that KKR's early rollover estimates were preliminary and that the Proxy disclosed KKR might roll over "all or a part of [its] equity interests" (Mot. at 19), but these arguments are misplaced.[10] The fact that, late in the sale process, KnowBe4's second largest shareholder, a sophisticated private equity firm, had decided to increase its equity rollover in the Company by 50-100% was highly material information for public stockholders (who were not given the opportunity to roll over their stock).

An omission is material where "a substantial likelihood exists that a reasonable investor would have viewed . . . [the] omission as significantly altering the total mix of information made available." *Vargas*, 716 F. Supp. 3d at 1309 (citation omitted) (cleaned up). Indeed, Defendants themselves acknowledged the materiality of this information. According to the Proxy, at a Special Committee meeting on September 8, 2022, "The Special Committee's advisors discussed certain signaling effects of a significant rollover of KKR's . . . equity in a potential acquisition of KnowBe4 by Vista and how conveying this information in advance of Vista's proposal or an agreement on price may impact the pricing for the transaction." ¶99. The fact that KKR doubled its preliminary rollover estimate upon learning the agreed-upon price signaled KKR's belief that the Merger price significantly undervalued the Company—information a reasonable investor would view as significantly altering the total mix of information when deciding whether to approve the transaction.[11]

### 5. Plaintiffs Adequately Alleged That Defendants Were "Makers" Of The Challenged Statements

The Complaint expressly alleges that all Defendants made the challenged statements, satisfying *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Under *Janus*, "attribution within a statement . . . is strong evidence that a statement was made by . . . the

---

[10] Defendants cite *Sulzer v. Associated Madison Cos., Inc.*, 1985 WL 5856, at *3 (M.D. Fla. May 10, 1985), for the proposition that no duty exists to disclose preliminary discussions, but that is not the relevant issue here. The relevant question is not whether Defendants had a duty to disclose KKR's decision to double its equity rollover, but whether such information was material to the Public Stockholders in deciding how to vote on the Merger.

[11] Defendants' citation to *In re KLX, Inc. Securities Litigation,* 232 F. Supp. 3d 1269, 1276 (S.D. Fla. 2017), actually undercuts their own position. (Mot. at 19). While Defendants note that the Proxy disclosed KKR might roll over "all or a part" of its equity, this general disclosure is incomplete. *Id.* Disclosing that KKR considered rolling over "all or part" of its equity is vastly different from disclosing that KKR doubled its intended rollover specifically because the Merger price was inadequate. The latter would have materially altered the total mix of information.

party to whom it is attributed." *Id.* at 142–43. First, Vista, along with KnowBe4, jointly issued the Merger Press Release on October 12, 2022, which falsely stated that the Special Committee was "comprised solely of independent and disinterested directors" and that its financial and legal advisors were independent. ¶217. Second, KnowBe4 and the Director Defendants disseminated the December 22, 2022 Proxy containing false and misleading statements and omissions of material facts described above. ¶219. Third, the Proxy also contained the opinions of the Director Defendants, Vista, Elephant Partners, and KKR that the Merger was in the "best interest of" and/or "fair to" the Public Stockholders—which they knew to be untrue. ¶220. Fourth, also on December 22, 2022, KnowBe4, KKR, Elephant Partners, Sjouwerman, and Vista jointly issued a Schedule 13E-3 for the Merger that incorporated the Proxy and its false and misleading statements, and which Sjouwerman, Daly and Shanley personally signed. ¶221. Such express attribution is more than sufficient to establish that each Defendant was a "maker" of these material misstatements.[12]

### B. Defendants' State of Mind Argument With Respect to the Section 14(a) Claims is Wrong

Plaintiffs easily meet the low bar of alleging each Defendant negligently issued the Proxy for the Section 14(a) claim. As explained in the Complaint, the Section 14(a) claim is based on the failure of "Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein." ¶210.

It is well settled that Section 14(a) claims that sound in negligence do not require a showing of scienter. *See, e.g.*, *Craig v. Target Corp.*, 2024 WL 4979234, at *14 (M.D. Fla. Dec. 4, 2024) ("A section 14(a) claim requires an allegation that the defendant *negligently* drafted a proxy statement."). Defendants' own cases confirm as much. *See Vargas*, 716 F. Supp. 3d 1295 n.3 ("section 14(a) claim" does "not requir[e] scienter"). Defendants argue a scienter standard may

---

[12] Defendants' citations to *Galectin* and *Deme* are distinguishable. Unlike here, where the Complaint expressly attributes false statements to all Defendants, the *Galectin* court held that "[g]iven the bereft factual allegations[], Galectin is not liable for any statements or omissions in the stock promoters' articles," where stock promoters—not defendants—made the false statements. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272 (11th Cir. 2016). Similarly, the *Deme* court held that plaintiffs failed to allege that two defendants were the makers of any false or misleading statements, which they endorsed but which were made by a third defendant. *A&M Mgmt. Inc. v. Deme*, 2019 WL 7344795, at *3 (S.D. Fla. Mar. 14, 2019).

