**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-22574-ALTONAGA/Reid**

| | |
|---|---|
| IN RE KNOWBE4, INC. SECURITIES LITIGATION | Class Action<br><br>Jury Trial Demanded |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF PROXY AND ANTI-FRAUD**
**<u>PROVISIONS OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................. 6

III.  PARTIES ................................................................................................................ 7

    A.  Lead Plaintiffs .............................................................................................. 7

    B.  Defendant KnowBe4 .................................................................................... 8

    C.  The Special Committee Defendants ............................................................. 8

    D.  The Director Defendants ............................................................................ 10

    E.  Defendant KKR ......................................................................................... 11

    F.  Defendant Elephant Partners ..................................................................... 12

    G.  Defendant Vista ......................................................................................... 13

    H.  Non-Party Morgan Stanley ........................................................................ 14

IV.  FACTUAL BACKGROUND ................................................................................ 14

    A.  Background of KnowBe4, and Elephant Partners' and KKR's Substantial Investments in the Company ................................................... 14

    B.  KnowBe4 Goes Public and Accelerates Its Growth but the Public Markets Did Not Credit Its Success ............................................................ 18

    C.  On October 12, 2022, KnowBe4 Announces a Take-Private Merger with Vista in Which Insiders Are Given Special Treatment, While Falsely Assuring Investors That the Deal Was Overseen by an "Independent" Special Committee and Financial Advisor ........................................... 21

    D.  The Merger Proxy Includes a Series of False and Misleading Statements and Omissions of Material Facts to Induce Public Stockholders to Vote For The Merger ....................................................... 23

        1.  The Purported Independence of the Special Committee ..................... 24

        2.  The Purported Independence of the Special Committee's Financial Advisor Morgan Stanley ................................................... 29

        3.  The Purported Fairness of the Merger Price ...................................... 31

4.      Omission That KKR Increased its Rollover Upon Learning of the Deal Price ................................................................. 34

E.      The Misleading Proxy Statement Was Critical to Obtaining Shareholder Approval of the Merger Especially in Light of the Unfair Pro-Vista Sales Process ..................................................................................... 35

F.      The Merger Closes And Public Stockholders Are Harmed ................................. 37

V.      DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT .................................... 38

A.      October 12, 2022 Merger Press Release ............................................................. 38

B.      October 13, 2022 Form 8-K and Merger Agreement .......................................... 40

C.      December 22, 2022 Definitive Proxy Statement .................................................. 41

1.      That The Merger was Fair and in the Best Interest of the Public Stockholders ................................................................. 42

2.      The Special Committee Members' Conflicts of Interest and the Evaluation of Those Conflicts .............................................. 44

3.      Morgan Stanley's Conflicts of Interest and the Evaluation of Those Conflicts ......................................................................... 45

4.      KKR's Decision to Significantly Increase its Rollover Contribution After the Low Merger Price was Established ...................... 47

D.      December 22, 2022 Schedule 13E-3 by KnowBe4, Vista, KKR, and Elephant Partners .............................................................................................. 48

VI.      ADDITIONAL ALLEGATIONS OF SCIENTER .......................................................... 48

A.      Defendant Vista Was a Long-Time Investor in KnowBe4 and Motivated To Buy Out the Company for as Cheaply as Possibly ......................................... 48

B.      Defendants KKR, Elephant Partners, and Sjouwerman Rolled Over Approximately Half Their Equity and Thus Were Not Motivated to Ensure the Merger Process was Fair and in the Best Interest of the Public Stockholders ...................................................................................................... 51

C.      KKR Increased its Rollover After Learning of the Deal Price Because It Believed the Deal Price was Low ........................................................................ 53

D.      The Director Defendants Were Conflicted ........................................................... 54

E.      The Special Committee Defendants Knew the Merger Process Favored Vista ..................................................................................................................... 56

F. The Special Committee Knew the Merger Consideration Was Too Low ............ 57

G. Defendants Vista, KKR, Elephant Partners, and Sjouwerman Down-Converted Their Shares to Manipulate the Vote.................................................... 58

VII. LOSS CAUSATION........................................................................................ 59

VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 62

IX. CLASS ACTION ALLEGATIONS .................................................................. 62

X. PRESUMPTION OF RELIANCE.................................................................... 64

COUNT I Against Defendants KnowBe4, Elephant Partners, KKR, Vista and Each of the Director Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder....................................................................................................... 67

COUNT II Against Defendants KnowBe4, Elephant Partners, KKR, Vista and Each of the Director Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder....................................................................................................... 70

COUNT III Against the Director Defendants, KKR, Elephant Partners, and Vista for Violations of Section 20(a) of the Exchange Act ......................................................................... 73

XI. PRAYER FOR RELIEF ................................................................................ 76

XII. JURY DEMAND ........................................................................................... 76

Lead Plaintiffs Water Island Event-Driven Fund, The Arbitrage Fund, AltShares Merger Arbitrage ETF, and the Hilary L. Shane Revocable Trust (collectively, "Lead Plaintiffs" or "Plaintiffs") bring this securities class action (the "Action") for violations of:

(i)     Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of themselves and other public holders of KnowBe4, Inc. ("KnowBe4" or the "Company") common stock as of the December 7, 2022 record date (the "Record Date") that were entitled to vote on the "take-private" acquisition by Vista Equity Partners Management, LLC and its affiliates (collectively, "Vista");[1] and

(ii)     Sections 10(b) and 20(a) of the Exchange Act, on behalf of themselves and all other persons or entities (excluding Defendants, defined more fully below) that sold shares of KnowBe4 common stock from the October 12, 2022 announcement date through the February 1, 2023 close of the Merger (the "Class Period"), including those who sold shares into the Merger, and were damaged thereby (collectively with holders on the Record Date, the "Class" or "Class Members").[2]

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon an investigation comprised of, among other things, the review and analysis of: (i) public filings by KnowBe4 and other Defendants; (ii) press releases and other public statements; (iii) media and analyst reports about the Company; and (iv) publicly filed pleadings in other proceedings, including the action for breach of fiduciary duty brought by shareholders in the Delaware Court of Chancery.

## I.     INTRODUCTION

1.     This Action arises from material misstatements and omissions of material facts in the proxy statement (the "Proxy") and other public filings related to the $4.6 billion acquisition of KnowBe4 by private equity firm Vista, which closed in February 2023 (the "Merger"). Among other misstatements, the Proxy and other public filings falsely represented to public investors (the

---

[1] 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 promulgated thereunder

[2] 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

"Public Stockholders") that the Merger was "*in the best interests of KnowBe4 and its stockholders*" and "*fair to KnowBe4's [public] security holders.*"  In reality, the Merger was tainted by numerous undisclosed conflicts of interest that resulted in a per-share price that the special committee of the KnowBe4 Board—created to evaluate the transaction—had previously instructed its bankers was "*[n]ot the right zone for a transaction.*"  Indeed, the Merger consideration was so inadequate that, upon learning of the price, insider Defendant KKR & Co. Inc. and its affiliate, KKR Knowledge Investors L.P. (together, "KKR"), decided to cash out less of its shares and take advantage of the unfair price by *secretly increasing* the size of its rollover of equity into the post-Merger company.

2.     The Merger was structured to allow KnowBe4's controlling stockholders—private equity firms KKR and Elephant Partners, along with the Company's founder and CEO Sjoerd Sjouwerman—to cash out a portion of their stock holdings while rolling over nearly $800 million in equity into the newly private company.  In this way, KKR, Elephant Partners, and Sjouwerman would realize an immediate benefit by liquidating some of their shares while continuing to benefit in KnowBe4's bright future at a favorable valuation.  On the other hand, the Public Stockholders would be cashed out at the undervalued $24.90 per share Merger price, with no ability to roll over their stock into the new company.

3.     When Vista approached KnowBe4 about a potential deal in the summer of 2022, KKR, Elephant Partners, and Sjouwerman indicated they were interested in rolling over all or a part of their equity in the transaction.  Given this conflict, the Board formed a special committee of purportedly "independent" directors (the "Special Committee") to consider and negotiate a potential merger.  Such special committees are often formed in circumstances like these to protect minority shareholders, where conflicts of interest prevent the full board from evaluating a

2

transaction.   As the Harvard Law School Forum on Corporate Governance explains, special committees of independent directors are meant to "protect stockholder interests by delegating a decision to a group of independent, disinterested directors in cases where the interests of certain directors . . . differ significantly from those of the public stockholders."   However, a special committee is "only effective" if its "members are disinterested and independent" from all parties to the deal and it retains "advice from independent advisors."[3]

4.      To assure the Public Stockholders that their interests were properly accounted for in the deal, Defendants repeatedly stressed that the "***Special Committee of KnowBe4's Board of Directors***" was "***comprised solely of independent and disinterested directors***," who were not tainted by undisclosed interests with ***any*** of the parties to the deal.  In fact, the Proxy (filed with the SEC on Schedule 14A on December 22, 2022) went out of its way to emphasize that the Special Committee members were ***"independent" from any "transaction" involving "one or more significant stockholders of KnowBe4,"*** *i.e.*, *Defendants KKR, Elephant Partners, and Sjouwerman*.  Moreover, the Proxy repeatedly and falsely represented that the Special Committee retained an "***independent financial [] advisor,***" *i.e.*, Morgan Stanley.  But in fact, each member of the Special Committee and Morgan Stanley harbored significant conflicts which were not disclosed—in the Proxy or otherwise—that undermined their ability to represent the interests of the Public Stockholders.  These material conflicts included:

- Special Committee member Shrikrishna Venkataraman and his wife had investments in KKR- and Elephant Partners-affiliated funds;

---

[3]    *See*    https://corpgov.law.harvard.edu/2019/09/23/use-of-special-committees-in-conflict-transactions/.

- Special Committee member Gerhard Watzinger had investments in KKR-affiliated funds and maintained friendships with several KKR- and Vista-affiliated individuals;

- Special Committee member Kevin Klausmeyer served as a director for a company (Jamf Holding Corp.) affiliated with Vista, and served as director for another company (Ivalua Inc.) affiliated with KKR; and

- Morgan Stanley had more than **$550 million** invested in KKR and its affiliates, including over $200 million directly invested in KKR.

5. These and other conflicts led to a rushed, conflicted and pro-Vista sale process that resulted in an unfair $24.90 per share Merger price. Then, to obtain approval of the Merger, Defendants told investors in the Proxy that they should vote in favor of the Merger because the Special Committee had determined "a transaction value in the **mid-to-high $20's per share range was appropriate**." However, the Special Committee did not believe the $24.90 per share price was fair. In fact, internal Morgan Stanley materials presented to the Special Committee reflected that "Per Prior Special Committee Direction," Morgan Stanley would respond to any offer from Vista that was below $25.00 per share by explaining that was **"not the right zone for a transaction"** and such an offer was "**not worth sending**." Further, with respect to any proposal by Vista between $25.00 to $27.00 per share, the instructions by the Special Committee to its bankers were that this range was at the "**[l]ow end of guidance**" and would "**need some work**." Based on this direct evidence of the Special Committee's undisclosed views on price, the Special Committee could not have held a good faith belief that a go-private price of less than $25.00 was fair from a financial point of view.

6.      Furthermore, after learning that the Special Committee and Vista agreed to a Merger price of $24.90 per share, Defendant KKR decided to *increase* the size of its equity rollover from a previously indicated $150-$200 million up to $300 million.  In other words, sophisticated controlling shareholder KKR—which was privy to KnowBe4's confidential financials and business prospects through its investment in the Company, Board-designees and due diligence conducted in connection with the rollover—decided to take *less cash* at the $24.90 per share price and retain *more equity* in the post-Merger private KnowBe4.  This material fact—which would have indicated to the Public Stockholders that KKR believed the deal was underpriced—was not disclosed to the Public Stockholders.

7.      A summary of the material misstatements and omissions of material facts in the Proxy and other public statements about the Merger is set forth below:

| Category of False Representation and Omission | Truth Not Disclosed to Public Stockholders |
|---|---|
| The Special Committee consisted of solely "independent" directors | All three members of the Special Committee lacked independence due to their own self-interests as they had significant investments and/or connections to KKR, Elephant Partners and Sjouwerman. |
| The Special Committee's financial advisor Morgan Stanley was "independent" | Morgan Stanley had more than $550 million invested in KKR and its affiliates, including over $200 million directly invested in KKR's parent company. |
| KKR's materially increased rollover | Despite internally acknowledging the materiality of the rollover amount and timing, the Proxy and other public statements failed to disclose that KKR increased its planned rollover from between $150-$200 million to $300 million only *after* learning that the final deal price fell below the $25 per share floor previously set by the Special Committee. |

| Category of False Representation and Omission | Truth Not Disclosed to Public Stockholders |
|---|---|
| The Special Committee believed "a transaction value in the mid-to-high $20's per share range was appropriate" and that Defendants believed the Merger was "fair to" and in the "best interest" of the Public Stockholders | Internal documents reveal that the Special Committee concluded to the contrary and could not have held a good faith belief that a go private price of $24.90 per share was fair. |

8.      The misleading statements in the Proxy were particularly material here because the Merger required approval by a majority of KnowBe4's Public Stockholders.  Had Lead Plaintiffs and other Public Stockholders known the truth, they would *not* have approved the unfairly priced transaction, would not have sold their stock after the Merger announcement or into the Merger at prices that were artificially depressed by the misstatements and omissions and did not reflect the true value of KnowBe4 common stock, and/or would have sought appraisal of their shares under the applicable legal provisions.

9.      Through this Action, Lead Plaintiffs seek to hold Defendants liable for their misstatements and omissions in the Proxy and other public statements.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 2401.10b-5 and 17 C.F.R. § 240.14a-9.  This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.      Personal jurisdiction exists over each Defendant either because: (i) the Defendant conducts business in or maintains operations in the State of Florida; or (ii) is an individual who is either present in the State of Florida for jurisdictional purposes or has sufficient minimum contacts

6

with the State of Florida to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements to, in, and from this District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs

14. Lead Plaintiff Water Island Event-Driven Fund is an investment fund organized under Delaware law.

15. Lead Plaintiff AltShares Merger Arbitrage ETF is an exchange-traded investment fund organized under Delaware law.

16. Lead Plaintiff The Arbitrage Fund is an investment fund organized under Delaware law.

17. Lead Plaintiff Hilary L. Shane Revocable Trust is a private trust organized under Florida law.

18. As set forth in the attached certifications, each Lead Plaintiff held and beneficially owned KnowBe4 common stock as of the Record Date for the Merger and was entitled to vote on the Merger and/or sold shares of KnowBe4 common stock during the Class Period and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

**B.      Defendant KnowBe4**

19.      KnowBe4 is a Delaware corporation headquartered in Clearwater, Florida that provides the world's largest security awareness training and simulated phishing platform. KnowBe4 was founded in 2010 and went public through an Initial Public Offering ("IPO") in April 2021.  Shares of KnowBe4 were traded on the Nasdaq National Market System ("NASDAQ") prior to the Merger.

