**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-22574-CIV-ALTONAGA/Reid**

In re:

**KNOWBE4, INC.**
**SECURITIES LITIGATION**

_____/

**LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF**
**CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL AND**
**INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

I.     MOTION AND RELIEF SOUGHT ............................................................................... 1

II.    SUMMARY OF ARGUMENT .................................................................................... 1

III.   FACTUAL BACKGROUND ....................................................................................... 2

IV.    PROCEDURAL POSTURE ......................................................................................... 4

V.     LEGAL STANDARD .................................................................................................. 4

VI.    ARGUMENT ............................................................................................................... 4

    A.   Securities Class Actions Are Ideally Suited for Class Certification ...................... 4

    B.   Lead Plaintiffs Have Standing, and the Proposed Class Is Ascertainable ............. 5

    C.   The Action Satisfies the Requirements of Rule 23(a) .......................................... 5

        1.   The Class Is So Numerous that Joinder of All Members Is Impractical ................................................................................................. 6

        2.   There Are Questions of Law and Fact Common to the Class .................... 7

        3.   Lead Plaintiffs' Claims Are Typical .......................................................... 8

        4.   Adequacy Is Established ............................................................................ 9

    D.   Rule 23(b)(3)'s Predominance Requirement Is Satisfied .................................... 10

        1.   Section 14(a) Claims ................................................................................ 11

        2.   Section 10(b) Claims ................................................................................ 12

        3.   KnowBe4 Securities Traded in an Efficient Market ................................ 12

        4.   In the Alternative to Fraud-on-the-Market, Predominance Is Met Under the Common Scheme Doctrine ....................................................... 16

        5.   The Calculation of Damages Is Also a Common Question ...................... 17

    E.   Superiority Is Established Under Rule 23(b)(3) ................................................... 19

    F.   The Court Should Approve Co-Lead Counsel Entwistle & Cappucci and Saxena White as Class Counsel and Kozyak Tropin & Throckmorton as Liaison Counsel ................................................................................................. 19

VII.   CONCLUSION .......................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................................... 10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..................................................................................................... 12

*Aranaz v. Catalyst Pharm. Partners Inc.*,
   302 F.R.D. 657 (S.D. Fla. 2014)......................................................................... 6, 8, 10, 14

*Basch v. Talley Indus., Inc.*,
   53 F.R.D. 14 (S.D.N.Y. 1971) ...................................................................................... 12

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................................... 11

*Brown v. Brewer*,
   No. CV 06–3731, 2009 WL 1574556 (C.D. Cal. May 29, 2009).................................... 12

*Bruhl v. Price WaterhouseCoopers Int'l*,
   257 F.R.D. 684 (S.D. Fla. 2008).................................................................................. 17

*Busby v. JRHBW Realty, Inc.*,
   513 F.3d 1314 (11th Cir. 2008) .................................................................................... 4

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ........................................................................... 13, 14

*Cheney v. Cyberguard Corp.*,
   213 F.R.D. 484 (S.D. Fla. 2003)............................................................................... 6, 16

*Cherry v. Dometic Corp.*,
   986 F.3d 1296 (11th Cir. 2021) ................................................................................. 4, 5

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
   322 F. Supp. 3d 676 (D. Md. 2018)............................................................................... 9

*City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*,
   No. 1:17-CV-0220, 2019 WL 3449671 (N.D. Ga. July 17, 2019) ................................ 19

*C-Mart, Inc. v. Metro. Life Ins. Co.*,
   299 F.R.D. 679 (S.D. Fla. 2014)................................................................................... 10

*Cox v. Am. Cast Iron Pipe Co.*,
   784 F.2d 1546 (11th Cir. 1986) ................................................................................... 6

*De Ford v. Koutoulas*,
   348 F.R.D. 724 (M.D. Fla. 2025)........................................................................ 5

*Di Donato v. Insys Therapeutics, Inc.*,
   333 F.R.D. 427 (D. Ariz. 2019) ....................................................................... 15

*Erica P. John Fund Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)................................................................................... 10, 12

*Erickson v. Jernigan Cap., Inc.*,
   692 F. Supp. 3d 114 (S.D.N.Y. 2023).............................................................. 8, 18

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   594 U.S. 113 (2021)........................................................................................ 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)................................................................................... 13, 16

*Herbst v. Int'l Tel. & Tel. Corp.*,
   495 F.2d 1308 (2d Cir. 1974).......................................................................... 11

*Herrera v. JFK Med. Ctr. L.P.*,
   648 F. App'x 930 (11th Cir. 2016) ................................................................... 17

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ..................................................................... 11

*In re BellSouth Corp.*,
   No. 1:02-CV-2142, 2006 WL 870362 (N.D. Ga. Apr. 3, 2006)........................... 9

*In re Checking Account Overdraft Litig.*,
   286 F.R.D. 645 (S.D. Fla. 2012)........................................................................ 8

*In re HealthSouth Corp. Sec. Litig.*,
   257 F.R.D. 260 (N.D. Ala. 2009)...................................................................... 14

*In re HealthSouth Corp. Sec. Litig.*,
   261 F.R.D. 616 (N.D. Ala. 2009).................................................................. 14, 17

*In re Heckmann Corp. Sec. Litig.*,
   No. 10–378, 2013 WL 2456104 (D. Del. June 6, 2013)..................................... 11

*In re Hot Topic, Inc. Sec. Litig.*,
   No. CV 13-02939, 2014 WL 12462472 (C.D. Cal. Nov. 3, 2014)...................... 11

*In re Internap Network Servs. Corp. Sec. Litig.*,
   No. 08-cv-03462, 2012 WL 12878579 (N.D. Ga. Aug. 22, 2012) ...................... 14

*In re Recoton Corp. Sec. Litig.*,
    248 F.R.D. 606 (M.D. Fla. 2006) ........................................................................ 8, 12, 19

*In re Theragenics Corp. Sec. Litig.*,
    205 F.R.D. 687 (N.D. Ga. 2002) .................................................................................. 1, 6

*In re Vale S.A. Sec. Litig.*,
    No. 19-CV-526, 2022 WL 122593 (E.D.N.Y. Jan. 11, 2022),
    *report and recommendation adopted*, 2022 WL 969724 (Mar. 31, 2022) ........................ 15

*In re Willis Towers Watson PLC Proxy Litig.*,
    No. 1:17-cv-1338, 2020 WL 5361582 (E.D. Va. Sep. 4, 2020) ...................................... 18

*Kennedy v. Tallant*,
    710 F.2d 711 (11th Cir. 1983) .................................................................................. 5, 17

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) ............................................................................ 2, 5, 17

*Kornberg v. Carnival Cruise Lines, Inc.*,
    741 F.2d 1332 (11th Cir. 1984) ...................................................................................... 8

