# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE KNOWBE4, INC. SECURITIES LITIGATION | Case No.: 25-cv-22574-ALTONAGA/REID |

# Expert Rebuttal Report of Michael L. Hartzmark, Ph.D.

## April 9, 2026

# Table of Contents

I.    Qualifications and Compensation ................................................................1

II.   Scope of Engagement and Summary of Opinions .......................................1

III.  Analysis of the Grenadier Report—Price Impact ......................................5

      A.    Summary of Dr. Grenadier's Opinions on Price Impact ................................5

      B.    Dr. Grenadier Ignores Generally Accepted Academic-Based Agency Theory, Information Asymmetry and Signaling Theory ..................................7

      C.    Dr. Grenadier's Opinion that the Special Committee But-For Disclosure **Would Not Have** Had Price Impact Is Flawed and Speculative ...................................................................................................10

      D.    Dr. Grenadier's Opinion that the KKR But-For Disclosure **Would Not Have** Had Price Impact Is Flawed and Speculative ...............................14

      E.    Dr. Grenadier's Opinion that KnowBe4's **Price Would Not Have Risen** Above $24.90 if the Probability of Receiving $24.90 Was Reduced Is Flawed and Speculative ...............................................................18

            1.    Dr. Grenadier's Assertion of No Possible Higher Bid Is Flawed and Speculative ...................................................................................19

            2.    Dr. Grenadier's Assertion of a Standalone Value Below $24.90 If the Merger Did Not Close Is Flawed and Speculative ......................23

      F.    Conclusions Regarding Price Impact...........................................................25

IV.  Analysis of the Grenadier Report— Common Damages Methodology .................26

      A.    Dr. Grenadier's Opinion on Common Damages Methodology is Flawed and Misleading...................................................................................27

      B.    Common Damages Methodology ..................................................................27

            1.    Damages for Section 14(a) Can Be Calculated on a Common Class-Wide Basis ..................................................................................28

            2.    Damages for Section 10(b) Can Be Calculated on a Common Class-Wide Basis ..................................................................................29

            3.    Damages under Section 14(a) or Section 10(b) for Loss of Appraisal Rights Can Be Calculated on a Common and Class-Wide Basis ...............................................................................................30

V.    Summary and Conclusions...........................................................................32

## I.    QUALIFICATIONS AND COMPENSATION

1. I am President of Hartzmark Economics Litigation Practice, LLC. My qualifications and remuneration for this matter are set forth in my Expert Report dated March 26, 2026 (the "Hartzmark Report" or the "Opening Report").

## II.    SCOPE OF ENGAGEMENT AND SUMMARY OF OPINIONS

2. I have reviewed the Expert Report of Steven R. Grenadier, Ph.D., dated March 26, 2026 (the "Grenadier Report") and maintain the three opinions set forth in my Opening Report, namely:

> **OPINION 1:** The Class A common stock of KnowBe4, Inc. ("KnowBe4" or the "Company") traded in an open, well-developed and efficient market (hereinafter referred to as an "efficient market") from October 12, 2022 through February 1, 2023, inclusive (the "10(b) Class Period" or "Class Period").[1]
>
> **OPINION 2:** The calculation of damages for violations of Section 10(b) of the Exchange Act alleged in this action can be computed on a class-wide basis using a broadly accepted methodology that would be common to all 10(b) Class members.
>
> **OPINION 3:** The calculation of damages for violations of Section 14(a) of the Exchange Act alleged in this action can be computed on a class-wide basis using a broadly accepted methodology that would be common to all 14(a) Class members.[2]

---

[1] Capitalized terms undefined herein shall have the meanings in the Hartzmark Report. Complaint, ¶188. Unless otherwise noted, references to KnowBe4 "common stock" are for the Company's publicly traded Class A shares. In addition, investors in the publicly traded stock are referred to as "Public Shareholders." I note that KnowBe4 Class A common stock was delisted when the "take-private" acquisition closed on February 1, 2023 and the last day of trading was January 31, 2023. As discussed in the Hartzmark Report, KnowBe4 Class B common stock had "super-voting" rights, was not publicly traded and was convertible one-to-one into Class A shares (Hartzmark Report, ¶18).

[2] As stated in the Hartzmark Report, Class or Class Members refers *collectively* to those shareholders on whose behalf Plaintiffs have asserted claims under *either* Section 10(b) or Section 14(a) of the Exchange Act, or both (Hartzmark Report, ¶4).

3.      After reviewing the Grenadier Report, it is my understanding that Dr. Grenadier offers two primary opinions: the first "that there was no price impact due to the allegedly 'false and misleading' statements" because these statements provide "no new value-relevant information;" and second, that "[b]ased on the discussion in Plaintiffs' Class Certification Motion, Plaintiffs have not identified, as an economic matter, a methodology to calculate damages."[3]

4.      I have the following additional opinions in response to my review of the Grenadier Report.

**REPLY OPINION 1**:

Dr. Grenadier's opinion "that there was no price impact due to the allegedly 'false and misleading' statements," because those statements provide no "new and value-relevant information"[4] is incorrect, speculative and fundamentally flawed. ***Dr. Grenadier ignores and/or discounts the <u>potential</u> importance of the new value-relevant <u>private</u> information that Plaintiffs allege should have been disclosed in what Dr. Grenadier refers to as the "But-For Disclosures."***[5]  In other words, he fails to address the critical issue of whether

---

[3]   Grenadier Report, ¶¶9, 10 and 12.  Also, Lead Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel and [Proposed] Incorporated Memorandum of Law in Support Thereof, January 27, 2026 ("Class Certification Motion").

[4]   Grenadier Report, ¶¶9-10.

[5]   Dr. Grenadier defines the "But-For Disclosures" at ¶41 of the Grenadier Report.  The But-For Disclosures relate to two items, namely the Special Committee's opinion about the fairness or adequacy of the $24.90 transaction price (which Dr. Grenadier labels the "Special Committee But-For Disclosure") and KKR's increased rollover participation into the post-close entity from approximately $200 million to $300 million (which Dr. Grenadier labels the "KKR Rollover But-For Disclosure").

A summary of these two But-For Disclosures can be gleaned from the December 23, 2025 Order on the Motion to Dismiss (ECF 100; the "MTD").  For example, related to the Special Committee But-For Disclosure: "The Proxy stated that the Special Committee believed a per-share value in the 'mid-to-high $20[]s' was 'appropriate' [citation omitted]; and the Merger was fair to public stockholders [citation omitted]. Simultaneously, however, the Special Committee internally regarded values below $25 as '[n]ot the right zone,' and values between $25 and $27 as at the '[l]ow end of guidance[,]' requiring 'some work.' [citation omitted].  These allegations support a reasonable inference that the Special Committee believed prices below $27 per share were inadequate — values under $25 being unacceptable and values between $25 and $27 representing an undervaluation requiring further negotiation — and that a $24.90

there *would have been* price impact in the *but-for world* with the revelation of the <u>private</u> information allegedly concealed by insiders, including the potential signaling effects that the <u>private</u> information would have had on market participants' expectations and trading activities, which would have impacted the market price of KnowBe4 common stock.[6]

**REPLY OPINION 2:** Dr. Grenadier's opinion is flawed and misleading when he states that, "Plaintiffs have not identified, as an economic matter, a methodology to calculate damages."[7] ***From both an economic and logical standpoint, Dr. Grenadier incorrectly collapses the critical distinction***

---

per-share valuation fell outside the 'right zone[.] [citation omitted]. Because this omitted valuation framework 'conflict[ed] with what a reasonable investor would take from the statement[s],' [citation omitted], Plaintiffs adequately allege that it was misleading to represent the Special Committee believed the entire mid-to-high $20s range was appropriate and that the Merger was fair to public stockholders …." (p. 21); and related to the KKR Rollover But-For Disclosure: "By choosing to speak on the discussions regarding KKR's potential rollover, the signaling effects of a significant rollover, and the potential of the rollover amount to affect the transaction's value, Defendants triggered a duty to disclose facts necessary to make the information they volunteered about the rollover discussions [citation omitted] not misleading. … Plaintiffs adequately allege that Defendants contravened that duty by omitting KKR's decision to significantly depart from the rollover discussed previously — implying that KKR increased its rollover because it believed KnowBe4's ultimate valuation was relatively low." (pp. 23-24).