16

apply, but fail to point to *any* Supreme Court or Eleventh Circuit authority for that proposition.[13] Indeed, courts defining the applicable duty of care have made clear that where, as here, "the plaintiffs represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the statement, they are not required to establish any evil motive or even reckless disregard of the facts." *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301–02 (2d Cir. 1973).

Because Section 14(a) claims only require negligence, the "[u]se of a solicitation that is materially misleading is itself a violation of [the] law." *Mills*, 396 U.S. at 383. In other words, Section 14(a) liability may be imposed solely upon a jury finding that defendants disseminated a materially false or misleading proxy statement to shareholders. *See, e.g.*, *Wilson*, 855 F.2d at 995 ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard."); *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 196–97 (3d Cir. 2007) ("For liability to attach under § 14(a), all that is required is that a proxy statement be 'false or misleading with respect to any material fact.'"); *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (affirming that "a proxy solicitation that contains a misleading misrepresentation or omission violates [§ 14(a)] even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials"); *In re Wells Real Est. Inv. Tr., Inc. Sec. Litig.*, 2010 WL 11468441, at *10 (N.D. Ga. Aug. 2, 2010), *order clarified*, 2010 WL 11470142 (N.D. Ga. Nov. 1, 2010) ("if the fact finder determines that the information withheld was material, then these defendants would be, as a matter of law, negligent in choosing to omit the information from the Proxy materials").

Even if Defendants were correct that Plaintiffs' Section 14(a) claims sound in fraud, Plaintiffs are still not required to plead scienter. *In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d 704, 713 (E.D. Va. 2020) (even where a section 14(a) claim "sounds in fraud," scienter is not required). Instead, Plaintiffs are required to meet the requirements of section 78u-4(b)(2) and Rule 9(b), which means only that the complaint "set forth particular allegations about the

---

[13] Both of Defendants' out-of-circuit cases indicating scienter is required for Section 14(a) claims made that finding in the context of claims against outside directors and/or outside accountants. *See S.E.C. v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) (outside directors and accountants); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980) (outside accountants).

'who, what, when, where, and how' of the fraud." *Lee v. Frost*, 2021 WL 3912651, at \*4 (S.D. Fla. Sept. 1, 2021). Plaintiffs allege in detail the misleading nature of the Proxy, including who issued the Proxy (¶¶205, 207, 209), when the Proxy was issued (¶119), what statements in the Proxy were misleading (or what material facts were omitted) (¶¶121, 122, 125, 127, 128, 129, 131, 132, 133, 136), and "why those statements were misleading and the facts on which their belief was formed" (¶¶123, 124, 126, 130, 134, 137-139). *Craig*, 2024 WL 4979234, at \*15. Nothing more is required.

To the extent Plaintiffs' Section 14(a) claims require state-of-mind allegations at all, the Complaint alleges that each Defendant not only failed to exercise reasonable care, but also had actual knowledge and/or acted with severe recklessness, as detailed in Section IV.C. *See id.* (Section 14(a) pled where plaintiff alleged defendants were "aware or should have been aware of red flags," were "on notice that Target was subject to the risk," and the Target directors "knew or should have known of the significant social and political risks").[14]

### C.  The Complaint Alleges a Strong Inference of Scienter for the Section 10(b) Claims

The Complaint also meets the state-of-mind requirements for the Section 10(b) claim. It alleges particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind" (15 U.S.C. § 78u-4(b)(2)), namely, scienter. In the Eleventh Circuit, scienter may be alleged "by a showing that the defendant had 'an intent to deceive[,] manipulate or defraud' or that the defendant 'acted with a severely reckless state of mind.'" *In re PainCare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1289 (M.D. Fla. 2008); *Tung v. Dycom Indus. Inc.*, 454 F. Supp. 3d 1244, 1258 (S.D. Fla. 2020) (scienter "runs the continuum from intentional to recklessness"). When analyzing scienter allegations, courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The inference that the defendant acted with scienter need not be "the most plausible of competing inferences"; rather, it need only be "at least as compelling" as any opposing inference of scienter. *Id.* at 324.

The Complaint alleges a straightforward motive theory that Vista, Elephant Partners, KKR and Sjouwerman—whom each of the individual Director Defendants are alleged to be affiliated

---

[14] Defendants rely on *Karp v. First Connecticut Bancorp, Inc.*, but that is a *summary judgment* decision where testimony that the directors acted consistent with industry practice was unrebutted. 69 F.4th at 229. Further, in that decision the Fourth Circuit specifically noted "we decline to reach Karp's argument that the district court erred in holding that he failed to establish negligence." *Id.*

with and/or loyal to—acquired significant equity in the private post-Merger KnowBe4 and thus were motivated to do so at a cheap valuation. This theory is compelling and specific. As explained in *Shanda Games*, "[t]he desire of an acquiring entity to save money by acquiring a target company at a lower price is not a motive that every corporate insider has and gives rise to concrete financial gain." 128 F.4th at 52; *see also In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 283–84 (E.D.N.Y. 2000) ("being able to acquire a company for a significantly reduced price is a sufficient economic benefit to satisfy the motive requirement for scienter").