20.      Defendant KnowBe4 is named in Count I under Section 14(a) as an issuer of the Proxy.  Defendant KnowBe4 is also named in Count II under Section 10(b) as the issuer of the October 12, 2022 Form 8-K and Merger Press Release, October 13, 2022 Form 8-K, the Proxy, and the Schedule 13E-3.

**C.      The Special Committee Defendants**

21.      Defendant Shrikrishna Venkataraman ("Venkataraman") served as a director of KnowBe4 from March 2022 through the closing of the Merger.  Immediately before his appointment to the Board, Venkataraman served as KnowBe4's Co-President and CFO from September 2018 to March 2022 and agreed to support his replacement after stepping down from those roles.  KnowBe4's 2022 annual proxy statement dated April 5, 2022 acknowledged that Venkataraman was not an "independent director[]" due to his previous service as Co-President and CFO of the Company, but he was nevertheless appointed as a purportedly "independent" member of the Special Committee.

22.      Defendant Venkataraman is named in Count I under Section 14(a) as the Proxy was issued "By Order of the Board of Directors."  Defendant Venkataraman is also named in Count II under Section 10(b) as a maker of statements in the Proxy.  Defendant Venkataraman is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

8

23. Defendant Kevin Klausmeyer ("Klausmeyer") served as a director of KnowBe4 from August 2020 through the closing of the Merger. Klausmeyer has served as a director at other companies that have received investments from Vista or KKR, including Jamf Holding Corp. ("Jamf"), a Vista-controlled company, where Vista appointed him to the board; and Ivalua Inc. ("Ivalua"), in which KKR invested and where a KKR partner, Defendant Shanley, formerly served on the board. Despite Defendant Klausmeyer's service as a director in KKR- and Vista-affiliated companies, he was nevertheless appointed as a purportedly "independent" member of the Special Committee.

24. Defendant Klausmeyer is named in Count I under Section 14(a) as the Proxy was issued "By Order of the Board of Directors." Defendant Klausmeyer is also named in Count II under Section 10(b) as a maker of statements in the Proxy. Defendant Klausmeyer is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

25. Defendant Gerhard Watzinger ("Watzinger") served as a director of KnowBe4 from October 2019 through the closing of the Merger. Watzinger had investments in KKR funds and relationships with Vista partners. Nevertheless, he was appointed as a purportedly "independent" member of the Special Committee.

26. Defendant Watzinger is named in Count I under Section 14(a) as the Proxy was issued "By Order of the Board of Directors." Defendant Watzinger is also named in Count II under Section 10(b) as a maker of statements in the Proxy. Defendant Watzinger is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

27. Defendants Klausmeyer, Venkataraman, and Watzinger are referred to herein as the "Special Committee" or "Special Committee Defendants."

9

**D.     The Director Defendants**

28.     Defendant Sjoerd Sjouwerman ("Sjouwerman") founded KnowBe4 and has served as its CEO and as a director since the Company's inception in 2010.  Sjouwerman was a large shareholder of KnowBe4 stock, and his holdings provided him with over 4.0% total voting power of the Company.  Unlike Public Stockholders, Sjouwerman rolled over $55 million of equity in the Merger (valued at the Merger price).  Sjouwerman has continued to lead KnowBe4 following the closing of the Merger.

29.     Defendant Sjouwerman is named in Count I under Section 14(a) as Defendant Sjouwerman signed the Proxy and the Proxy was issued "By Order of the Board of Directors." Defendant Sjouwerman is also named in Count II under Section 10(b) as a maker of statements in the October 12, 2022 Merger Press Release, the Proxy and the December 22, 2022 Schedule 13E-3, which was also signed by Defendant Sjouwerman.  Defendant Sjouwerman is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

30.     Defendant Jeremiah Daly ("Daly") served as a director of KnowBe4 from January 2016 through the closing of the Merger.  Daly is a co-founder and General Partner of private equity firm Defendant Elephant Partners, which was a pre-IPO investor in KnowBe4 and rolled over $425 million of equity in the Merger valued at the inadequate Merger price.

31.     Defendant Daly is named in Count I under Section 14(a) as the Proxy was issued "By Order of the Board of Directors."  Defendant Daly is also named in Count II under Section 10(b) as a maker of statements in the Proxy and the October 22, 2022 Schedule 13E-3, which was signed on Defendant Daly's behalf by his attorney.  Defendant Daly is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

32.     Defendant Stephen Shanley ("Shanley") served as a director of KnowBe4 from March 2019 through the closing of the Merger.  Shanley is the Head of Tech Growth and a Partner

10

at the private equity firm Defendant KKR, which was a pre-IPO investor in KnowBe4 and rolled over $300 million of equity in the Merger valued at the inadequate Merger price.

33.     Defendant Shanley is named in Count I under Section 14(a) as the Proxy was issued "By Order of the Board of Directors."  Defendant Shanley is also named in Count II under Section 10(b) as a maker of statements in the Proxy and the October 22, 2022 Schedule 13E-3, which was signed by Defendant Shanley.  Defendant Shanley is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

34.     Defendant Kara Wilson ("Wilson") served as a director of KnowBe4 from January 2020 through the closing of the Merger.  Wilson has served as a Senior Advisor to Defendant KKR since October 2019 and as a director for other KKR affiliated portfolio companies.

35.     Defendant Wilson is named in Count I under Section 14(a) as the Proxy was issued "By Order of the Board of Directors."  Defendant Wilson is also named in Count II under Section 10(b) as a maker of statements in the Proxy.  Defendant Wilson is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

36.     Defendants Sjouwerman, Daly, Shanley, and Wilson, together with the Special Committee Defendants, are referred to herein as the "Board of Directors," or "Director Defendants."

### E.     Defendant KKR

37.     Defendant KKR & Co. Inc. is a global private equity and investment management firm with operations in Miami, Florida.

38.     Defendant KKR Knowledge Investors L.P. was an affiliate of Defendant KKR & Co. Inc. and the direct owner of shares of KnowBe4 common stock.  KKR Knowledge Investors L.P. is referred to in the Proxy as the "KKR Investor."  According to the Proxy, the principal business of the KKR Investor "is making equity and other types of investments."

39.     As defined above, Defendants KKR & Co. Inc. and KKR Knowledge Investors L.P. are collectively referred to herein as "KKR."

40.     KKR held a significant interest in KnowBe4 prior to the Merger, representing 26.4% total voting power of the Company.  KKR rolled over $300 million of equity in connection with the Merger, including more than $100 million of equity it decided to roll over following the inadequate pricing of the transaction.  KKR had the discretion to structure its commitment by either rolling over its existing interest or cashing out and reinvesting the proceeds through an equity financing transaction.

41.     KKR is one of the "Purchaser Filing Parties" in the Proxy and a signatory to the Schedule 13E-3 filed with the SEC pertaining to the Merger.  Defendant KKR is named in Count I under Section 14(a) as a maker of statements in the Proxy and because KKR allowed its name to be used in the Proxy and other solicitation materials.  Defendant KKR is also named in Count II under Section 10(b) as a maker of statements in the Proxy and the December 22, 2022 Schedule 13E-3.  Defendant KKR is also named in Count III under Section 20(a) as a control person of Defendants KnowBe4, Shanley and Wilson.

#### F.     Defendant Elephant Partners

42.     Defendant Elephant Partners is a venture capital management firm focused on enterprise software, consumer internet, and mobile markets with operations in Boston, Massachusetts.

43.     Defendants Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P. and Elephant Partners II-B, L.P. are all wholly owned affiliates of Elephant Partners that directly held shares of KnowBe4 common stock, and had no independent decision making apart from that of Elephant Partners itself.

44.     Defendants Elephant Partners, Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P., and Elephant Partners II-B, L.P. are collectively referred to herein as "Elephant Partners."

45.     Elephant Partners held a significant ownership interest in KnowBe4 prior to the Merger, providing it with 37.5% total voting power over the Company.  Elephant Partners was permitted to rollover equity into the newly private company, through its affiliates identified below, rolling over $425 million of equity in connection with the Merger.

46.     Elephant Partners is one of the "Purchaser Filing Parties" in the Proxy and a signatory to the Schedule 13E-3 filed with the SEC pertaining to the Merger.  Defendant Elephant Partners is named in Count I under Section 14(a) as a maker of statements in the Proxy and because Elephant Partners allowed its name to be used in the Proxy and other solicitation materials. Defendant Elephant Partners is also named in Count II under Section 10(b) as a maker of statements in the Proxy and the December 22, 2022 Schedule 13E-3.  Defendant Elephant Partners is also named in Count III under Section 20(a) as a control person of Defendants KnowBe4 and Daly.

### G.     Defendant Vista

47.     Defendant Vista Equity Partners Management, LLC ("Vista") is a global private equity and investment firm with operations in Austin, Texas.  Vista and its subsidiaries (including VEPF Funds, Vista Equity Partners Fund VII GP, L.P., and VEPF VII GP, Ltd.) held a significant ownership interest in KnowBe4 prior to the Merger, providing it with 13.5% total voting power over the Company.

48.     Vista is one of the "Purchaser Filing Parties" in the Proxy and a signatory to the Schedule 13E-3 filed with the SEC pertaining to the Merger.  Defendant Vista is named in Count I under Section 14(a) as a maker of statements in the Proxy and because Vista allowed its name to

be used in the Proxy and other solicitation materials.  Defendant Vista is also named in Count II under Section 10(b) as a maker of statements in the Proxy and the December 22, 2022 Schedule 13E-3.  Defendant Vista is also named in Count III under Section 20(a) as a control person of Defendant KnowBe4.

### H.      Non-Party Morgan Stanley

49.     Morgan Stanley LLC & Co. ("Morgan Stanley") served as the Special Committee's financial advisor.  Morgan Stanley has a long history with Defendants KnowBe4, Vista and KKR. In just the two years before it issued its fairness opinion in connection with the Merger, Morgan Stanley received: (i) $5 to $10 million in fees from KnowBe4; (ii) $120 to $140 million in fees from Vista-related entities; and (iii) $80 to $105 million from KKR related entities.  Additionally— undisclosed to Public Stockholders—at the time of the Merger, Morgan Stanley held over $550 million of investments in KKR and its affiliates, including over $200 million invested directly in KKR & Co. Inc.  Nevertheless, Morgan Stanley was appointed as a purportedly "independent" financial advisor to the Special Committee.

## IV.     FACTUAL BACKGROUND

### A.      Background of KnowBe4, and Elephant Partners' and KKR's Substantial Investments in the Company

50.     KnowBe4, founded in 2010 by Defendant Sjouwerman, is a cybersecurity awareness training platform.  The Company's "Security Awareness Training" is used by organizations worldwide to help manage cybersecurity risks such as phishing and related attacks.  As stated in its March 10, 2022 Form 10-K filed with the SEC, KnowBe4:

> has developed the leading security awareness platform enabling organizations to assess, monitor and minimize the ongoing cybersecurity threat of social engineering attacks. We are pioneering an integrated approach to security awareness that incorporates cloud-based software, machine learning, artificial intelligence, advanced analytics and insights with engaging content.

51.     In the years leading up to KnowBe4's April 2021 IPO, private equity firms KKR and Elephant Partners made several major investments in the Company, including a joint $309.4 million investment in June 2019 which valued the Company at $1 billion.  Through these investments, along with related agreements KKR and Elephant Partners entered into with the Company, KKR and Elephant Partners, with Defendant Sjouwerman, became the Company's dominant shareholders.  Specifically, prior to the IPO, Elephant Partners beneficially owned 28.77% of the Company's total voting power, and KKR beneficially owned 19.72% of the Company's total voting power.

52.     On April 22, 2021, KnowBe4 completed its IPO, selling 10,925,000 shares of Class A common stock at an offering price of $16 per share, raising approximately $174 million.  The now-publicly traded KnowBe4 had a dual class stock structure, with publicly-traded Class A common stockholders entitled to one vote per share and "super-voting" Class B common stock (which was not publicly traded) holders entitled to 10 votes per share.  The Class B shares were convertible into single-vote Class A shares at the option of the holders.  Following the IPO, Elephant Partners and KKR's voting power was largely unchanged: Elephant Partners beneficially owned 28.83% of the Company's total voting power, and KKR beneficially owned 19.76% of the Company's total voting power.  Neither Elephant Partners nor KKR owned any Class A common stock, as all of their holdings were through "super-voting" Class B shares.  In addition, Defendant Sjouwerman held 4.07% of the Company's total voting power, mainly through Class B shares.

53.     To protect the Class A common stockholders from exploitation by the dominant Class B stockholders, KnowBe4's Amended and Restated Certificate of Incorporation (the "Charter") contained a so-called "Equal Treatment Provision," which required that Class A and Class B shares be treated equally in a merger.  Article IV, § C(d) of the Charter provides:

*Treatment in a Change of Control or any Merger Transaction*. In connection with any Change of Control Transaction, shares of Class A Common Stock and Class B Common Stock shall be treated equally, identically and ratably, on a per share basis, with respect to any consideration into which such shares are converted or any consideration paid or otherwise distributed to stockholders of the Corporation, unless different treatment of the shares of each such class is approved by the affirmative vote of the holders of a majority of the outstanding shares of Class A Common Stock and by the affirmative vote of the holders of a majority of the outstanding shares of Class B Common Stock, each voting separately as a class….

54.     Another major pre-IPO investor in KnowBe4 was Vista—one of the largest private equity investment firms in the U.S. and widely known for being founder-friendly. Naturally, Vista's founder-friendly approach is one of its selling points in pursuing mergers and acquisitions. Indeed, the Delaware Court of Chancery has observed that "Vista ha[s] a history of retaining management in take-private transactions and offering them compensation packages with significant upside."[4]

55.     Vista is highly successful. Vista has more than $100 billion in assets under management and, according to public statements by Vista's CEO, Robert Smith, has **never** lost money on a buy-out deal. Vista's record is especially notable in the private equity industry, which is known for big hits and big misses. According to numerous public reports, Vista's exceptional record of success is owed to the firm's secret operating manual. As the *Wall Street Journal* has reported, the manual, known as "Vista's Best Practices," reportedly "transform[s] business-software companies into profit machines."[5] As the *Wall Street Journal* explained, once Vista

---

[4] *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *4 (Del. Ch. Oct. 2, 2020) (further noting allegations in that case that Vista retained senior management at 85% of companies acquired over a two-year period and provided buy-side equity that positioned a target entity's CEO with the opportunity to receive nearly $1 billion).