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................ 13, 16

*Kron v. Grand Bahama Cruise Line, LLC*,
    328 F.R.D. 694 (S.D. Fla. 2018) ................................................................................. 6, 9

*Krukever v. TD Ameritrade, Futures & Forex LLC*,
    328 F.R.D. 649 (S.D. Fla. 2018) ................................................................................. 7, 8

*Little v. T-Mobile USA, Inc.*,
    691 F.3d 1302 (11th Cir. 2012) ...................................................................................... 4

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) .......................................................................... 13, 14, 15

*Monroe Cnty. Emps.' Ret. Sys. v S. Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019) ..................................................................... 13, 14, 17, 18

*Pellman v. Cinerama, Inc.*,
    89 F.R.D. 386 (S.D.N.Y. 1981) ...................................................................................... 12

*Rensel v. Centra Tech, Inc.*,
    No. 17-24500-CIV, 2021 WL 4134984 (S.D. Fla. Sep. 10, 2021) .................................... 5

iv

*Rescigno v. Statoil USA Onshore Props. Inc.*,
    No. CV 3:16-85, 2023 WL 145008 (M.D. Pa. Jan. 10, 2023)
    *aff'd*, No. 20-2431, 2024 WL 4249491 (3d Cir. Sep. 20, 2024) ......................................... 9

*Robinson Humphrey/Am. Express v. Sanders*,
    485 U.S. 959 (1988) ...................................................................................................... 2

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
    601 F.3d 1159 (11th Cir. 2010) ................................................................................. 17

*Sargent v. Genesco, Inc.*,
    75 F.R.D. 79 (M.D. Fla. 1977) ............................................................................ 11, 16

*Thorpe v. Walter Inv. Mgmt., Corp.*,
    No. 1:14–cv–20880, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016) ................... 1, 5, 12, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .................................................................................................. 10

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ................................................................................. 9

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ............................................................................. 7, 8

*Williams v. Wells Fargo Bank, N.A.*,
    280 F.R.D. 665 (S.D. Fla. 2012) ............................................................................... 6

*Zeidman v. J. Ray McDermott & Co., Inc.*,
    651 F.2d 1030 (5th Cir. 1981) ................................................................................... 6

**Rules**

Fed. R. Civ. P. 23 ......................................................................................................... passim

## I.     MOTION AND RELIEF SOUGHT

Court-appointed Lead Plaintiffs Water Island Event-Driven Fund, The Arbitrage Fund, AltShares Merger Arbitrage ETF, and the Hilary L. Shane Revocable Trust (collectively, "Lead Plaintiffs") respectfully move, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), for: (1) certification of the above-captioned case (the "Action") as a class action; (2) appointment of Lead Plaintiffs as Class Representatives; and (3) appointment of Co-Lead Counsel as Class Counsel pursuant to Rule 23(g) and appointment of Liaison Counsel as Class Liaison Counsel.

Lead Plaintiffs seek certification of the following plaintiff class:

(i)     all persons and entities that held KnowBe4, Inc. ("KnowBe4") Class A common stock as of the December 7, 2022 record date (the "Record Date") that were entitled to vote on the "take-private" acquisition by Vista Equity Partners Management, LLC and its affiliates; and

(ii)    all persons and entities that sold shares of KnowBe4 Class A common stock from October 12, 2022 through the February 1, 2023 close of the Merger (the "Class Period"), including those who sold shares into the Merger;

**Excluding**: Defendants and their affiliates, the officers and directors of Defendants, members of their immediate families and their legal representatives, heirs, successors and assigns and any entity in which any excluded persons have—or had at any time since the start of the Class Period—a controlling interest.

## II.    SUMMARY OF ARGUMENT

"It is well-established that class actions are a particularly appropriate means for resolving securities fraud actions." *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *4 (S.D. Fla. Mar. 16, 2016) (citation and quotation marks omitted). This Action asserts securities claims on behalf of a large number of individual and institutional investors who were harmed in the same way by the same misrepresentations made by the same Defendants which were false and misleading for the same reasons. "The Eleventh Circuit has explicitly recognized that securities class actions serve both the public interest in maintaining the integrity of the securities markets and the private interests of investors who would not otherwise obtain redress of grievances through a multiplicity of small individual damage suits." *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 693-94 (N.D. Ga. 2002) (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987), *cert. denied sub nom*, *Robinson Humphrey/Am. Express v. Sanders*, 485 U.S. 959

(1988)). As demonstrated herein, this action readily meets the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

*Numerosity* is established. During the Class Period, there were more than 85 million Class A shares outstanding, held by hundreds if not thousands of investors. *Commonality* is satisfied because common questions of law and fact abound, including (i) whether each Defendant violated Section 14(a), 10(b) and/or 20(a) of the Exchange Act; (ii) whether the statements made to the public, including in the Proxy, misrepresented or omitted material facts; and (iii) whether the Defendants acted with the required state of mind. *Adequacy* and *typicality* are satisfied because (i) Lead Plaintiffs and the Class assert identical claims arising from the same misstatements and course of events; and (ii) Lead Plaintiffs have no conflict with the Class, have been actively monitoring and supervising this Action, and have retained experienced counsel with proven track records in securities class actions like this one.

*Predominance* is satisfied because Lead Plaintiffs will establish through common proof that Defendants misrepresented or omitted material facts to investors and did so with the required state of mind, which are questions with a common answer for all Class members. These core questions predominate over any individualized ones. In addition, the market for KnowBe4 Class A common stock was efficient during the Class Period, entitling Class members to a common presumption of reliance on Defendants' misstatements (a required element for the Section 10(b) claims), and the calculation of damages for all Class members for both the Section 10(b) and 14(a) claims are subject to common methodologies. Finally, *superiority* is satisfied because a class action is superior to any other method of adjudication.

## III.    FACTUAL BACKGROUND

As alleged in Lead Plaintiffs' Consolidated Amended Class Action Complaint for Violations of Proxy and Anti-Fraud Provisions of the Federal Securities Laws, filed September 23, 2025, at ECF No. 70 (the "Complaint"), KnowBe4 is a company that, prior to the subject Merger,[1] was controlled by KKR, Elephant Partners, and KnowBe4's founder, Sjoerd Sjouwerman. ¶¶ 28, 40, 45.  These controlling shareholders collectively structured a deal to sell KnowBe4 to private equity giant Vista at a price they knew was unfair, while falsely representing to investors and shareholders the transaction was "fair" and in unaffiliated shareholders' "best interests."

---

[1] Paragraph references herein are to paragraphs in the Complaint, and all capitalized terms not defined herein have the meaning given to them in the Complaint.