[6]   Therefore, Dr. Grenadier's opinions (a) do not consider the value relevance of the allegedly concealed information and (b) ignore the generally accepted notion of asymmetric information wherein insiders know more than public investors (*see* Section III.B, below).

For example, in this matter financial economic theory on signaling and asymmetric information, where insiders know more than public investors (*e.g.*, insiders had more complete information about the Special Committee's opinion and KKR's increased rollover contribution), supports the conclusion that such information in the But-For Disclosures would have signaled to the market that insiders might have known something new or different than market participants—suggesting to investors that the insider opinions and rollover decisions reflected a valuation different than the market price was reflecting.

The Special Committee's opinion and KKR's increased rollover contribution conclusions emerge from two of Dr. Grenadier's analyses. However, all his analyses are flawed, including but not limited to those discussing (a) the "Special Committee's subjective opinion regarding the value of KnowBe4", (b) that "KKR was rolling over", (c) reduced probability of deal closing at $24.90, (d) the other hypothetical bids and (e) higher Standalone Value (*e.g.*, Grenadier Report, ¶¶10-11).

[7]   Grenadier Report, ¶12.

***between (i) a class-wide damages methodology and (ii) the case-specific techniques and inputs required to implement that methodology on a class-wide basis***. In the Hartzmark Report, I clearly identify, as an economic matter, methodologies to calculate both 10(b) and 14(a) damages on a class-wide basis using broadly accepted—indeed virtually universally accepted approaches—that are common to 10(b) and 14(a) Class members.[8] I was not asked to develop or identify—nor would it be reasonable, prior to discovery—the specific techniques, let alone construct and/or populate the case-specific inputs to which would be required to perform investor-specific damages calculations at this preliminary class-certification stage.

5.    In addition to these two Reply Opinions, I note that Dr. Grenadier states:

> For the purposes of this report, I have been asked to assume that Plaintiffs will establish that the at-issue common shares of KnowBe4 traded in an efficient market, as they claim in the Complaint and Class Certification Motion.[9]

6.    Therefore, Dr. Grenadier does not dispute that KnowBe4 common stock traded in an efficient market during the Class Period, nor does Dr. Grenadier offer any analysis contradictory to my opinion that KnowBe4 common stock traded in an efficient market during the Class Period.

7.    In reaching my opinions, I have relied upon various materials, which are listed in **Appendix A** and/or are otherwise cited in this report. The research and analysis upon which my opinion is based has been conducted by me with the assistance of personnel working under my direction and supervision. My conclusions are based on information available to me as of the date of this report. I understand that discovery has only recently commenced, and I may review, evaluate, and analyze relevant material that becomes available to me in the future. I reserve the right to modify my conclusions based on additional information.

---

[8]    Hartzmark Report, Sections VI and VII.

[9]    Grenadier Report, ¶6.

## III.    ANALYSIS OF THE GRENADIER REPORT—PRICE IMPACT

### A.  Summary of Dr. Grenadier's Opinions on Price Impact

8.    Dr. Grenadier opines:

> As an economic matter and given the nature of Plaintiffs' allegations, for an alleged misrepresentation or omission to have price impact, it must be the case that the price of KnowBe4 common stock would have increased in response to alternative But-For Disclosures that would have disclosed the alleged truth and made the allegedly "false and misleading statements" not false and misleading.  As I show in this report, such a conclusion (*i.e.*, that there was such price impact) has no economic support given the evidence and Plaintiffs' allegations.  Therefore, I conclude that there was no price impact due to the allegedly "false and misleading" statements.[10]

---

[10]   Grenadier Report, ¶9 (footnote omitted).

I note that, in this paragraph Dr. Grenadier refers to "**alternative** But-For Disclosures" but in his report he only defines "But-For Disclosures" (Grenadier Report, ¶41, emphasis added).  Therefore, for the purposes of my Reply Report I assume that the "**alternative** But-For Disclosures" refer to those **alternative and/or additional single or series of disclosures that would have revealed the alleged truth**, which are in my interpretation, the "But-For Disclosures." (Grenadier Report, ¶41, emphasis added).  In other words, I assume there is no "alternative" or "additional" set or series of But-For Disclosures.

I also note that in this paragraph Dr. Grenadier states, (a) "for an alleged misrepresentation or omission to have price impact, it must be the case that the price of KnowBe4 common stock would have increased in response to alternative But-For Disclosures," (b) "that there was such price impact," and (c) "I conclude that there was no price impact due to the allegedly "false and misleading" statements." For the purposes of my Reply Report, I assume that when the term "price impact" is used throughout his and my reports, as Dr. Grenadier suggests, the terminology means that *but-for* the alleged misrepresentation or omission, the price *would have* increased.  If Dr. Grenadier is mixing the use of these terms, wherein he sometimes means that there must be an observable price increase at the time when there is "an alleged misrepresentation or omission," then I disagree.  This is an omissions-claim matter where it is alleged the truth was never publicly revealed and wherein at the time of an alleged misrepresentation or omission (*i.e.*, an omission in this case) it would not be expected to cause any observable price movement.  That price movement *would have been observed* only when the alleged truth was revealed.  (Grenadier Report, ¶9, emphasis added).

9.     Dr. Grenadier offers multiple purported bases for his conclusion.  First, Dr. Grenadier opines that "the allegedly omitted information that would have been disclosed as part of the But-For Disclosures is not consistent with that information being new and value-relevant that would impact market prices."[11]  He asserts that:

> [T]here is no reason to expect that, in an efficient market, the disclosure of what Plaintiffs allege was the Special Committee's **subjective** opinion regarding the value of KnowBe4 would have impacted the market's assessment of KnowBe4's cash flows and risks given other information that was either already known or disclosed to the market.[12]

10.    He further asserts that:

> To the extent Plaintiffs allege that the **incremental disclosure of the increase** in the number of shares that KKR was rolling over would have been new and value-relevant information about the value of the Company, this has no economic support. At most, such a disclosure would have been consistent with an obvious conclusion by the market that KKR was willing to sell more shares of KnowBe4 at a higher price, which would not provide, by itself, new and value-relevant information about the Vista Merger Price.[13]

11.    Second, Dr. Grenadier opines that, based on his understanding, the allegations "are consistent with the But-For Disclosures decreasing the market's assessment of the probability of the Vista merger closing at $24.90," and that his analysis is "overall consistent with the conclusion that, had the information in the But-For Disclosures been disclosed, it would not have been value-relevant."[14]  Continuing, Dr. Grenadier asserts:

> [T]o the extent that the Vista Merger would not have taken place had the But-For Disclosures been made, the value of KnowBe4 common shares would have been no higher than

---

[11]   Grenadier Report, ¶10.  Dr. Grenadier defines the But-For Disclosure at ¶41 of the Grenadier Report, which include the Special Committee But-For Disclosure and the KKR Rollover But-For Disclosure (*see* footnote 5).

[12]   Grenadier Report, ¶10a (emphasis added).

[13]   Grenadier Report, ¶10b (emphasis added).

[14]   Grenadier Report, ¶11 (footnote omitted).

$24.90, which indicates that the alleged misrepresentations did not have price impact and did not result in artificial deflation in the common stock price.[15]

12. Dr. Grenadier further claims that, had the But-For Disclosures been made, he finds no economic evidence that KnowBe4's common stock price "would have incorporated any expectation that shareholders 'would have obtained a higher price per share' in an alternative transaction"; or that the "market's assessment of the standalone value of KnowBe4 would have been higher than $24.90 per share."[16]

13. I disagree with Dr. Grenadier's opinions and conclude that Dr. Grenadier has made a fatal error in his analyses by ignoring and/or discounting the Plaintiffs' claims that the But-For Disclosures *would have* provided the market with new value-relevant information about insiders' views of the true merger value of the Company.  In other words, **the But-For Disclosures would have signaled to market participants valuable information about the Company.  To assume otherwise is simply to assume that certain facts alleged will ultimately not be proven, a determination which I understand would properly fall within the role of the trier of fact, not the economist.** The bases of my opinions are presented in Sections III.B-III.E, below.