Unable to rebut this obvious motive, Defendants wrongly assert their "interests were aligned with those of Plaintiffs and the other stockholders." (Mot. at 21). Defendants' claim is not only illogical, but it is also belied by the Proxy's warning that "The Purchaser Filing Parties [Vista, Elephant Partners, KKR and Sjouwerman] have interests in the Merger that are different from, and in addition to, the unaffiliated security holders of KnowBe4." [ECF No. 60, Ex. A at p. 65].

Defendants' case law is equally misleading. Defendants cite *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, but that case involved a wholly different theory in which the defendants supposedly *inflated* the price of the stock, but "did not sell their stock just prior to a price drop." 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (also noting certain defendants *increased* their positions prior to the stock drop). Likewise, in *Rombach v. Chang*, the lack of motive was because there was no allegation "that defendants sold stock or profited in any way during the relevant period" and "defendants were among Family Golf's largest shareholders and shared the pain when the company failed." 355 F.3d 164, 177 (2d Cir. 2004). These cases are the opposite of the financial motive alleged here, where Vista, Elephant Partners, KKR and Sjouwerman were buyers of KnowBe4 equity and are alleged to have engaged in the fraud to purchase KnowBe4 equity at a discounted price. Put simply, by depressing the Merger price, each Defendant benefited by acquiring KnowBe4 equity on the cheap. And misleading investors to approve the Merger was required to complete that purchase.

Defendants' other scienter tactic is pretending the Complaint's scienter allegations are "non-existent" or somehow rely on impermissible group pleading. In reality, the Complaint more than adequately alleges that each Defendant acted with scienter.

*Vista.* As detailed above, as the acquirer of KnowBe4 in the Merger, Vista was financially motivated to acquire KnowBe4 as cheaply as possible. ¶¶147-149. Vista also knew of the flaws in the Merger process and of KKR's increased rollover. Indeed, through its NDA with KnowBe4 and

19

pre-Merger ownership interests in the Company, Vista is alleged to have had actual knowledge that it would have an unfair timing and informational advantage in connection with a potential acquisition. ¶145. The Motion concedes this is an allegation as to state of mind, but contends the Complaint contains "no details what Vista purportedly knew, let alone how one could infer (from that knowledge) a strong inference to deceive investors." (Mot. at 21). To the contrary, the Complaint alleges (i) Vista had a long-time desire to acquire KnowBe4; (ii) Vista knew it had an advantage in any sales process; (iii) Vista leveraged that advantage to negotiate a materially low deal price; and (iv) to consummate the purchase of KnowBe4 at the substantial discount, Vista was motivated to deceive investors in order to obtain shareholder approval of the proposed Merger. ¶¶143, 145, 147-149.

**KKR.**  In addition to the perverse financial motivations due to its rollover (¶151), KKR had actual knowledge of the information omitted from the misleading statements. *See In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002) ("Actual knowledge, of course, would also suffice" for scienter); *see also In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1241 (N.D. Ga. 2002) ("scienter may be shown by detailing either direct or circumstantial evidence of Defendants' actual knowledge or severely reckless state of mind"). KKR knew or was severely reckless in not knowing: (i) its *own* decision to increase its rollover after learning of the Merger price; (ii) that Venkataraman and Watzinger, as well as Morgan Stanley, had significant investments *in KKR*; and (iii) that Klausmeyer was on the board of KKR's affiliate.

In addition, KKR implicitly acknowledged the $24.90 per share Merger consideration was underpriced by increasing its planned rollover from $150-$200 million to $300 million after it learned of the Merger price. ¶¶156-158. As a highly sophisticated inside shareholder, KKR would have fully understood KnowBe4's business and financials and conducted a thorough financial analysis before increasing its rollover. The only logical inference from KKR deciding to increase its rollover is that KKR determined the equity in the private post-Merger KnowBe4 was worth more than the $24.90 per share cash consideration. As a result, KKR could not have possibly believed its representation that the Merger was fair to KnowBe4's Public Stockholders.

**Elephant Partners.**  The allegations demonstrating Elephant Partners' scienter largely mirror those of KKR's. Elephant Partners was able to cash out $498 million in the Merger and roll over $425 million in the private post-Merger KnowBe4. ¶152. As a buyer of KnowBe4 equity through the rollover, Elephant Partners was motivated to have the Merger approved despite the

materially low price. Also, like KKR, Elephant Partners was certainly aware (or was reckless in not being aware) that Venkataraman was conflicted through his investments in Elephant Partners-affiliated funds.