[5] Miriam Gottfried and Laura Cooper, "*Billionaire's Secret Buyout Formula: 110 Instructions and an Intelligence Test*," WALL STREET JOURNAL (Jul. 9, 2018), https://www.wsj.com/articles/billionaires-secret-buyout-formula-110-instructions-and-an-intelligence-test-1531151197

acquires a company, "[m]embers of the firm's 100-person Vista Consulting Group, or VCG, then swoop in.  Some set to work revamping the company's contracts and building in automatic price increases and renewals, with the goal of increasing recurring revenue and lowering the risk of customer defections.  Vista also overhauls the sales process, encouraging cross-selling of products, through commissions."[6]  Indeed, according to one longtime Vista investor, Grosvenor Capital Management, Vista's "process is like a factory. A deal comes in and it gets compartmentalized, and they apply experts on each compartment.  After it goes off the assembly line, the margins are higher."[7]

56.    Tellingly, Vista's "largest fund has consistently been in the top quartile of comparable funds formed the same year, measured by annualized returns after fees."[8]  As such, partnering alongside Vista tends to be a highly successful strategy for other investors—one that KKR, Elephant Partners, and Sjouwerman sought for KnowBe4.

57.    In 2020, Vista and KnowBe4 began discussing a variety of potential transactions with each other.  Indeed, according to the Proxy, prior to becoming an investor in KnowBe4, which occurred before the IPO, "Vista and KnowBe4 discussed, in general terms, a variety of different transactions, including the possible acquisition of KnowBe4 by Vista."  As a result, on July 30, 2020, KnowBe4 engaged Morgan Stanley as its financial advisor in connection with the potential sale of equity to Vista.  Thereafter, Vista and KnowBe4 conducted due diligence regarding a potential sale.

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

58.     Instead of purchasing the Company at that time, Vista became a minority investor on March 5, 2021, when it acquired KnowBe4 preferred shares directly from KKR, Elephant Partners and a third shareholder for $300 million, at approximately $20.61 per share.  Following the IPO, Vista beneficially owned 10.42% of the Company's total voting power.  At the time of the Merger, Vista, KKR, Elephant Partners, and Sjouwerman collectively held 47.8% of KnowBe4's total voting power.

**B.     KnowBe4 Goes Public and Accelerates Its Growth but the Public Markets Did Not Credit Its Success**

59.     After the IPO, KnowBe4 continued its rapid growth and expansion and developed aggressive international expansion plans.  According to the IPO prospectus, one of the "key elements" of KnowBe4's growth strategy was to rapidly expand internationally: "The international market represents a clear expansion opportunity for us. . . ."  On April 23, 2021, Defendant Sjouwerman stated in an interview with *SC Media* that "[t]he main reason [for the IPO] is international expansion." KnowBe4's international expansion efforts were successful, as by September 30, 2021, KnowBe4's customers outside of North America provided 16.8% of the Company revenues—a significant increase from 9.7% of the Company's revenues in 2019.

60.     Additionally, in November 2021, KnowBe4 acquired SecurityAdvisor, which had more than fifty integrations to leading cybersecurity products including Crowdstrike, Zscaler, Okta, and Netskope.  In the press release announcing the completion of the Security Advisory transaction, Defendant Sjouwerman called the acquisition "a significant leap forward in enabling [] users to defend against the ongoing problem of social engineering attacks[.]"  During a November 3, 2021 conference call with investors and analysts to discuss KnowBe4's financial and operational results for the third quarter of 2021, analysts expressed their excitement over SecurityAdvisor's $5 billion total addressable market—bringing KnowBe4's company-wide total

addressable market to $23 billion—and inquired as to the anticipated timeline to recognize revenue from the SecurityAdvisor acquisition. In response, Defendant Sjouwerman projected that the fruits of this acquisition would not be immediate, stating that the Company did not "expect revenue until the second half next year and it might even be Q4."

61. Despite reporting business success and customer growth post-IPO, a downturn in the technology sector in the summer of 2021 and a global economic downturn in 2022 meant that the public markets did not reward KnowBe4's business successes. In fact, Defendant Sjouwerman acknowledged that KnowBe4's stock was undervalued throughout its entire public existence. For example, in January 2023, after the Merger was announced but before it closed, Defendant Sjouwerman commented that "[a]s a public company, we didn't get credit for the very high-quality stock that we really are . . . . And so we saw our stock price go up and down, and we didn't necessarily feel we had much control over that. For us at our stage, where we are still growing very rapidly, we felt going private was actually the better choice." But Public Stockholders would not have the opportunity to participate in the ongoing rapid growth because, unlike the insiders, they were not given an opportunity to roll over their shares in the Merger.

62. Indeed, KnowBe4 had consistently reported impressive financial results. For example, on May 10, 2022, KnowBe4 reported its financial and operational results for the first quarter of 2022 in advance of the earnings conference call with analysts and investors. The first quarter of 2022 results included record revenue and annual recurring revenue ("ARR") and beat all previously announced guidance "across the board." Analysts were encouraged by KnowBe4's results, as analysts from Piper Sandler set the Company's price target at $29 and stated that "[n]ew products slated for end-of-year release add incremental excitement to an already strong growth story … Results in the Q were strong … Investments continue to drive new customer adds and an

19

expanding product portfolio supporting multi-product adoption … We like the setup for continued beats and raises." Additionally, analysts from Truist reported that the earnings "call made us incrementally optimistic on [KnowBe4's] ability to rapidly generate operating leverage within the model as the business scales. We believe [KnowBe4] is well-positioned to capitalize on the rising number and sophistication of cyberattacks." A number of other analysts recognized KnowBe4's value, including Canaccord Genuity, Cowen, and Goldman, all of whom set price targets at $28 per share, well above the ultimate deal price.

63.     On August 4, 2022, KnowBe4 announced its results for the second quarter of 2022, again beating previously announced guidance as the Company reported over 36% year-over-year ARR growth and a strong 23.7% free cash flow margin. In the press release announcing the results, Defendant Sjouwerman boasted that "we are continuing on our high-growth trajectory." In addition to impressive financial results, the Company also announced the launch of KnowBe4 Ventures, a fund that would "make early stage investments in organizations that are committed to integrating with [the Company's] platform and bringing innovation to [its] customer base." On the accompanying earnings conference call, Defendant Sjouwerman boasted that the Company "is positioned for continued expansion with the balance of growth and profitability," and emphasized the potential of the international business, highlighting a total addressable market of "6 to 7 times larger than U.S. domestic." Analysts were again encouraged by these results, as analysts from Truist reported that KnowBe4 "demonstrated stellar growth," and that "[t]he results give us further confidence in their ability to grow while generating operating leverage." Accordingly, the Truist report concluded that KnowBe4 was "well-positioned to capitalize on the rising number and sophistication of cyberattacks" and reiterated a price target for KnowBe4 at $28. A few weeks later, on September 19, 2022, analysts at Cowen similarly set a price target for KnowBe4 at $28.

20

64.     In sum, KnowBe4's Board, including the Special Committee members, had every reason to believe that the Company was on a strong upward trajectory, supported by consistent indicators of growth, and performance metrics that suggested that such growth would continue.

**C.     On October 12, 2022, KnowBe4 Announces a Take-Private Merger with Vista in Which Insiders Are Given Special Treatment, While Falsely Assuring Investors That the Deal Was Overseen by an "Independent" Special Committee and Financial Advisor**

65.     Despite Defendant Sjouwerman's representation on August 4, 2022 that the Company "is positioned for continued expansion with the balance of growth and profitability," on October 12, 2022, KnowBe4 announced that it had entered into an agreement with Vista that, if approved, would take the Company private, cashing out the Public Stockholders and preventing them from participating in the Company's future.

66.     According to the October 12, 2022 press release announcing the deal (the "October 12, 2022 Merger Press Release"), the Merger valued the total Company at $4.6 billion and would provide the Public Stockholders with $24.90 per share upon completion—well below the recent analyst price targets discussed above.  Notably, the October 12, 2022 Merger Press Release also made clear that Defendants Sjouwerman, KKR, and Elephant Partners—three of the Company's largest and most knowledgeable shareholders—were not being completely cashed out like the Public Stockholders, but instead were given the opportunity to "roll some of their existing equity into the acquiring company."

67.     This preferential treatment of insiders raised serious red flags for the Public Stockholders.  Indeed, the Company's most powerful and informed shareholders—those with privileged access to material, non-public information about KnowBe4's operations and growth trajectory—received fundamentally different treatment that was unavailable to the Public Stockholders.  While Public Stockholders faced forced liquidation of their entire holdings, these

insider investors would strategically retain a portion of their equity positions, securing exclusive access to participate in what the Company itself characterized as KnowBe4's "profitab[le]" future growth.

68. To dispel any potential concerns that these insiders were gaming the system to cash out the Public Stockholders at a below-value price, the October 12, 2022 Merger Press Release touted that the Merger was negotiated and approved by "an independent Special Committee of KnowBe4's Board of Directors" who had no interests in the transaction and, therefore, were solely focused on ensuring that the Public Stockholders obtained a fair deal. Furthermore, the deal was shepherded by financial advisors at Morgan Stanley who, according to the October 12, 2022 Merger Press Release, served only as the "financial advisor to the Special Committee," *i.e.*, not working for the KnowBe4 Board, KKR, Vista, or Elephant Partners. The release further stated that the Special Committee not only ran a "robust process" before agreeing to the Vista deal but also considered whether entering into any deal was better for the Public Stockholders than simply remaining a standalone Company. Specifically, the October 12, 2022 Merger Press Release stated that the Special Committee "evaluat[ed] transaction alternatives against KnowBe4's standalone plan and other strategic alternatives."

69. The independence of the Special Committee was material to shareholders. According to the Harvard Law School Forum on Corporate Governance, "[s]pecial committees often play a critical role in conflict transactions," including those where "corporate insiders" partake in a "going private" transaction.[9] That is because the Special Committee is meant to "protect stockholder interests by delegating a decision to a group of independent, disinterested directors in cases where the interests of certain directors. . . differ significantly from those of the

---

[9] *See* https://corpgov.law.harvard.edu/2019/09/23/use-of-special-committees-in-conflict-transactions/.

public stockholders." Accordingly, a Special Committee is "only effective" if its "members are disinterested and independent" from all parties to the deal and it retains "advice from independent advisors." In fact, in a post titled "Deals With Controlling Stockholders: 5 Tips for Boards" on the website Boardmember.com, attorneys at Gibbson Dunn & Crutcher LLP, counsel to KKR here, explained that the members of a special committee should be "disinterested in the transaction in the sense that they would not receive, directly *or indirectly*, benefits that are above and beyond those received by the minority stockholders" and that "all relevant facts relating to the deal, *including any relationships* [or] *conflicts*" be "disclosed to the minority stockholders so that they can make an informed decision about whether to approve the transaction."

70.     As detailed below, in reality neither the Special Committee nor Morgan Stanley was independent. Indeed, all three of the Special Committee members harbored significant conflicts of interest, including (1) Venkataraman had investments in KKR and Elephant Partners' funds, and his wife was a long-time Morgan Stanley employee; (2) Watzinger had investments in KKR funds and relationships with Vista partners; and (3) Klausmeyer served as a director at Vista- and KKR-affiliated companies. Moreover, Morgan Stanley was not independent because it had a $550 million investment in KKR and its affiliates. None of these material conflicts were disclosed in the October 12, 2022 Merger Press Release.

### D.     The Merger Proxy Includes a Series of False and Misleading Statements and Omissions of Material Facts to Induce Public Stockholders to Vote For The Merger

71.     On December 22, 2022, KnowBe4 issued a definitive proxy statement, filed with the SEC on Schedule 14A, soliciting stockholder approval of the Merger.

72.     The Proxy stated that approval of the deal required the affirmative vote of: (a) the holders of a majority of the voting power of KnowBe4 common stock (voting together as a single class), (b) a majority of the outstanding shares of Company Class A common stock, (c) a majority

23

of the outstanding shares of Company Class B common stock, and, most importantly, (d) a majority of the Public Stockholders—*i.e.*, shareholders unconnected to Defendants Vista, KKR, Elephant Partners (or any of their affiliated funds), or KnowBe4 officers like Defendant Sjouwerman.

73.     In connection with the Merger, Defendants KKR, Elephant Partners, and Sjouwerman signed Support Agreements requiring them to vote in favor of the Merger.  The Support Agreements disclosed that: (i) Defendant KKR would be rolling over 12,048,193 of its 26,115,895 KnowBe4 shares (~46%), worth $300 million; (ii) Defendant Elephant Partners would be rolling over 17,069,823 of its 37,069,823 KnowBe4 shares (~46%), worth $425 million; and (iii) Defendant Sjouwerman would be rolling over 2,189,121 of his 4,482,058 KnowBe4 shares (~49%), worth $54.5 million.  However, despite the Support Agreements, the vote of the Public Stockholders was still required.

74.     To assure the Public Stockholders that the Merger was in their best interest, and that they should therefore approve the deal, the Proxy included numerous materially false and misleading statements and omitted critical facts.  Those same materially false and misleading statements and omissions deprived Public Stockholders of the ability to make an informed decision as to whether to forgo the $24.90 per share Merger consideration and seek appraisal of the fair value of their shares.  Relying on the false assurances in the Proxy that the deal process was fair and the $24.90 price in the best interests of the Public Stockholders, upon information and belief the vast majority of the Public Stockholders ***did not*** seek appraisal of their shares.

### 1.     The Purported Independence of the Special Committee

75.     The Proxy repeatedly touted that the Merger process and negotiations were overseen by the Special Committee, whose members were "independent" and "disinterested" from all of the

24

other interested parties, and who was advised by its "own independent" financial advisor.

76.     Specifically, the Proxy explained that the Special Committee was established precisely because KKR, Elephant Partners, and Sjouwerman were rolling over a portion of their equity stakes, and therefore their interests were not aligned with those of the Public Stockholders. As the Proxy explained, the Special Committee was needed due to "the potential conflicts of interest involving members of the KnowBe4 Board . . . *including if any of the existing significant stockholders of KnowBe4 elected to rollover any portion of their equity*."  Thus, according to the Proxy, association with or separate investments in KKR, Elephant Partners, or Vista—the insiders who were keeping equity in the post-deal private company—was a potential conflict that would impugn a Board member's ability to represent the interests of the Public Stockholders.

77.     The Proxy then confirmed that "each of Gerhard Watzinger, Kevin Klausmeyer and Krish Venkataraman were independent and disinterested for purposes of a possible transaction with Vista" and accordingly, the Special Committee was "*comprised solely of independent and disinterested* members of the KnowBe4 Board."  Given the presence of multiple conflicted parties in the Merger and the relatively swift four-month deal process that focused almost exclusively on Vista (discussed in greater detail in Section IV.E and VI.E below), the Proxy sought to reassure shareholders of the Special Committee's independence by noting that its members had been vetted by two separate legal counsel.  The Proxy explained that on July 5, 2022, Wilson Sonsini, counsel to the full KnowBe4 Board, presided over the Board "discussion" at which the Board concluded that Watzinger, Klausmeyer, and Venkataraman were "independent and disinterested."  The Proxy further disclosed that, at a Special Committee meeting on July 13, 2022, Potter Anderson (the Special Committee's legal counsel) "conducted *an additional independence review* of the Special Committee members and, after such review, the Special Committee concluded that each member

25

was independent and disinterested for purposes of evaluating a potential acquisition of the Company." In short, the Proxy stressed that the Special Committee members—charged with maximizing the value of the Public Stockholders' shares—were not conflicted through any association with Elephant Partners, KKR, or Vista.