Vista indicated in May 2022 that it was interested in acquiring KnowBe4. ¶¶ 6, 7. Because KKR, Elephant Partners, and Sjouwerman were conflicted, as they were interested in rolling over all or a part of their equity in any merger transaction, KnowBe4 formed a special committee of purportedly independent directors ("Special Committee") to oversee negotiations with Vista and other potential deal partners. ¶ 3. Internally, the Special Committee set a "floor" of $25.00 per share for any potential transaction and instructed its financial advisor Morgan Stanley that any offer from Vista that was below $25.00 per share was "[n]*ot the right zone for a transaction*" and "*not worth sending*." ¶¶ 94-95. The Special Committee further instructed Morgan Stanley that even offer prices from $25-$27 per share were insufficient as they were at the "[l]ow end of guidance" and would "need some work." ¶ 95. Despite this internal belief, the Special Committee ultimately agreed to a transaction with Vista at a price of $24.90 per share.

KKR, Elephant, and Sjouwerman each rolled over equity into the transaction. Critically, earlier in the process—at a point when they anticipated a higher merger price—KKR had planned on rolling over only $150 to $200 million in equity. ¶¶ 97-98. However, after learning that the actual deal price was only $24.90, KKR doubled its equity rollover to $300 million—indicating its belief that the equity was worth more than the cash consideration. ¶¶ 98-100. While Plaintiffs are in the early stages of reviewing Defendants' document productions, discovery has confirmed that other Defendants also considered KnowBe4 to be worth more than $24.90 per share.

In soliciting the required shareholder approval for the Merger, Defendants issued a series of public statements, including a Proxy Statement, which were materially false and misleading or omitted material facts. Among other things, Defendants:

- Stated they believed the Merger was "in the best interests of KnowBe4 and its stockholders" and "fair to KnowBe4's [Public Stock]holders" (¶¶ 114, 121-122), when in fact the Special Committee believed the $24.90 price was "[n]*ot the right zone for a transaction*" and such an offer was "*not worth sending*" (¶ 115);

- Stated that the Special Committee believed a "value in the mid-to-high $20[s] per share range was appropriate" for the Merger (¶ 125), when in fact the Special Committee had concluded that anything below $27 per share was the "[l]ow end of guidance" and "will need some work"; (¶ 126) and

- Discussed KKR's rollover and the signaling effect of any equity rollover while omitting that KKR increased its planned rollover into the post-close KnowBe4 by 50-100% after it learned of the $24.90 per share deal price (¶¶ 136-139).

*Id.* at ¶ 5. Based on these misrepresentations, investors were deprived of their congressionally mandated right to make an informed vote on the Merger and were injured when they sold their shares in the market, or into the Merger, at prices deflated by Defendants' misstatements.

## IV. PROCEDURAL POSTURE

This Action was commenced on June 5, 2025. On September 2, 2025, the Court appointed Lead Plaintiffs under Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(B). [ECF No. 51]. The Court appointed Entwistle & Cappucci LLP and Saxena White P.A. as Co-Lead Counsel and Kozyak Tropin & Throckmorton LLP as Liaison Counsel. On September 23, 2025, Lead Plaintiffs filed the operative Complaint [ECF No. 70]. On December 23, 2025, the Court denied in part Defendants' motion to dismiss the Complaint, finding Lead Plaintiffs alleged actionable misstatements regarding both the fairness of the Merger and KKR's rollover. [ECF No. 100] ("MTD Order"). The Court reaffirmed the actionability of these alleged misstatements in its April 6, 2026 Order on Defendants' Motion for Reconsideration [ECF No. 144].

Lead Plaintiffs served a draft of this Motion on Defendants on January 27, 2026. Class certification discovery has since been conducted, and merits discovery is ongoing.

## V. LEGAL STANDARD

To obtain certification of a class, the movants must demonstrate that they have standing, and the putative class must satisfy both the requirements of Rule 23(a) and at least one of the requirements found in Rule 23(b). *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1321 (11th Cir. 2008). Additionally, the movants "bear the burden to establish that their proposed class is 'adequately defined and clearly ascertainable,' and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)).

## VI. ARGUMENT

### A. Securities Class Actions Are Ideally Suited for Class Certification

The Eleventh Circuit recognizes the utility of class actions in cases "governing the

securities markets." *Kirkpatrick*, 827 F.2d at 727; *see also Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("Indeed, we find that this suit involving a single conspiracy and fraudulent scheme against a large number of individuals is particularly appropriate for class action. Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts."). For this reason, "class actions are a particularly appropriate means for resolving securities fraud actions," *Rensel v. Centra Tech, Inc.*, 2021 WL 4134984, at *9 (S.D. Fla. Sep. 10, 2021) (citation and quotation marks omitted), and "class actions in securities fraud cases have received favorable treatment in the Eleventh Circuit." *Thorpe*, 2016 WL 4006661, at *4. This case is no exception.

**B.      Lead Plaintiffs Have Standing, and the Proposed Class Is Ascertainable**

As demonstrated by their certifications attached to the Complaint, Lead Plaintiffs Water Island Event-Driven Fund, The Arbitrage Fund, and AltShares Merger Arbitrage ETF have standing to sue Defendants for violations of Section 14(a) because they held shares as of the Record Date and were entitled to vote on the Merger. [ECF Nos. 70-1, 70-2]. Lead Plaintiffs also have standing to sue Defendants for their violations of Section 10(b) because they sold shares at prices deflated by Defendants' conduct. *Id*.

The Class is ascertainable because membership depends on ownership of KnowBe4 Class A common stock at a particular time and/or a sale of stock. Such holdings and sales can be readily determined from brokerage statements and the Company's records. *See Cherry*, 986 F.3d at 1303 (a class is ascertainable if "its membership is 'capable of being' determined" (citations omitted)); *see also De Ford v. Koutoulas*, 348 F.R.D. 724, 735 (M.D. Fla. 2025) (proposed class ascertainable where "membership in the Class turns on the objective, verifiable criterion of having purchased [the subject security] during the specific dates of the Class period"). The Class is therefore ascertainable.

**C.      The Action Satisfies the Requirements of Rule 23(a)**

Rule 23(a) permits class actions if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Each element of Rule 23(a) is easily satisfied here.

**1.    The Class Is So Numerous that Joinder of All Members Is Impractical**

The numerosity required by Fed. R. Civ. P. 23(a)(1) is satisfied because the Class is "so numerous that joinder of all members is impracticable." "While there is no fixed rule, generally a class size less than twenty-one is inadequate, while a class size of more than forty is adequate." *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 671-72 (S.D. Fla. 2012) (citing *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489-90 (S.D. Fla. 2003)). While a plaintiff must present some evidence that the class to be certified will satisfy the numerosity requirement of Rule 23, "it is well-settled that a specific number of class members is not necessary." *Kron v. Grand Bahama Cruise Line, LLC*, 328 F.R.D. 694, 700 (S.D. Fla. 2018) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)).