B. Dr. Grenadier Ignores Generally Accepted Academic-Based Agency Theory, Information Asymmetry and Signaling Theory

14. Based on a long history of academic-based, economic research about how companies operate, insiders would be expected to have more information about a Company's value than what is publicly known.  In the financial literature, this phenomenon emerges from the combination of what economists refer to as "agency theory," "information asymmetry" and "signaling theory."

---

[15] Grenadier Report, ¶11.

[16] Grenadier Report, ¶¶11a-d.

15.     In agency theory,[17] economists posit that because most economic activity takes place through organizations, such as firms (*e.g.*, corporations like KnowBe4), economic exchange occurs as labor-market exchanges between the owners of a firm (which economists refer to as principals or shareholders, and in this matter the Class members) and non-owners (which economists refer to as agent/insiders or managers and executives, and in this matter the Defendants).  It is the agent/insiders who will control the day-to-day operations of the firm.  By virtue of their control over firm operations, agent/insiders hired by the principal/outsiders have more information about the condition of the firm than the principal/outsiders.

16.     This leads to information asymmetry.  The academic research and economic logic suggest that the agent/insiders are at an advantage to the principal/outsiders (*i.e.*, the Class members).  This information asymmetry creates opportunities for the agent/insiders to pursue their own self-interest at the expense of the principal/outsider.  Given the informational advantage held by agent/insiders, market participants routinely scrutinize their disclosures and trading activity in an effort to detect signals of new value-relevant private information.  This is the essence of academic-based signaling theory, which is the study of how signals via the activities of agent/insiders can "convey[] credible and valuable information to external parties"[18] and the power of such signals.  In this theory, market participants detect, decipher, process and interpret the signals from agent/insider activities and update their expectations.  Market participants then trade on their revised expectations, and their trading activity incorporates those updated expectations—shaped by agent/insider activities—into the company's valuation.

17.     Agency theory also describes corporate governance mechanisms that enable principal/outsiders to potentially monitor agent/insiders' actions, exact discipline and take

---

[17]   For example, *see* Michael C. Jensen and William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976).

[18]   Brian L. Connelly, S. Trevis Certo, Christopher R. Reutzel, Mark R. DesJardine, and Yi Shi Zhou, *Signaling Theory: State of the Theory and Its Future*, 51 J. of Mgmt. 24, 25 (2025).

corrective action. However, once the principal/outsiders cease to be owners—or the agent/insiders no longer are acting as agent/insiders for the principals—monitoring actions, exacting discipline and taking corrective action is impossible (except as we see in this matter through legal remedies). The combination of coordinated governance (that results from the principal-agent relationship studied in agency theory) and asymmetric information highlights the central role of information signaling in a merger transaction, particularly where the acquiring party consists of agent/insiders. For example, in mergers, Copeland and Weston state: "The *information*, or *signaling, hypothesis* refers to the revaluation of the ownership shares of firms owing to new information that is generated during the merger negotiations, the tender offer process or the joint venture planning."[19]

18.    A merger announcement is a major event in the existence of a publicly traded firm, and the transaction itself generates a substantial amount of information that is known to the deal negotiators (*i.e.*, agents/insiders) but not necessarily to the firm's shareholders (*i.e.*, principal/outsiders). This information asymmetry problem can be especially problematic when the acquiring entity is itself associated with the firm's managers (as was the case here). In cases such as this, governance standards require that a special committee of the board of directors be formed consisting of only directors that are not affiliated with the takeover bid. This is undertaken to fulfill the board's fiduciary obligations to its outside shareholders when agent/insiders (with an informational advantage) are effectively buying the firm from principal/outsiders. The special committee is formed to protect the interests of principal/outside shareholders when there is an obvious conflict of interest.

19.    Merger announcements are, therefore, events associated with extraordinary levels of attention paid by principal/outsiders to any signals provided by agent/insiders by which principal/outsiders can infer facts and update their expectations based on the activities of agent/insiders that will be important to them in evaluating and considering approving the proposed transaction (especially because even special committees of the board are legally prohibited from communicating all relevant private information to

---

[19]   Thomas E. Copeland and J. Fred Weston, Financial Theory and Corporate Policy, Third Edition (Addison-Wesley, 1988), 686.

shareholders in the course of a takeover bid).  All outsiders (market makers, arbitrageurs, analysts, shareholders, etc.), even non-shareholders, attempt to decode activity by agent/insiders, and market prices adjust as the market processes the perceived information in the signals embedded in agent/insiders' activity surrounding a merger.

20.    Given the level of information asymmetry in a merger, especially one in which the acquirer and target firm include the same agent/insiders, the signals relating to the merger value from an insider—and buyer—would be of great importance to all outsiders, including the public shareholders.  Thus, additional information provided about agent/insiders' beliefs on value and the appropriate price of the deal would be expected to be considered highly credible and useful signals in the context of the existing informational asymmetry.

21.    In the context of this matter, the But-For Disclosures incorporate signals from agent/insiders and thus would have been highly credible and useful information, which all principal/outsiders, including Class members, would attempt to detect, decipher, process and interpret.  Furthermore, in an efficient market, processing these signals leads to trading activities by outsiders, which serves to incorporate the private information into the market price so that the market price reflects the market's understanding of and updated expectations based on the signals sent by the agent/insiders.  The Grenadier Report ignores the value relevance and potential price impact of the signaling effects from agent/insiders of both of the But-For Disclosures.  As I discuss below, these signals could have changed market participants' perceptions of the appropriate or fair merger price and KnowBe4's ultimate value.    By ignoring these most basic economic matters—agency theory, information asymmetry and signaling—Dr. Grenadier's opinions are flawed and speculative.

C.  Dr. Grenadier's Opinion that the Special Committee But-For Disclosure **Would Not Have** Had Price Impact Is Flawed and Speculative

22.    Dr. Grenadier opines: "There is no economic evidence that the Special Committee But-For Disclosure would have represented new, value-relevant information if

it had been disclosed."[20]  Dr. Grenadier's argument is that given the market's access to a "broad range of information relevant to the valuation of KnowBe4," this But-For Disclosure would have revealed "at most, the Special Committee's subjective opinion of KnowBe4's valuation."[21]

23.    Dr. Grenadier states that Plaintiffs did not point to any specific information about cash flow or risks that was unavailable to the market that should have been disclosed, which in turn would have altered the mix of information available to investors and thus would have led to a change in the market's valuation of KnowBe4 common shares.[22]  Dr. Grenadier asserts multiple purported reasons why there was no new value-relevant information in this Special Committee But-For Disclosure, including:

> a)  that management projections of "certain financial metrics approved by the Special Committee and Morgan's Stanley's valuation of KnowBe4" (which included several types of valuation analyses) were released in the November 14, 2022 Proxy.[23]
>
> b)  that many of the underlying valuation analyses were based on public information, and that equity analysts and proxy advisors benchmarked the merger price against precedent transactions and potentially comparable companies.[24]
>
> c)  that in the November 14, 2022 Proxy, it was "disclosed that, in a meeting on August 19, 2022, '[t]he Special Committee discussed its views on valuation, including that it believed that a transaction with

---

[20]  Grenadier Report, ¶62.

[21]  Grenadier Report, ¶62.

[22]  Grenadier Report, ¶63.

[23]  Grenadier Report, ¶¶64-65 (footnote omitted).  Also, KnowBe4, Inc., Form PREM14A, filed November 14, 2022 ("November 14, 2022 Proxy").