*Sjouwerman*.  Like KKR and Elephant Partners, Sjouwerman rolled over approximately half of his equity into the private post-Merger KnowBe4. ¶153. As a buyer through the rollover, Sjouwerman was motivated to have the Merger approved.

*Venkataraman, Klausmeyer and Watzinger*.  Venkataraman, Klausmeyer and Watzinger – the "Special Committee Defendants" – each had personal financial benefits and known ties to KKR, Elephant Partners and/or Vista that compromised their state of mind.

Venkataraman was loyal to KnowBe4's controlling shareholders KKR, Elephant Partners and Sjouwerman because he made a fortune (nearly $50 million) in compensation while working as KnowBe4's Co-President and CFO from 2018-2022. ¶163. In addition, Venkataraman and his wife held investments in KKR and Elephant Partners-affiliated funds. *Id.*

Watzinger was likewise loyal to KKR, Elephant Partners and Sjouwerman because he earned more than $15 million from serving as a KnowBe4 director for just three years. ¶165. In addition, Watzinger had investments in KKR-affiliated funds and maintained friendships with several KKR- and Vista-affiliated individuals.

Klausmeyer similarly was loyal to KKR, Elephant Partners and Sjouwerman from earning approximately $13 million from serving as a KnowBe4 director for about two years.  Klausmeyer was also loyal to Vista and KKR because he served on the board of directors of Jamf (a Vista controlled company) and Ivalua (which KKR invested in and KKR Partner Defendant Shanley formerly served on the board of). ¶164.

Each of these Special Committee Defendants acted on their skewed loyalties by negotiating, agreeing to and recommending approval of a Merger below the price they knew was fair. The Special Committee knew the sales process provided Vista with an unfair timing and information advantage. ¶¶168-169. This led to an unfairly low Merger price. Indeed, a slide in a September 15, 2022 Morgan Stanley presentation stated that the "Response Per Prior Special Committee Direction" was to tell Vista that anything below $25 per share was "[n]ot the right zone for a transaction" and that $25 to $27 per share was at the "[l]ow end of guidance" and "will need some work." ¶¶95, 170. Based on this direction, there is no other logical inference than that Venkataraman, Klausmeyer, and Watzinger believed the $24.90 per share price was not adequate.

21

Venkataraman, Klausmeyer, and Watzinger also must have known about their own personal conflicts that are the subject of certain of the alleged false and misleading statements.

***Daly, Shanley and Wilson.*** Daly, Shanley and Wilson were each conflicted through their affiliation with Elephant Partners or KKR. Specifically, Daly was conflicted because he is Elephant Partners' co-founder and General Partner, and Shanley and Wilson were conflicted because of their affiliation with KKR (Shanley is a KKR Partner, while Wilson is a KKR Senior Advisor). ¶160. Because of their senior positions at Elephant Partners and KKR, Daly, Shanley and Wilson shared the same perverse incentives as Elephant Partners and KKR. ¶161.

The above particularized scienter allegations for each Defendant go much further than those in Defendants' cornerstone case, *Brophy v. Jiangbo Pharmaceuticals, Inc.*, 781 F.3d 1296 (11th Cir. 2015). In that case, the Court found an executive in Florida was too far removed from accounting wrongdoing *in China* and that there was no alleged motive for the fraud besides the executive receiving her salary. *Id.* at 1306. Indeed, the *Brophy* court even recognized scienter allegations would have been adequate where a "senior financial executive [had] oversight of the processes that produce the company's financial statements" and if the plaintiffs had alleged the executive "knew or were severely reckless in disregarding how those processes were distorted by fraud." *Id.* at 1304–05. That situation is analogous to Defendants Venkataraman, Klausmeyer and Watzinger, who served on the Special Committee specifically formed to negotiate a sale of KnowBe4, and each of those Defendants were alleged to be aware or were severely reckless in disregarding how the Merger process and resulting price they negotiated was unfair.

Finally, Defendants' argument that their "stock sales are akin to involvement in a stock purchase program" (Mot. at fn 6) only underscores the significance of the allegations relating to KKR's increased rollover. Using Defendants' analogy, the facts surrounding KKR's rollover is equivalent to an insider planning to repurchase stock, but, after learning the stock price was artificially inflated, deciding to repurchase *less* stock to minimize its exposure to the forthcoming bad news and stock price decline. Here, the situation is the same but in the reverse: KKR was planning to sell most of its shares in the Merger, but, when it learned the Merger price was artificially depressed compared to the value of the stock, decided to sell $100-150 million less worth of its shares by increasing its equity rollover. Put another way, KKR's actions in increasing its rollover are analogous to it selling shares immediately prior to a stock price drop, a hallmark fact supporting scienter. *See In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at \*27 (N.D.

Ga. Aug. 2, 2019) ("stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter").