78. The representations in the Proxy and October 12, 2022 Merger Press Release were false. Critically, the Board knew that all three of the Special Committee members harbored significant conflicts of interest, as (1) Defendant Venkataraman had investments in KKR and Elephant Partners funds, and his wife was a long-time Morgan Stanley employee; (2) Defendant Watzinger had investments in KKR funds and relationships with Vista partners; and (3) Defendant Klausmeyer served as a director at Vista- and KKR-affiliated companies.

79. Special Committee member Venkataraman was not independent. Venkataraman was the Company's Co-President and CFO from September 2018 to March 2022, three months before Vista commenced active discussions about the Merger, but during the Company's prior discussions with Vista regarding potential transactions. Venkataraman worked directly for Sjouwerman and, as an executive of a controlled company, was dependent on the goodwill of the controlling stockholders for his employment and lucrative compensation, which netted him approximately $55 million before he retired at age 45. Immediately after he retired, the Board appointed Venkataraman as a director and gave him a $3 million grant, specifically acknowledging "Venkataraman [is] not considered a[n] independent director[] because of [his] position[] as . . . former Co-President and Chief Financial Officer," which would "interfere with [his] exercise of independent judgment in carrying out the responsibilities of a director."

80. Critical for this case, Venkataraman and his spouse maintained undisclosed equity stakes in separate investment vehicles managed by KKR and Elephant Partners—investments that

26

were, on information and belief, both material and significant.  The secretive nature of these relationships is particularly concerning given Elephant Partners' exclusivity.  Industry publication *AltAssets Private Equity News, Views & Insights* has characterized Elephant Partners as a "secretive VC house," and the firm's own website reinforces this opacity—containing virtually no information about its accomplishments, portfolio investments, or track record, while providing no contact information or public investment solicitation.  This wall of secrecy confirms what is widely understood in the venture capital industry: access to Elephant Partners' investment opportunities is invitation-only and requires substantial capital commitments.

81.    According to public records, the average investment in an Elephant Partners-run investment vehicle is in the multi-million-dollar range.  For example, in December 2019, Elephant Partners reported raising $57.5 million from just ten investors, for an average investment of $5.75 million per investor, and in June 2019, the firm raised $74.4 million from just fourteen investors, amounting to an average investment of $5.3 million.  Similarly, in July 2021, Elephant Partners reported a $600 million raise from 148 investors, amounting to an average investment of over $4 million per investor.  In March 2023, Elephant Partners raised $151 million from just 25 investors, with an average investment of over $6 million per investor.  In May and August 2023, Elephant Partners reported funds of $82.7 million with an average investment of $4.8 million per investor and over $790 million with an average investment of nearly $4.5 million per investor.  Thus, it is inferable that Venkataraman's personal investment in Elephant Partners was sizeable and material to him.  Furthermore, Venkataraman and his wife were also invested in KKR.  Like other private equity firms, an investment from a personal investor in KKR was likely significant.[10]

---

[10]    *See    https://guideforinvestment.com/what-is-the-minimum-investment-for-private-equity/* explaining that minimum private equity investments typically start at over $100,000 and often exceed "several million dollars."

82.     While Venkataraman made his investment in KKR and Elephant Partners known to the KnowBe4 Board, the fact that he was invested in two of the companies which he was supposed to be "independent" and "disinterested" from was *not disclosed to the public*.

83.     In addition, Venkataraman's wife had spent over twenty years at Morgan Stanley. At the time of the Merger, she held the position of Managing Director and served as Co-Head of Morgan Stanley's Americas Securities Lending division.  This connection to Morgan Stanley was not disclosed to shareholders and is a further significant conflict of interest.

84.     Watzinger, like Venkataraman, had investments with KKR funds, which made him anything but independent and disinterested from KnowBe4's second largest shareholder (which was seeking to roll over much of its equity).  Watzinger also had relationships with several Vista partners.  While these issues were disclosed to the Special Committee, *they were never disclosed to stockholders*.

85.     Special Committee member Klausmeyer has served as a director of Vista-controlled Jamf since 2019.  In fact, Vista selected Klausmeyer as one of its contractual Board designees and kept him on the Board after Jamf's IPO.  From 2019 to 2023, Klausmeyer earned over $1.2 million in Jamf board fees from his service on the Vista-controlled entity.  This was significant as Klausmeyer has not had regular employment since 2011 separate and apart from his director work.  Furthermore, since October 2019, Klausmeyer had served as a director of Ivalua, a private company in which KKR invested $70 million.  Klausmeyer and Defendant Shanley of KKR served concurrently on Ivalua's board until August 2020.  While Klausmeyer's board service with Ivalua and Jamf were publicly disclosed, the Proxy failed to disclose those companies' connections to Vista and KKR and failed to disclose that Klausmeyer's positions were due to his connections with Vista and KKR—parties he was purportedly "independent" from.

28

### 2.     The Purported Independence of the Special Committee's Financial Advisor Morgan Stanley

86.     To further put to bed any concern that the Special Committee members were influenced by association with KKR, Elephant Partners, or their fellow KnowBe4 Board members, the Proxy touted that the Special Committee was advised by its "own *independent* financial . . advisors" and that the "Special Committee selected Morgan Stanley to act as its financial advisor based on, among other things, Morgan Stanley's *independence*."

87.     The independence of Morgan Stanley was material to shareholders.  Courts in Delaware have stressed the importance of a full and fair disclosure regarding financial advisor conflicts and compensation agreements "[b]ecause of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives[.]"[11]

88.     The protections of an independent Special Committee and a financial advisor free of conflicts were especially important here because dominant shareholders KKR, Elephant Partners, and Sjouwerman were on both sides of the transaction—they were rolling over equity—and therefore their interests were not fully aligned with the Public Stockholders.  Indeed, since the Public Stockholders would be cashed out of their KnowBe4 stock and would not be allowed to roll over any of their stock and participate in the Company's bright future, their only concern in the Merger was maximizing the value of their shares.  On the other hand, KKR, Elephant Partners and Sjouwerman rolled almost half their equity into the newly private company, so KKR, Elephant Partners, and Sjouwerman were focused on their total return—here driven by the enormously favorable terms of the rollover—and were therefore far less sensitive to a lower deal price than the Public Stockholders.

---

[11] *See City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, 2024 WL 1244032, at *17 (Del. Mar. 25, 2024); *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs, Inc.*, 2024 WL 1896096, at *15–21 (Del. May 1, 2024) (internal citations omitted).

29

89.     The Proxy recognized the fact that insiders were rolling over shares, which made the independence of Morgan Stanley particularly important.  In addition, the Proxy stated that at a September 18, 2022 meeting the Special Committee determined the conflicts related to the rollover could be mitigated by having "independent" Morgan Stanley be involved in any communications between the rollover parties (*i.e.*, Defendants KKR, Elephant Partners and Sjouwerman) and Vista:

> The Special Committee and its advisors discussed potential communications between or among Vista and KKR and/or Elephant [Partners] regarding the Proposal and *a range of process guardrails* in connection therewith. After discussion, *the Special Committee determined that any communications between or among Vista and KKR and/or Elephant [Partners] would also need to include representatives of Morgan Stanley* for the time being and authorized representatives of Morgan Stanley to inform the parties that the parties were not to discuss pricing for Vista's proposed acquisition of KnowBe4 in any discussions held between the parties at that time until the Special Committee and Vista reached a preliminary agreement on pricing.

90.     The Proxy represented that Morgan Stanley was an "**independent**" financial advisor and in the section on potential conflicts only vaguely disclosed the following:

> *Morgan Stanley*, its affiliates, directors or officers . . . *may have committed* and may commit in the future *to invest in* private equity funds managed by the Vista Related Entities, *the KKR Related Entities*, and Elephant Partners or in affiliates of Morgan Stanley that may hold direct equity and/or partnership interests in private equity funds managed by Vista, the Vista Related Entities, KKR or the KKR Related Entities.

91.     However, Morgan Stanley was nowhere near independent because in reality it had more than *$550 million* invested in KKR and its affiliates, including over $200 million directly invested in the KKR parent company—a substantial, material investment that should have been disclosed.  Much of that investment appears to be held in Morgan Stanley's own account.  Thus, while investors were told Morgan Stanley was an "independent financial advisor" to the Special Committee, it was actually interested in maximizing value for KKR and promoting its own interests.

30

### 3.      The Purported Fairness of the Merger Price

92.      The Proxy communicated to stockholders that both the Special Committee and Defendants Vista, KKR, Elephant Partners and Sjouwerman determined that the $24.90 per share Merger price was fair.  Specifically, at a Special Committee meeting on October 11, 2022, the Special Committee unanimously determined that "the Merger Agreement, the Rollover Stockholder Support Agreements, the Limited Guarantees and the other transactions contemplated by the Merger Agreement, including the Merger, are advisable, fair to, and in the best interests of KnowBe4 and the Public Stockholders[.]"  The Proxy also stated that at the same meeting, Morgan Stanley presented valuation materials to the Special Committee and offered its opinion that the price "was fair, from a financial point of view," to holders of shares of KnowBe4 common stock.

93.      In addition to repeatedly emphasizing the purported fairness of the Merger and recommending shareholders vote FOR the transaction, the Proxy also stated that at an August 19, 2022 meeting of the Special Committee, the Special Committee "discussed its views on valuation, including that it believed that a transaction with a value in the mid-to-high $20's per share range was appropriate for a potential acquisition of KnowBe4."

94.      To this end, in a September 15, 2022 Morgan Stanley presentation to the Special Committee partially disclosed by Defendants as an attachment to a Schedule 13E-3, the slide below was presented regarding an "Illustrative Response Framework for Potential Offer Prices" between $23 and $28 per share.  This public slide redacted the critical information in the righthand column that indisputably shows the Special Committee could not have held a good faith belief in the fairness of the transaction or the adequacy of the Merger price of $24.90.

31



95.     The full slide—not disclosed to investors prior to the Merger—is copied below. As set forth in that internal document from Morgan Stanley, the "Response Per Prior Special Committee Direction" for any price below $25 per share was "[n]ot the right zone for a transaction," and Morgan Stanley should advise Vista it is "not worth sending." The same slide also reflects that the Special Committee had instructed Morgan Stanley to convey to Vista that a Merger price of $25 to $27 per share was at the "[l]ow end of guidance" and "w[ould] need some work."

Morgan Stanley

### 3 Illustrative Response Framework For Potential Offer Prices

| Price | Premium / (Discount) To | | | Fully Diluted EV ($Bn) | Agg. Value ($Bn) | Street Case | | Illustrative Response Per Prior Special Committee Direction |
| | Current | 30 D Avg | 52 Wk. High | | | AV / Revenue CY2023E | P / FCF CY2023E | |
| Metric | $19.41 | $19.37 | $27.40 | $3.6 | $3.3 | $415 | $105 | |
| Growth Rate / Margin | | | | | | 25% | 25% | |
| $19.41 | 0% | 0% | (29%) | $3.6 | $3.3 | 7.9x | 34.3x | |
| $23.00 | 18% | 19% | (16%) | $4.3 | $3.9 | 9.5x | 40.7x | Not the right zone for a transaction. Unless you can see your way into the mid-to upper $20s, then it's not worth sending in a letter |
| $24.00 | 24% | 24% | (12%) | $4.5 | $4.1 | 10.0x | 42.5x | |
| $25.00 | 29% | 29% | (9%) | $4.6 | $4.3 | 10.4x | 44.3x | Low end of guidance. Think it will need some work. It's clear and specific, so we'll take it to the Committee |
| $26.00 | 34% | 34% | (5%) | $4.8 | $4.5 | 10.9x | 46.0x | |
| $27.00 | 39% | 39% | (1%) | $5.0 | $4.7 | 11.3x | 47.8x | It's clear and specific, so we'll take it to the Committee |

96.    It is no wonder that Defendants decided to redact the "Response Per Prior Special Committee Direction" in the public version of the slide because it is direct evidence of the Special Committee's views on price. This makes clear that the Special Committee did not have a good faith belief in the fairness of the transaction or the adequacy of the Merger price of $24.90 per share.

33

4.      **Omission That KKR Increased its Rollover Upon Learning of the Deal Price**

97.     The Proxy also did not disclose that KKR *doubled* the amount of equity it would be rolling over after it learned of the $24.90 per share deal price.  Earlier in the process, KKR had planned to roll over just $150 million to $200 million in equity.  This was described in the Proxy as discussions between Morgan Stanley and KKR regarding the "quantum" of KKR's rollover.

98.     When KKR learned that the deal price would be just $24.90 per share, it decided to double its equity commitment to a total of $300 million.  While the Proxy discloses the total $300 million "equity contribution" of KKR to finance the Merger, it does not disclose that KKR had originally intended to rollover $150 million to $200 million.  Likewise, the Proxy does not disclose that KKR only decided to increase its rollover amount after it learned the Merger was priced below the Special Committee's internal thresholds and below the valuation Morgan Stanley provided to the Special Committee.

99.     The Special Committee recognized the materiality of the rollover process— including the size of the equity being rolled over—to investors, including specifically its potential signaling and impact on the pricing of the transaction.  According to the Proxy, at a Special Committee meeting on September 8, 2022, "*The Special Committee's advisors discussed certain signaling effects of a significant rollover of KKR's, Elephant [Partners'] and Mr. Sjouwerman's equity in a potential acquisition of KnowBe4 by Vista and how conveying this information in advance of Vista's proposal or an agreement on price may impact the pricing for the transaction.*"

100.   Nevertheless, Defendants omitted from the Proxy materials any information about the dramatic increase in the rollover by KKR following the pricing of the transaction.  The omission of the KKR post-pricing rollover increase, combined with the fact that the deal price was

34

well below the threshold set by the Special Committee in internal documents, make clear that the Special Committee could not have possibly held a good faith belief that the transaction was fair to and in the best interests of the Public Stockholders who had no opportunity to roll over their shares and were instead forced to sell their shares at an intentionally low value, which benefitted Vista and Defendants KKR, Elephant Partners and Sjouwerman to the detriment of the Public Stockholders.