Here, as of the start of the Class Period, KnowBe4 had 85.6 million Class A shares outstanding and had an average weekly trading volume during the Class Period of 7.9 million shares, and Class members held approximately 85 million shares as of the Record Date.[2] In addition, at least 224 institutions held KnowBe4 shares within the Class Period, based on their holdings as of December 31, 2022, as disclosed in their SEC Forms 13F and other documents. Ex. 3 ("Hartzmark Rep.") ¶ 43. Accordingly, there are hundreds, and likely thousands, of members of the Class. ¶ 190. Courts routinely find the numerosity requirement of Rule 23(a)(1) is met in class action suits involving securities traded on a national public exchange. *See Theragenics*, 205 F.R.D. at 694 ("Numerosity is generally presumed when a claim involves nationally traded securities." (citing *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981))); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 664 (S.D. Fla. 2014) ("Securities fraud actions predicated on public misrepresentations typically satisfy Rule 23(a)(1) where the securities were traded on a national public exchange, as the putative class members are likely to be numerous, geographically dispersed and difficult to identify." (citations omitted)).

---

[2] There were 132,747,542 shares of KnowBe4 Class A common stock outstanding as of the Record Date (¶ 190), following the "down-conversion" of Class B shares into Class A shares by certain Defendants and their affiliates (¶ 176). Post down-convert, approximately 40% of these Class A shares were held by Defendants, their affiliates or other insiders, who are excluded from the Class. Proxy at 44.

**2.** **There Are Questions of Law and Fact Common to the Class**

The commonality requirement is satisfied where, as here, "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This is a "low hurdle." *Krukever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 657 (S.D. Fla. 2018). "The low hurdle requires that there be 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Id.* (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009)). Plaintiffs easily meet this minimal burden here, where common questions abound. These common questions include:

- Whether Defendants, or any of them, violated Section 14(a) of the Exchange Act and/or Rule 14a-9 promulgated thereunder;

- Whether Defendants, or any of them, violated Section 10(b) of the Exchange Act and/or Rule 10b-5 promulgated thereunder;

- Whether the Director Defendants, Defendants Elephant Partners, KKR and Vista, or any of them, violated Section 20(a) of the Exchange Act;

- Whether statements made by Defendants to the investing public during the Class Period, including in the Proxy, misrepresented or omitted material facts; and

- Whether Defendants acted with the required state of mind.

Additionally, calculating the quantum of damages presents common, rather than individual, questions. The judicially recognized remedies for Section 14(a) violations (*i.e.*, out-of-pocket loss, lost opportunity, benefit of the bargain, etc.) could and would be calculated on a per-share basis applicable to all members of the Class. The only individual question would be the number of shares each Class member held on the Record Date, which is readily ascertainable from each Class member's records and the Company's (and transfer agent's) records of the vote. And, to the extent that the Court orders disgorgement of Defendants' ill-gotten gains, this is a strictly Defendant-focused inquiry that does not raise individual questions (and the funds disgorged would mechanically be distributed pro-rata based on the number of shares held by each Class member). Damages resulting from Defendants' violations of Section 10(b) can likewise be calculated arithmetically. The amount by which the price of KnowBe4's stock was deflated at any point during the Class Period can be established by applying a generally accepted methodology to the proof developed in discovery and, ultimately, at trial. Although each Class member will have sold (and some will have purchased) a different number of shares at various prices, each shareholder's

Section 10(b) damages can be calculated arithmetically by multiplying the number of shares sold by the artificial deflation present in the market price of the stock at the time of the sale (offset by the artificial deflation present at the time of their purchase, if any). Similarly, damages associated with the loss of appraisal rights can be mechanically applied to shareholders who forwent the opportunity to assert those rights. Thus, the commonality required by Rule 23(a)(2) is readily met.

### 3. Lead Plaintiffs' Claims Are Typical

The "typicality" requirement is satisfied where, as here, "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Krukever*, 328 F.R.D. at 658 (quoting *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012)). "The claim of a class representative is typical if 'the claims . . . of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Williams*, 568 F.3d at 1357 (quoting *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Here, Lead Plaintiffs' claims and the claims of the Class all arise out of the same unlawful conduct—namely, Defendants' public misrepresentations—and will be proven by the same set of facts. *See Kornberg*, 741 F.2d at 1337; *see also Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 126 (S.D.N.Y. 2023) ("In securities class actions such as this, when all of the class members' claims depend on the same alleged misleading proxy, the nature of the evidence will be the same for all and the theories of liability are identical.").

Regarding the Section 10(b) claims, Defendants' misstatements affected Lead Plaintiffs and all Class members because each sold common stock at an artificially deflated price. ¶ 181; Hartzmark Rep. § VI. The same is true for the Section 14(a) claims, where the false and misleading Proxy affected Lead Plaintiffs and the Class members by depriving them of an informed vote on the corporate transaction. ¶ 186; Hartzmark Rep. § VII. The typicality requirement is therefore met. *See, e.g.*, *Aranaz*, 302 F.R.D. at 665 (plaintiffs' claims are typical of the class where "they each allege that in purchasing . . . stock, they relied to their detriment on Defendants' . . . fraudulent misrepresentation . . . . Thus, their claims arise from the same event, are based on the same legal theory and share the same essential characteristics" (internal footnote omitted)); *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 619 (M.D. Fla. 2006) (typicality requirement was met where plaintiffs "alleged that all of the proposed class members were the victims of the defendants' scheme to mislead the public as to the true value of [the company's] stock"); *In re BellSouth Corp.*,

2006 WL 870362, at *3 (N.D. Ga. Apr. 3, 2006) (typicality satisfied in securities fraud lawsuit alleging defendants overstated company's revenue).

### 4. Adequacy Is Established

The proposed class representatives satisfy the adequacy requirement of Rule 23(a)(4) if, as here, they "will fairly and adequately protect the interests of the class." Courts in the Eleventh Circuit examine a two-prong test for adequacy: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Kron*, 328 F.R.D. at 701 (quoting *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)).

First, there are no conflicts between Lead Plaintiffs and the Class. Like other Class members, Lead Plaintiffs (a) held KnowBe4 shares as of the record date, and/or (b) sold KnowBe4 common stock at deflated market prices during the Class Period, and were therefore injured by the same materially false and misleading statements. [ECF Nos. 70-1, 70-2]. Thus, in proving their own claims to establish liability, Lead Plaintiffs will also prove the Class's claims. *BellSouth*, 2006 WL 870362, at *3 (adequacy shown where plaintiffs "seek to recover from Defendants for the same alleged unlawful misconduct as the class members").