[24]  Grenadier Report, ¶¶66-68.

a value in the mid-to-high $20's per share range was appropriate for a potential acquisition of KnowBe4."[25]

24.    Based on these observations, Dr. Grenadier draws his conclusion that the Special Committee But-For Disclosure would not have revealed any additional new value-relevant information to the market.  But, Dr. Grenadier's opinion ignores the economic importance of information asymmetry and signaling by ignoring one of the primary claims in this matter: that the Special Committee, by its nature, would have been privy to non-public information such as private insight, more detailed knowledge, and greater understanding/detail about KnowBe4's future prospects, including various scenarios related to expected cash flow or risks.  In addition, Dr. Grenadier appears to be taking on the role of the trier of fact and simply finding the Plaintiffs' allegations are false and that the undisclosed information was immaterial.

25.    For example, Dr. Grenadier apparently disregards the potential effect on market participants' perceptions of the fairness of the merger price from what was redacted from the Morgan Stanley presentation.  This presentation showed the responses to potential offer prices as shown in the Complaint, where $25 and $26 were listed as having a response of "Low end of guidance.  Think it will need some work."[26]  This belies Dr. Grenadier's possible misinterpretation of the August 19, 2022 Special Committee view of a potential transaction in the "mid-to-high $20's"[27] as appropriate.  Although the interpretation of the Special Committee's view is, in the end, an issue for the trier of fact to resolve, based on the redacted slide, the Special Committee But-For Disclosure is consistent with new value-relevant non-public information that the Special Committee concealed, namely that the value should have been in excess of the $25 to $26 range and a transaction price below $25 was "not the right zone for a transaction."[28]  Although the redaction was not specific to expected cash flows or risks, it was an indication or signal of the agent/insiders'

---

[25]   Grenadier Report, ¶69 (footnote omitted).

[26]   Complaint, ¶¶94-96.

[27]   Grenadier Report, ¶69.

[28]   Complaint, ¶95.

information about KnowBe4's value, and thus indirectly its expected cash flow and risk based on possible alternative internal cash flow and risk analyses they might have relied upon.   It is reasonable to conclude that such private information concealed by agent/insiders might have altered the total mix of information available to investors, and thus it is reasonable to conclude the additional information could have signaled private valuation information and thus changed the market's perception of the appropriate or fair merger price and KnowBe4's ultimate value.   This is also consistent with the Court's opinion in the MTD:

> Because this omitted valuation framework 'conflict[ed] with what a reasonable investor would take from the statement[s],' [citation omitted], Plaintiffs adequately allege that it was misleading to represent the Special Committee believed the entire mid-to-high $20s range was appropriate and that the Merger was fair to public stockholders ...."[29]

26.   Furthermore, if the Special Committee But-For Disclosure had been made (*e.g.*, that the Special Committee's opinion was that a bid below $25 was not in the right zone for a transaction), the market would have been interested to learn **why** the Special Committee had accepted a bid that was not *ex-ante* attractive to them (*i.e.*, less than $25). This might have motivated investors to ask more questions and possibly to request supplemental information, including, but not limited to, an appraisal.   This is particularly the case given the market participants' understanding that the bid was from a consortium of private equity firms, including the firm's largest three shareholders controlling more than ¾ of the firm's aggregate votes; and who as we shall discuss below were going to roll over a substantial portion of their shares into the new entity.[30]

27.   In addition, given the nature of special committees and from my experience as a former business executive and Board member, it is likely the Special Committee would have had access to alternative scenarios or more detailed management projections than

---

[29]   MTD, p. 21.

[30]   According to the Complaint, the three firms held 77.4% of the voting power prior to the Merger (KKR, 26.4%; Elephant Partners, 37.5%, and Vista 13.5%).   Complaint, ¶¶40, 45, 47.

- 13 -

those provided in the November 14, 2022 Proxy that would have informed their opinion on value.[31] As Dr. Grenadier noted, *many* of the data sources and inputs underlying the valuation analyses were public information[32]—but not all insider information was disclosed. This is a factual (and perhaps legal) issue that can only be resolved on a developed factual record, and it is my understanding that discovery is not complete at this time. And, as discussed above, this asymmetric information is clearly a feature of public corporations.

D. Dr. Grenadier's Opinion that the KKR But-For Disclosure **Would Not Have Had Price Impact Is Flawed and Speculative**

28. Dr. Grenadier concludes that: "There is no economic evidence that the KKR Rollover But-For Disclosure would have conveyed new and value-relevant information."[33] Dr. Grenadier bases this conclusion on agent/insider-KKR exchanging the majority of its shares (after the rollover) and that the incremental increase in the rollover would "[a]t most, … been consistent with an obvious conclusion by the market that KKR was willing to sell more shares of KnowBe4 at a higher price, which would by itself not provide new, value-relevant information about the Vista Merger."[34] Dr. Grenadier further asserts that because agent/insider-KKR exchanged the majority (54%) of its shares, it somehow worked against its economic incentives if it thought the Merger price was too low (*i.e.*, it should have exchanged a smaller percentage).[35]

29. Dr. Grenadier is ignoring the Plaintiffs' contention that the KKR Rollover But-For Disclosure would have informed investors that after the $24.90 merger price was

---

[31] It seems that much of the basis of Dr. Grenadier's opinions are associated with an apparent belief there is a single set of cash flow and risk figures that make up the valuation of a firm. In my experience, both as an expert economist and former business executive and Board member, there are all types of internal cash flow and risk assessments and scenarios; and it is up to agent/insiders to determine which of those scenarios or which combination of scenarios they might disclose to the public.

[32] Grenadier Report, ¶66.

[33] Grenadier Report, ¶71.

[34] Grenadier Report, ¶71.

[35] Grenadier Report, ¶¶73-74.

fixed, agent/insider-KKR had *increased* the dollar amount and/or number of shares of its rollover *compared to what it originally had planned to rollover*.  Dr. Grenadier apparently concludes that a disclosure to market participants that agent/insider-KKR was willing to retain more of its equity at, presumably what it believed was a more favorable value, was not new or value-relevant information.  This is based on unscientific speculation at best and contrary to economic logic at its worst.  Moreover, this conclusion is based on Dr. Grenadier inserting himself into the role of trier of fact and finding, without the benefit of a developed record, the Plaintiffs' allegations are not proven and that the alleged misstatements were immaterial.

30.    Further, Dr. Grenadier fails to consider the implied value to agent/insider-KKR by its action of increasing its rollover.  For every additional share agent/insider-KKR rolled over, it would be giving up a certain amount, namely $24.90, in exchange for an uncertain future payout in the new privately held KnowBe4.  In other words, had agent/insider-KKR been indifferent between the merger price of $24.90 and the value of what it was expecting to receive in the new privately held KnowBe4, it would not have changed the amount of its rollover shares.  Thus, when agent/insider-KKR increased its rollover, it must have expected that the riskier payout (the expected cash flow after discounting for uncertainty of the new privately held KnowBe4) was greater than $24.90, otherwise based on economic logic, it would not have increased its rollover amount.  Therefore, information about the increase in rollover would have signaled to the market that agent/insider-KKR's valuation based on its private expectations of future cash flows and risk (the uncertain future payout) was not $24.90.  In other words, there would have been a signal to market participants that at least agent/insider-KKR had a different or altered view of the publicly disclosed cash flow and risk associated with the new privately held KnowBe4.

31.    To demonstrate Dr. Grenadier's obvious error by his reliance on a single variable as being adequate disclosure, namely the dollar amount and percentage of agent/insider-KKR's holdings, and why the signal of the increase would have changed the mix of information available to investors and could have been a critical signal that all outsiders (including Class members) could utilize in making their investment decisions, I use the following *extreme hypothetical*.

> Assume that initially KKR believed it would receive $30.00 per share for its KnowBe4 shares and that it was going to exchange 95% of its holding, while rolling over 5% of its holding into the new privately held KnowBe4.  Following this initial decision, negotiations take place and the merger price is determined, as is KKR's final exchange amount.  The merger price is fixed at $24.90 and then there is a public announcement.  In that announcement it is disclosed KKR will exchange 54% of its holding and rollover 46% of its holding.  The importance of the information to investors would not be 54%, but the fact that KKR increased the amount of its anticipated rollover from 5% to 46% or an increase of 820%, while it reduced the amount it would exchange from 95% to 54% or a decrease of 43%.