### D. The Complaint Adequately Alleges Loss Causation

The Complaint more than adequately pleads loss causation. As an initial matter, Defendants' Motion entirely ignores that "loss causation is not subject to the PSLRA's heightened pleading requirement and must only be pled in accordance with Federal Rule of Civil Procedure 8(a)(2)." *Skypoint Advisors, LLC. v. 3 Amigos Prods. LLC.*, 2019 WL 4600409, at *8 (M.D. Fla. Sept. 23, 2019). While the Complaint meets even the heightened pleading requirement, to satisfy the Rule 8 standard, Plaintiffs need only make "a short and plain statement" giving "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Because of the Rule 8 "plausibility" pleading standard and factual nature of the loss causation inquiry, it is usually inappropriate for a Court to rule on loss causation at the motion to dismiss stage. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.35 (5th Cir. 2009) ("[S]everal circuit courts and district courts point out that it is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over 'loss causation.'"); *Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, *5 (M.D. Fla. Sept. 28, 2009) (noting "loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss").[15]

The Complaint alleges the misstatements and omissions in the Proxy and other public filings harmed Public Stockholders in three ways, each independently sufficient to support loss causation at the pleading stage: (1) the tender of shares into the Merger for less than fair value; (2) the loss of their ability to exercise their state law appraisal rights on an informed basis; and (3) for the Section 10(b) class, the sale of shares during the Class Period at an artificially deflated value. ¶¶178, 179, 181, 183.

*First*, Plaintiffs plead the "materially false and misleading statements and omissions . . . caused Lead Plaintiffs and other members of the Class to vote in favor of the Merger and/or accept Merger consideration that failed to adequately value KnowBe4 common stock." ¶178. Courts have held this is adequate to plead loss causation. For example, in *Vargas v. Citrix*

---

[15] In merger cases, the requisite causation for securities fraud claims encompasses both "transaction causation and loss causation." *Craig*, 2024 WL 4979234, at *15. Defendants do not challenge transaction causation.

*Systems, Inc.*, the Court found an almost identical allegation – specifically, that "[t]he Amended Complaint alleges that but for the allegedly material misrepresentations and omissions in the Proxy, Citrix shareholders would not have voted for the Merger and cashed out their shares" – sufficed for pleading loss causation. 716 F. Supp. 3d at 1311. Other courts have found the same. *See, e.g.*, *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 92 (D. Conn. 2019) ("Multiple courts have also found that where, as here, a plaintiff asserts that shareholders were misled into approving an acquisition that undervalued the company, loss causation is adequately alleged"); *Mills*, 396 U.S. at 389 (holding that shareholders may suffer loss "if the merger resulted in a reduction of the earnings or earnings potential of their holdings").

*Second*, the Complaint alleges an independent basis for loss causation – that the misstatements and omissions in the Proxy and other public filings caused Class members to forgo exercising their statutory appraisal rights and receiving the fair value for their shares. ¶¶181, 183, 185, 186. The Second Circuit recently confirmed this theory of loss causation, explaining in *Shanda Games* that "loss causation may be established when a proxy statement prompts a shareholder to accept an unfair exchange ratio for his shares rather than recoup a greater value through a state appraisal." 128 F.4th at 57 (quoting *Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924, 931 (2d Cir. 1992)). Additional courts have reached the same conclusion. *See Merritt v. Colonial Foods, Inc.*, 499 F. Supp. 910, 914 (D. Del. 1980) (causation where misstatements affected shareholder's "investment decisions" including "whether to accept the offer, seek an appraisal, or institute proceedings in an attempt to enjoin the merger"); *Swanson v. Am. Consumers Indus., Inc.*, 475 F.2d 516, 521 (7th Cir. 1973) (sustaining Section 10(b) claim for "loss of [plaintiffs'] informed ability to exercise their statutory appraisal rights"). This District has recognized loss causation was adequately alleged in a similar situation where, but for the failure to disclose material information, the plaintiff could have exercised state law rights to seek to enjoin a merger. *Xuelian Bian*, 2018 WL 1611847, at *1 (loss causation pled where plaintiffs alleged defendants "fraudulently deprive[d] Linkwell shareholders of their stock for less than fair value" and related misstatements prevented shareholder from seeking to enjoin a freeze-out merger).