**E.     The Misleading Proxy Statement Was Critical to Obtaining Shareholder Approval of the Merger Especially in Light of the Unfair Pro-Vista Sales Process**

101.   The conflicts of interest of the Special Committee and Morgan Stanley, the Proxy's representations regarding the fairness of the Merger price, and the omission of KKR's increased rollover upon learning of the deal price were particularly material in light of the circumstances of the Merger.  As discussed above, without the support of the Public Stockholders the Merger could not be approved.  And without the approval of the Merger, KKR, Elephant Partners, and Sjouwerman could not team up with Vista and share in the Company's future success.

102.   The Merger process was rigged from the start to result in a deal that was favorable for Vista, KKR, Elephant Partners, and Sjouwerman.  The process that led to the approval of Vista's $24.90 per share was designed to favor Vista—KKR's preferred acquirer—to the exclusion of other credible bidders.

103.   Vista recognized and exploited that KKR favored a deal with Vista over any other potential buyer.  Early in the sale process, the Proxy states that KKR's legal counsel, Gibson Dunn, advised the Special Committee's legal counsel that KKR would consider maintaining an equity interest in connection with a sale of KnowBe4, "including in connection with a potential acquisition of KnowBe4 by Vista."  Three days later, on July 21, 2022, it was clear that KKR had set its sights on an acquisition by Vista, a powerhouse in the private equity world known for its

35

expertise in operating acquired companies and wringing profits from them.  That same day, Defendant Shanley—a Board member and KKR partner—told Morgan Stanley that KKR would consider rolling over its equity if Vista was the acquiror "but could not commit to maintaining an equity interest in KnowBe4 in connection with any other potential acquisition of KnowBe4 without knowing the identity of the acquiror in any such transaction."  KKR's preference for Vista—and its concomitant operational expertise that resulted in a direct benefit to the rollover Defendants— ensured that Vista was the only bidder that was truly considered as a buyer of the Company.

104.   For example, while Morgan Stanley contacted at least 18 parties to gauge their interest in a potential acquisition of KnowBe4, Vista had a timing advantage over all of the other potential bidders given its discussions with the Company, which long predated Morgan Stanley's sale process.  Vista executed a non-disclosure agreement ("NDA") on August 8, 2022 and began its due diligence discussions with KnowBe4 the same day.  While nine other parties signed NDAs to allow them to discuss a potential acquisition, the Special Committee declined to pause Vista's due diligence to allow other potential bidders to catch up.  On September 2, the Special Committee discussed whether to expedite the work to be performed by the non-Vista potential bidders. In light Vista's statement that it would provide feedback on September 9 as to whether it was interested in acquiring KnowBe4, the Special Committee "determined that it would continue to allow each potential bidder to proceed at its own pace."  With Vista's head start, none of the other companies were able to advance in the process quickly enough to submit a competing bid.

105.   While it was bad enough that no other bidders were able to conduct due diligence and submit a bid during the process, the chance for any kind of competing bid was made worse when the Special Committee failed to negotiate a "go-shop" provision that might have enabled

higher bids after the deal was announced.[12]  With zero price competition, Vista knew that it could offer a sub-optimal price, and that the conflicted Special Committee and Morgan Stanley would sign off.

106.   Given the quick and unfair process tilted in Vista's favor, the Special Committee's and Morgan Stanley's perceived independence and belief that the Merger price was fair was critical in assuring the Public Stockholders that the deal was in their best interest.  However, it was the undisclosed conflicts that in fact ensured that the controlling stockholders' favored deal with Vista would be approved by the Board.  The Public Stockholders were therefore misled to approve the deal.

### F.      The Merger Closes And Public Stockholders Are Harmed

107.   On January 31, 2023, KnowBe4 held a virtual special meeting of stockholders to approve the Merger.  The Merger received a majority of approval on each of the four separate votes required for the Merger to close.  As a result, the Merger closed on February 1, 2023, at which point the Public Stockholders received $24.90 per share as Merger consideration and the Company's common stock was delisted from NASDAQ.

108.   Notably, the Company continued to perform well after the Merger was announced. On November 14, 2022, KnowBe4 released its financial and operating results for the third quarter of 2022, which reported that revenues increased 33.9% year-over-year, ARR increased 32.4% year-over-year, and KnowBe4's customer base grew to more than 54,200 customers (its 22nd straight quarter of customer growth and its largest quarter to quarter increase ever).  Similarly, on January 24, 2023, KnowBe4 announced its preliminary financial and operating results for the fourth quarter of 2022, which again reported the Company's year-over-year increases of 30% for

---

[12] A go-shop is a routine deal term in which alternative bidders are permitted to submit proposals after a merger agreement is signed.

37

revenue, 29% for ARR, and 21% for total number of customers.  But with their shares in KnowBe4 cashed out in the Merger, the Public Stockholders were denied the opportunity to participate in the Company's future success.

## V.   **DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT**

109.   During the Class Period, each of the Defendants made materially false and misleading statements and omitted material facts in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Specifically, Defendants' SEC filings during the Class Period included material misstatements and omissions concerning: (i) the overall fairness of the Merger to the Public Stockholders; (ii) the Special Committee's purported independence and disinterestedness; (iii) Morgan Stanley's purported independence as the Special Committee's financial advisor; and (iv) KKR's decision to double its equity rollover once it learned the Merger price.

110.   As discussed above and further below, each of the Defendants' representations were false and misleading when made and omitted material facts necessary to make Defendants' statements not misleading.  These material misstatements and omissions denied KnowBe4's Public Stockholders the opportunity to make an appropriately informed vote on whether to vote in favor of the Merger (and accept the Merger consideration) or exercise their appraisal rights instead.

### A.   **October 12, 2022 Merger Press Release**

111.   The Class Period begins on October 12, 2022, when KnowBe4 and Vista issued the October 12, 2022 Merger Press Release.  The October 12, 2022 Merger Press Release was filed with the SEC on Form 8-K, and later incorporated by reference into the Proxy, and was intended to satisfy the filing obligation of KnowBe4's "[s]oliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)."  The Form 8-K stated that "On October 12, 2022 KnowBe4, Inc. [] and Vista Equity Partners Management, LLC [] announced the execution of an

Agreement and Plan of Merger." The October 12, 2022 Merger Press Release informed the market that KnowBe4 "entered into a definitive agreement to be acquired by [Vista] in an all-cash transaction valued at approximately $4.6 billion on an equity value basis" and stated that "***an independent Special Committee of KnowBe4's Board of Directors [] was formed to review this proposal*** and other potential value creation opportunities." The October 12, 2022 Merger Press Release also included quotes about the Merger from Defendant Sjouwerman, Michael Fosnaugh (a Senior Managing Director at Defendant Vista) and Rod Aliabadi (a Managing Director at Defendant Vista).

112. The October 12, 2022 Merger Press Release then emphasized the role of the Special Committee, noting that:

> As disclosed by KnowBe4 in a press release dated September 19, 2022, an ***independent Special Committee*** of KnowBe4's Board of Directors (the "Special Committee") was formed to review this proposal and other potential value creation opportunities . . . . In connection with Vista's initial acquisition proposal, ***KnowBe4, under the supervision of the Special Committee and its legal and financial advisors, engaged in a robust process, including evaluating transaction alternatives against KnowBe4's standalone plan and other strategic alternatives.***

113. The statements referenced in ¶¶111-112 were materially false and misleading and omitted material information when made. In reality, the Special Committee members were not "independent" as Defendants Venkataraman, Watzinger, and Klausmeyer were all conflicted with respect to the Merger and the rollover stockholders Defendants KKR, Elephant Partners and Sjouwerman. Specifically, the October 12, 2022 Merger Press Release failed to disclose that: (i) Defendant Venkataraman and his wife invested in KKR- and Elephant Partners-affiliated funds, and his wife had a decades-long tenure with the Special Committee's financial advisor Morgan Stanley; (ii) Defendant Watzinger invested in KKR-affiliated funds and maintained friendships with several KKR- and Vista-affiliated individuals; and (iii) Defendant Klausmeyer served as a

director for a company (Jamf Holding Corp.) affiliated with Vista, and served as director for another company (Ivalua Inc.) affiliated with KKR.

114. The October 12, 2022 Merger Press Release continued that:

Following this process, the Special Committee and KnowBe4's Board of Directors each unanimously determined that *the transaction with Vista is in the best interests of KnowBe4 and its stockholders.*

115. The statement referenced in ¶114 was misleading and omitted material information when made. Based upon the Special Committee's undisclosed conclusions on value and all of the Director Defendants' knowledge of the conflicted and unfair sales process, the Special Committee Defendants and Director Defendants could not have genuinely believed the transaction was in the best interest of the Public Stockholders. For example, during the sale process, the Special Committee determined and instructed its financial advisors at Morgan Stanley to tell Vista that anything below $25 per share was "[n]ot in the right zone for a transaction" and "not worth sending," and that $25 to $27 per share was at the "[l]ow end of guidance" and "will need some work." These internal conclusions indicate the Special Committee could not have had a good faith basis to believe the $24.90 per share Merger consideration was in the Public Stockholders' best interest.

### B.      October 13, 2022 Form 8-K and Merger Agreement

116. On October 13, 2022, KnowBe4 filed another Form 8-K with the SEC, which also was later incorporated by reference into the Proxy, and intended to satisfy the filing obligation of KnowBe4's "[s]oliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)" (the "October 13, 2022 Form 8-K").

117. Regarding the Special Committee, the October 13, 2022 Form 8-K stressed that:

KnowBe4's Board of Directors (the "Board") formed a Special Committee of the Board *comprised solely of independent and disinterested directors* (the "Special Committee") to engage with Vista, to consider other potential value creation

opportunities and to take other actions that the Special Committee deemed appropriate, ***with the assistance of its independent financial and legal advisors.***

118.   The statements referenced in ¶117 were materially false and misleading and omitted material information when made.   In reality, the Special Committee members were not "independent and disinterested" as Defendants Venkataraman, Watzinger, and Klausmeyer were all conflicted with respect to the Merger and the rollover stockholders Defendants KKR, Elephant Partners and Sjouwerman.  Specifically, the October 13, 2022 Form 8-K failed to disclose that: (i) Defendant Venkataraman and his wife invested in KKR- and Elephant Partners-affiliated funds, and his wife had a decades-long tenure with the Special Committee's financial advisor Morgan Stanley; (ii) Defendant Watzinger invested in KKR-affiliated funds and maintained friendships with several KKR- and Vista-affiliated individuals; and (iii) Defendant Klausmeyer served as a director for a company (Jamf Holding Corp.) affiliated with Vista, and served as director for another company (Ivalua Inc.) affiliated with KKR.   Furthermore, Morgan Stanley was not "independent" for the reasons stated above, including that it held over $550 million of investments in KKR and its affiliates.

### C.      December 22, 2022 Definitive Proxy Statement

119.   On December 22, 2022, KnowBe4 filed a definitive proxy statement on Schedule 14A with the SEC (previously defined as the "<u>Proxy</u>"), which was issued "By Order of the Board of Directors" and signed by Defendant Sjouwerman.  The Proxy also referred Public Stockholders to the "Transaction Statement on Schedule 13E-3" filed by Defendants Vista, KKR, Elephant Partners and Sjouwerman as a place "Where You Can Find Additional Information" about the Merger.  Defendants Vista, KKR and Elephant Partners allowed their names to be used repeatedly in the Proxy.

120.   Defendants' representations in the Proxy were false and misleading when made and omitted material facts, as detailed below.

### 1. That The Merger was Fair and in the Best Interest of the Public Stockholders

121.   The Proxy represented that the Special Committee unanimously determined that the Merger was "***advisable, fair to and in the best interests of KnowBe4 and its stockholders, including the [Public] Stockholders***."   The Proxy also contained a conclusion and recommendation by the Director Defendants "that the Merger is ***fair to KnowBe4's [Public Stock]holders***" based on the "procedural fairness of the Merger, including that [] it was negotiated by the Special Committee consisting solely of independent (and for purposes of serving on the Special Committee) and disinterested directors" and represented by "independent financial and legal advisors."

122.   In addition, the Proxy contained a representation by the "Purchaser Filing Parties" (*i.e.*, Defendants Vista, KKR, Elephant Partners and Sjouwerman) that they "***believe the Merger is substantively and procedurally fair to KnowBe4's [Public Stock]holders***" based on the same factors considered by the Special Committee.

123.   The statements referenced in ¶¶121-122 were misleading and omitted material information when made.  Based upon the Special Committee's undisclosed conclusions on values and the Director Defendants and Defendants Vista, KKR and Elephant Partners' knowledge of both the Special Committee and Morgan Stanley conflicts and their knowledge that the Merger price undervalued the transaction in terms of the price paid to Public Stockholders and relatedly created significant value for the nearly $800 million dollars in equity being rolled over into the new company by these Defendants, it is clear that none of these Defendants could have genuinely believed the transaction was in the best interest of Public Stockholders.

124.    For example, during the sale process, the Special Committee instructed its financial advisors at Morgan Stanley to tell Vista that anything below $25 per share was "[n]ot the right zone for a transaction" and "not worth sending," and that $25 to $27 per share was at the "[l]ow end of guidance" and "will need some work."  These internal conclusions indicate the Special Committee had concluded and could not have had a good faith basis to believe the $24.90 per share Merger consideration was in the Public Stockholders' best interest.  In addition, all Defendants were aware that upon learning of the $24.90 per share Merger consideration, Defendant KKR determined to increase the amount of equity it was rolling over into the private post-Merger KnowBe4.  Logically, KKR did this because it believed equity in the private post-Merger KnowBe4 was more valuable than the $24.90 per share Merger consideration, meaning they could not have believed the Merger was fair to the Public Stockholders (who could only receive the $24.90 per share consideration and did not have rollover opportunity like KKR, Elephant Partners and Sjouwerman).

125.    The Proxy disclosed that the Special Committee authorized Morgan Stanley to provide Vista with the Special Committee's views on valuation prior to Vista's initial bid:

> The Special Committee and its advisors also discussed whether this was the appropriate time in the Special Committee's process to convey the Special Committee's views on valuation to Vista. In that regard, the Special Committee noted that the Special Committee's process was utilizing KnowBe4 resources and KnowBe4 management's time, and that it would not make sense to proceed further with Vista unless Vista was prepared to submit a proposal at a price that the Special Committee found attractive. ***The Special Committee discussed its views on valuation, including that it believed that a transaction with a value in the mid-to-high $20's per share range was appropriate*** for a potential acquisition of KnowBe4 based upon, among other things, Morgan Stanley's financial analysis and the Special Committee's views on KnowBe4's business, and that it did not make sense to proceed further with Vista, given Vista's existing knowledge of KnowBe4 and its due diligence progress at that point in time, unless it shared a similar view to the Special Committee on valuation.

43

126.    The statement referenced in ¶125 was a misleading opinion statement and omitted material information when made.  By stating the Special Committee believed a value "in the mid-to-high $20's per share range was appropriate" it implied the $24.90 Merger consideration was appropriate.    However, in reality, the Special Committee's internal conclusion was starkly different.  Specifically, the Special Committee determined and instructed Morgan Stanley to tell Vista that anything below $25 per share was "[n]ot the right zone for a transaction" and "not worth sending," and that $25 to $27 per share was at the "[l]ow end of guidance" and "will need some work."