Second, as evidenced by their participation in this litigation, Lead Plaintiffs have demonstrated their adequacy by consistently taking an active role in and exerting control over this litigation to protect the interests of the Class, including by receiving frequent status updates from counsel, seeking appointment as Lead Plaintiffs, filing a highly detailed Complaint,[3] defeating Defendants' motions to dismiss and for reconsideration, vigorously pursuing fact and expert discovery including obtaining an order to compel production of documents [ECF No. 147] and

---

[3] Court-appointed Lead Plaintiff AltShares Merger Arbitrage ETF is a proper class representative regardless of whether it appears in the Parties section of the Complaint. *See Rescigno v. Statoil USA Onshore Props. Inc.*, No. CV 3:16-85, 2023 WL 145008, at *16 (M.D. Pa. Jan. 10, 2023), *aff'd*, No. 20-2431, 2024 WL 4249491 (3d Cir. Sep. 20, 2024) ("courts have appointed individuals as class representatives who were not named in the complaint"); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 685 (D. Md. 2018) ("Rule 23 affirmatively permits the appointment of class representatives who were not named in the complaint"). Here, AltShares Merger Arbitrage ETF was properly named on page one of the Complaint, and Defendants have known since at least January 27, 2026—when this motion was served—that it would seek appointment as a class representative. Defendants took full advantage of that notice, conducting class certification discovery on AltShares Merger Arbitrage ETF. There is no prejudice and no basis to challenge its appointment.

deposing Defendants' class certification expert, and responding to discovery requests from Defendants, including producing over fourteen thousand documents, responding to dozens of interrogatories and sitting for depositions. Lead Plaintiffs remain fully committed to the prosecution of the Action for the benefit of the Class. Ex. 1, Ex. 2.[4]

Third, Lead Plaintiffs have engaged Entwistle & Cappucci and Saxena White to represent them in this litigation. Both firms are experienced in the areas of class actions and securities litigation, and particularly securities litigation involving false and misleading statements issued in connection with a proposed merger. *See* Ex. 6, Ex. 7. Plaintiffs' counsel have the skill and knowledge to effectively and expeditiously prosecute this action on behalf of the Class. *See* Ex. 6, Ex. 7. Indeed, as Court-appointed Lead Counsel have already committed substantial time, energy, and resources to advocating for the interests of Plaintiffs and the Class. Ex. 1 ¶ 10, Ex. 2 ¶ 9.

### D.    Rule 23(b)(3)'s Predominance Requirement Is Satisfied

The proposed Class also satisfies Rule 23(b)(3), which requires that (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," and the Supreme Court has recognized that "[p]redominance is a test readily met in . . . cases alleging . . . securities fraud" like this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594, 625 (1997). Class-wide issues predominate where "issues subject to generalized proof, which are applicable to the putative class members equally, predominate over issues requiring individualized evidence." *Aranaz*, 302 F.R.D. at 666. "[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately," so long as "one or more of the central issues in the action are common to the class and can be said to predominate." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 691-92 (S.D. Fla. 2014) (quoting *Erica P. John Fund Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*")).

---

[4] "Ex. __" herein refers to the Exhibits to the Declaration of Andrew J. Entwistle in Support of Lead Plaintiffs' Motion for Class Certification, submitted herewith.

### 1.   Section 14(a) Claims

To establish a claim for violations of Section 14(a), Lead Plaintiffs must show that: "(1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions." MTD Order at 6. Thus, Plaintiffs "must prove that certain allegedly fraudulent statements were falsely made, that $[24.90] per share was not a fair value for [KnowBe4] shareholders, and that [KnowBe4]'s merger resulted in shareholders receiving too low a price for [KnowBe4]'s value." *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 12462472, at \*5 (C.D. Cal. Nov. 3, 2014). Because "[t]hese issues are identical across all class members, and if they are proved, shareholders should receive an identical amount per share," it is clear that "common issues predominate over individual ones." *Id.*

Individualized reliance is not an element of the Section 14(a) claims asserted in this case. *See, e.g.*, *Herbst v. Int'l Tel. & Tel. Corp.*, 495 F.2d 1308, 1318 (2d Cir. 1974) ("Since individual reliance is not a part of plaintiff's case, the district court did not err in holding that common issues of law and fact were predominant."); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at \*10 (D. Del. June 6, 2013) ("Unlike a claim for a violation under § 10(b), to recover damages under § 14(a) of the Securities Exchange Act, plaintiff need not prove reliance because it is not an element of the claim."); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 141-42 (S.D.N.Y. 2012) ("No individualized inquiry is required to determine whether the proxy materials ran afoul of Section 14(a). . . . The issue of whether the proxy materials misled and damaged shareholders does not require individualized state-of-mind inquiries defeating predominance.").

Notably, because reliance is not required for the Section 14(a) claims—and thus Plaintiffs do not seek to invoke the *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) class-wide presumption of reliance for those claims—the related question of whether Defendants can rebut that presumption by showing a lack of price impact is wholly irrelevant to class certification of the Section 14(a) claims. *See Sargent v. Genesco, Inc.*, 75 F.R.D. 79, 86 (M.D. Fla. 1977) (finding reliance issues did not factor into Rule 23(b)(3) analysis of plaintiffs' Section 14(a) claims because "the Supreme Court has held that individual reliance need not be proven in an action pursuant to [Section] 14(a) of the Securities Exchange Act" (citation omitted)).

Nor does it matter how Plaintiffs or Class members voted on the Merger. *See, e.g., Basch*

*v. Talley Indus., Inc.*, 53 F.R.D. 14, 18 (S.D.N.Y. 1971) ("Although the defendants claim that discovery is necessary to determine whether the plaintiffs voted for or against the merger or did not vote at all, that type of discovery would not be useful for a determination of this [class certification] motion. It does not matter how the particular plaintiffs voted. What matters is that deception practiced on other GTC shareholders to induce them to vote for the merger would be sufficient to create liability."); *Pellman v. Cinerama, Inc.*, 89 F.R.D. 386, 387-88 (S.D.N.Y. 1981) ("[C]ourts have consistently refused to deny class certification in omission cases because of purported nonreliance."); *Brown v. Brewer*, 2009 WL 1574556, at \*2 (C.D. Cal. May 29, 2009) (same). Accordingly, predominance is easily satisfied for the Section 14(a) claims.

### 2. Section 10(b) Claims

The elements of Plaintiffs' claims based on violations of Section 10(b) of the Exchange Act are: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called 'loss causation.'" MTD Order at 6. The first three elements are entirely focused on the Defendants and their conduct, and therefore, rely entirely on the same legal theories and require identical proof.