32.     On its face, this additional information about the change in the rollover decision is new value relevant information.  This then shows the KKR Rollover But-For Disclosure would have been new value-relevant information and would have altered the mix of information all outsiders, including Class members, could act upon.

33.     Dr. Grenadier states, "To the extent that KKR viewed the Vista Merger as 'underpriced,' selling a majority of its KnowBe4 holdings at the Vista Merger Price would be against KKR's economic interest."[36]  Even if this is ultimately determined to be true with the benefit of discovery from agent/insider-KKR, it still fails to acknowledge that agent/insider-KKR was on both sides of the transaction and it was clearly in agent/insider-KKR's interest to not only maximize the value of its KnowBe4 shares, **but to also maximize the value per share of its holdings in the new privately-held KnowBe4.**  This is also new value-relevant information that would change the mix of information available to all outsiders, including Class members, had the KKR Rollover But-For Disclosure been revealed.

34.     Finally, Dr. Grenadier states, "The fact that KKR decided to exchange the majority of its shares of KnowBe4 common stock for cash at the Vista Merger Price is instead consistent with the market concluding that KKR viewed $24.90 per share as a **fair**

---

[36]   Grenadier Report, ¶73.

**price**."[37]   Contrary to Dr. Grenadier's speculation about "fair," this might actually be an indictment of the Defendants and reveal the reason why agent/insiders chose only to disclose the level of the amount to be exchanged rather than both the level and the alleged change in the level.   As Dr. Grenadier proposes: this single variable potentially signaled what agent/insiders might have hoped to signal to the market participants, namely investors would process the signal as "consistent with the market concluding that KKR viewed $24.90 per share as a **fair price**," when internally the agent/insiders believed it was underpriced.

35.   In addition, although "fair price" is something discussed in merger analysis, what is considered the "fair price" in this matter will be made by a trier of fact.   Indeed, the only information we can glean from the statement that "KKR decided to exchange the majority of its shares of KnowBe4 common" is that based on the negotiation with the other agent/insiders, tax issues, and other factors, agent/insider-KKR would want to act in its own interest and do what it considered a "fair price" to itself; otherwise it is up to market participants to evaluate and process the signals and let the market determine what is a "fair price" to market participants, based on having all relevant information.   Without support, it is, in my opinion, not necessarily Dr. Grenadier's "obvious" assertion that the price was fair, that might be wrong, but his baseless conclusion that additional information about the actions of agent/insider-KKR would not (in his belief) provide information that the "fair market price" could be higher.   Moreover, his opinion is at direct odds and contradicts the economic logic of what the Court found in the MTD Order:

> Plaintiffs adequately allege that Defendants contravened that duty by omitting KKR's decision to significantly depart from the rollover discussed previously — implying that KKR increased its rollover because it believed KnowBe4's ultimate valuation was relatively low.[38]

36.   Thus, Dr. Grenadier simply speculates that information about what an agent/insider thought about the Company would offer no new information to what the

---

[37]   Grenadier Report, ¶74 (emphasis added).

[38]   MTD Order, p. 24.

public already had.  This ignores the "obvious" additional knowledge an agent/insider would have had about a company.  Again, this was a signal of insider information about the Company, which would be new information to the <u>public</u> and could change the market's perception of the Merger and KnowBe4's value.

      E.   <u>Dr. Grenadier's Opinion that KnowBe4's **Price Would Not Have Risen** Above $24.90 if the Probability of Receiving $24.90 Was Reduced Is Flawed and Speculative</u>

37.    As part of his purported support for the lack of price impact, Dr. Grenadier asserts that if the Merger had not taken place, "the value of KnowBe4 common shares would have been no higher than $24.90, which indicates that the alleged misrepresentations did not have price impact and did not result in artificial deflation in the common stock price[,]"[39] because had the But-For Disclosures been made, he finds no economic evidence that KnowBe4's common stock price "would have incorporated any expectation that shareholders 'would have obtained a higher price per share' in an alternative transaction"; or that the "market's assessment of the standalone value of KnowBe4 would have been higher than $24.90 per share."[40]  Again, Dr. Grenadier ignores the <u>potential</u> new value-relevant <u>private</u> information that Plaintiffs allege should have been disclosed.

38.    Dr. Grenadier posits two possible scenarios that would increase KnowBe4's stock price above the Merger price of $24.90 if the probability of the deal proceeding at $24.90 were to fall: (i) an expectation of a bid higher than $24.90; or (ii) KnowBe4's standalone value would be higher than $24.90.[41]  Dr. Grenadier asserts that in neither of these cases would the price increase over $24.90 if the But-For Disclosures were made.  Again, his opinion is flawed.

---

[39]   Grenadier Report, ¶11.

[40]   Grenadier Report, ¶¶11a-b.

[41]   Grenadier Report, ¶76.

### 1. Dr. Grenadier's Assertion of No Possible Higher Bid Is Flawed and Speculative

39.     Dr. Grenadier discusses the public disclosures regarding the potential of other bidders or a higher price being offered by Vista (based on the viewpoint of the Special Committee).[42]  Given this <u>public</u> information, Dr. Grenadier concludes that "there is no economic basis to conclude that the market price of KnowBe4 common stock would have incorporated any expectation that shareholders 'would have obtained a higher price per share' in an alternative transaction, from Vista or another hypothetical bidder, had the But-For Disclosures been made."[43]  Dr. Grenadier's conclusion is flawed and based on speculation and assumes the same public information and outcomes *with* the But-For Disclosures.  However, the Plaintiffs allege that the But-For Disclosures would have provided new value relevant information to the market and that new value relevant information might have (a) affected how other bidders valued the company, (b) delayed the process (especially if the new value relevant information motivated the exercise of appraisal rights) and made it possible for other potential bidders to emerge (say for example, if the But-For Disclosures suggested a non-insider group might be able to consummate a deal), (c) increased the likelihood of public shareholders rejecting the allegedly low merger price and motivated the agent/insiders to extend the process, (d) motivate some subset of investors to seek appraisal, which in itself could cause the market price to increase beyond the merger price or, (e) based on shareholder reaction, might have caused further negotiation with Vista to increase the merger price to those levels described in the MTD to a level where the Special Committee felt that in the "mid-to-high $20[]s" was "appropriate."  It is reasonable to conclude that with the change to the mix of information available to investors, any or all of these states of the world might have emerged.  Whether any of these would have emerged is for the trier of fact to determine.

40.     Dr. Grenadier makes a similar argument based on the equity analyst commentary.  Dr. Grenadier argues equity analysts suggested that an alternative bidder was

---

[42]   Grenadier Report, ¶¶81-86.

[43]   Grenadier Report, ¶86 (footnote omitted).

not forthcoming.[44]  However, this is clearly based on the public information disclosed in the November 14, 2022 Proxy.  Dr. Grenadier again speculates that equity analysts would not have changed their analyses and opinions if the But-For Disclosures were made.  In essence, Dr. Grenadier is simply assuming in this situation that the But-For Disclosures would have provided no new value-relevant information and therefore there would have been no reason for the equity analysts to update their analyses and conclusions.  Again, Dr. Grenadier simply assumes away any value-relevant effect of the agent/insider information that would have been signaled by the But-For Disclosures.

41.    Dr. Grenadier also cites to the proxy advisor ISS stating there is a "potential downside risk" if the merger is not completed.[45]  Again, this argument suffers from the same flaw as discussed in relation to Dr. Grenadier's discussion of the response of equity analysts.  Because ISS's report was based on the publicly available information, had the But-For Disclosures been made, the new value relevant information might have motivated ISS to alter its view.

42.    Dr. Grenadier then presents a stylized formula for showing the market Stock Price as a function of the probability of the Merger closing at the $24.90 price (call it $p$) or not closing and trading at a standalone value (call it $1 - p$).  Dr. Grenadier's formula is:

$$\textit{Stock Price} = p \times \textit{Vista Merger Price} + (1 - p) \times \textit{Standalone Value}.^{46}$$

43.    In his model he implicitly concludes that a failed merger along with the But-For Disclosures would have resulted in the Standalone Value being $24.90 or lower.  He uses this formula assuming the irrelevance of the But-For Disclosures to purportedly demonstrate how the Stock Price could not end up higher than $24.90.