*Third*, for the Section 10(b) claims, the Complaint alleges that "Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Lead Plaintiffs and the Class, and induced Lead Plaintiffs and the Class to sell KnowBe4 shares at prices that were below the actual value of those securities[.]" ¶181. Defendants argue there is no

24

"corrective disclosure or other event linking the misstatements to a tangible loss," ignoring that this is not a typical Section 10(b) case because the truth was not revealed until *after* the Merger closed – i.e., when KnowBe4 stock was no longer publicly traded and thus the market could not absorb the truth. Defendants also wrongly argue the theory alleged by Plaintiffs here that "members of the class sold their shares at 'artificially devalued' prices due to the misstatements concealing the merger's unfairness" has been "rejected." (Mot. at 24). But Defendants do not cite a single case where that theory was even alleged. Indeed, both of Defendants' cases cited for the proposition that the artificial *deflation* theory alleged here has been rejected are cases that involved allegations of artificial *inflation*. *See Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 861 (11th Cir. 2015) (mem.) (stock price *declines* following disclosure of government subpoenas and an analyst report repackaging public information insufficient for loss causation); *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890, 894 (11th Cir. 2012) (stock price *decline* following admission of online institution's student enrollment were affected by government activity was not a concession the institution had engaged in improper recruiting tactics). Neither case involved a situation where the truth was not revealed until after the subject stock stopped trading publicly. Here, Plaintiffs allege that "[b]ased on Defendants' misrepresentations, KnowBe4's stock price became tethered to the underpriced Merger consideration" through the closing of the Merger, and that because "the market price was artificially depressed, members of the Class who sold their shares during the Class Period received an artificially lower value for their shares." ¶¶184-185.

Defendants also argue that Plaintiffs "fail to connect misstatements to economic harm beyond hypothetical 'fair value' arguments" (Mot. at 24), relying on two non-binding, out-of-circuit cases where the plaintiffs' allegations of unfair merger consideration were entirely speculative and not tied to the alleged undisclosed information. In *In re Ocera Therapeutics Securities Litigation*, the plaintiffs' claims regarding the true value of Ocera was based on "the consensus price target for Ocera by securities analysts" that were entirely based on public information. 806 F. App'x 603, 605 (9th Cir. 2020) (mem.). Similarly, in *Beck v. Dobrowski*, the plaintiff alleged the shareholders could have rejected the merger and continued to own shares, and such shares would have arguably been more valuable because of another *publicly disclosed* competing acquisition offer even though that offer was only 1% higher, would not close for several additional months, and included stock consideration that was much riskier than the cash merger consideration. 559 F.3d at 684. By contrast, here, Plaintiffs allege that each of the Defendants knew

but did not disclose KnowBe4's true value exceeded the Merger consideration based on the facts that (i) the $24.90 per share Merger price was below what the Special Committee had concluded was "[n]ot [in] the right zone for a transaction" and "not worth sending in a letter [proposal]," and well below the $25-27 range the Special Committee decided would "need work"; (ii) Morgan Stanley's financial analyses valued KnowBe4 at between $25.05 and $37.52 per share based on projections that excluded growth initiatives that were underway; and (iii) recognizing that the Merger was underpriced, inside shareholder KKR secretly increased its rollover commitment from its initial rollover discussions. ¶180. Indeed, the Complaint alleges significantly more than was alleged in *Vargas*, where the Court found loss causation was adequately alleged. There, the plaintiffs argued a benchmark transaction involving Citrix's acquisition of another SaaS business showed that the deal price undervalued Citrix and caused losses for its shareholders. *Vargas*, 716 F. Supp. 3d at 1295; *see also Lane v. Page*, 727 F. Supp. 2d 1214, 1236–37 (D.N.M. 2010) (plaintiff adequately alleged loss causation by alleging the stock was worth "more than the shareholders received from the merger and bases that allegation on alleged appraisals of which the Defendants were allegedly aware").

### E.     Plaintiffs' Section 10(b) Claims are Timely

Defendants argue that Plaintiffs' Section 10(b) claim is time-barred under the two-year statute of limitations in 28 U.S.C. § 1658(b)(1), asserting that Plaintiffs were on "inquiry notice" of the Section 10(b) claims as of the October 12, 2022 Merger announcement as public stockholders were purportedly aware of "serious red flags" at that time.

The Supreme Court has held "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010). This standard is different than the "inquiry notice" standard, as it requires a showing that the plaintiff discovered or reasonably would have discovered *all* necessary facts underlying the violation, not just facts that would lead a reasonably diligent plaintiff to investigate further. *See id.* at 651. As such, the inquiry under § 1658(b)(1) is highly fact-intensive and is generally not resolved on a motion to dismiss. *See, e.g., Delgado v. Rutledge*, 2024 WL 3570258, at *3 (S.D. Fla. Mar. 29, 2024) (refusing to dismiss Section 10(b) claim on limitation grounds because the court could not determine, "as a matter of law, that a reasonable person in Plaintiffs' position would have

26

discovered facts alerting them to the fraud by [Defendants' proposed date]"); *Friedman v. Hammer*, 2020 WL 2559549, at \*3 (S.D. Fla. May 20, 2020) (defendant's limitations arguments raised "factual questions inappropriate for resolution on a motion to dismiss"). As courts in this Circuit have held, "a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred because [a] statute of limitations bar is an affirmative defense, and . . . plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *Lindley v. City of Birmingham*, 515 F. App'x 813, 815 (11th Cir. 2013) (citation omitted).