### 2.    The Special Committee Members' Conflicts of Interest and the Evaluation of Those Conflicts

127.    The Proxy stated that the Board formed the Special Committee "***comprised solely of independent and disinterested directors*** . . . to engage with Vista, to consider other potential value creation opportunities and to take other actions that the Special Committee deemed appropriate." The Proxy further described that Defendants Watzinger, Klausmeyer and Venkataraman were appointed to the Special Committee after KnowBe4's Board determined that each of the Special Committee Defendants were "***independent and disinterested*** for purposes of a possible transaction with Vista[.]"

128.    The Proxy further stated that during a July 13, 2022 meeting between the Special Committee and representatives from Potter Anderson, "[r]epresentatives of Potter Anderson conducted an additional independence review of the Special Committee members and, after such review, the Special Committee concluded that ***each member was independent and disinterested*** for purposes of evaluating a potential acquisition of the Company."

129.    In addition, under the header "Reasons for the Merger; Recommendation of the Special Committee and the KnowBe4 Board," the Proxy stated that:

44

*The Special Committee, since its formation, has consisted solely of independent (for purposes of serving on the Special Committee) and disinterested directors that are not affiliated with, and are independent of, any of the potential counterparties to a potential acquisition of KnowBe4* (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole) *and were otherwise disinterested and independent with respect to a potential acquisition of KnowBe4* (including a potential acquisition of KnowBe4 that has a transaction or series of transactions in which one or more significant stockholders of KnowBe4 have an interest that is in addition to, and/or different from, the interests of KnowBe4's stockholders as a whole), other than as discussed in the section of this proxy statement captioned "*Special Factors—Interests of KnowBe4's Directors and Executive Officers in the Merger*[.]"

130.   The statements referenced in ¶¶127-129 were materially false and misleading and omitted material information when made.  In reality, the Special Committee members were not "independent and disinterested" as Defendants Watzinger, Klausmeyer and Venkataraman were all conflicted with respect to the Merger and the rollover stockholders Defendants KKR, Elephant Partners and Sjouwerman.  Specifically, the Proxy failed to disclose that: (i) Venkataraman and his wife invested in KKR- and Elephant Partners-affiliated funds, and his wife had a decades-long tenure with the Special Committee's financial advisor Morgan Stanley; (ii) Watzinger invested in KKR-affiliated funds and maintained friendships with several KKR- and Vista-affiliated individuals; and (iii) Defendant Klausmeyer served as a director for a company (Jamf Holding Corp.) affiliated with Vista, and served as director for another company (Ivalua Inc.) affiliated with KKR.

### 3.   Morgan Stanley's Conflicts of Interest and the Evaluation of Those Conflicts

131. In  addition  to  repeatedly  discussing  the  Special  Committee's  purported independence and disinterestedness, the Proxy further stated the Special Committee "evaluated the Merger, *with the assistance of its own independent financial and legal advisors*."  In support of the "independen[ce]" of the Special Committee's financial advisor, the Proxy stated that:

45

On July 12, 2022, representatives of Morgan Stanley delivered Morgan Stanley's customary relationships disclosures memorandum to the Special Committee, which provided an overview of Morgan Stanley's relationships (or lack thereof) with KnowBe4, Vista and certain of its affiliates, KKR and certain of its affiliates, and Elephant [Partners] and certain of their affiliates.

132.   Furthermore, the Proxy highlighted that, just before the Special Committee executed an engagement letter with Morgan Stanley on July 13, 2022:

The Special Committee and representatives of Potter Anderson also reviewed Morgan Stanley's relationships disclosure memorandum and Morgan Stanley's draft engagement letter. Following such review, *the Special Committee determined that no conflicts had been disclosed in Morgan Stanley's relationship disclosure memorandum that would affect the ability of Morgan Stanley to fulfill its responsibilities as an independent financial advisor to the Special Committee* and to engage Morgan Stanley as the Special Committee's independent financial advisor.

133.   The Proxy also discussed Morgan Stanley's actual and potential conflicts but disclosed only that it "may" have committed investments in KKR:

In addition, Morgan Stanley, its affiliates, directors or officers, including individuals working with the Special Committee in connection with the Merger, *may have committed and may commit in the future to invest in private equity funds managed by Vista, the Vista Related Entities, KKR, the KKR Related Entities*, Elephant Partners or in affiliates of Morgan Stanley that may hold direct equity and/or partnership interests in private equity funds managed by Vista, the Vista Related Entities, KKR or the KKR Related Entities.

134.   The statements referenced in ¶¶131-133 were materially false and misleading and omitted material information when made.   Indeed, Morgan Stanley, serving as the Special Committee's financial advisor, was not "independent" as it held over $550 million of investments in KKR and its affiliates, and the wife of Special Committee Defendant Venkataraman had a decades-long tenure at Morgan Stanley.

46

**4.      KKR's Decision to Significantly Increase its Rollover Contribution After the Low Merger Price was Established**

135.   The Proxy made false and misleading statements and omitted material facts regarding KKR's significantly increased planned rollover after learning that the Merger price was much lower than previously expected.

136.   The Proxy states that on September 13, 2022, Morgan Stanley met with KKR to discuss "*the potential quantum*" of KKR rollover and thereafter "conveyed such interest and *potential quantum* to representatives of Vista." Later, however, the Proxy and its attached exhibits only disclosed that KKR was rolling over $300 million worth of equity in the post-Merger company. Nowhere does the Proxy describe that KKR doubled the amount of its equity rollover after learning of the undervalued Merger price.

137.   The statements and omissions in ¶¶135-136 were misleading. The Proxy omits the critical fact that KKR increased its planned rollover amount after learning of the final agreed deal price. Specifically, undisclosed to Public Stockholders, in July of 2022, Morgan Stanley advised the Special Committee that KKR expressed that it planned to roll over approximately $150 million to $200 million, structured as an investment from a new fund. At that point, Morgan Stanley and the Special Committee expected that a transaction would be priced in the mid-to-upper $20s per share (and specifically, above $25 per share).

138.   Also undisclosed to Public Stockholders, on September 13, 2022, KKR conveyed to representatives of Morgan Stanley that it planned to roll over or reinvest approximately $200 million into the post-close entity. At that point, Morgan Stanley and the Special Committee had already conveyed its mid-to-upper $20s per share pricing guidance to Vista, which the Special Committee was clear meant a price above $25 per share, and likely above $25-27 which the Special Committee described as "low" and would "need work".

47

139.    By late September 2022, when it was clear the Merger price would be below the Special Committee's threshold, KKR decided to increase its rollover participation to $300 million, as much as double its previously indicated roll over $150 to $200 million.

**D.     December 22, 2022 Schedule 13E-3 by KnowBe4, Vista, KKR, and Elephant Partners**

140.    On December 22, 2022, KnowBe4, Vista, KKR, and Elephant Partners jointly issued a Schedule 13E-3 for the Merger, signed by Defendant Sjouwerman on behalf of KnowBe4, as well as representatives from KKR, Vista, and Elephant Partners.  The Schedule 13E-3, which KnowBe4 filed with the SEC, stated that it was filed in connection with the "filing of solicitation materials or an information statement subject to Regulation 14A, Regulation 14C or Rule 13e-3(c) under the Securities Exchange Act of 1934[,]" and expressly attached and incorporated by reference the Proxy in its entirety.

141.    Thus, the Schedule 13E-3 included the same false and misleading statements described in Section V.C, *supra*, which were materially false and misleading for the same reasons.

**VI.    <u>ADDITIONAL ALLEGATIONS OF SCIENTER</u>**

142.    For purposes of Count II below, as alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the Merger process were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following.

**A.     Defendant Vista Was a Long-Time Investor in KnowBe4 and Motivated To Buy Out the Company for as Cheaply as Possibly**

143.    Vista had a longtime interest in acquiring KnowBe4 prior to the Merger.  According to the Proxy, even before KnowBe4's 2021 IPO, "Vista and KnowBe4 discussed, in general terms, a variety of different transactions, including the possible acquisition of KnowBe4 by Vista."  In connection with those discussions, on March 12, 2020, KnowBe4 and Vista entered into an NDA

that permitted KnowBe4 to provide confidential and proprietary information to Vista for a period of three years.

144.   On March 5, 2021, Vista became an investor in the then-private KnowBe4 when it acquired $300 million in equity from KKR, Elephant Partners and Goldman Sachs.   Vista purchased an additional $30 million of KnowBe4 shares in KnowBe4's April 2021 IPO. According to KnowBe4's 2022 annual proxy statement, as of March 15, 2022, Defendant Vista had 13.5% voting power in KnowBe4 through its ownership of 1,875,000 Class A KnowBe4 shares and 14,557,960 Class B KnowBe4 shares.

145.   Through Vista's prior discussions concerning a possible acquisition of KnowBe4 and entry into a non-disclosure agreement, coupled with Vista's ownership of approximately 13% of KnowBe4 since 2021, Vista had access to valuable non-public information regarding KnowBe4's business, innerworkings, and strategic options.  This included knowledge that Vista itself would have (and did have) an unfair timing and informational advantage over other potential acquirors in connection with any process to sell KnowBe4.

146.   Notably, Vista is well known for using a high-speed, high-pressure acquisition strategy.[13]  At least one court analyzing issues relating to a Vista take-private merger such as the one at issue here has noted that historically "Vista leverages its ability to move quickly from an expression of interest, through confirmatory diligence, to a firm offer, thereby truncating the process and reducing interloper risk.   Vista calls it 'sprinting,' and for Vista, that's good business."[14]  Although speed suits Vista's needs, it often presents problems for target companies

---

[13] *See In re Mindbody, Inc., Stockholder Litigation*, C.A. No. 2019-0442-KSJM, 2023 WL 2518149, at *14 (Del. Ch. Mar. 15, 2023) ("Vista is a pro at acquiring companies . . . Vista's advantage is speed.").

[14] *Id.*, at *1.

and their minority stockholders. "For a target company seeking to maximize stockholder value, however, a truncated timeline can present challenges. It takes time to develop alternatives to promote competition and extract the best price. By sprinting to the finish line, Vista seeks to prevent a target company from doing that."[15]

147. Like in any merger transaction, Vista as the acquiror was motivated to purchase KnowBe4 as cheaply as possible. Accordingly, Vista was incentivized to use its timing and information advantage to negotiate a per share Merger price that was lower than KnowBe4's true value.

148. In addition, Vista could, and did, minimize the cash and debt it needed to expend to acquire KnowBe4 by encouraging Defendants KKR, Elephant Partners and Sjouwerman to rollover a significant portion of their equity. Vista made this opportunity attractive to KKR, Elephant Partners and Sjouwerman by negotiating a materially low cash Merger price, meaning KKR, Elephant Partners and Sjouwerman would be receiving their equity in the private post-Merger KnowBe4 at a discounted valuation. Indeed, as detailed herein, Vista negotiated such an unfair deal price that upon learning of the Merger price KKR decided to double the amount of equity it was rolling over in the transaction. By encouraging KKR, Elephant Partners and Sjouwerman to maintain a significant equity interest in the post-Merger private KnowBe4 (instead of selling all their shares in the Merger), Defendant Vista was able to spend less cash and incur less debt to acquire KnowBe4.

149. Finally, once the Merger agreement was signed and publicly disclosed, Vista was highly motivated to obtain shareholder approval of the Merger. After expending months on due diligence and negotiations, Vista had agreed to acquire KnowBe4 at a substantial discount.

---

[15] *Id.*

Accordingly, it was in Vista' best interest to convince the Public Stockholders to approve the Merger.

**B.      Defendants KKR, Elephant Partners, and Sjouwerman Rolled Over Approximately Half Their Equity and Thus Were Not Motivated to Ensure the Merger Process was Fair and in the Best Interest of the Public Stockholders**

150.   Defendants KKR, Elephant Partners, and Sjouwerman collectively rolled over equity worth approximately $780 million at the deal price into the private post-Merger KnowBe4. This allowed these Defendants to liquidate a portion of their investment while also maintaining a very significant investment in KnowBe4's upside at a discounted valuation.

151.   Through the Merger, Defendant KKR was able to cash out a portion of its shares while maintaining ownership of the Company going forward essentially risk-free.  Specifically, Defendant KKR held 26,115,895 shares of KnowBe4 prior to the Merger.  KKR sold 14,067,702 of those shares (about 54%) into the Merger for approximately $350 million in cash, and rolled over the remaining 12,048,193 of those shares (about 46%) into an investment valued at $300 million in the private post-Merger KnowBe4. As an insider, KKR had a significant informational advantage over the Public Stockholders and so it is unsurprising that it focused on its total return— driven by the rollover at a favorable valuation—rather than on maximizing the cash consideration paid to Public Stockholders which would reduce the value of the rollover investment.

152.   Defendant Elephant Partners was likewise able to cash out a portion of its shares while maintaining ownership of the Company, going forward essentially risk-free.  Specifically, Defendant Elephant Partners held 37,069,823 shares of KnowBe4 prior to the Merger.  Elephant Partners sold 20,000,000 of those shares (about 54%) into the Merger for $498 million in cash, and rolled over the remaining 17,069,823 of its shares (about 46%) into an investment valued at $425 million in the private post-Merger KnowBe4.  As an insider, Elephant Partners had a

significant informational advantage over the Public Stockholders and so it is unsurprising that it focused on its total return—driven by the rollover at a favorable valuation—rather than on maximizing the cash consideration paid to Public Stockholders which would reduce the value of the rollover investment.

153.   Defendant Sjouwerman held 4,501,010 shares of KnowBe4 prior to the Merger. Sjouwerman sold 2,311,889 of his shares into the Merger (about 51%) for approximately $57.6 million in cash, and rolled over 2,189,121 of those shares (about 49%) into an investment valued at $54.5 million in the private post-Merger KnowBe4. As an insider and the founder of KnowBe4, Sjouwerman had a significant informational advantage over the Public Stockholders and so it is unsurprising that he focused on his total return—driven by the rollover at a favorable valuation— rather than on maximizing the cash consideration paid to Public Stockholders which would reduce the value of the rollover investment.

154.   Because Defendants KKR, Elephant Partners, and Sjouwerman were rolling over approximately half of their equity into the post-Merger KnowBe4, these defendants had no interest in ensuring that the Merger consideration was fair.  Indeed, for every share these defendants sold at the $24.90 per share Merger price, they also rolled over approximately one share into the private post-Merger KnowBe4 at the same valuation, providing them a discounted stake in the private post-Merger KnowBe4.

155.   The substantial upside from the rollover structure afforded to Defendants KKR, Elephant Partners, and Sjouwerman highly motivated them to obtain the Public Stockholder approval of the Merger and ensure the Merger closed quickly.