Moreover, in "a private securities fraud action, questions of materiality and loss causation are considered common questions and thus remain outside the judicial inquiry in a class certification motion, as do, generally, questions of individualized damages." *Thorpe*, 2016 WL 4006661, at \*12 (collecting cases); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013) ("[T]his Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."). Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. However, "[t]he issue of individual reliance is not of great concern at the class certification stage in a fraud-on-the-market case such as this one" because a Class-wide presumption of reliance under *Basic Inc. v. Levinson* applies. *Recoton*, 248 F.R.D. at 621.

### 3. KnowBe4 Securities Traded in an Efficient Market

A plaintiff may invoke the fraud-on-the-market doctrine in connection with a Section 10(b) class claim by showing the security at issue traded in an efficient market. *Halliburton Co. v. Erica*

*P. John Fund, Inc.*, 573 U.S. 258, 279 (2014) ("*Halliburton II*"). The Eleventh Circuit has identified "features of an efficient market: high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information." *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014). To evaluate whether a security traded in an efficient market, many courts look to the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). Although the Eleventh Circuit has declined to "adopt the *Cammer* factors as [a] mandatory analytical framework," it has recognized that "some of those factors might prove particularly useful" in the analysis. *Regions*, 762 F.3d at 1255. As further discussed below and in the reports of Plaintiffs' expert, Dr. Michael Hartzmark, each of the factors strongly supports a finding that the market for KnowBe4 Class A common stock was efficient throughout the Class Period. *See* Hartzmark Rep. §§ IV–V; Ex. 4 ("Hartzmark Rebuttal") ¶ 2. Defendants' expert, Dr. Grenadier, does not dispute that KnowBe4 stock traded in an efficient market during the Class Period.  Ex. 5 at 35:20-36:11.

**High Trading Volume Supports Market Efficiency (*Cammer* Factor 1).** The first *Cammer* factor, high weekly trading volume, indicates efficiency because "it implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286; *Regions*, 762 F.3d at 1255 ("high-volume trading activity" is a "general sign[] of an efficient market"). An "[a]verage weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Monroe Cnty. Emps.' Ret. Sys. v S. Co.*, 332 F.R.D. 370, 383 (N.D. Ga. 2019) (quoting *Cammer*, 711 F. Supp. at 1286). Here, the average weekly trading volume during the Class Period was approximately 7.9 million shares, which is 7.87% of the shares outstanding during the Class Period. Hartzmark Rep. ¶ 30. These turnover percentages are well over the two percent benchmark common for a "strong presumption" of efficiency under *Cammer* and thus strongly support a finding of market efficiency. *See Monroe*, 332 F.R.D. at 383 (average weekly trading volume of 2.58% supported market efficiency); *see also* Hartzmark Rep. § IV.B.1.

**Extensive Analyst Coverage Supports Market Efficiency (*Cammer* Factor 2).** The second *Cammer* factor, the amount of analyst coverage, is another "general sign[] of an efficient market." *Regions*, 762 F.3d at 1255. This is because analysts facilitate the dissemination of

13

information, increasing the likelihood that information released by a company is being relied upon by investors and reflected in the price of the company's securities. Here, there were on average 12 research analysts reporting on KnowBe4 during the Class Period. *See* Hartzmark Rep. ¶¶ 33-34. This high number of analysts following KnowBe4 supports market efficiency. *See, e.g.*, *Aranaz*, 302 F.R.D. at 669 ("at least four different securities analysts" during the Class Period indicates market efficiency); *see also* Hartzmark Rep. ¶¶ 33-34.

**Numerous Market Makers Supports Market Efficiency (*Cammer* Factor 3).** The third *Cammer* factor, the existence of numerous market makers, is also satisfied here. The more market makers a security has, the more efficient the market will be in responding to new information about the issuer, thereby incorporating that information into the market price. *See* Hartzmark Rep. ¶ 78; *Cammer*, 711 F. Supp. at 1286-87; *see also Regions*, 762 F.3d at 1258. At least 224 institutions filed SEC Form 13Fs and other documents disclosing ownership positions in KnowBe4 during the Class Period. *See In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 637 (N.D. Ala. 2009) (finding efficient market where "118 to 489 . . . institutions actively traded HealthSouth notes"); *Aranaz*, 302 F.R.D. at 668-69 (finding the presence of 47 market makers supportive of market efficiency). The short interest in KnowBe4 common stock provides further evidence that the stock traded in an efficient market through the Class Period. Hartzmark Rep. ¶¶ 45-46.

Moreover, KnowBe4 common stock traded on the NASDAQ exchange, which courts "presum[e] . . . [to be a] developed and efficient [market] for virtually all the securities traded there." *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

**Short Form Registration Supports Market Efficiency (*Cammer* Factor 4).** A company's eligibility to file a Form S-3 Registration Statement—which requires the issuer to have, among other things, a float of over $75 million and to have filed SEC reports for at least twelve consecutive months—is also a factor supportive of market efficiency. *See Regions*, 762 F.3d at 1258; *Cammer*, 711 F. Supp. at 1287. This is because "Form S-3 is reserved for companies whose stock is actively traded and widely followed." *In re Internap Network Servs. Corp. Sec. Litig.*, 2012 WL 12878579, at *7 n.6 (N.D. Ga. Aug. 22, 2012) (citation omitted). Here, KnowBe4 was current on its SEC filings and had a public float well in excess of the $75 million requirement to file a Form S-3, indicating its common stock traded in an efficient market. *See* Hartzmark Rep. ¶¶ 47-49; *Monroe*, 332 F.R.D. at 384 ("The ability to file the abbreviated Form S-3 creates a presumption that the securities trade [in] an efficient market." (citation omitted)).

14

**The Price Reaction to New, Company-Specific Information (*Cammer* Factor 5).** The fifth and final *Cammer* factor considers whether there was a cause-and-effect relationship between the release of unexpected material company news and movements in KnowBe4's stock price. *Regions*, 762 F.3d at 1254, n.2. However, the Eleventh Circuit, does not require proof that "the alleged misrepresentations had an immediate effect on the stock price." *Id*. at 1256. Furthermore, where, as here, the other *Cammer* factors are satisfied, "it is not necessary to satisfy the fifth *Cammer* factor." *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 442 (D. Ariz. 2019); *see, e.g., In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *8 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (Mar. 31, 2022) ("[I]f the first four *Cammer* factors and the three *Krogman* factors are satisfied, the Court need not consider—and a plaintiff need not submit—evidence supporting *Cammer* factor 5.").