44.    In this formula, Dr. Grenadier states that the Standalone Value must be below $24.90 if the observed market Stock Price is not above $24.90, which it was throughout

---

[44]   Grenadier Report, ¶¶87-91.

[45]   Grenadier Report, ¶98.

[46]   Grenadier Report, ¶93.

the Class Period.[47]  He notes that if the Standalone Value was higher than $24.90, then the market Stock Price would have been above $24.90, which did not occur at all during the Class Period.[48]  He concludes that if the Merger did not close, the Standalone Value would therefore be under $24.90.

45.    This conclusion fails to account for the potential reaction of the market participants to the revelation of the new value relevant information in the But-For Disclosures.  For example, had it been disclosed that the Special Committee felt that a transaction price below $25 was "not the right zone for a transaction," while it was also disclosed that the "mid-to-high $20[]s" was "appropriate," the market might have reacted by moving the probability of rejection of the merger proposal (1-$p$) from close to 0% to 100% with the idea that over time the merger price would meet the view of the Special Committee (*i.e.*, the Standalone Value would change or a higher bid might emerge).

46.    Further, Dr. Grenadier's formula does not allow for the possibility that with the revelation of the information in the But-For Disclosures, the mix of information available to market participants as well as to other potential bidders would have changed. For example, a higher proposed merger price (and/or Standalone Value) might have emerged.  In essence Dr. Grenadier's simplistic formula is too simple.  Although also simplistic, if in the formula above there is a third term representing a potential higher *alternative* merger price offer being expected from Vista or another bidder (call it *Alt Price*, with probability $p^{alt}$), the expected stock price would then be represented in the formula that follows:

$$\textit{Expected Stock Price} = \begin{aligned} &(p^{alt} \times \textit{Alt Price}) \\ &+ (p \times \textit{Vista Merger Price}) \\ &+ [(1 - p - p^{alt}) \times \textit{Standalone Value}] \end{aligned}$$

47.    As $p^{alt}$ and *Alt Price* would have increased, the Expected Stock Price would have also increased and potentially the Expected Stock Price could have eclipsed the

---

[47]   Grenadier Report, ¶94.

[48]   Grenadier Report, ¶94.

$24.90 level, especially as the probability of any deal ($p + p^{alt}$) approached 100%, thereby negating any standalone market value of KnowBe4 below $24.90.

48.    A table with simplified examples is below, showing the Expected Stock Price and the Price Impact.

**Table 1[49]**

| | Probability of Vista @$24.90 | Probability of Standalone @$17.30 | Probability of Alternative @$30 | Expected Stock Price | Price Impact Relative to $24.90 |
|---|---|---|---|---|---|
| | 95% | 5% | 0% | $24.52 | ($0.38) |
| **Grenadier** | 90% | 10% | 0% | $24.14 | ($0.76) |
| **Limited** | 80% | 20% | 0% | $23.38 | ($1.52) |
| **States of** | 70% | 30% | 0% | $22.62 | ($2.28) |
| **the World** | 60% | 40% | 0% | $21.86 | ($3.04) |
| | 50% | 50% | 0% | $21.10 | ($3.80) |
| | 45% | 5% | 50% | $27.07 | $2.17 |
| **Alternative** | 40% | 10% | 50% | $26.69 | $1.79 |
| **States of** | 30% | 20% | 50% | $25.93 | $1.03 |
| **the World** | 65% | 5% | 30% | $26.05 | $1.15 |
| | 60% | 10% | 30% | $25.67 | $0.77 |
| | 50% | 20% | 30% | $24.91 | $0.01 |

49.    This table shows numerically why Dr. Grenadier concludes there would have been no price impact if the Standalone Value remained below $24.90.  For the purposes of this analysis and to provide an example where there is more variability in the Expected Stock Price, I conservatively assume the Standalone Value would have been $17.30 or the price just prior to the announcement of the proposed merger.[50]   I also assume a certain probability of the merger taking place at the $24.90 Vista Merger Price.  Finally, I assume for simplicity and to give this hypothetical example some variation, that if an alternative emerged (whether a new Vista proposal, payment of an appraisal value or new suitor emerging) the transaction would have been consummated at $30.00.  In this simplistic

---

[49]   The Expected Stock Price is calculated by taking the weighted average of the three states of the world, and the Price Impact Relative to $24.90 is calculated as the Expected Stock Price less $24.90.

[50]   Clearly, there would have been far more information on cash flow and risk of KnowBe4 with the disclosure of the information in the November 14, 2022 Proxy and the But-For Disclosures.

- 22 -

example I simply add the possibility of an alternative state of the world with an alternative price and probability emerging as the result of the information revealed in the But-For Disclosures (whether a new proposal came from Vista, an alternative emerged or there was a rejection of the current deal with anticipation of another more favorable transaction taking place in the future, the exercise of appraisal rights, or other reasons). This reasonable example of a but-for world demonstrates the Expected Stock Price could have exceeded $24.90 and there are literally an infinite number of states of the world when there would have been price impact from the But-For Disclosures.

50. For example, in one state of the world I assume upon the revelation of the But-For Disclosures there would have been: (a) a 45% probability of the Vista Merger Price being the final exchange value of $24.90, (b) a 5% probability that no transaction would take place and the Standalone Value would fall to $17.30, and (c) a 50% probability that the final outcome over time would have been $30.00 exchange value. In this stylized and hypothetical example, the Expected Stock Price would have been $27.07, and the Price Impact would have been $2.17 if the truth had been revealed in the But-For Disclosures.

### 2. Dr. Grenadier's Assertion of a Standalone Value Below $24.90 If the Merger Did Not Close Is Flawed and Speculative

51. Dr. Grenadier posits another scenario that might have led to a higher Stock Price—namely if the Standalone Value of KnowBe4 increases above the $24.90 merger price.[51] Dr. Grenadier's formula for calculating the Stock Price based on the probability $p$ of a completed merger at the merger price of $24.90, and the converse probability of the merger not completing and KnowBe4 trading then at its Standalone Value (*i.e.*, $1 - p$), also fails to account for the fact that there would have been a different mix of information investors would have relied upon after the information in the November 14, 2022 Proxy and But-For Disclosures were disseminated to market participants. Indeed, if as a result of the But-For Disclosures, market participants perceived that there were alternative cash flow and risk assessments that agent/insiders utilized to value KnowBe4, the Standalone Value might have been impacted and risen above $24.90.

---

[51] Grenadier Report Section VII.B.2.

52.     Moreover, Dr. Grenadier's arguments fail to account for the probability of a higher bid or the potential of investors to expect they could obtain a higher value than the Vista Merger Price if they would have been motivated by the information in the But-For Disclosures to exercise their appraisal rights.  In that case, it is possible that these investors' actions would have incorporated their updated expectations on KnowBe4 and led to an increase of the Stock Price above the $24.90 merger price.  Moreover, they would have been motivated to continue to purchase shares until all the information about a prospective appraisal was incorporated into the market Stock Price; at which point the Stock Price would have reached an equilibrium that incorporated the investors' views of their expected recovery in an appraisal proceeding (*i.e.*, the market impounds the information of these investors' value information).  The formula above is thus relevant for this appraisal situation as well, if the Standalone Value could have increased above $24.90, in which case the Stock Price would have been higher than $24.90.

53.     In Dr. Grenadier's zero-sum analysis, he again assumes the new standalone market price would be based on all the current public information available at that time of a failed merger based only on the information in the November 14, 2022 Proxy—ignoring again (or effectively minimizing) the valuation effects of the But-For Disclosures or what information might have been transmitted if the merger failed.  For example, there is a possibility that the merger would have failed because investors felt the cash flow and risk information in the November 14, 2022 Proxy undervalued KnowBe4, but they believed they were powerless with the agent/insiders controlling the process; and that is why they took no action.