Defendants' argument ignores that Plaintiffs allege the fraud is based on *misleading statements in the October 12, 2022 Merger announcement* aimed to dispel the red flags, including assuring investors that the Merger was negotiated by an "independent" Special Committee and that the Special Committee and KnowBe4 Board had determined the transaction was in the best interests of KnowBe4 stockholders. Of course, at the time of the Merger announcement Plaintiffs had no reason to believe those statements were false and misleading, and thus, Plaintiffs had no reason to believe they had a cause of action for fraud at the time of the Merger announcement. ¶68. It was not until the filing of the Chancery complaint on November 7, 2024 (which was based on internal company documents not available to public stockholders), that Plaintiffs learned of the conflicts of interest that revealed Defendants' statements were false and misleading. *See Le Clair v. KnowBe4, Inc.*, C.A. No. 2024-1143-KSJM (Del. Ch. Nov. 7, 2024); *see also* ECF No. 70 at 1 (noting that Plaintiffs' claims are based in part on "publicly filed pleadings in other proceedings, including the action for breach of fiduciary duty brought by shareholders in the Delaware Court of Chancery"). Because Plaintiffs did not, and could not, discover all the facts constituting the *violation* until they reviewed the Chancery complaint filed on November 7, 2024, the filing of the Complaint in this case in June 2025 was well within the two-year limitations period.

### F.   The Complaint Adequately Pleads Section 20(a) Claims

To state a claim under Section 20(a), Plaintiffs must allege that (1) defendants committed a primary violation of the securities laws; (2) the control defendants had the power to control the primary violator; and (3) they had "the requisite power to directly or indirectly control or

influence" the public statements at issue. *Ryder Sys., Inc.*, 603 F. Supp. 3d at 1240–41.[16] Plaintiffs have done so here. Specifically, Plaintiffs allege Defendants KnowBe4, Shanley, Wilson and Daly each violated Sections 14(a) and 10(b) of the Exchange Act, and that Defendants Vista, KKR and Elephant and each of the Director Defendants had the power to and did control KnowBe4, and that KKR and Elephant Partners controlled their Board designees, Shanley (KKR), Wilson (KKR) and Daly (Elephant Partners). ¶¶228-229.

Defendants' argument that the Section 20(a) claim must be dismissed because Plaintiffs have failed to plead a primary violation under Section 10(b) or 14(a) should be rejected because those claims are adequately alleged as detailed above. *Vargas*, 716 F. Supp. 3d at 1311 ("Because the Court finds that primary violations have been alleged, the dismissal of allegations regarding control persons in Count II is not warranted").

Defendants also argue that Plaintiffs "Fail to Plead Control by Any Defendant Individually." (Mot. at 27-28). But Plaintiffs easily meet the Rule 8 notice pleading standard for control person liability. *Miller v. Dyadic Int'l Inc.*, 2009 WL 10697095, at *11 (S.D. Fla. Sept. 29, 2009) ("allegations of control are not subject to the Rule 9(b) particularity requirement, since fraud is not an element of control person liability"). Indeed, the question of control person liability represents a "factual inquiry" that is usually "inappropriate" for resolution at the pleading stage. *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1181 (S.D. Fla. 2005).

The Complaint details numerous facts indicating control for each Defendant. For example, the Complaint alleges the Proxy was issued "By Order of the Board of Directors" (i.e. each of the Director Defendants) and signed by Defendant Sjouwerman. ¶233; *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1360 (S.D. Fla. 2005) (control person liability alleged where CEO and majority shareholder signed financial statements that formed the basis for fraud claims). The Complaint also details that the Director Defendants were involved in the formation of the conflicted Special Committee, the hiring of the conflicted Morgan Stanley, and negotiating and approving the Merger Agreement, all of which were critical to the fraud here. ¶¶230-231; *Miller*, 2009 WL 10697095, at *11 (control person liability alleged where individual defendants "were

---

[16] The SEC has clarified that, in this context, "control" means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

involved in Dyadic's day-to-day operations, signed various financial statements, and controlled the content and dissemination of the statements that Plaintiffs allege were false and misleading").