**C.    KKR Increased its Rollover After Learning of the Deal Price Because It Believed the Deal Price was Low**

156.    In July of 2022, Morgan Stanley advised the Special Committee that KKR planned to roll over approximately $150 million to $200 million into the post-Merger KnowBe4.  At that point, Morgan Stanley, the Special Committee, and KKR expected that a transaction would be priced in the mid-to-upper $20s per share (and, specifically, above the $25 per share "floor" set by the Special Committee).

157.    After learning of the $24.90 per share Merger consideration, KKR decided to *increase* the size of its equity rollover from the $150 to $200 million it had discussed with the Special Committee in July to $300 million.  There is only one logical reason KKR would do this: they believed the equity in a private post-Merger KnowBe4 was worth more than the $24.90 per share cash Merger consideration.

158.    KKR is a highly sophisticated investor, a long-time inside shareholder of KnowBe4, and appointed its Partner, Defendant Shanley, and its Senior Advisor, Defendant Wilson, to the KnowBe4 Board of Directors.  There is no doubt KKR fully understood KnowBe4's business and financials, conducted a thorough financial analysis, and before increasing its rollover determined that the equity in the private post-Merger KnowBe4 at the Merger valuation would be worth more than the $24.90 per share cash consideration being paid to investors.  Indeed, the Proxy stated that KKR requested "to perform due diligence on KnowBe4 in connection with [its] potential equity co-investment with Vista."  KKR's decision to increase the size of its rollover is analogous to insider trading based on material nonpublic information that the $24.90 per share Merger consideration was below the stock's true value.

**D.      The Director Defendants Were Conflicted**

159.    Each of the Director Defendants harbored conflicts that motivated them to mislead investors in order to obtain approval of the Merger.

160.    Four of the seven KnowBe4 Directors that approved the Merger were conflicted through their affiliations with the Defendants that were involved in the above-referenced rollover. Specifically, Defendant Sjouwerman was conflicted because he personally rolled over approximately half of his equity in KnowBe4.  Defendant Daly was conflicted because he is Elephant Partners' co-founder and General Partner, and Elephant Partners rolled over nearly half of its equity in KnowBe4.  And Defendants Shanley and Wilson were conflicted because of their affiliation with KKR (Defendant Shanley is a KKR Partner, while Defendant Wilson is a KKR Senior Advisor), and KKR rolled over nearly half of its equity in KnowBe4.

161.    Defendants Daly, Shanley, and Wilson's affiliation with KKR and Elephant Partners gave them the same incentive structure as Defendants Elephant Partners, KKR and Sjouwerman discussed above.  That is, because their employers were rolling over nearly half of their equity, it was irrelevant to them whether the Merger price was indeed in the best interest of the Public Stockholders.  In addition, once the Merger agreements were signed it was in their best interest to obtain shareholder approval of the Merger.

162.    The other three Director Defendants—Defendants Venkataraman, Klausmeyer and Watzinger—were appointed as the purported "independent" Special Committee in connection with the Merger process.  However, each of the Special Committee Defendants had received significant compensation from and owed their loyalty to KnowBe4, Elephant Partners, KKR and/or Sjouwerman, and each stood to gain millions through their Restricted Stock Units ("RSUs") if the Merger closed.

163. Defendant Venkataraman received approximately $50 million in compensation while working as KnowBe4's Co-President and Chief Financial Officer from September 2018 to March 2022. Because of Defendant Venkataraman's historical compensation from the KnowBe4 Board, Defendant Venkataraman was loyal to the Company's controlling shareholders, KKR, Elephant Partners and Sjouwerman. In addition, Venkataraman and his wife held investments in KKR and Elephant Partners-affiliated funds.

164. Defendant Klausmeyer received approximately $13 million from serving as a KnowBe4 director for just over two years. Because of Defendant Klausmeyer's historical compensation from the KnowBe4 Board, Defendant Klausmeyer was loyal to the Company's controlling shareholders, KKR, Elephant Partners, and Sjouwerman. In addition, Klausmeyer serves on the board of directors of Jamf (a Vista controlled company) and Ivalua (which KKR invested in and KKR Partner Defendant Shanley formerly served on the board of), giving him even more reason to appease Vista and KKR by cooperating with their scheme to take KnowBe4 private at a substantial discount.

165. Defendant Watzinger received approximately $15.4 million from serving as a KnowBe4 director for three years. Because of Defendant Watzinger's historical compensation from the KnowBe4 Board, Defendant Watzinger was loyal to the Company's controlling shareholders, KKR, Elephant Partners, and Sjouwerman.

166. Defendants Venkataraman, Klausmeyer, and Watzinger's compensation for serving on the KnowBe4 Board of Directors also included receiving RSUs. These RSUs included accelerated vesting upon a "change in control," and resulted in significant payments to Defendants Venkataraman, Klausmeyer and Watzinger upon the closing of the Merger. Specifically, Venkataraman received approximately $4.6 million from RSUs vesting at the close of the Merger,

Klausmeyer received approximately $6.1 million and Watzinger received approximately $38 million.  If Defendants Venkataraman, Klausmeyer and Watzinger did not approve the Merger or support the issuance of false and misleading statements to obtain shareholder approval of the Merger, they risked being removed from the Board by Defendants Vista, KKR, Elephant Partners and Sjouwerman and losing their RSUs.

167.   In sum, each of the Director Defendants were financially motivated to mislead investors and obtain shareholder approval of the Merger despite knowing the Merger price was materially unfair to the Public Stockholders.

E.   **The Special Committee Defendants Knew the Merger Process Favored Vista**

168.   The Special Committee Defendants knowingly and repeatedly allowed Vista to maintain an unfair timing and information advantage in connection with the sales process.  While Vista already had a significant head start based on its previous discussions regarding an acquisition of KnowBe4 and its prior investments in KnowBe4, and Vista was well-known for using high-speed tactics to force favorable deals, the Special Committee knowingly allowed Vista to maintain and grow its timing advantage.  This included, among other things: (i) only reaching out to a select few other potential acquirors; (ii) providing due diligence to Vista on an expedited basis, including providing Vista early access to its data room; (iii) delaying the execution of non-disclosure agreements with other potential bidders; (iv) providing Vista, but not other bidders, the Special Committee's internal views on valuation; (v) providing Vista information regarding a potential rollover by KKR, Elephant Partners and Sjouwerman before making an initial bid; (vi) setting an aggressive transaction timeline for all bidders that did not provide other potential bidders time to catch up; and (vii) declining to insist on a go-shop period to see if other interested parties would make a superior offer post-Merger announcement.

169. As the committee specifically created for the purpose of overseeing the sales process, the Special Committee knew or recklessly disregarded the fact that Vista had an unfair advantage in the sale process and was able to leverage that advantage to negotiate a deal that was not in the best interest of the Public Stockholders.

### F. The Special Committee Knew the Merger Consideration Was Too Low

170. After reviewing KnowBe4's valuation with financial advisors and management, a slide in a September 15, 2022 Morgan Stanley presentation stated that the KnowBe4 Special Committee determined that anything below $25 per share was "[n]ot the right zone for a transaction" and that $25 to $27 per share was at the "[l]ow end of guidance" and "will need some work." Defendants were aware this slide was problematic in light of the $24.90 per share Merger price. Indeed, while the September 15, 2022 Morgan Stanley presentation containing the slide was disclosed, Defendants decided to redact the column of the slide containing the Special Committee's direction regarding any offer below $25 per share.

171. The Special Committee was also aware that its financial advisor, Morgan Stanley, had previously presented it with analyses that valued KnowBe4 at between $25.05 and $37.52 per share based on conservative management projections that did not include several growth initiatives then underway at the Company.

172. Despite reaching the above conclusions about the unacceptable and "low" zones for a potential transaction and reviewing Morgan Stanley's financial analyses, the Special Committee nevertheless agreed to, and recommended shareholders vote FOR, the Merger that provided shareholders only $24.90 per share.

**G.**     **Defendants Vista, KKR, Elephant Partners, and Sjouwerman Down-Converted Their Shares to Manipulate the Vote**

173.   Following its April 2021 IPO, KnowBe4 had a dual-class share structure.  The Class A shares, which were publicly issued through the IPO, received one vote per share and were primarily held by the Public Stockholders.  Class B shares received ten votes per share and were never publicly traded.  Holders of Class B shares had the right to convert their shares at any time to Class A shares with a single vote.

174.   Approval of the Merger Agreement required four affirmative votes: (i) the majority vote of all outstanding shares (voting together as a single class); (ii) the majority vote of the outstanding shares of KnowBe4 common stock (voting together as a single class) held by the Public Stockholders; (iii) the majority vote of the Class A common stockholders; and (iv) the majority vote of the Class B common stockholders.

175.   Following the IPO, the vast majority of interest in KnowBe4 Class B shares, and the vast majority of the outstanding Class B shares were held by Vista, KKR, Elephant Partners, and Sjouwerman.

176.   On October 9, 2022, Vista successfully proposed that it and KKR, Elephant Partners, and Sjouwerman "down-convert" their Class B shares to the less-powerful Class A shares.  This helped ensure majority approval by Class A stockholders and was part of their overall scheme to ensure that the Merger was approved.  These shareholders forfeited 90% of their votes for two reasons.  *First*, a clause in KnowBe4's Charter required that Class A shares and Class B shares be treated equally in any change-in-control transaction, such as the Merger.  Defendants Vista, KKR, Elephant Partners and Sjouwerman exploited this clause because KKR, Elephant Partners, and Sjouwerman would be rolling over equity into the private post-Merger KnowBe4, an opportunity that was not provided to the Public Stockholders.  *Second*, by converting their shares from Class

B to Class A shares, it gamed the required Class A shareholder vote by giving Defendants Vista, KKR, Elephant Partners and Sjouwerman a significant portion of that vote. Put another way, these Defendants converted their Class B shares to ordinary Class A shares in an attempt to control the Class A vote and gain approval of the Merger. This is a highly uncommon maneuver in the merger of a public corporation and demonstrates that these Defendants would do anything (including mislead investors in the Proxy) to push through the Merger, which disproportionately benefited them.

177. The foregoing facts, particularly when considered holistically and in the light most favorable to the Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

VII. **LOSS CAUSATION**

178. As described herein, Defendants made or caused to be made materially false and misleading statements and omissions of material facts in the Proxy. These materially false and misleading statements and omissions as set forth above caused Lead Plaintiffs and other members of the Class to vote in favor of the Merger and/or accept Merger consideration that failed to adequately value KnowBe4 common stock. As a result, Lead Plaintiffs and other Class Members suffered damages under Section 14(a) of the Exchange Act.

179. The false and misleading statements alleged herein artificially devalued the market price that members of the Class received for their KnowBe4 shares in the Merger and in open-market sales during the Class Period, by concealing facts indicating that the shares were more valuable than the Merger price, and that a higher price could be obtained.

180. As described above, KnowBe4 was far more valuable than the Merger price. *First*, the $24.90 per share Merger price was below what the Special Committee had concluded was "[n]ot [in] the right zone for a transaction" and "not worth sending in a letter [proposal.]" *Second*, Morgan Stanley's financial analyses valued KnowBe4 at between $25.05 and $37.52 per share

59

based on projections that even excluded growth initiatives that were underway. *Third*, recognizing that the Merger was underpriced, KKR significantly increased its rollover commitment from its initial rollover discussions after the deal was priced.

181. During the Class Period, Defendants also made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Lead Plaintiffs and the Class, and induced Lead Plaintiffs and the Class to sell KnowBe4 shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger consideration. In addition, had Lead Plaintiffs and members of the Class not been induced to sell at deflated prices, they could have secured the fair value of their shares through statutory appraisal rights. Lead Plaintiffs and the Class suffered economic harm as a result of their sales of KnowBe4 common stock during the Class Period, *i.e.*, damages under Section 10(b) of the Exchange Act.

182. Had the truth been known to the market, KnowBe4 shares would have traded at higher prices throughout the Class Period. Members of the Class who sold their shares during the Class Period would therefore have obtained a higher price for their shares.

183. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and Class Members would have obtained a higher price per share. Alternatively, stockholders would have voted down the Merger, and no transaction would have been effectuated, such that members of the Class who retained their shares would not have been deprived of the fair value of their shares in either open market transactions or in a forced sale. In addition, had Lead Plaintiffs and members of the Class been informed of

the truth they could have secured fair value of their shares through exercising their statutory appraisal rights.

184. Based on Defendants' misrepresentations, KnowBe4's stock price became tethered to the underpriced Merger consideration, as indicated in the following chart:



185. As the market price was artificially depressed, members of the Class who sold their shares during the Class Period received an artificially lower value for their shares.

186. Members of the Class who held KnowBe4 shares on the Record Date were deprived of the information necessary to exercise a fully informed vote, as well as a fully informed decision whether to dissent and seek appraisal for the fair value of their KnowBe4 shares, and other available relief. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and Plaintiffs would have obtained a higher price per share. Alternatively, stockholders would have voted down the Merger and no transaction would have been effectuated resulting in stockholders retaining their shares and thus enjoying the ongoing growth of the Company.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

187.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by a director or officer of the Company who knew that the statement was false when made.

## IX.   CLASS ACTION ALLEGATIONS

188.   Lead Plaintiffs bring this Action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of (i) the Public Stockholders that held shares on the Record Date and were entitled to vote on the Merger and (ii) sellers of KnowBe4 common stock from October 12, 2022 through the close of the Merger on February 1, 2023 (the "Class Period"), including those stockholders who sold shares in the Merger (together, the "Class").   Excluded from the Class are the Defendants and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

189.   This Action is properly maintainable as a class action.

190.   The Class is so numerous that joinder of all members is impracticable.   According to the Proxy, there were 132,747,542 shares of KnowBe4 common stock outstanding as of the

62

Record Date.  In addition, the publicly reported open-market trading volume during the Class Period is 132,462,874 shares.  Upon information and belief, there are hundreds or thousands of members of the Class.

191.   There are questions of law and fact that are common to the Class, including, among others:

(a)   Whether Defendants violated Section 14(a) of the Exchange Act and/or Rule 14a-9 promulgated thereunder;

(b)   Whether Defendants violated Section 10(b) of the Exchange Act and/or Rule 10b-5 promulgated thereunder;

(c)   Whether the Director Defendants, Defendants Elephant Partners, KKR and Vista violated Section 20(a) of the Exchange Act;

(d)   Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)   Whether Defendants knew, recklessly and/or negligently disregarded that their statements and/or omissions were false and misleading;

(f)   Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)   The extent of damage sustained by Class Members and the appropriate measure of damages.

192.   Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class have been damaged by each of the Defendants' wrongful conduct.

193.   Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.  All members of the Class have suffered the same harm.