During the Class Period, KnowBe4's common stock price behaved as expected in an efficient market where the security is subject to a merger proposal that has an apparent likelihood of completion at a price market participants believe equals or exceeds the company's standalone value – i.e. a stable price slightly below the proposed Merger price. On the three days before the Class Period when KnowBe4 released company-specific news, and on the first day of the Class Period when KnowBe4 announced its agreement to the Merger, KnowBe4's stock price experienced a statistically significant residual return on all four of those dates, including on the first day of the Class Period. In contrast, only 3.4% of no-news days (4 of 117) were associated with abnormal returns during the same period. Hartzmark Rep. ¶ 85. The lack of abnormal returns on one news day during the Class Period is entirely consistent with the conclusion that the market for KnowBe4 Class A common stock was efficient because the news concerned the standalone value of the company (without indicating the standalone value exceeded the Merger price), and market participants at that time perceived a high likelihood that the Merger would close at the announced deal price. *See* Hartzmark Rep. § V.C. Additionally, there was no statistically significant autocorrelation for KnowBe4's returns during the Class Period or in the months leading up to it, further indicating that KnowBe4's common stock price reacted to news about the company. *See id.* The cause-and-effect relationship supports a finding of market efficiency.

**The "Krogman Factors" Also Support Market Efficiency.** KnowBe4's high market capitalization, narrow bid ask spread and large public float, further indicate that its common stock

15

traded in an efficient market. *See Krogman*, 202 F.R.D. at 478; *Cheney*, 213 F.R.D. at 501-02; Hartzmark Rep. ¶¶ 50-60.

<u>**Defendants Have Failed to Rebut the Fraud-on-the-Market Presumption of Reliance**</u>

With respect to Section 10(b) claims, a defendant may rebut the *Basic* presumption at class certification "by showing . . . that the particular misrepresentation at issue did not affect the stock's market price." *Halliburton II*, 573 U.S. at 279. The Supreme Court recently confirmed "the defendant bears the burden of persuasion to prove a lack of price impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126 (2021).

Dr. Hartzmark's rebuttal report details that Defendants' expert Dr. Grenadier failed to properly consider "the potential importance of the new value-relevant private information that Plaintiffs allege should have been disclosed" and therefore "fails to address the critical issue of whether there *would have been* price impact in the *but-for world* with the revelation of the <u>private</u> information allegedly concealed by insiders, including the potential signaling effects that the <u>private</u> information would have had on market participants' expectation and trading activities, which would have impacted the market price of KnowBe4 common stock." Ex. 4 ¶ 4. In other words, Defendants have not established that there would have been *no* price impact in a but-for world where Defendants disclosed that they did not believe the Merger was fair, that the agreed-upon price of $24.90 was "not the right zone for a transaction," and that KKR doubled the amount it was planning to roll over after learning of the Merger price. A jury may reasonably infer that these signals on price from insiders with an informational advantage over public investors would have caused the price of KnowBe4's stock price to increase, if, for example, market participants understood that they might have an opportunity to retain shares worth more than the Merger price or obtain additional value through an appraisal action. *See* Hartzmark Rebuttal § 3. Notably, even if Defendants could somehow demonstrate a lack of price impact to rebut the *Basic* presumption (and they can't), such a showing would have no impact on the predominance analysis for the Section 14(a) claims, as those claims do not require reliance. *See Sargent*, 75 F.R.D. at 86.

### 4. In the Alternative to Fraud-on-the-Market, Predominance Is Met Under the Common Scheme Doctrine

Even if the fraud-on-the-market presumption does not apply, class certification is appropriate here under the common fraudulent scheme theory. In the Eleventh Circuit, "to obtain class certification under the 'common fraudulent scheme' theory, [the plaintiffs must demonstrate] that the same or substantially the same misrepresentations were made to the putative class and that

16

they were of such a nature that it can be presumed that all members of the class relied upon them either to invest in the first instance, to remain in the investment, or to redeem their interest in the investment." *Bruhl v. Price WaterhouseCoopers Int'l*, 257 F.R.D. 684, 696 (S.D. Fla. 2008); *Kennedy*, 710 F.2d at 718 (predominance requirement satisfied where the suit involves "a single conspiracy and fraudulent scheme against a large number of individuals").

Here, the same statements were made to all Class members in the Proxy and otherwise regarding the Merger and – given that the Merger was the most important event in KnowBe4's short history as a public company – it can be presumed all members of the Class relied upon those statements. For example, in *In re HealthSouth Corp. Sec. Litig.*, the Court found the common scheme theory applied where defendants allegedly made "written misrepresentations about the financial well being of HealthSouth and the strength of its securities," and "[p]robability and common sense lead to the presumption that investors . . . made their decisions to buy, hold or sell HealthSouth notes based upon the complete mix of publicly available information about the creditworthiness of those notes and the Company that issued them." 261 F.R.D. at 645-46; *see also Kirkpatrick*, 827 F.2d at 724. The same logic applies here. Defendants made the same alleged misrepresentations about the proposed KnowBe4 Merger to all KnowBe4 shareholders. Considering the Merger was so significant it would cash out shareholders if approved, common sense dictates that investors considered those statements when transacting in KnowBe4 stock.

### 5.   The Calculation of Damages Is Also a Common Question

In the Eleventh Circuit, "[t]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Herrera v. JFK Med. Ctr. L.P.*, 648 F. App'x 930, 936 (11th Cir. 2016) (citation omitted). Rather, "common issues predominate if liability can be determined on a class-wide basis." *Id.*; *Monroe*, 332 F.R.D. at 397.

While the amount of individual damages will be different for each Class member based on the specifics of each of their holdings and transactions in KnowBe4 stock, each Class member's damages can be computed in the same way common to all Class members. *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (where "damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods," individualized damages issues "are of course least likely to defeat predominance" (internal citation and quotation omitted)). In other words, that damages

17

amounts for individual investors will vary does not defeat predominance because Plaintiffs advance a single, class-wide damages methodology tied to their theory of liability.

For the Section 14(a) claims, the damages are based on harm to shareholders who had a right to cast a fully informed vote but were deprived of that right by the misleading statements and omissions of material facts in the Proxy. Had the truth been revealed at the time of the Proxy's issuance, Class members could have avoided voting for the Merger and considered alternative opportunities. While there are numerous remedies that may be presented for Defendants' Section 14(a) violations, each of them can be applied equally on a per-share basis based on how many shares each Class member was entitled to vote. For example, Section 14(a) damages for all Class members with such claims may be calculated using the valuation of KnowBe4 in the "but for" world where shareholders knew the truth regarding the unfairness of the KnowBe4 Merger. The valuation accepted by the jury will be on a per-share basis and can easily be distributed to Class members in a claims administration process. As another example, Section 14(a) damages may also include disgorgement, and such disgorged gains can readily be distributed formulaically on a pro-rata basis to each Class member based on the shares they were eligible to vote. Hartzmark Rep. ¶ 105. Courts regularly recognize that such a model supports class certification. *See Erickson*, 692 F. Supp. 3d at 122 ("Plaintiff's theory of damages – namely, that they amount to the difference between Jernigan's fair value and the Transaction's $17.30 per share consideration – is consistent with Plaintiff's argument that the Proxy thwarted a sale price reflecting that higher value."); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *10 (E.D. Va. Sep. 4, 2020) (certifying class where damages model could "measure the loss in value *all* Towers stockholders experienced as a result of the Merger's announcement and approval as compared to what Towers stockholders would have retained (or obtained) had the Merger not been approved.").