54.     Dr. Grenadier also cites to literature on terminated mergers, stating that it finds "the most likely outcome when a merger is terminated is that the stock price would decrease to remove (at least part of) this merger premium [merger price relative to unaffected price]."[52]  Dr. Grenadier again ignores the nature of the But-For Disclosures, by simply assuming the "most likely outcome" from his interpretation of the research was the average outcome.   He bases this conclusion on this research purportedly having a

---

[52]   Grenadier Report, ¶97.

comparable sample of firms. However, it would seem unlikely the sample of firms necessarily reflected firms that as in this matter had agent/insider information that was concealed, nor did Dr. Grenadier evaluate the research and create possible subsets of companies and returns that would explain the observed price movements segmented by firm characteristics such as whether the firms were in the technology sector or not, had large insider holdings, had agent/insiders selling to entities that were controlled by that same group of agent/insiders, etc.

55.    Moreover, Dr. Grenadier and other academic literature are clear that there is often a revaluation of the standalone value of the firm after a failed merger attempt. Indeed, the empirical results in the academic research cited by Dr. Grenadier show a substantial revaluation after failed mergers.[53]   I can only assume that these failed only after the investors rejected the proposal based on all value relevant information that had been disclosed. In this *KnowBe4* matter, this revaluation would allegedly underestimate the level of revaluation, as the Plaintiffs allege there would have been additional new value relevant information disclosed in the But-For Disclosures. Therefore, consistent with the discussion above, the impact on the standalone value might have been far greater than those observed in the sample used by the authors.

F.  Conclusions Regarding Price Impact

56.    Plaintiffs allege that the depressed market price for KnowBe4 common stock would have increased in the but-for world (*i.e.,* there would have been price impact with the revelation of the information in the But-For Disclosures) had new and value-relevant information NOT been withheld, suppressed or omitted. Moreover, this but-for observed price impact would have been consistent with and supported by Dr. Grenadier's opinion that, "As an economic matter and given the nature of Plaintiffs' allegations, for an alleged

---

[53]  Malmendier, Opp, and Saidi state: "We exploit detailed data on unsuccessful takeover bids between 1980 and 2008, and we show that targets of cash offers are revalued on average by [around] 15% after deal failure… Our results are most consistent with cash bids revealing prior undervaluation of the target." Ulrike Malmendier, Marcus M. Opp and Farzad Saidi, *Target revaluation after takeover attempts: Cash versus Stock*, 119 J. Fin. Econ. 92, 92 (2016).

misrepresentation or omission to have price impact, it must be the case that the price of KnowBe4 common stock would have increased in response to alternative But-For Disclosures that would have disclosed the alleged truth and made the allegedly 'false and misleading statements' not false and misleading."[54]

57.    Dr. Grenadier instead opines that the information regarding the merger that was <u>publicly</u> available during the Class Period would render the But-For Disclosures immaterial to the market's valuation of KnowBe4.[55]  Dr. Grenadier erroneously bases his opinion that the But-For Disclosures would provide no new value-relevant information on speculation, cherry-picking from a rather sparse private documents record, and, most critically, his own determination of what are the most important disputed and unresolved factual issues that will be determined by the trier of fact.  In other words, Dr. Grenadier fails to address the allegations and provide an answer to the question of whether there would have been price impact caused by the revelation of the private information allegedly concealed by agent/insiders.  Taking this opinion at face value, Dr. Grenadier finds the allegations to be false, and the alleged misstatements immaterial, usurping the role of the trier of fact and thus going well beyond that of the economic expert.

## IV.    ANALYSIS OF THE GRENADIER REPORT— COMMON DAMAGES METHODOLOGY

58.    Regarding common damages methodologies, Dr. Grenadier opines that, based on the Plaintiffs' Class Certification Motion,[56] "Plaintiffs have not identified, as an economic matter, a methodology to calculate damages."[57]

---

[54]    Grenadier Report, ¶9 (footnote omitted).

[55]    Dr. Grenadier also ignores the potential value-relevance of the information that allegedly would have been disclosed but-for the alleged misstatements and omissions.

[56]    Class Certification Motion, pp. 7-8 and 17–18.

[57]    Grenadier Report, ¶12.

A. Dr. Grenadier's Opinion on Common Damages Methodology is Flawed and Misleading

59.    Dr. Grenadier's opinion is flawed and misleading *from both an economic and logical standpoint.  Dr. Grenadier incorrectly collapses the critical distinction between (i) a class-wide damages methodology and (ii) the case-specific techniques and inputs required to implement that methodology on a class-wide basis*.  In the Hartzmark Report, I clearly identify, as an economic matter, methodologies to calculate both 10(b) and 14(a) damages on a class-wide basis using broadly accepted—indeed virtually universally accepted approaches—that are common to 10(b) and 14(a) Class members.[58] I was not asked to develop or identify—nor would it be reasonable, prior to the completion of discovery—the appropriate techniques, let alone construct and/or populate the case-specific inputs to use in the methodologies and techniques required to perform investor-specific damages calculations at this preliminary class-certification stage.

60.    Furthermore, in my Opening Report I suggested a multitude of techniques to calculate damages that might be employed in a damages report.[59]  I also identified what might be the inputs into the formulas—for example, artificial deflation and trading activities of Class members—without prematurely completing actual calculations of these specific measures.  The choice of the applicable technique and then the estimates of the inputs would be done at the appropriate time, likely after the completion of discovery when the facts and circumstances were clearer.

B. Common Damages Methodology

61.    Dr. Grenadier opines that "from an economic standpoint, Plaintiffs have not provided a methodology to compute damages on a class-wide basis and in a manner consistent with Plaintiffs' allegations and theory of liability."[60]  Importantly, Dr. Grenadier

---

[58]   Hartzmark Report, Sections IV and V.

[59]   *See*, Hartzmark Report, ¶¶98, 105-107.

[60]   Grenadier Report, ¶102.

acknowledges that: "Plaintiffs do not need to actually compute damages or assess loss causation at this stage of [the] litigation."[61]

62.   In the Hartzmark Report, I identified methodologies to compute damages on a class-wide basis that are consistent with Plaintiffs' allegations.

63.   In general, Dr. Grenadier is confusing two different concepts: (1) the methodology or formula, and (2) the numbers or inputs to plug into the methodology or formula.   Indeed, Dr. Grenadier's opinion collapses entirely because he has collapsed a basic distinction: (1) methodology is the formula or rule that applies to everyone, while (2) inputs and techniques are the case-specific data needed to execute.   It is my understanding as an expert in class action securities litigation for multiple decades that at the class certification stage the Courts require the first—not the second.

### 1. Damages for Section 14(a) Can Be Calculated on a Common Class-Wide Basis

64.   Dr. Grenadier states that Plaintiffs:

> [did] not include a methodology to determine whether shareholders would have 'avoided voting for the Merger' but for the alleged misrepresentations in the Proxy.  To the extent that Plaintiffs' "but for world" assumes that shareholders would have rejected the Vista Merger at $24.90, Plaintiffs have not provided a methodology to support this assumption. If rejection of the merger was not certain, one would need a methodology to determine the likelihood that the merger would have been rejected had the hypothetical but-for disclosures been made.[62]

65.   Dr. Grenadier also concludes that:

> (i) Plaintiffs have not provided a methodology that accounts for the impact on value and therefore on damages of the "alternative opportunities" Proposed Class Members under Section 14(a) would have considered in the "but for world" if they "could have avoided voting for the Merger," (ii) Plaintiffs have not provided a methodology that accounts for the valuation impact of "enjoying the ongoing growth of the

---

[61]   Grenadier Report, ¶101.

[62]   Grenadier Report, ¶104 (footnote omitted).

Company" and (iii) Plaintiffs have not provided a methodology to determine when to measure any alternative "valuation of KnowBe4 in the 'but for' world," or how that valuation would have evolved over time.[63]

66.  In the Hartzmark Report, I did provide accepted methodologies that could be employed on a class-wide basis to measure the value of KnowBe4 in a variety of circumstances. These could account for such issues as the date of sale of the shares if not held through the closing of the merger or decisions made in a But-For World. Dr. Grenadier claims that it is not only necessary to arrive at a value of KnowBe4's common shares in the But-For world, but that it would also be necessary to model investment decisions.[64] This seems to be a highly unrealistic and unnecessary complication and ignores that the alleged damages were suffered due to an actual transaction that allegedly should have taken place at a higher price. Dr. Grenadier obfuscates the recovery due to what actually happened by requiring investors to go back and make hypothetical decisions in the But-For world.