Vista, KKR and Elephant Partners are similarly alleged to have issued and signed the Schedule 13E-3 (¶230), and the Complaint details that each of these defendants had the contractual right to comment on the Proxy and even obligated these defendants to ensure the information they supplied for the Proxy and other public filings not "contain any untrue statement of a material fact or omit to state any material fact." ¶232; *In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 363 (S.D. Fla. 1991) (sustaining Section 20(a) claim based on allegations that outside directors "directly or indirectly" controlled the contents of the various financial statements and reports disseminated to plaintiffs and rendered assistance in drafting, reviewing and approving the alleged misrepresentations). KKR and Elephant Partners' control is also evidenced by their appointment of KnowBe4 board members. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945–46 (9th Cir. 2003) ("having a prior lending relationship, owning stock in the target company, or having a seat on the board" are indicative of control).[17]

Defendants further argue that Plaintiffs fail to plead a "control group." (Mot. at 29). While Plaintiffs allege each of the Defendants named in Count III controlled KnowBe4 individually and thus a control group is not necessary, Plaintiffs also allege Defendants collectively controlled KnowBe4 through their "majority equity stake and voting power and by appointing a majority of its directors." ¶229. Defendants with *collective* control of the primary violator can be held liable under Section 20(a). *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *11 (S.D. Tex. Jan. 19, 2016) (group of private equity sponsors "together controlled [the company] based, *inter alia*, on their significant stock ownership and ability to elect a majority of [the company]'s Board of Directors"). This is especially true here, where the Defendants are alleged to have acted collectively to take KnowBe4 private at a price unfair to Public Stockholders and jointly issued

---

[17] KKR & Co. argues it cannot be liable because it did not own KnowBe4 stock (Mot. at fn 7), ignoring there are a myriad of ways to prove control and that Section 20(a) was enacted specifically to avoid the result KKR is advocating for. *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008) (per curium) ("The legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws.").

the false and misleading Proxy and Schedule 13E-3 to obtain shareholder approval of the lucrative (to them) Merger.[18]

*Finally*, Defendants argue "Plaintiffs' 20(a) Claim Continues to Rely on Improper Shotgun Pleading" because the Complaint, they say, does not specify "whom or the precise primary violation over which each 20(a) Defendant had control." (Mot. at 30). But the Complaint clearly alleges: "The Director Defendants, KKR, Elephant Partners and Vista each had the ability to control, and did control, KnowBe4" and that "Defendants KKR and Elephant Partners also had the ability to control, and did control, their appointees to the KnowBe4 Board of Directors – Defendants Shanley (a KKR Partner), Wilson (a KKR Senior Advisor) and Daly (co-founder and General Partner of Elephant Partners." ¶229; *see also* ¶¶22, 24, 26, 29, 31, 33, 35, 41, 46, 48. And the Complaint also clearly alleges which actionable statements those controlled entities/persons (KnowBe4, Shanley, Wilson and Daly) are alleged to have made. ¶228; *see also* ¶¶20, 31, 33, 35. The Complaint also alleges how Defendants had the power to and did exercise the alleged control. *See, e.g.*, ¶¶229, 232, 233. Thus, "it is certainly not 'virtually impossible' to know which factual allegations are intended to support which claims for relief." *S.E.C. v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309, 1341 (S.D. Fla. 2021).

None of the key factors that led the Court to conclude the complaint in *Gnanaraj v. Lilum N.V.*, 2023 WL 9064669 (S.D. Fla. Dec. 18, 2023) was a shotgun pleading are present here. That complaint contained "multiple counts where each count adopts the allegations of all preceding counts" and included some counts that alleged multiple causes of action. *Id.* at *6. Here, none of the counts incorporate the other counts, and each cause of action is alleged in separate counts even though they involve the same alleged false and misleading statements.

## V.   CONCLUSION

For the reasons set forth herein, the Defendants' Motion should be rejected in its entirety.

---

[18] Defendants' cases on control groups are of no help. *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 663–73 (N.D. Tex. 2013) (no control where allegations of control were based solely on stock ownership and board appointments); *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *35 (C.D. Cal. Aug. 8, 2013) (voting agreement between defendants where they agreed to reelect each other to the board insufficient to demonstrate control); *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *13 (W.D. Wash. Dec. 29, 2008) (no allegation the defendants acted collectively); *In re Worlds of Wonder Sec. Litig.*, 721 F. Supp. 1140, 1145 (N.D. Cal. 1989) (same).

Dated: October 21, 2025

**KOZYAK TROPIN & THROCKMORTON LLP**

By: /s/ *Benjamin J. Widlanski*
Benjamin J. Widlanski
Florida Bar No. 1010644
Jorge L. Piedra
Florida Bar No. 88315
Brandon M. Sadowsky
Florida Bar No. 1052643
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone:  (305) 372-1800
bwidlanski@kttlaw.com
jpiedra@kttlaw.com
bsadowsky@kttlaw.com

*Liaison Counsel for Lead Plaintiffs*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice)*
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com
asher@entwistle-law.com

Andrew J. Entwistle (*pro hac vice*)
500 West Second Street
Floor 19, Suite 16
Austin, Texas 78701
Telephone:  (512) 710-5960
aentwistle@entwistle-law.com

*Co-Lead Counsel for Lead Plaintiffs*

31

Adam Warden (Fla. Bar # 0873691)
Jonathan Lamet (Fla. Bar # 0106059)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
(561) 394-3399
awarden@saxenawhite.com
jlamet@saxenawhite.com

***Co-Lead Counsel for Lead Plaintiffs***

32