194.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.  Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

195.   The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## X.   PRESUMPTION OF RELIANCE

196.   Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.  Because this Action involves Defendants' failure to disclose information regarding KnowBe4's business and sales process, among other things, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions of material facts set forth above, that requirement is satisfied here.

197. In the alternative, Lead Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions of material facts pursuant to the fraud-on-the market doctrine because, at all relevant times, the market for KnowBe4 securities was open, efficient and well developed for the following reasons, among others:

(a) KnowBe4 was listed and actively traded on the NASDAQ, a highly efficient market;

(b) As a regulated issuer, KnowBe4 filed periodic public reports with the SEC and/or the NASDAQ;

(c) The price of KnowBe4 common stock reacted to the announcement of the Merger and remained near the estimated per share Merger consideration during the Class Period;

(d) KnowBe4 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e) KnowBe4 was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

198. Because the market for KnowBe4 was efficient, it is assumed that: (1) any misrepresentations were incorporated into the market price; (2) Lead Plaintiffs and Class members relied on that market price when deciding when to buy or sell, and; therefore, (3) Lead Plaintiffs

and Class members indirectly relied on any misrepresentations when deciding to sell KnowBe4 common stock, including the decision to tender shares into the Merger, rather than seeking appraisal.

199.   The stock price strongly reacted to the announcement of the Merger and Merger related news.  Furthermore, during the period after the announcement of the Merger, it is clear that the stock price was influenced by the Merger price.  These facts strongly support a presumption of market efficiency because they show the market reacted efficiently to information, and the Merger is obviously important information that would be reflected in the stock price.

200.   In addition, while a merger is pending, a vital right affecting share ownership is the right to seek appraisal.  Market participants often buy or sell the stock based on their valuation of an appraisal claim.  Trading based on the value of the right to seek appraisal affects the overall market price of the stock.  Indeed, if information is disclosed that causes investors to perceive an appraisal claim as more valuable, investors interested in seeking appraisal will consequently value the shares at a higher level, placing upward pressure on the stock price.  If information is disclosed showing that appraisal would be less valuable, the share price could experience downward pressure.  Other investors who are not interested in seeking appraisal may adjust their own valuation of the shares based on their perception of what other investors are willing to pay due to the possibility of appraisal.  Accordingly, the possibility of appraisal ties information relating to the company to the value of its shares even in instances where a merger is likely to close.

201.   The relationship between the right to appraisal and the market price for a company's shares was explained in a University of Washington Law Review Article:

> In a developed appraisal market, appraisal arbitrageurs will seek to accumulate a position in the target company following the announcement of a transaction, and will continue to purchase shares until the market price has been driven to the risk-adjusted expected present value of an appraisal claim. . . . Minority shareholders

would thus share in the expected gains from appraisal without having to file a petition themselves, just as the benefits from the market for corporate control accrue to ordinary shareholders. Indeed, minority shareholders could be better off by sharing in these gains than if they had sought appraisal themselves because professional arbitrageurs, as sophisticated repeat players, may be able to reduce overall costs in pressing claims or achieve better results in appraisal than individual investors could on their own.

*See* Charles R. Korsmo, Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U.L. Rev. 1551 (2015).

202. Aside from appraisal, investors rely on company-specific information during the pendency of a merger. Often referred to as "merger arbitrage," investors often buy shares below a proposed merger price and either sell those shares in the merger or at a higher value as new information pertaining to the merger emerges. These investors may often make a purchase based on the prospect of a higher offer arising before the merger closes or based on the "fallback" value of the company should the merger fail, both of which are based on and tied to information about company fundamentals. Accordingly, information relating to the company would be relevant to the valuation of the security and the price at which the security trades while a merger is pending.

203. During the Class Period, many sophisticated investors specializing in investing during the pendency of a merger made investments in KnowBe4, thereby enhancing the market efficiency of KnowBe4.

## COUNT I
**Against Defendants KnowBe4, Elephant Partners, KKR, Vista and Each of the Director Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

204. Lead Plaintiffs repeat and re-allege ¶¶ 1–141, 178–203 as if fully set forth herein. For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

67

205.  Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants (*i.e.*, Defendants Klausmeyer, Venkataraman, Watzinger, Sjouwerman, Daley, Shanley and Wilson) disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

206.  Specifically, as set forth in more detail above, the Proxy omitted material facts concerning key aspects of the Merger process, including that:

(a)  the Special Committee lacked independence from its own self-interest and domination by the controlling stockholders;

(b)  Morgan Stanley lacked independence from KKR;

(c)  KKR increased its planned rollover or reinvestment into the post-close KnowBe4 by 50-100% after it learned of the deal price; and

(d)  The Special Committee could not have held a good faith belief that a go-private price of less than $25.00 was fair from a financial point of view.

207.  The Proxy also included the opinion of each the Director Defendants, Vista, Elephant Partners and KKR that the Merger was in the "best interest[] of" and/or "fair to" the Public Stockholders and recommendations that shareholders vote FOR approval of the Merger, opinions which, as set forth in more detail above, none of these Defendants genuinely believed.

208.  The Proxy was prepared, reviewed and/or disseminated by Defendants KnowBe4 and the Director Defendants.  Each of the Defendants named in this count authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sale process leading up to the closing of the Merger.  Indeed, the Proxy was issued "By Order of the

68

Board of Directors" – *i.e.*, Director Defendants Klausmeyer, Venkataraman, Watzinger, Sjouwerman, Daley, Shanley and Wilson and signed by Defendant Sjouwerman.

209.   In addition, KnowBe4, KKR, Elephant Partners, Sjouwerman, and Vista jointly issued a Schedule 13E-3 for the Merger.  The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its *entirety*."   The Proxy also specifically referred Public Stockholders to the Schedule 13E-3 as somewhere "Where You Can Find Additional Information" regarding the Merger.

210.   By virtue of their positions as directors of KnowBe4 and access to Company and Merger information, each of the Director Defendants (Klausmeyer, Venkataraman, Watzinger, Sjouwerman, Daley, Shanley and Wilson) were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.  Likewise, as significant shareholders of KnowBe4, Defendants KKR and Elephant Partners had access to Company and Merger information and therefore were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Schedule 13E-3.  Finally, as a major KnowBe4 shareholder who was given preferential treatment in the Merger process, Vista was aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.  Plaintiffs, while reserving all rights, expressly disclaim and disavow at this time any allegation that could be construed as alleging that this claim sounds in fraud in connection with this Count.  This claim sounds in negligence and is based on the failure of Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants to

69

exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

211. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to KnowBe4 shareholders.

212. The Proxy was an essential link in causing KnowBe4 shareholders to approve the Merger and to forego their appraisal rights.

213. Because of the false and misleading statements in the Proxy, Lead Plaintiffs and the Class were harmed by an uninformed shareholder vote approving the Merger.

214. By reason of the foregoing, Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants (*i.e.*, Defendants Klausmeyer, Venkataraman, Watzinger, Sjouwerman, Daley, Shanley and Wilson) violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

## COUNT II
**Against Defendants KnowBe4, Elephant Partners, KKR, Vista and Each of the Director Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

215. Lead Plaintiffs repeat and re-allege ¶¶ 1–203 as if fully set forth herein.

216. During the Class Period, Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low

70

market prices for KnowBe4 securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

217.   Specifically, as detailed above, KnowBe4 and Vista issued the joint Merger Press Release on October 12, 2022.  As detailed above, among other things, the Merger Press Release misstated that the Special Committee was "comprised solely of independent and disinterested directors" and that its financial and legal advisors were independent.  Neither of these statements were true.  The October 12, 2022 Merger Press Release also omitted the quantum of the equity rollover by Defendants KKR, Elephant Partners and Sjouwerman.

218.   Next, Defendant KnowBe4 issued the October 13, 2022 Form 8-K attaching the Merger Agreement.  As detailed above, among other things, the October 13, 2022 Form 8-K misrepresented the purported independence of the Special Committee and Morgan Stanley.

219.   Defendant KnowBe4 and each of the Director Defendants (*i.e.*, Defendants Klausmeyer, Venkataraman, Watzinger, Sjouwerman, Daley, Shanley and Wilson) disseminated false and misleading statements in the Proxy containing statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.  Specifically, as set forth in more detail above, the Proxy omitted material facts including that:

(a)     the Special Committee lacked independence from its own self-interest and domination by the controlling stockholders;

(b)     Morgan Stanley lacked independence from KKR;

(c)     KKR increased its planned rollover or reinvestment into the post-close KnowBe4 by 50-100% after it learned of the deal price; and

(d)     The Special Committee could not have held a good faith belief that a go-private price of less than $25.00 was fair from a financial point of view.

220.   The Proxy also included the opinions of each of the Director Defendants, Vista, Elephant Partners and KKR that the Merger was in the "best interest of" and/or "fair to" the Public Stockholders, along with their recommendations that shareholders vote FOR approval of the Merger, opinions which, as set forth in more detail above, none of these Defendants genuinely believed.

221.   Also on December 22, 2022, Defendants KnowBe4, the controlling stockholders (KKR, Elephant Partners and Sjouwerman), and Vista jointly issued a Schedule 13E-3 for the Merger.  The Schedule 13E-3 incorporated the Proxy, including the false and misleading statements detailed above.  Defendants Sjouwerman, Daly and Shanley signed the Schedule 13E-3.

222.   Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading statements and concealed material information about the Company, its operations and prospects, as well as material information concerning the Merger and the sale process, as described above.

223.   During the Class Period, Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

224.    Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein and/or recklessly disregarded the true facts that were available to them as described above.  Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants engaged in this misconduct to falsely misrepresent KnowBe4's true financial condition and material information regarding the Merger and the sales process from the investing public and to support the artificially low prices of the Company's securities.

225.    As a direct and proximate result of the wrongful conduct of the Defendants named in this count, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

226.    By virtue of the foregoing, Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III
### Against the Director Defendants, KKR, Elephant Partners, and Vista for Violations of Section 20(a) of the Exchange Act

227.    Lead Plaintiffs repeat and re-allege ¶¶ 1–203 as if fully set forth herein.

228.    Defendants KnowBe4, Elephant Partners, KKR, Vista and each of the Director Defendants disseminated false and misleading statements in the October 12, 2022 Merger Press Release, October 13, 2022 Form 8-K, Proxy and/or Schedule 13-E in violation of Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, promulgated thereunder.

229.    The Director Defendants, KKR, Elephant Partners, and Vista each had the ability to control, and did control, KnowBe4 at all relevant times through their majority equity stake and voting power and by appointing a majority of its directors.  Defendants KKR and Elephant Partners also had the ability to control, and did control, their appointees to the KnowBe4 Board of Directors

73

– Defendants Shanley (a KKR Partner), Wilson (a KKR Senior Advisor) and Daly (co-founder and General Partner at Elephant Partners) – at all relevant times through their employment of those individuals.

230. In addition to controlling the composition of the Board, the Director Defendants, KKR, Elephant Partners and Vista were entitled to exercise control over significant transactions. Further, the Director Defendants, KKR, Elephant Partners and Vista controlled the sale process by appointing its own conflicted banker, Morgan Stanley, ostensibly to advise KnowBe4, and participated in concealing this and other facts through the Board Members it appointed and controlled. The Director Defendants, KKR, Elephant Partners and Vista refused to allow the Special Committee to solicit offers for anything other than a minority investment in KnowBe4 that would cash out Public Stockholders, provide significant liquidity to these Defendants, and keep them in control. Defendants Vista, Elephant Partners, KKR, Sjouwerman, Daly and Shanley (or representatives on their behalf) signed the December 22, 2022 Schedule 13E-3, which incorporated the Proxy.

231. The Director Defendants, KKR, Elephant Partners and Vista acted as controlling persons of KnowBe4 and culpably participated in the Exchange Act violations within the meaning of Section 20(a) of the Exchange Act as alleged herein. In particular, as directors of the company and/or significant shareholders, each Defendant named in this count had direct and supervisory involvement in the day-to-day operations of KnowBe4, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same. The Director Defendants, KKR, Elephant Partners and Vista were involved in negotiating, reviewing, and approving the Merger Agreement.

232. The Director Defendants, KKR, Elephant Partners and Vista were provided with or had unlimited access to copies of the Proxy and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Indeed, the Support Agreements signed by Defendants KKR, Elephant Partners and Sjouwerman (in which each defined those parties and/or their affiliates as the "Stockholder") stated that KnowBe4 "will not file the Proxy Statement with the SEC without first providing the Stockholder and its counsel a reasonable opportunity to review and comment thereon, and the Company will give good faith consideration to all reasonable additions, deletions or changes suggested by the Stockholder of its counsel." The Support Agreements also provided an obligation for Defendants KKR, Elephant Partners and Sjouwerman to ensure the information they supplied for the Proxy and other public filings not "contain any untrue statement of a material fact or omit to state any material fact." The Merger Agreement executed by Vista (through its subsidiaries, defined as the "Parent") and KnowBe4 stated the same with respect to Vista.

233. The Proxy also expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Sjouwerman as Chairman of the Board of Directors. Defendants Vista, KKR and Elephant Partners also allowed their names to be used repeatedly in the Proxy and other solicitation materials.

234. The Director Defendants, KKR, Elephant Partners and Vista had the ability to exercise control over and did control a person(s) who has violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

75

235.   By virtue of the foregoing, each of the Director Defendants, KKR, Elephant Partners and Vista have violated Section 20(a) of the Exchange Act.

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for judgment and relief:

A.   Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Determining that KnowBe4, each of the Director Defendants, KKR, Elephant Partners and Vista violated Section 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C.   Determining that KnowBe4, each of the Director Defendants, KKR, Elephant Partners and Vista violated Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

D.   Determining that each of the Director Defendants, KKR, Elephant Partners and Vista violated Section 20(a) of the Exchange Act;

E.   Awarding damages in favor of Lead Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon; and

F.   Granting such other and further relief as this Court may deem just and proper.

## XII.   **JURY DEMAND**

236.   Lead Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: April 8, 2026

**KOZYAK TROPIN & THROCKMORTON LLP**

By: /s/ *Benjamin J. Widlanski*
Benjamin J. Widlanski
Florida Bar No. 1010644
Jorge L. Piedra
Florida Bar No. 88315
Brandon M. Sadowsky
Florida Bar No. 1052643
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone:  (305) 372-1800
bwidlanski@kttlaw.com
jpiedra@kttlaw.com

76

bsadowsky@kttlaw.com

*Liaison Counsel for Lead Plaintiffs*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice)*
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com
asher@entwistle-law.com

Andrew J. Entwistle (*pro hac vice*)
500 West Second Street
Floor 19, Suite 16
Austin, Texas 78701
Telephone:  (512) 710-5960
aentwistle@entwistle-law.com

*Co-Lead Counsel for Lead Plaintiffs*

Adam Warden (Fla. Bar # 0873691)
Jonathan Lamet (Fla. Bar # 0106059)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
(561) 394-3399
awarden@saxenawhite.com
jlamet@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs*

77