Per-share damages for all Class members for the Section 10(b) claims are also readily calculable using the "out-of-pocket" (OOP) methodology and/or valuation methodologies. Valuation methodologies such as discounted cash flows are routinely applied in appraisal cases and can be mechanically applied on a per-share basis to calculate damages stemming from the loss of appraisal rights. And the OOP methodology uses a common formula where per-share losses equal the difference between the per-share artificial deflation when the Class member sold shares and the per-share artificial deflation when the Class member purchased shares. Hartzmark Rep. ¶¶ 93-99; *Monroe*, 332 F.R.D. at 398 (approving use of event study to calculate damages and

18

finding such models "ha[ve] been accepted in securities fraud class actions in cases like this one, where Plaintiffs seek out-of-pocket damages to recover artificial inflation caused by Defendants' misrepresentations"); *see also City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, 2019 WL 3449671, at *6-7 (N.D. Ga. July 17, 2019) (finding that plaintiff's "out-of-pocket" method was the "the standard and well-settled formula for assessing damages for each class member" and that it was "sufficiently linked to [plaintiff's] theory of liability to satisfy predominance").

**E.      Superiority Is Established Under Rule 23(b)(3)**

This securities action easily satisfies Rule 23's "superiority" requirement. Fed. R. Civ. P. 23(b)(3); *Thorpe*, 2016 WL 4006661, at *15 (securities fraud actions "are particularly suitable for class action litigation"); *Recoton*, 248 F.R.D. at 616 ("the case law is clear that class actions are a particularly appropriate means for resolving securities fraud actions" (citation omitted)). Rule 23(b)(3) sets forth the following factors to be considered when assessing "superiority": (a) the class members' interest in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.

Each of these factors supports class certification here. *First*, hundreds or thousands of Class members is far too numerous, and the typical claim is generally too small, for each individual Class member to have an interest in maintaining a separate action. *Second*, to date there are no individual actions brought on behalf of KnowBe4 investors that seek recovery under the federal securities laws for damages caused by Defendants' fraud. *Third*, the nationwide and international geographical dispersion of the Class members makes it desirable to litigate Lead Plaintiffs' claims in this forum. Miami is an international hub for travel, and KnowBe4 is headquartered in Florida. *Finally*, Lead Plaintiffs and Class Counsel are not aware of management difficulties that preclude this Action from being maintained as a class action. Thus, a class action is "superior to other available methods for fairly and efficiently adjudicating" this Action. Fed. R. Civ. P. 23(b)(3).

**F.      The Court Should Approve Co-Lead Counsel Entwistle & Cappucci and Saxena White as Class Counsel and Kozyak Tropin & Throckmorton as Liaison Counsel**

Rule 23(g) requires that a court appoint class counsel upon certification of a class, setting forth four factors for consideration. The first factor focuses on "the work counsel has done in identifying or investigating potential claims in the action." Fed. R. Civ. P. 23(g)(1)(A)(i). Here,

Entwistle & Cappucci and Saxena White have conducted a thorough investigation of the facts giving rise to the detailed allegations in the Complaint, including the federal securities law claims sustained by the Court.

The second factor is "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action." Fed. R. Civ. P. 23(g)(1)(A)(ii). As set forth in their firm resumes, Entwistle & Cappucci and Saxena White have proven track records of successfully handling class actions and other complex litigation, particularly securities fraud cases. *See* Ex. 6, Ex. 7. The third factor, "counsel's knowledge of the applicable law," Fed. R. Civ. P. 23(g)(1)(A)(iii), is satisfied here for the same reasons.

Finally, Entwistle & Cappucci and Saxena White have already demonstrated "the resources that they will commit to representing the class," Fed. R. Civ. P. 23(g)(1)(A)(iv), as evidenced by the time the firms have devoted to the case thus far, including filing three complaints, opposing the motions for a stay, to dismiss and for reconsideration, serving and reviewing discovery, litigating discovery disputes, preparing this motion for class certification, retaining an expert to opine on class certification related issues, taking and defending expert depositions, and associating with highly qualified Liaison Counsel. Similarly, Kozyak Tropin & Throckmorton has effectively, efficiently, and determinedly served the Class since the inception of the case in its role as Court-appointed Liaison Counsel, and Lead Plaintiffs submit that Kozyak Tropin & Throckmorton should therefore be appointed Liaison Counsel for the Class. Ex. 8.

## VII.   CONCLUSION

Lead Plaintiffs request that the Court (i) certify the Action as a class action pursuant to Rules 23(a) and (b)(3); (ii) appoint Lead Plaintiffs as Class Representatives; and (iii) appoint Co-Lead Counsel as Class Counsel and Kozyak Tropin & Throckmorton LLP as Class Liaison Counsel.

Dated:  May 1, 2026

Respectfully submitted,

*/s/ Benjamin J. Widlanski*
**KOZYAK TROPIN &**
**THROCKMORTON LLP**
Benjamin J. Widlanski (Fla. Bar # 1010644)
bwidlanski@kttlaw.com
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134

20

Tel.: (305) 372-1800

*Court-Appointed Liaison Counsel and Proposed Class Liaison Counsel*

Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher *(pro hac vice)*
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com
asher@entwistle-law.com

Andrew J. Entwistle (*pro hac vice*)
500 West Second Street
Suite 1900
Austin, Texas 78701
Tel.: (512) 710-5960
aentwistle@entwistle-law.com

Adam Warden (Fla. Bar # 0873691)
Jonathan Lamet (Fla. Bar # 0106059)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
awarden@saxenawhite.com
jlamet@saxenawhite.com

David J. Schwartz (*pro hac vice*)
10 Bank Street, Suite 882
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
dschwartz@saxenawhite.com

Thomas Curry (*pro hac vice*)
824 N. Market Street, Suite 1003
Wilmington, Delaware 19801
Tel.: (302) 485-0483
tcurry@saxenawhite.com

21

*Court-Appointed Co-Lead Counsel and*
*Proposed Class Counsel*

22

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served through the Clerk's CM/ECF system to counsel of record of May 1, 2026.

*/s/ Benjamin J. Widlanski*
Benjamin J. Widlanski

23