67.  In any case, Dr. Grenadier's criticism of the Class Certification Motion is not about commonality, but instead argues about inputs rather than methodology, without attempting to explain why the calculations could not be applied class-wide. Indeed, all calculations proposed by Dr. Grenadier could be applied class-wide.

### 2. Damages for Section 10(b) Can Be Calculated on a Common Class-Wide Basis

68.  Dr. Grenadier acknowledges that an out-of-pocket methodology was suggested by Plaintiffs in which artificial deflation in the stock would be calculated each day,[65] as I also discussed in the Hartzmark Report. However, Dr. Grenadier then opines that "Plaintiffs do not provide a methodology to determine 'per-share artificial deflation' at any point during the Proposed Class Period."[66] In the Hartzmark Report, I did provide

---

[63]  Grenadier Report, ¶105 (footnotes omitted).

[64]  Grenadier Report, ¶¶108-109.

[65]  Grenadier Report, ¶110.

[66]  Grenadier Report, ¶110 (footnote omitted).

the accepted techniques that could be used to calculate a per-share artificial deflation each day.  And, as noted by Dr. Grenadier, this stage of the litigation does not require an actual calculation of daily artificial deflation.[67]   Again, Dr. Grenadier's criticism of the Class Certification Motion is not about commonality, but instead argues about the case-specific calculation of inputs rather than the clearly specified methodology, without attempting to explain why the calculations could not be applied class-wide.  Indeed, all calculations proposed by Dr. Grenadier could be applied class-wide.  For example, he agrees that an artificial deflation ribbon would be calculated, and that ribbon would be applied class-wide using the common damages methodology I proposed in the Hartzmark Report.

### 3.    Damages under Section 14(a) or Section 10(b) for Loss of Appraisal Rights Can Be Calculated on a Common and Class-Wide Basis

69.    Dr. Grenadier states, in respect to Plaintiffs' claims regarding the loss of appraisal rights for investors, "Plaintiffs have not articulated a methodology to calculate "damages stemming from the loss of appraisal rights" for either Section 10(b) or Section 14(a) in a manner consistent with their theory of liability an on a class-wide basis."[68]

70.    First, Dr. Grenadier states:

> If Plaintiffs allege that but for the alleged misrepresentations, shareholders would have voted down the Vista Merger, then there would be no appraisal right—as I understand that appraisal rights can only be exercised if the merger is completed.  Therefore, Plaintiffs have not articulated how their damages methodology can account for the mutually exclusive outcomes in which Proposed Class Members under Section 14(a) would have (1) voted down the merger or (2) exercised appraisal rights."[69]

71.    This appears to me to be a factual issue that will be determined by the trier of fact.

---

[67]   Grenadier Report, ¶100.

[68]   Grenadier Report, ¶116.

[69]   Grenadier Report, ¶117.

72. Next, Dr. Grenadier asserts: "to the extent Plaintiffs claim 'damages associated with the loss of appraisal rights' are relevant for calculating damages under Section 14(a) because some investors would have exercised their appraisal rights, Plaintiffs have not provided a methodology to determine which Proposed Class Members under Section 14(a) would have chosen to exercise their appraisal rights in a "but for world."[70]

73. As before, this is a straw man argument as Dr. Grenadier appears to be requiring a model of hypothetical investor behavior, irrespective of the allegation that investors did not have the full set of information when making a decision whether to utilize their appraisal rights. It does not matter how investors would have reacted in terms of exercising appraisal rights after the information in the But-For Disclosures was revealed. For example, even if a subset of investors were motivated to seek appraisal, their actions could have impacted the market price and possibly the final outcome. In this case, in an efficient market where all publicly available information is incorporated into the market price, all investors would have been impacted identically, whether they would have exercised their appraisal rights or not.

74. Finally, Dr. Grenadier states that if a valuation methodology is employed to estimate the value of appraisal rights in the But-For world, it would need to account for "the market's expectation for the outcome of the merger … and the market's evaluation of KnowBe4's value that would be obtained in an appraisal proceeding."[71] Dr. Grenadier's latter point would be the reasoning behind doing a valuation model—in essence, the damages report would be doing an appraisal. Moreover, clearly whatever the damages expert and thus the trier of fact determines would be the appropriate damages technique, it might incorporate a measurement of the probability of "the outcome of the merger" or might incorporate a measurement of the "value that would be obtained in an appraisal proceeding." No matter which technique(s) were accepted, the inputs from the technique would be applied class-wide using the common methodology I have already specified.

---

[70] Grenadier Report, ¶118.

[71] Grenadier Report, ¶119.

## V.    SUMMARY AND CONCLUSIONS

75.    In reaching his price impact opinion, Dr. Grenadier ignores one of the most basic features of an efficient securities market, namely that market prices reflect what investors <u>can know</u> (*i.e.,* what has been publicly disclosed), not what has been concealed, suppressed or withheld.[72]   This is his failure and the essence of what the Plaintiffs will attempt to prove at trial.

76.    In reaching his damages opinion, Dr. Grenadier confuses two different concepts: (1) the methodology or formula and (2) the numbers or inputs to plug into the methodology or formula.

---

[72]    Dr. Grenadier makes the statement:

"In an efficient market, information would have to be both new and value-relevant for its hypothetical disclosure (alternatively, alleged failure to disclose) to impact the share price, as Plaintiffs allege.  As a result, this economic finding is inconsistent with price impact." [Grenadier Report, ¶10].

This is really two conclusions, with one being:

"In an efficient market, information would have to be both new and value-relevant for its [] alleged failure to disclose[] to impact the share price, as Plaintiffs allege.  As a result, this economic finding is inconsistent with price impact."

This conclusion reflects a profound misunderstanding of the omission-based claims in this matter.  Fundamentally, in an efficient market, market prices reflect what investors can know (*i.e.*, what has been publicly disclosed), not what has been concealed, suppressed or withheld.  When the company fails to disclose new, value-relevant information, the market price **cannot** adjust.  Accordingly, the absence of an observed price reaction does not indicate that the information lacked "newness" or "value-relevance."  Rather, it demonstrates that investors were deprived of the ability to act upon that information.  In this context, Dr. Grenadier's conclusion is not merely incorrect—it is economically incoherent and ignores the fundamental principles at the foundation of the efficient markets hypothesis.

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS  9th DAY OF APRIL 2026*

_____

Michael L. Hartzmark, Ph.D.

**Appendix A**
**Additional Materials Relied Upon**

**COURT DOCUMENTS**
Expert Report of Steven R. Grenadier, Ph.D., dated March 26, 2026 (and production).

Order on the Motion to Dismiss, December 23, 2025 (ECF No. 100).

Lead Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel and [Proposed] Incorporated Memorandum of Law in Support Thereof, January 27, 2026.

**ACADEMIC PAPERS AND BOOKS**
Brian L. Connelly, S. Trevis Certo, Christopher R. Reutzel, Mark R. DesJardine, and Yi Shi Zhou, *Signaling Theory: State of the Theory and Its Future*, 51 J. of Mgmt. 24 (2025).
Thomas E. Copeland and J. Fred Weston, Financial Theory and Corporate Policy, Third Edition (Addison-Wesley, 1988).
Michael C. Jensen and William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976).
Ulrike Malmendier, Marcus M. Opp and Farzad Saidi, *Target revaluation after takeover attempts: Cash versus Stock*, 119 J. Fin. Econ. 92 (2016).

**SEC FILING**
KnowBe4, Inc., Form PREM14A, filed November 14, 2022.

All other specific materials and information otherwise described or set forth in the body of this Rebuttal Report or in Exhibit B to the Expert Report of Michael L. Hartzmark, Ph.D., dated March 26, 2026.