# Exhibit 5

**IN THE SUPREME COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| BILL LE CLAIR and JOSEPH POSPISIL, on behalf of themselves and all other similarly situated former stockholders of KNOWBE4, INC.,<br><br>Plaintiffs-Below, Appellants,<br><br>v.<br><br>KNOWBE4, INC., SJOERD SJOUWERMAN, JEREMIAH DALY, STEPHEN SHANLEY, KEVIN KLAUSMEYER, SHRIKRISHNA VENKATARAMAN, GERHARD WATZINGER, KARA WILSON, KKR & CO. INC., KKR KNOWLEDGE INVESTORS L.P., ELEPHANT PARTNERS, ELEPHANT PARTNERS I, L.P., ELEPHANT PARTNERS II, L.P., ELEPHANT PARTNERS 2019 SPV-A, L.P., and ELEPHANT PARTNERS II-B, L.P.,<br><br>Defendants-Below, Appellees. | No. ________, 2026<br><br>Court Below:<br><br>Court of Chancery of the State of Delaware,<br><br>C.A. No. 2024-1143-KSJM |

**<u>NOTICE OF APPEAL FROM MEMORANDUM OPINION</u>**

TO:

Elena C. Norman
Y. Carson Zhou
Skyler A. C. Speed
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

T. Brad Davey
J. Matthew Belger
Nina N. Monzack
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000

Blake Rohrbacher
Kevin M. Kidwell
Benjamin O. Allen
RICHARDS, LAYTON
& FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

David E. Ross
Kevin A. Rudolph
ROSS ARONSTAM & MORITZ LLP
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600

PLEASE TAKE NOTICE that Plaintiffs-Below/Appellants Bill Le Clair and Joseph Pospisil, on behalf of themselves and all other similarly situated former stockholders of Knowbe4, Inc., do hereby appeal to the Supreme Court of the State of Delaware from the Memorandum Opinion dated May 27, 2026 (the "Memorandum Opinion") of the Court of Chancery of the State of Delaware, by the Honorable Kathaleen St. Jude McCormick, in the action below captioned *Bill Le Clair et al. v. KnowBe4, Inc. et al.*, C.A. No. 2024-1143-KSJM (Del. Ch.).

A copy of the Memorandum Opinion sought to be reviewed is attached hereto as Exhibit A.

The names and addresses of the attorneys for Plaintiffs-Below/Appellants are:

Ned Weinberger
Brendan W. Sullivan
Ryan C. Stieve
LABATON KELLER SUCHAROW LLP
222 Delaware Avenue, Suite 1510
Wilmington, DE 19801

The parties against whom the appeal is taken are Defendants-Below/Appellees KnowBe4, Inc., Sjoerd Sjouwerman, Jeremiah Daly, Stephen

Shanley, Kevin Klausmeyer, Shrikrishna Venkataraman, Gerhard Watzinger, Kara Wilson, KKR & Co. Inc., KKR Knowledge Investors L.P., Elephant Partners, Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P., and Elephant Partners II-B, L.P. The names and addresses of the attorneys for the Defendants-Below/Appellees are:

Elena C. Norman
Y. Carson Zhou
Skyler A. C. Speed
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

T. Brad Davey
J. Matthew Belger
Nina N. Monzack
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000

Blake Rohrbacher
Kevin M. Kidwell
Benjamin O. Allen
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

David E. Ross
Kevin A. Rudolph
ROSS ARONSTAM & MORITZ LLP
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600

PLEASE TAKE FURTHER NOTICE that, in accordance with Supreme Court Rules 7(c)(6) and 9(e)(ii), a transcription of the proceedings below need not be ordered because the proceedings have already been transcribed and are part of the record.

Plaintiffs-Below/Appellants hereby designate the entire record for review on appeal.

LABATON KELLER SUCHAROW LLP

*/s/ Brendan W. Sullivan*
Ned Weinberger (Bar No. 5256)
Brendan W. Sullivan (Bar No. 5810)
Ryan C. Stieve (Bar No. 7460)
222 Delaware Avenue, Suite 1510
Wilmington, DE 19801
(302) 573-2540
nweinberger@labaton.com
bsullivan@labaton.com
rstieve@labaton.com

*Counsel for Plaintiffs*

*Of Counsel*:

John Vielandi
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

Jeremy Friedman
David Tejtel
Christopher Windover
Lindsay La Marca
FRIEDMAN OSTER & TEJTEL PLLC
493 Bedford Center Road, Suite 2D
Bedford Hills, NY 10507
(888) 529-1108

Douglas E. Julie
W. Scott Holleman
JULIE & HOLLEMAN LLP
157 E. 86th Street, 4th Floor
New York, NY 10028
(929) 415-1020

*Counsel for Plaintiffs*

Dated: June 25, 2026

# EXHIBIT A

EFiled: May 27 2026 03:46PM EDT
Transaction ID 79571791
Case No. 2024-1143-KSJM

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| BILL LE CLAIR and JOSEPH POSPISIL, on behalf of themselves and all other similarly situated former stockholders of KNOWBE4, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 2024-1143-KSJM |
| KNOWBE4, INC., SJOERD SJOUWERMAN, JEREMIAH DALY, STEPHEN SHANLEY, KEVIN KLAUSMEYER, SHRIKRISHNA VENKATARAMAN, GERHARD WATZINGER, KARA WILSON, KKR & CO. INC., KKR KNOWLEDGE INVESTORS L.P., ELEPHANT PARTNERS, ELEPHANT PARTNERS I, L.P., ELEPHANT PARTNERS II, L.P., ELEPHANT PARTNERS 2019 SPV-A, L.P., and ELEPHANT PARTNERS II-B, L.P., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: January 12, 2026
Date Decided: May 27, 2026

Ned Weinberger, Michael C. Wagner, Ryan C. Stieve, LABATON KELLER SUCHAROW LLP, Wilmington, DE; John Vielandi, LABATON KELLER SUCHAROW LLP, New York, NY; Jeremy Friedman, David Tejtel, Christopher M. Windover, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, NY; Douglas E. Julie, W. Scott Holleman, JULIE & HOLLEMAN LLP, New York, NY; D. Seamus Kaskela, Adrienne Bell, KASKELA LAW LLC, Newtown Square, PA; *Counsel for Plaintiffs Bill Le Clair and Joseph Pospisil.*

Elena C. Norman, Skyler A. C. Speed, YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, DE; Andrew J. Rossman, Courtney C. Whang, Charles H. Sangree, Julia I. Nusgart, QUINN EMANUEL URQUHART & SULLIVAN LLP, New York, NY; *Counsel for Defendants KnowBe4, Inc. and Sjoerd Sjouwerman.*

Blake Rohrbacher, Benjamin O. Allen, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Brian M. Lutz, Jeff Lombard, GIBSON, DUNN & CRUTCHER LLP, San Francisco, CA; Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, Irvine, CA; *Counsel for Defendants KKR & Co. Inc., KKR Knowledge Investors L.P., Stephen Shanley, and Kara Wilson.*

David E. Ross, Kevin A. Rudolph, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; Colleen Smith, Anastasia Pyrinis, LATHAM & WATKINS LLP, San Diego, CA; Stephen T. Nasko, LATHAM & WATKINS LLP, Washington, D.C.; *Counsel for Defendants Jeremiah Daly, Elephant Partners, Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P., and Elephant Partners II-B, L.P.*

T. Brad Davey, J. Matthew Belger, Eric J. Nascone, Nina N. Monzack, POTTER ANDERSON & CORROON LLP, Wilmington, DE; *Counsel for Defendants Kevin Klausmeyer, Shrikrishna Venkataraman, and Gerhard Watzinger*.

**McCORMICK, C.**

A private equity firm agreed to acquire KnowBe4, Inc., conditioned on two institutional investors and the CEO rolling over their equity. The merger closed. After, the plaintiffs sued on behalf of a class of stockholders. They claim that the rollover stockholders and CEO formed a control group in connection with the merger and breached their fiduciary duties to the class. They also assert claims for breach of fiduciary duties against the KnowBe4 directors. The defendants moved to dismiss the complaint, and this decision grants their motions. As to the claims against the alleged control group, the plaintiffs failed to adequately allege that the rollover stockholders formed a control group with respect to the merger. As to the director defendants, this decision assumes that the entire fairness standard applies because a majority of the board rolled over shares or lacked independence from investors who did. But where entire fairness applies due to board conflicts, either a fully empowered, independent special committee or a fully informed, uncoerced stockholder vote can cleanse the transaction. The defendants rely foremost on the stockholder vote. The plaintiffs fail to identify any disclosure deficiencies that would render the vote coerced or uninformed. The business judgment standard thus applies, and the plaintiffs fail to state a claim under that standard.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Amended Class Action Complaint (the "Amended Complaint") and the documents it incorporates by reference.[1] By

[1] C.A. No. 2024-1143-KSJM, Docket ("Dkt.") 35 ("Am. Compl.").

stipulation, the documents incorporated by reference include KnowBe4's production made under 8 *Del. C.* § 220, "to the extent permitted by Delaware law."[2]

**A. Elephant And KKR Invest In KnowBe4.**

KnowBe4 (or the "Company") is a Delaware corporation headquartered in Clearwater, Florida. KnowBe4 helps organizations manage cybersecurity risks through security awareness trainings. Sjoerd Sjouwerman founded KnowBe4 in 2010, served as CEO, and held 4.2% of KnowBe4's voting power on December 7, 2022 (the "Record Date"), the date that stockholders voted for the challenged merger.

Shortly after founding KnowBe4, Sjouwerman recruited non-party Kevin Mitnick as the Company's Chief Hacking Officer. Mitnick was a KnowBe4 director from January 2016 to March 2021. After Mitnick joined KnowBe4, the Company's product portfolio—including the "Kevin Mitnick Home Internet Security Course," the "Kevin Mitnick VST Scenario," and its flagship offering, the "Kevin Mitnick Security Awareness Training"—gained significant market traction.

---

[2] Dkt. 49, Ex. 2 ¶ 16, Ex. 3 ¶ 16. As to the Section 220 production, "[a]lthough the parties agree the [documents] are incorporated by reference into the Amended Complaint, this agreement does not enable the court to weigh evidence" at the pleading stage. *Wei v. Levinson*, 2025 WL 1565356, at *8 n.50 (Del. Ch. June 3, 2025). "When a document leads to competing factual conclusions or interpretations, the court draws inferences in Plaintiffs' favor." *Id.* "The doctrine of incorporation by reference does not enable a court to weigh evidence on a motion to dismiss, nor does it mean that the defendants receive inferences in their favor that run contrary to the allegations of the complaint." *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *14 (Del. Ch. June 11, 2020). "If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff has made a well-pled factual allegation, then the allegation will be credited." *Id.* "[I]f a document supports more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference." *Id.*

KnowBe4's performance attracted investments from KKR Knowledge Investors L.P., an affiliate of KKR & Co. Inc. (together, "KKR") and from funds affiliated with Elephant Partners, including Elephant Partners I, L.P., Elephant Partners II, L.P., Elephant Partners 2019 SPV-A, L.P., and Elephant Partners II-B, L.P. (collectively, "Elephant"). From 2016 through 2020, KKR and Elephant separately invested millions of dollars into KnowBe4 through several financing rounds.

Elephant first invested $8 million in January 2016 in exchange for Series A-1 preferred stock and a board seat. In February and March 2017, Elephant acquired $5.5 million more of KnowBe4's Series A-1 preferred stock. Less than a year later, Elephant acquired $2.5 million of Series B preferred stock.

Three years after Elephant's initial investment, in March 2019, KKR made its first investment, purchasing approximately $31.6 million of KnowBe4's Series C preferred stock. KnowBe4 signed an investors' rights agreement as part of the Series C round.

Three months later, KKR and Elephant invested $309.4 million into KnowBe4.[3] After this investment, KnowBe4 entered into an amended investors' rights agreement that gave Elephant and KKR registration rights, information and inspection rights, board observer rights, rights to participate in future stock issuances, and shared consent rights over various corporate acts, including the hiring,

[3] Am. Compl. ¶ 60.

termination, and compensation of KnowBe4's executive officers, strategic alternatives, and financing activities.[4]

KKR and Elephant also signed a right of first refusal agreement with KnowBe4.[5] The agreement gave them each the option to purchase any shares KnowBe4 repurchased from an existing stockholder and the right to participate in any sale of KnowBe4 shares by an existing stockholder to a third party.[6] Under this agreement, KKR and Elephant each purchased common stock in December 2020.

**B. Vista Acquires Preferred Shares In KnowBe4.**

KnowBe4's performance also attracted private equity firm Vista Equity Partners Management LLC.[7] In 2020, Vista and KnowBe4 held preliminary discussions about investment options, including a potential acquisition of KnowBe4. Vista and KnowBe4 executed a three-year NDA in March 2020. In July 2020, the Company retained Morgan Stanley as its financial advisor for any proposed change-of-control sale to Vista. Vista then abandoned its pursuit of KnowBe4.

On March 5, 2021, Vista purchased preferred shares from KKR, Elephant, and another institutional investor for $300 million. This transaction gave Vista 12.4% of KnowBe4's Class A shares, representing 2.8% of KnowBe4's voting power.

---

[4] Dkt. 49, Ex. 28 (KnowBe4, Inc. Amended and Restated Investors' Rights Agreement) §§ 2, 3.1–3.3, 4.1, 5.4.

[5] Am. Compl. ¶ 62.

[6] *Id.*

[7] This decision refers to Vista Equity Partners Management LLC and its relevant affiliates as "Vista."

KKR and Elephant retained sizeable stakes in KnowBe4. KKR owned 9.1% of KnowBe4's Class A shares and 31.6% of KnowBe4's Class B shares as of the Record Date, representing 26.4% of KnowBe4's voting power. Elephant owned 12.9% of KnowBe4's Class A shares and 44.9% of KnowBe4's Class B shares as of the Record Date, representing 37.5% of KnowBe4's voting power.

After Vista's investment, KnowBe4 completed an IPO. The Company adopted a dual-class structure with the newly issued Class A stock, with one vote per share. All pre-IPO stock converted into Class B stock, with 10 votes per share.

### C. Vista Expresses Interest In A Potential Transaction.

At all relevant times, seven individuals comprised KnowBe4's Board of Directors (the "Board"): Sjouwerman, Elephant's Board designee Jeremiah Daly, KKR's Board designee Stephen Shanley, KKR senior advisor Kara Wilson, KnowBe4's former CFO Shrikrishna Venkataraman, and outside directors Kevin Klausmeyer and Gerhard Watzinger.

Between May 20 and June 8, 2022, Vista met separately with Shanley, Daly, and Sjouwerman. During these meetings, Vista queried whether KKR and Elephant would have any "interest in a potential sale" of KnowBe4.[8]

On May 20, 2022, Shanley met with Vista to discuss the Company's business and a potential sale. They had a follow-up meeting on June 1. A week later, Vista approached Daly to also discuss the Company's business and a potential sale. On June 16, Vista met again with Daly, Shanley, and Sjouwerman "to discuss the

---

[8] Am. Compl. ¶¶ 95, 97–98; Dkt. 49, Ex. 1 ("Proxy Statement") at 28.

Company's business and a potential sale transaction."[9] Vista then held a follow-up meeting with Daly and Sjouwerman on June 22, to "further discuss 'Vista's existing investment in the Company[.]'"[10] During this meeting, Vista indicated "that if KnowBe4 were ever to be interested in a transaction, Vista would want to be included."[11]

Following the latter meeting, Daly contacted KnowBe4's outside counsel, Wilson Sonsini Goodrich & Rosati, "to inform them as to the conversations with Vista up to that point."[12]

### D. The Board Forms A Special Committee.

On June 28, 2022, the Board met to discuss the recent conversations with Vista. According to the meeting minutes, the Board confirmed that "the participants in those meetings did not engage in any discussions regarding any economic or other terms of a potential transaction."[13] Plaintiffs do not allege anything to the contrary.

During the meeting, Wilson Sonsini advised the Board regarding potential conflicts of interest.[14] Daly and Shanley each stated that Elephant and KKR might "not sell some or all of their" holdings "depending upon the terms and counterparty

---

[9] Am. Compl. ¶ 99.

[10] *Id.* ¶ 100.

[11] *Id.*

[12] Proxy Statement at 29.

[13] *Id.*; Dkt. 49, Ex. 6 ("6/28/22 Board Minutes") at KB4-000469. The Amended Complaint references the 6/28/22 Board Minutes. *See* Am. Compl. ¶¶ 102–05.

[14] Proxy Statement at 29; 6/28/22 Board Minutes at KB4-000469–70.

to a potential transaction[.]"[15] Sjouwerman disclosed that he and members of management "might also not sell all of their equity interests in a potential transaction."[16]

The Board then discussed forming a special committee and requested Wilson Sonsini provide a recommendation regarding committee membership.

The Board formed a Special Committee on July 5 comprising Watzinger, Klausmeyer, and Venkataraman (the "Special Committee").[17] The Board did not establish the scope of the Special Committee's authority on July 5.

The Special Committee met immediately after the July 5 Board meeting. They contacted Potter Anderson & Corroon LLP and Morgan Stanley to potentially serve as the Committee's legal and financial advisors, respectively. On July 7, the Special Committee retained Potter Anderson as its legal advisor and Morgan Stanley as its financial advisor, subject to receipt of a relationships disclosure memorandum and execution of an engagement letter.

---

[15] Am. Compl. ¶ 103; 6/28/22 Board Minutes at KB4-000470.

[16] 6/28/22 Board Minutes at KB4-000470; *see also* Am. Compl. ¶ 103.

[17] The Board met to discuss Wilson Sonsini's recommendation on July 5. During the meeting, "the Board did not actually make any determinations regarding any directors' disinterestedness and independence[.]" Am. Compl. ¶ 107. According to the Proxy Statement, after the meeting, the Board determined that Watzinger, Klausmeyer, and Venkataraman were independent and disinterested and appointed them to a special committee. Proxy Statement at 29. The Proxy Statement does not state how the Board determined to form the Special Committee after the Board meeting. The language suggests that the Board made this decision informally. Presumably for that reason, the Board ratified its decision to form the Special Committee through a unanimous written consent on July 11, 2022.

### E. The Board Implements *MFW* Protections.

On July 11, 2022, the Board executed a Unanimous Written Consent, formally establishing the Special Committee and the scope of its authority.[18]

The Unanimous Written Consent authorized the Special Committee to "consider and evaluate the advisability of" both a "Strategic Transaction" and a "Specified Strategic Transaction" (such as the challenged merger "or any alternative thereto and any related transaction").[19] It authorized the Special Committee to "recommend, reject or approve" any transaction.[20] It also provided that Board approval of any Specified Strategic Transaction would depend on the prior approval of (i) the Special Committee and (ii) a majority-of-the-minority vote of KnowBe4's disinterested stockholders.[21]

The Special Committee met again on July 13. Potter Anderson conducted an additional independence review. The Special Committee reaffirmed "that each of the [Special] Committee members was independent and disinterested for purposes of evaluating a Potential Transaction."[22] At the same meeting, the Special Committee

[18] Am. Compl. ¶¶ 124–25.

[19] Dkt. 49, Ex. 8 (Unanimous Written Consent of the Board of KnowBe4) at KB4-000471–73; *see also* Am. Compl. ¶¶ 125–27, 314 (referencing the Unanimous Written Consent).

[20] Unanimous Written Consent of the Board of KnowBe4 at KB4-000473.

[21] The Unanimous Written Consent also authorized the committee to retain its own advisors, which it had already done.

[22] Dkt. 49, Ex. 9 ("7/13/22 Special Committee Minutes") at KB4-000870; *see also* Am. Compl. ¶¶ 128–33 (referencing the 7/13/22 Special Committee Minutes).

reviewed Morgan Stanley's relationships disclosure memorandum (the "July 12 Memo").

During a July 14 meeting, Morgan Stanley advised the Special Committee to gather further information on whether Vista planned to ask stockholders to roll over their shares. The committee then authorized Morgan Stanley to inform Vista that any transaction involving a rollover by significant stockholders would need to be conditioned on *Kahn v. M & F Worldwide Corp.* ("*MFW*")[23] protections.

Later that day, Morgan Stanley met with Vista. Vista conveyed that it "would be open to exploratory conversations regarding a potential acquisition," but Vista "would not expect to condition any . . . transaction on any stockholder rolling a specific amount of equity."[24] Morgan Stanley and Vista did not discuss any specific terms or valuation with respect to a potential transaction.

During a July 18, 2022 meeting, Morgan Stanley informed the Special Committee that Vista was open to a potential rollover but that Vista's proposal would not depend on anyone rolling their equity.[25] Potter Anderson noted that KKR expressed a willingness to roll over with Vista or other sponsors.[26] The Special Committee authorized Morgan Stanley to reach out to KKR to determine "whether

---

[23] 88 A.3d 635 (Del. 2014).

[24] Proxy Statement at 31.

[25] Dkt. 49, Ex. 11 ("7/18/22 Special Committee Minutes") at KB4-000881_R; *see also* Am. Compl. ¶¶ 153–56 (referencing the 7/18/22 Special Committee Minutes).

[26] Am. Compl. ¶¶ 149–51, 154; 7/18/22 Special Committee Minutes at KB4-000881_R, KB4-000882_R.

there were any set of circumstances where KKR envisioned itself as a potential buyer."[27] Morgan Stanley met with Shanley on July 21. Shanley confirmed that KKR would not pursue an acquisition of KnowBe4 but was open to rolling over equity in a potential transaction.[28]

### F. The Special Committee Launches Outreach And Diligence.

Also during the July 18 meeting, Morgan Stanley advised the Special Committee of the four potential financial sponsors most likely to complete an acquisition of KnowBe4.[29] The Special Committee then authorized Morgan Stanley to contact those financial sponsors. As of July 24, only one party "had expressed an interest in signing a non-disclosure agreement with the Company to further discuss a Potential Transaction."[30] On July 26, Vista provided initial diligence requests and sent a diligence plan to Morgan Stanley. The same day, another potential bidder exited the process.

The Special Committee continued to oversee the sale process while limiting the involvement of KKR and Elephant. On July 28, the Special Committee authorized Potter Anderson to provide updates to KKR's and Elephant's outside counsel, but the committee determined that neither KKR nor its designee would participate in the sale process. The committee also directed Morgan Stanley to expand its outreach.

---

[27] Am. Compl. ¶¶ 157, 159; Proxy Statement at 32.

[28] Am. Compl. ¶ 160; *see also* Proxy Statement at 33.

[29] Proxy Statement at 32; 7/18/22 Special Committee Minutes at KB4-000883_R.

[30] Dkt. 49, Ex. 12 ("7/24/22 Special Committee Minutes") at KB4-000886_R; *see also* Am. Compl. ¶ 161 (referencing the 7/24/22 Special Committee Minutes).

In early August, the Special Committee advanced the diligence process. It amended Vista's non-disclosure agreement to facilitate diligence but declined to accelerate pricing discussions. By mid-August, Vista was engaged in diligence. When the Special Committee met on August 17, it considered whether to slow Vista's progress, allowing other bidders to catch up. Morgan Stanley advised against doing so because bidders could always fast-track their diligence if they learned of an impending merger and had sufficient interest. The committee permitted each bidder to proceed at its own pace.

By late August, Vista had advanced significantly in diligence, while other bidders lagged. Morgan Stanley noted that Sjouwerman had recently been contacted by "a pension fund with a history of investing in large private equity sponsor companies," but that it was unclear whether the pension fund would be a potential bidder for KnowBe4.[31] The Special Committee decided not to pursue the pension fund.[32]

### G. KnowBe4 And Vista Agree On Price, Which Vista Conditions On A Rollover.

On August 19, after reviewing preliminary financial analyses, the Special Committee stated that a price in the "mid-to-high $20s" would be necessary for a transaction to proceed.[33] Morgan Stanley relayed this guidance to Vista.

---

[31] Am. Compl. ¶ 210.

[32] *See* Dkt. 49, Ex. 15 ("8/26/22 Special Committee Minutes") at KB4-000999_R; *see also* Am. Compl. ¶¶ 204–12 (referencing the 8/26/22 Special Committee Minutes and the presentation it covered).

[33] Am. Compl. ¶¶ 195, 198.

Through early September, the Special Committee repeatedly declined to adjust the timeline to assist competing bidders. As Vista progressed toward a proposal, the Special Committee authorized discussions regarding potential equity rollovers with Sjouwerman, KKR, and Elephant (the "Rollover Stockholders"). Sjouwerman indicated that he would roll over roughly half his holdings; Shanley suggested that KKR would sell and reinvest at least $200 million; and Daly stated that Elephant would only sell $20 million of its holdings.

On September 15, Morgan Stanley reviewed the potential rollovers and potential responses to a Vista bid with the Special Committee. Morgan Stanley also advised that it had contacted the most likely bidders for a potential transaction.

On September 16, Vista conveyed to Morgan Stanley its intent to submit a proposal to acquire KnowBe4 (the "Merger") for $24 per share. Vista stated that it would expect the transaction to be expressly conditioned on the *MFW* framework. Vista subsequently submitted a written proposal at $24 per share. The next day, Vista provided Morgan Stanley with a list of debt and equity financing sources and requested the Special Committee's approval to contact Elephant, KKR, and Sjouwerman regarding a rollover.

The Special Committee met to discuss Vista's proposal the next day. The Special Committee countered at $26.50 per share. The Special Committee also discussed the impact that Mitnick might have on the majority-of-the-minority vote and determined that Sjouwerman and Watzinger should meet with Mitnick.

After a September 18 meeting, the Special Committee authorized Vista, with Morgan Stanley's oversight, to communicate with each of KKR and Elephant regarding a potential equity rollover. The Special Committee did not authorize the parties to discuss pricing for Vista's proposed acquisition of KnowBe4 until the committee and Vista reached a preliminary agreement on pricing.

On September 19, Vista publicly disclosed its $24-per-share proposal through a Schedule 13D filing.

On September 28, Vista increased its offer to $24.60 per share, conditioned on a rollover of "at least $675MM . . . from Elephant/KKR/[Sjouwerman]."[34]

On September 29, the Special Committee authorized Morgan Stanley to submit a $25.75 per share counterproposal and to inform Vista to bid "as far into the $25.00s as Vista could go."[35] The Special Committee also discussed the terms of a potential equity rollover and the need for, and proper composition of, a majority-of-the-minority vote.

Later that day, after Morgan Stanley relayed the Special Committee's counterproposal, Vista responded with an offer of $24.80 per share, stating that it could not bid in the $25 range. The Special Committee countered with $24.90 per share. Vista accepted, contingent upon KKR, Elephant, and Sjouwerman collectively rolling over equity worth $682 million.

---

[34] *Id.* ¶ 256; Proxy Statement at 41.

[35] Am. Compl. ¶ 258.

### H. No Competing Bidder Emerges.

On October 2, the Special Committee met and Morgan Stanley reported that, even though Vista's bid had been public for nearly two weeks, it "had not received, and was not otherwise aware of, any inbound interest from a potential third party who was interested in acquiring KnowBe4" since Vista publicly disclosed its proposal.[36] Morgan Stanley added that it conducted additional outreach to certain potential bidders that it had previously contacted after Vista's public bid. Each party "had either not responded to Morgan Stanley's outreach or had confirmed that they were not interested."[37]

Morgan Stanley also advised the Special Committee on its outreach efforts, explaining that it contacted 16 parties excluding Vista. Nine parties executed NDAs, eight parties met with KnowBe4 management, but only two parties submitted due diligence requests. No party other than Vista submitted a bid. According to Morgan Stanley, the lack of interest was attributable to concerns relating to the scope of KnowBe4's total addressable market, competition, continued growth prospects, and the ability to pay a meaningful premium to the Company's current market trading price.

### I. Vista And The Rollover Stockholders Down-Convert Their Shares From Class B To Class A Stock.

On October 7, the Special Committee again discussed an approach for securing Mitnick's approval of the Merger and how his vote would impact the majority-of-the-

[36] Proxy Statement at 43.

[37] *Id.*

minority vote. The Special Committee decided "that it was supportive of seeking a commitment from Mr. Mitnick to vote in favor of the Merger Agreement."[38] The Special Committee then determined that Sjouwerman—Mitnick's long-time friend and business partner—should contact Mitnick.

On October 9, Kirkland & Ellis LLP (Vista's counsel), Wilson Sonsini (KnowBe4's counsel), and Potter Anderson (the Special Committee's counsel) met to discuss how to structure the stockholder vote in light of an equal treatment provision in KnowBe4's Certificate of Incorporation.[39] Kirkland recommended that the Merger be subject to separate votes for Class A and Class B common stock given the rollover.

Further, Kirkland indicated that Vista planned to exercise its contractual right to down-convert its Class B stock to Class A stock before the Record Date—thereby surrendering its superior voting power—and requested that the Rollover Stockholders do the same. The Proxy Statement disclosed that Vista, KKR, Elephant, and Sjouwerman would control 36% of the Class A vote following the conversions.[40]

### J. The Parties Execute The Merger Agreement And Support Agreements.

On October 10, the Special Committee confirmed that it was comfortable proceeding with Vista's proposal. The Special Committee also noted that KKR had decided to increase its rollover amount.

---

[38] Am. Compl. ¶ 268.

[39] Proxy Statement at 44.

[40] *Id.*

The next day, Morgan Stanley confirmed that it had no material updates to its prior conflict disclosure. It also reported that Sjouwerman had begun discussions with Mitnick about a potential support agreement. According to Sjouwerman, Mitnick said he did not want to roll over his stake. Mitnick thus would be counted as unaffiliated and included in the majority-of-the-minority vote.

The Special Committee then recommended the Merger to KnowBe4's Board. Later that day, Morgan Stanley provided an overview of the negotiations to the Board, which unanimously approved the Merger at $24.90 per share, for a total equity value of $4.6 billion. The parties signed the merger agreement that night, October 11. And the Rollover Stockholders each executed support agreements which completed their rollovers and committed them to vote for the Merger.[41]

The parties announced the Merger on October 12. On December 1, Vista, KKR, Elephant, and Sjouwerman down-converted their shares. A week later, Mitnick signed a support agreement similar to those signed by the Rollover Stockholders. Mitnick's agreement, however, only obligated him to vote for the Merger. He did not roll over his shares.[42] He had already down-converted two million of his Class B shares sometime in 2022. Mitnick held 31% of the voting power of unaffiliated stockholders.

---

[41] Am. Compl. ¶¶ 280–282; *see also* Dkt. 49, Exs. 30 ("Elephant Support Agreement"), 31 ("KKR Support Agreement").

[42] Mitnick passed away in July 2023 after a long battle with pancreatic cancer.

On the Record Date, there were 132,747,542 Class A shares and 44,539,649 Class B shares entitled to vote.

**K. Morgan Stanley Discloses Fees Received From Vista Affiliates.**

The Special Committee met on December 15. Morgan Stanley reported that it had received $120 to $140 million in fees in the prior two years from entities affiliated with Vista, approximately $80 million higher than the range it had disclosed in its relationship memorandum. Morgan Stanley attributed the difference to the July 12 Memo's exclusion of fees it had earned from entities in which Vista only held a minority stake. The Special Committee determined that these fees were immaterial.

**L. KnowBe4 Files The Proxy Statement And The Stockholders Approve The Merger.**

On December 22, KnowBe4 filed a Proxy Statement, later amended in January 2023, soliciting stockholder approval of the Merger. The Company conditioned approval of the Merger on four separate votes: (i) a majority vote (the combined Class A and B stockholders); (ii) a majority-of-the-minority vote (stockholders unaffiliated with Vista and excluding Elephant and KKR); (iii) a majority vote of Class A shares; and (iv) a majority vote of Class B shares.

On January 31, 2023, the stockholders voted on the Merger:[43] Of the outstanding stock entitled to vote, 99.8% of the majority approved; 99.0% of the

[43] Dkt. 49, Ex. 22 (Form 8-K) at 7; *see also* Am. Compl. ¶¶ 292–94 (referencing the stockholder votes reported in the Form 8-K).

minority approved; 98.9% of Class A stockholders approved; and 100% of Class B stockholders approved.[44]

The Merger closed on February 1, 2023.

**M. Plaintiffs File This Suit.**

Plaintiffs Bill Le Clair and Joseph Pospisil ("Plaintiffs") owned KnowBe4 Class A stock at the time of the Merger. They filed this action on November 7, 2024 against Sjouwerman, Daly, Shanley, Klausmeyer, Venkataraman, Watzinger, and Wilson (the "Director Defendants"), KKR, and Elephant (with the Director Defendants, "Defendants"). Defendants moved to dismiss on January 22, 2025 and Plaintiffs filed their Amended Complaint on March 10, 2025.

The Amended Complaint contains three Counts. In Count I, Plaintiffs claim that KKR, Elephant, and Sjouwerman comprised a control group and breached their fiduciary duties in connection with the Merger. In Count II, Plaintiffs claim that the Director Defendants breached their duty of loyalty in connection with the Merger. In Count III, Plaintiffs claim that the Company breached the equal-treatment provision in the Company's charter, which required that Class A and Class B common stock be treated equally in an acquisition.

[44] Form 8-K at 7. 95,375 shares abstained from the majority, minority, and Class A votes. The percentages are calculated based on total outstanding shares, inclusive of those abstaining.

Defendants moved to dismiss the Amended Complaint. The parties completed briefing on September 8, 2025, and the court held oral argument on January 12, 2026.[45]

## II. LEGAL ANALYSIS

In briefing, Plaintiffs did not advance arguments concerning Count III and thus waived their ability to do so.[46] Count III is dismissed. Defendants seek dismissal of Counts I and II under Court of Chancery Rule 12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[47] When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[48] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[49]

---

[45] Dkts. 47 ("KnowBe4 and Sjouwerman Opening Br."), 51 ("KKR Opening Br."), 52 ("Elephant Opening Br."), 53 ("Special Comm. Opening Br."), 66 ("Pls.' Ans. Br."), 71 ("KnowBe4 and Sjouwerman Reply Br."), 72 ("Special Comm. Reply Br."), 73 ("KKR Reply Br."), 75 ("Elephant Reply Br."), 97.

[46] *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

[47] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[48] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[49] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

### A. Count I Against The Alleged Control Group

Plaintiffs allege that KKR, Elephant, and Sjouwerman breached their fiduciary duties as controllers in connection with the Merger. Plaintiffs do not argue that any one of these defendants individually controlled KnowBe4. They instead allege that the three defendants formed a group for the purpose of directing the outcome of the sale process.

In *Sheldon v. Pinto Technology Ventures, L.P.*, the Delaware Supreme Court explained the "legally significant connection" standard for pleading the existence of a control group:

> To demonstrate that a group of stockholders exercises control collectively, the [plaintiffs] must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. . . . [T]here must be some indication of an actual agreement, although it need not be formal or written.[50]

To meet this standard, the complaint must "'give rise to a reasonably conceivable inference' that an alleged control group struck an 'actual agreement to work together in connection with' a challenged transaction."[51]

Absent a formal or written agreement establishing a legally significant connection, a plaintiff must plead "an array of plus factors"[52] "like historical ties and

---

[50] 220 A.3d 245, 251–52 (Del. 2019) (internal quotation marks omitted) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014)).

[51] *Patel v. Duncan*, 2021 WL 4482157, at *11 (Del. Ch. Sep. 30, 2021) (quoting *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *10 (Del. Ch. Dec. 20, 2019)).

[52] *Garfield*, 2019 WL 7168004, at *9.

transaction-specific ties that support a reasonable inference of an actual agreement."[53] "[V]oting power, concurrence of interests, historical ties, and transaction-specific coordination" can "give rise to a reasonably conceivable inference that [an] alleged group had more than a mere concurrence of self-interest and the actual agreement to work together in connection with the [transaction]."[54] Alleging a concurrence of self-interest among purported group members is insufficient.[55] "[C]onflat[ing] acts of consensus with the act of forming a group" cannot support a reasonable inference of a control group "[e]ven at the plaintiff-friendly motion to dismiss stage[.]"[56]

Plaintiffs do not allege that KKR, Elephant, and Sjouwerman entered into a written agreement to work together to consummate the Merger. They argue instead that the court should infer a legally significant agreement from the group members' historical ties and transaction-specific connections.

Historical ties relevant to a control group analysis are typically thick and long-standing.[57] Generally, the law requires a "long, well-documented history of

---

[53] *Patel*, 2021 WL 4482157, at *11.

[54] *Garfield*, 2019 WL 7168004, at *10 (internal quotation marks omitted); *see also Zimmerman v. Crothall*, 2012 WL 707238, at *11 (Del. Ch. Mar. 5, 2012), *as revised* (Mar. 27, 2012) (explaining that "parallel interests, in addition to other facts alleged by Plaintiff, support a reasonable, but not necessarily conclusive, inference that the [defendants] acted as a controlling shareholder").

[55] *Garfield*, 2019 WL 7168004, at *10.

[56] *Silverberg v. Padda*, 2019 WL 4566909, at *7 (Del. Ch. Sep. 19, 2019).

[57] *See, e.g.*, *In re Tilray, Inc. Reorg. Litig.*, 2021 WL 2199123, at *1, *11 (Del. Ch. June 1, 2021) (inferring a control group based on "historical ties" where group members were "former classmates and long-time friends" who "quit their investment banking

coordinated investments" that demonstrates that the parties have previously "operated in tandem."[58]

Transaction-specific connections relevant to a control-group analysis must extend beyond "mere concurrence of self-interest."[59] A plaintiff must plead specific facts that create a reasonably conceivable inference that the members of the alleged control group "functioned as a control group" through actual agreement or concerted efforts that influenced a corporation's decision-making process for the specific transaction being challenged.[60] This court has inferred a legally significant connection based on transaction-specific coordination where the alleged group members each "desire[d] to avoid massive tax liability,"[61] or negotiated "as a collective unit[.]"[62]

---

jobs" to found a business together, where they worked "just down the hall from each other" for nearly a decade); *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *7 (Del. Ch. June 18, 2018) (inferring a control group based on twenty-one-year "history of cooperation and coordination" that included at least seven joint investments, and where alleged group members described themselves as a "group" in historical SEC filings); *Garfield*, 2019 WL 7168004, at *9 (inferring a control group based on a ten-year history of co-investment in a company the defendants founded together).

[58] *Sheldon*, 220 A.3d at 250.

[59] *Id.* at 255 (quoting *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018)).

[60] *Id.*; *see also Lockton v. Rogers*, 2022 WL 604011, at *14 (Del. Ch. Mar. 1, 2022); *Patel*, 2021 WL 4482157, at *16; *Silverberg*, 2019 WL 4566909, at *7.

[61] *Tilray*, 2021 WL 2199123, at *12.

[62] *Garfield*, 2019 WL 7168004, at *10.

This court evaluates control-group allegations holistically, asking whether the collection of alleged contacts supports an inference of a legally significant connection.[63]

Plaintiffs do not identify any meaningful historical connection between the control-group members. Elephant had no real connection to either KKR or Sjouwerman. According to the Amended Complaint, Elephant was "nascent" and lacked a long history of cooperation with any other investor, including KKR.[64] Elephant's and KKR's initial investments in KnowBe4 occurred three years apart.[65] Plaintiffs identify one joint investment by Elephant and KKR over five years, but ignore that Elephant and KKR made four separate and independent investments in KnowBe4 during that same period. And Plaintiffs do not allege that KKR and Elephant worked together when exercising their right of first refusal to purchase additional shares.[66] Separate investments like these in a single company are

---

[63] *See Berteau v. Glazek*, 2021 WL 2711678, at *27 (Del. Ch. June 30, 2021) (explaining that the court assesses control holistically).

[64] *See* Am. Compl. ¶ 51 ("Elephant was a nascent firm at the time, and its KnowBe4 investment was its second-ever investment.").

[65] *Compare id.* ¶¶ 51, 55–57 (stating that Elephant funds became a KnowBe4 investor in January 2016, three years before KKR's first KnowBe4 investment in March 2019)*, with Garfield*, 2019 WL 7168004, at *9 (finding sufficient historical ties where the alleged control group members founded the company together, shared a ten-year history of co-investment, and identified themselves as "strategic partners" in public disclosures).

[66] Am. Compl. ¶ 63 (". . . the Company repurchased 731,760 shares of common stock from a former employee at a purchase price of $5.84 per share. The Company subsequently sold those shares to KKR and Elephant in December 2020 at the same price pursuant to the [right of first refusal agreement].").

insufficient to show a coordinated investment strategy relevant to the control-group analysis.

Likewise, Plaintiffs' reliance on KnowBe4's investors' rights agreement with KKR and Elephant is not enough. Plaintiffs only allege the agreement's existence. Nowhere do they allege the two worked in tandem to negotiate the agreement. Nor do they allege that KKR and Elephant exercised their rights under the agreement.

*Sheldon* is instructive. There, the Delaware Supreme Court held that the plaintiff failed to plead a control group based on allegations that venture capital firms had "crossed paths in a few investments," and other investors (not alleged to be part of the control group) participated in financing rounds and received the same securities.[67] So too here. The mere fact that Elephant and KKR separately participated in private funding rounds does not establish historical ties sufficient to create a control group.[68]

Nor do Plaintiffs allege facts showing a strong historical connection between Elephant and KKR, on the one hand, and Sjouwerman, on the other. The Amended Complaint does not contain any allegations regarding historical ties between KKR

[67] *Sheldon*, 220 A.3d at 255 (internal quotation marks omitted).

[68] *See also Anchorage Police & Fire Ret. Sys. v. Adolf*, 2025 WL 1000153, at *18 (Del. Ch. Apr. 3, 2025) (noting "[n]o Delaware decision has found that fitting the description of an 'anchor' investor or having one's board nominee serving on a board with management suffices to group an investor with management absent some plus factor"); *Ross v. Lineage Cell Therapeutics, Inc.*, C.A. No. 2019-0822-AGB, at 17:4–12 (Del. Ch. Sep. 21, 2020) (TRANSCRIPT) (finding a single, previous parallel investment did "not come close . . . to the type of long-standing coordinated investment history necessary to support a reasonable inference of a control group").

and Sjouwerman before KKR's investment in KnowBe4. Plaintiffs allege that Sjouwerman "got along" with Elephant's founders,[69] but a cordial relationship is not a sufficient basis to infer a legally significant connection required to group otherwise independent stockholders.[70]

As for transaction-specific connections, Plaintiffs advance four arguments.

First, Plaintiffs point to the "concurrent" decision by Elephant, KKR, and Sjouwerman to roll over their stock in December 2022.[71] But a decision to roll over is a quintessential example of parallel economic interests that does not independently establish a legally significant connection required for a control group.[72] The "concurrent" timing of a decision to roll over is typically driven by the deal itself, not the group members. Beyond the fact that each rolled over, Plaintiffs do not allege

---

[69] Am. Compl. ¶ 52.

[70] *Compare van der Fluit v. Yates*, 2017 WL 5953514, at *6 (Del. Ch. Nov. 30, 2017) (finding no "meaningful connections" between members of an alleged control group when plaintiff did not "offer any facts about the personal relationship" between the co-founders nor details about their "working relationship"), *with Tilray*, 2021 WL 2199123, at *1, *11, *and Garfield*, 2019 WL 7168004, at *9 (describing a shared ten-year history of co-investment with no gaps and concurrent investment at the company's founding); *see also Adolf,* 2025 WL 1000153, at *18 (holding that mere "friendship is weaker than the kinds of relationships from which this court has inferred the existence of a control group").

[71] Pls.' Ans. Br. at 41–42.

[72] *See, e.g.*, *Adolf*, 2025 WL 1000153, at *6, *16–19 (dismissing control group claim despite allegations of contemplated equity rollovers by private equity and management defendants purported to be members of the control group); *see also Hansen*, 2018 WL 3030808, at *7 (holding that, based on various allegations, including entering into a voting agreement and a stock purchase agreement, "each of these factors alone, or perhaps even less than all these factors together, would be insufficient to allege a control group existed").

any coordinated strategy in connection with the rollover agreements. In fact, documents incorporated by reference into the Amended Complaint reflect that Elephant maintained a fixed sale percentage and KKR varied its rollover amount.[73]

Second, Plaintiffs identify five early-stage meetings between Vista and control-group representatives: on May 20, 2022, Shanley met individually with Vista; over a week later, Vista met again with Shanley individually; a week after that, Daly met separately with Vista; roughly another week later, Daly, Shanley, and Sjouwerman met with Vista; and Daly and Sjouwerman had a final meeting with Vista shortly after.[74]

All these meetings occurred before any substantive Merger negotiations. Only one involved all alleged group members. Only two involved more than one alleged group member. And Plaintiffs fail to detail the working or personal relationships suggesting that the Rollover Stockholders operated in unison.[75] It is hard to view these meetings as evidencing more than parallel interests.

---

[73] *Compare* Elephant Support Agreement at KB4-001831, KB4-001854 (selling 20,000,000 shares and retaining 17,069,823 shares), *with* KKR Support Agreement at KB4-002116 (giving KKR "sole discretion . . . to reduce the number of Rollover Shares that are contributed in the Exchange").

[74] Plaintiffs also allege that the Special Committee provided routine updates about the Merger to Daly and Shanley, as either Board members or major stockholders. But this fact is present in nearly every transaction involving significant stockholders and does not support the claim that there was a legally significant connection. *See Patel*, 2021 WL 4482157, at *14 ("[T]he fact that two large stockholders sent representatives to Board meetings does not support an inference that they were tied to each other.").

[75] *See van der Fluit*, 2017 WL 5953514, at *6.

Third, Plaintiffs point to Elephant, KKR, and Sjouwerman's decisions to enter into support agreements with KnowBe4, including the requirement to down-convert their shares in connection with the stockholder vote.[76] These were separate agreements; Plaintiffs do not allege otherwise. Like the decisions to roll over, the decisions to enter into support agreements reflect no more than "an alignment of interests," not a legally significant connection among the alleged group members.[77]

Fourth, Plaintiffs argue that the Board's discussions of *MFW* protections were a concession that Elephant, KKR, and Sjouwerman constituted a group.[78] Relatedly, they allege that both Morgan Stanley and the Special Committee treated Elephant, KKR, and Sjouwerman as a group.[79] On June 28, the alleged group members informed the Board that they were interested in rolling over their KnowBe4 shares in connection with the Merger.[80] On July 7, the Special Committee received legal

---

[76] Pls.' Ans. Br. at 41–42.

[77] *Frank v. Mullen*, 337 A.3d 824, 842 (Del. Ch. 2025) (explaining that to establish transaction-specific ties, there must be "more than an alignment of interests: it requires some indication of an actual agreement"); *see also van der Fluit*, 2017 WL 5953514, at *6 (dismissing a control group claim in part because agreements requiring stockholders to vote for a transaction did not "evidence the presence of a control group rather than a 'concurrence of self-interest among certain stockholders'" (quoting *In re Crimson*, 2014 WL 5449419, at *15)); *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *5 (Del. Ch. May 22, 2009) ("[S]hareholders are entitled to vote based on their own self-interest, regardless of whether their interests are consistent with the interests of other shareholders.").

[78] Pls.' Ans. Br. at 48–50.

[79] *Id.* at 56.

[80] Am. Compl. ¶ 103.

advice regarding controlling stockholder issues.[81] And on July 11, 2022, the Board submitted the Merger to *MFW*'s dual protections.[82] From that point forward, the Special Committee and the Board received legal advice on risks associated with conflicted-controller transactions throughout the process,[83] Morgan Stanley treated the alleged group members as a control group, and Vista conditioned the Merger on *MFW* protections, according to Plaintiffs.

This argument is weak. As a policy matter, *MFW* incentivizes boards to adopt procedural protections when negotiating deals that involve potential controller conflicts.[84] Deeming the decision to adopt *MFW* protections as a concession concerning the existence of a conflicted controller would disincentivize their use. Here, no other facts support treating the alleged controllers as a group. The Board's decision to adopt prophylactic procedures does not, standing alone, support doing so.

In all, Plaintiffs' alleged transaction-specific connections do not demonstrate the relevant connection among Defendants from which the court can infer the existence of a group.

Moreover, Plaintiffs' authorities do not support their position. *Hansen* involved members of the alleged group who (i) coordinated their investment strategy

---

[81] Dkt. 49, Ex. 7 ("7/7/22 Special Committee Minutes") at KB4-000863; *see also* Am. Compl. ¶¶ 116–23 (referencing the 7/7/22 Special Committee Minutes).

[82] Am. Compl. ¶¶ 124–27.

[83] *Id.* ¶¶ 128, 144, 168, 179, 240.

[84] *See generally In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185, at *33 (Del. Ch. Apr. 27, 2022), *aff'd*, 298 A.3d 667 (Del. 2023).

in at least seven companies over 21 years, (ii) declared themselves a group to the SEC, and (iii) entered into agreements early in negotiations that allowed only them to negotiate with the buyer.[85] *Frank v. Elgamal* involved members of the alleged control group "act[ing] together to attain unique benefits for themselves at the expense of [the company's] other stockholders."[86] *Garfield v. BlackRock Mortgage Ventures, LLC* involved facts suggesting that the alleged group members acted as a "collective unit" with respect to the transaction.[87] None of these facts are alleged in the complaint.

*In re Pattern Energy Group Inc. Stockholders Litigation* also contrasts with the present case.[88] There, the plaintiffs alleged that the control group negotiated for consent rights and "contractual control" over the company. The plaintiffs alleged that company fiduciaries did the bidding of the control group, including by considering and hiring an advisor to explore a sale process without the board's knowledge, initiating a sale process when the company had no "apparent need to sell," introducing entities friendly with the alleged control group members, and generally

---

[85] *Hansen*, 2018 WL 3025525, at *7; *see also In re Hansen Med., Inc. S'holders Litig.*, C.A. No. 12316-VCMR, Dkt. 76 (Consolidated Amended Complaint) ¶¶ 40, 74 (alleging that the buyer's CEO believed that one member of the control group negotiated on behalf of the others).

[86] 2012 WL 1096090, at *8 n.57 (Del. Ch. Mar. 30, 2012) (stating that specific allegations of rollover and voting agreements, and an agreement to work at the post-merger entity is sufficient).

[87] 2019 WL 7168004, at *10 (Del. Ch. Dec. 20, 2019).

[88] 2021 WL 1812674 (Del. Ch. May 6, 2021).

pushing the alleged control group's agenda, and steering the transaction to the control group's preferred bidder.[89] Plaintiffs do not allege anything similar here.

Finally, *MH Haberkorn 2006 Trust v. Empire Resorts, Inc.* does not help Plaintiffs.[90] There, the court held that excluding the alleged control group from the majority-of-the-minority vote supported an inference that they were a control group.[91] But that case involved several plus factors that led the court to infer a concerted effort among the alleged group members to act in unison.[92] For example, one member brought in two others to effectuate the merger.[93] Members of the control group then formed a joint venture.[94] And two members negotiated against the special committee.[95] Again, Plaintiffs have failed to allege the same degree of orchestrated effort.

Even viewing Plaintiffs' allegations holistically, Plaintiffs fail to support an inference of a legally significant agreement among the alleged group members. Plaintiffs' control-group theory fails. Count I is dismissed.

---

[89] *Id.* at *42.

[90] C.A. No. 2020-0619-KSJM (Del. Ch. July 23, 2021) (TRANSCRIPT).

[91] *Id.* at 47:10–23, 48:2–8.

[92] *Id.*

[93] *Id.* at 47:4–9.

[94] *Id.* at 47:10–14.

[95] *Id.* at 47:24–48:2.

### B. Count II Against The Director Defendants

Plaintiffs allege that the Director Defendants breached their fiduciary duties in connection with the Merger. A court applying Delaware law evaluates fiduciaries' conduct through a standard of review.[96] When a defendant moves to dismiss a claim for breach of fiduciary duty, the standard of review supplies a gating and often dispositive issue. Delaware law has three standards of review: business judgment, enhanced scrutiny, and entire fairness.[97]

Plaintiffs argue that Delaware's most onerous standard of review—entire fairness—applies for two alternative reasons. They first contend that a conflicted control group stood on both sides of the transaction, but this decision has rejected that theory. They also argue that entire fairness applies because "at least half of the directors who approved" the Merger are not independent or disinterested.[98] This decision assumes that Sjouwerman, who rolled over his shares,[99] and Shanley, Daly, and Wilson, who were alleged to be dual fiduciaries for Rollover Stockholders, were interested in the Merger.[100] Entire fairness thus applies based on that assumption.

---

[96] *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013) ["*Trados II*"].

[97] *Chen*, 87 A.3d at 666.

[98] Pls.' Ans. Br. at 61 (citing *Firefighters' Pension Sys. of Kansas City v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1142 (Del. Ch. 2024)).

[99] *Hansen*, 2018 WL 3025525, at *9 (holding entire fairness applies when a fiduciary, as part of a control group, receives a non-ratable benefit because they roll over their stock in the company into preferred stock in the buyer).

[100] *See, e.g.*, *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *30 (Del. Ch. Apr. 14, 2017) (finding that where "allegations support a reasonable inference that the" dual fiduciaries furthered one entity's interests over the other, they could not "be considered disinterested or independent for purposes of

Yet when entire fairness applies due to director conflicts, either a fully empowered, independent special committee or a fully informed, uncoerced stockholder vote can cleanse the transaction.[101] Here, Defendants rely foremost on the cleansing effect of the stockholder vote under *Corwin v. KKR Financial Holdings LLC*.[102] As a result, Plaintiffs bear the burden of pleading a disclosure deficiency.

To challenge the effect of a stockholder vote at the pleading stage, Plaintiffs must allege facts that "support[] a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[103] Information is material if "a reasonable shareholder would consider it important in deciding how to vote."[104] The "materiality test 'does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable

---

determining the standard of review"); *Wei*, 2025 WL 1565356, at *13 (finding directors affiliated with interested counterparties "were prototypical dual-fiduciaries"); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) ["*Trados I*"] (finding that directors are interested in a transaction that benefited preferred stockholders where "each had an ownership or employment relationship with an entity that owned [the company's] preferred stock").

[101] *Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020) ("Where entire fairness applies because of a conflicted controller, under *MFW*, a board can recover business judgment review by making the transaction contingent from inception upon the presence of a fully constituted, fully authorized special committee *and* a vote of informed and un-coerced minority stockholders. Under *Corwin*, 'absent a looming conflicted controller,' approval by a fully informed, un-coerced vote of disinterested stockholders can cleanse the transaction—even where entire fairness would otherwise apply. Alternatively, absent a conflicted controller, a fully-empowered, independent special committee can potentially cleanse the transaction under the rationale noted in *Trados II*." (cleaned up)).

[102] 125 A.3d 304 (Del. 2015).

[103] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

[104] *Id.* (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

investor to change his vote,'" only that it would have "altered the total mix of information made available."[105]

"Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[106] Material information must be disclosed in a "clear and transparent manner,"[107] as "proxy statements are not intended to be mysteries to be solved by their audience."[108]

Plaintiffs identify five alleged disclosure deficiencies: (a) the Special Committee's conflicts of interest; (b) Morgan Stanley's conflicts of interest; (c) KKR's rollover participation; (d) the circumstances surrounding Mitnick's support agreement; and (e) the Special Committee's alleged favoritism of Vista.

**a. The Special Committee's Conflicts Of Interest**

Plaintiffs argue that the stockholder vote was uninformed because the Proxy Statement omitted material information concerning the Special Committee members' potential conflicts of interest and described the members as "independent and disinterested."[109]

According to Plaintiffs, the following constitute potential conflicts that should have been disclosed to stockholders: Venkataraman and his wife had investments

---

[105] *Id.* at 283 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[106] *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018).

[107] *Vento v. Curry*, 2017 WL 1076725, at *4 (Del. Ch. Mar. 22, 2017).

[108] *Appel*, 180 A.3d at 1064.

[109] Am. Compl. ¶ 296.

with KKR and Elephant; Klausmeyer served on the boards of Jamf and Ivalua, which were affiliated with Vista and KKR, respectively; and Watzinger had invested in KKR-affiliated funds and was friends with KKR- and Vista-affiliated individuals.[110] None of these allegations were likely to alter the total mix of information.

Delaware law presumes directors are independent and disinterested.[111] "[A] lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'"[112] And a director is interested if they receive a unique personal benefit not shared equally by the stockholders.[113] The benefit must be "of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest. . . ."[114]

Information regarding Venkataraman's investments in KKR and Elephant funds is not material. It is theoretically possible that holdings in a rollover stockholder standing alone would create a potential conflict of interest. But Plaintiffs

---

[110] Pls.' Answering Br. at 94–98.

[111] *Nguyen v. Barrett*, 2016 WL 5404095, at *5 (Del. Ch. Sep. 28, 2016).

[112] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Delaware Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015)).

[113] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

[114] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999).

have not pled enough to support that inference here. This was a clean process. There are no allegations that KKR or Elephant influenced the Special Committee's negotiations with Vista. Plaintiffs rely exclusively on the investments in KKR or Elephant or their affiliates to show a conflict of interest, failing to grapple with the fact that Venkataraman had significant economic incentives to maximize the deal value. In this circumstance, both the overall rollover, and the size of the director's stake in the rollover stockholder, would need to be sufficiently sizeable to create conflicting economic incentives for an otherwise independent director. Plaintiffs allege that investments in Elephant funds are invite-only, rare, and usually require individual investors to "commit a sizable amount of capital."[115] But these are generalized allegations. Plaintiffs do not make similar arguments as to KKR. Nor do Plaintiffs allege that Venkataraman or his wife were invested in the precise Elephant funds that rolled over their equity.[116] A reasonable stockholder would not consider this information important in deciding how to vote.[117]

---

[115] Am. Compl. ¶ 111.

[116] *See id.* ¶¶ 110, 133.

[117] In briefing, unconnected to their arguments regarding disclosure deficiencies, Plaintiffs argue: (i) that Venkataraman harbored a sense of owingness or was beholden to the alleged control group due to his past employment and his unvested restricted stock units; (ii) that Venkataraman's brother-in-law worked at KnowBe4; and (iii) that disclosures required by Nasdaq identified Venkataraman as lacking independence. According to Plaintiffs, all of this gave rise to potential conflicts of interest. Pls.' Answering Br. at 63–73. These additional issues did not warrant additional disclosures.

Plaintiffs did not adequately allege that Venkataraman harbored feelings (either owingness or beholdenness) that would compromise his independence. This argument depends on the existence of a control group—a group to which Venkataraman felt obligated, from which he feared retribution, or that otherwise

Klausmeyer's other board positions were not a source of conflict warranting disclosure. Vista selected Klausmeyer as one of its contractual board designees to Jamf Holding Corp., a company it controls, and Klausmeyer received over $1.2 million in Jamf director fees between 2019 and 2023. Since October 2019, Klausmeyer has been a director of Ivalua, in which KKR invested $70 million. Klausmeyer serves on that board with Shanley. Plaintiffs argue that Klausmeyer's Jamf board

---

created a controlled mindset. But as discussed above, Plaintiffs fail to adequately allege the existence of a control group. Even if they had, Plaintiffs' theory was that the alleged group members worked in concert to control the Merger, not past actions (like Venkataraman's compensation) or future actions (like the election of directors).

Plaintiffs' allegations regarding Venkataraman's brother-in-law also lack any details logically connecting the allegations to the relevant analysis.

Nor do Plaintiffs' allegations regarding past disclosures concerning Venkataraman move the needle. When Venkataraman joined the Board, the Company disclosed that "Venkataraman is not considered an independent director because of his positions as . . . former Co-President and Chief Financial Officer," which would "interfere with his exercise of independent judgment in carrying out the responsibilities of a director." Pls.' Ans. Br., Ex. 4 at 10 (cleaned up). This is because, under Nasdaq rules "a director who is, or at any time during the past three years was, employed by the Company" "shall not be considered independent." Nasdaq, Rule 5605(a)(2)(A), *available at* https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/nasdaq-5600-series. Under Delaware law, corporate officers may lack independence from controllers because their employment depends on the controller. But again, there is no control group here. And it is undisputed that Venkataraman did not serve as an officer when the Merger negotiations began or when the Board appointed him to the Special Committee. His employment (and income) thus did not depend on the approval of any of KnowBe4's stockholders. Nor did his continued employment depend on a relationship with the acquirer. Nasdaq only classified Venkataraman as not independent because the rules have a three-year lookback. *See id.* That is not enough. *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015) (rejecting a similar effort to piggyback an independence determination on stock exchange rules, explaining that a past non-independent designation under the NYSE rules carries "little weight" in a Delaware court's analysis when the NYSE rule is the result of a bright-line, mechanical disqualification).

appointment and service on the Ivalua board indicates a close relationship with Vista and KKR, respectively, that undermines Klausmeyer's independence, and which should have been disclosed.

Under Delaware law, "a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."[118] And "ordinary past business relationships, board nominations, and board service . . . [are] insufficient to cast doubt on a director's independence."[119] Although being appointed by an investor to serve on multiple boards can give rise to a "sense of owingness,"[120] the facts alleged against Klausmeyer do not give rise to that inference.[121]

A sense of owingness requires deep ties. For example, this court found a sense of owingness when an investor had a "long history" with the director, including investing in multiple companies where the director served as an executive, appointing him to a board, and providing the director access to three of the investor's funds.[122]

---

[118] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[119] *Firestone*, 2021 WL 5991886, at *4.

[120] *See City of Hialeah Emps. Ret. Sys. ex rel. of nCino, Inc. v. Insight Vent. P'rs, LLC,* 2023 WL 8948218, at *8 (Del. Ch. Dec. 28, 2023), *aff'd*, 326 A.3d 1201 (Del. 2024) ("This Court has reasoned that a controller with a history of appointing a director to boards, and the capability to appoint that director to more boards in the future, can inspire a sense of owingness that casts reasonable doubt on the director's impartiality.").

[121] *Firestone*, 2021 WL 5991886, at *5 (holding that a director's membership on two boards affiliated with an alleged controller "is insufficient to cast doubt on [the director's] independence"); *see also DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *13 (Del. Ch. Sep. 30, 2013) (holding that a director's co-investment and board services with an alleged controller did not render the director conflicted).

[122] *Trados II*, 73 A.3d at 54.

Here, KKR's single investment in Ivalua does not create the same close relationship sufficient to undermine Klausmeyer's independence. And Klausmeyer's Vista connection is even more remote. A single board appointment is the exact kind of ordinary business relationship that fails to compromise a director's independence.[123] Klausmeyer's board positions do not present a conflict. Nor would a reasonable stockholder consider this information important in deciding how to vote.

Watzinger's ties to KKR and Vista are even more attenuated. Plaintiffs claim that Watzinger was invested in funds managed by KKR. This allegation is not enough for the same reasons that the allegations concerning Venkataraman's investments fail. Plaintiffs also allege that Watzinger was friends with several Vista partners. But friendship standing alone is not a disqualifying circumstance under Delaware law.[124] Plaintiffs have not adequately alleged that Watzinger lacked independence from KKR or Vista. And a reasonable stockholder would not consider information regarding that relationship important in deciding how to vote.

---

[123] *See KKR*, 101 A.3d at 996. Plaintiffs also cite to *Atallah v. Malone*, 2023 WL 4628774 (Del. Ch. July 19, 2023), but independence there turned on "personal interactions" including grilling steaks, piloting a yacht through a storm, and celebrating a 50th wedding anniversary. *Id.* at *8–9. Plaintiffs here do not allege those personal interactions.

[124] *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").

**b. Morgan Stanley's Conflicts Of Interest**

Plaintiffs argue that the stockholder vote was uninformed based on the Proxy Statement's disclosures regarding Morgan Stanley's investments in KKR & Co. Inc. and its portfolio companies.

The Proxy Statement disclosed that, for the two years before the Merger, Morgan Stanley received fees from: (i) "Vista Related Entities"; (ii) "KKR Related Entities"; and (iii) KnowBe4.[125] The Proxy Statement further disclosed that "[i]n the two years prior to the date of Morgan Stanley's opinion, Morgan Stanley has not provided financial advisory and/or financing services to Elephant Partners."[126] The Proxy Statement did not disclose that, at the time Morgan Stanley advised the Special Committee on the Merger, Morgan Stanley held investments of approximately $200 million in KKR & Co. Inc. and $350 million in KKR portfolio companies.[127] This information was disclosed to the Special Committee. Plaintiffs argue that it was material and should have been disclosed to stockholders.

---

[125] Proxy Statement at 65.

[126] *Id.*

[127] Am. Compl. ¶¶ 320–21. The $200 million presumably includes funds held by Morgan Stanley on its clients' behalf, but Plaintiffs alleged that "[m]uch if not substantially all of those investments, Morgan Stanley appeared to hold for its own account," rather than on its clients' behalf. *Id.* ¶ 321. Defendants dispute this factual assertion, noting that "positions disclosed on a Form 13F include the positions held in all discretionary client accounts that Morgan Stanley manages." KnowBe4 and Sjouwerman Opening Br. at 45. They argue, and it is true, that Delaware law does not require that a financial advisor to a special committee disclose investments held on behalf of its clients. *See id.* at 45–46 (citing *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *11 (Del. Ch. Feb. 29, 2012) ("Equally unavailing are Plaintiffs' claims that the Board breached its fiduciary duties by failing to disclose . . . Goldman's

Plaintiffs rely on a single case, *City of Dearborn Police & Fire Revised Retirement System v. Brookfield Asset Management Inc.*, which involved a controller squeeze-out.[128] There, Morgan Stanley had significant relationships with the company's controller, Brookfield. Morgan Stanley had "received tens of millions of dollars in advisory fees" from the company and controller pre-merger and had concurrent engagements for the controller.[129] Also, Morgan Stanley had an approximately half-billion-dollar investment in the controller that the proxy statement failed to disclose.[130] The Supreme Court held "[i]t is reasonably conceivable that from the viewpoint of a stockholder, Morgan Stanley's nearly half a billion-dollar holding in Brookfield was material and would have been material to a stockholder in assessing Morgan Stanley's objectivity."[131]

This case is distinguishable. KKR was neither a controller nor a counterparty. Rather, KKR was a minority stockholder that rolled over its shares. Because the rollover posed a potential conflict, the Special Committee excluded KKR from its negotiations with Vista. KKR and Vista negotiated the amount of KKR's rollover, not KKR and the Special Committee (or Morgan Stanley). And the Special Committee

---

interest in Amgen stock . . . most of which it holds on behalf of its clients.")). But the court must accept Plaintiffs' allegations as true for purposes of this motion.

[128] 314 A.3d 1108 (Del. 2024).

[129] *Compare id.* at 1117, 1130, *with* Am. Compl. ¶¶ 39–40.

[130] *Brookfield*, 314 A.3d at 1130.

[131] *Id.* at 1132 (cleaned up) (first quoting *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 860 (Del. 2015), then quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011)).

maintained oversight of those discussions. Under these circumstances, information on Morgan Stanley's investments with a rollover stockholder (or its affiliates)—who did not participate in the Special Committee process—does not alter the total mix of information.

*PLX* supports this conclusion.[132] In *PLX*, the court evaluated an investment bank's conflicts as part of a *Revlon* claim.[133] The bank had a "thick relationship" with the buyer, which it also contemporaneously advised on another transaction.[134] The bank's relationship with the buyer gave it a "powerful incentive 'to maintain good will and not push too hard' during the negotiations."[135] Similar to *Brookfield*, the central lesson of *PLX* is that an advisor possesses material conflicts when it has a close relationship with a counterparty. But KKR was not a counterparty. And the Special Committee quarantined the Rollover Stockholders.

The failure to disclose Morgan Stanley's investments in KKR and its portfolio companies did not render the stockholder vote uninformed.

**c. KKR's Rollover Participation**

Plaintiffs argue that the stockholder vote was uninformed because the Proxy Statement failed to disclose KKR's decision to increase its rollover participation after

---

[132] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018).

[133] *See id.* at *38–39.

[134] *Id.* at *43.

[135] *Id.* (quoting *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 94 (Del. Ch. 2014)). Plaintiffs settled with the investment bank before trial. *Id.* The court expanded on the bank's role because its "position on both sides of the deal necessarily colors the court's assessment of the decisions that the directors made." *Id.*

Vista submitted its initial offer to buy the Company. According to Plaintiffs, if stockholders knew of KKR's earlier (and lower) estimated rollover amounts, they would have concluded that KKR subjectively believed that "the Merger underpriced KnowBe4."[136]

The Proxy Statement disclosed in detail the negotiating process that led to KKR's final rollover amount, including that it was interested in potentially "rolling all or a part of [its] equity" in a potential transaction and that its "preliminary interest in a potential rollover . . . and the potential quantum for such equity rollover" was requested by Vista and conveyed to Morgan Stanley, the Special Committee, and Vista before Vista had submitted an offer to buy KnowBe4.[137] The Proxy Statement also disclosed the final rollover amount and attached a copy of KKR's rollover agreement.[138] From these disclosures, stockholders knew that the amount of KnowBe4 stock KKR would roll over was fluid and that KKR would potentially roll over its entire equity stake.

Moreover, KKR's earlier, estimated rollover amounts were contingent on other factors that changed throughout negotiations. Indeed, Plaintiffs concede that "the price Vista would pay in any transaction could affect the amount of equity Vista asked

---

[136] Am. Compl. ¶ 305.

[137] Proxy Statement at 29, 34, 37–41.

[138] *Id.* at 11, 89, Annex D.

investors to roll over."[139] Thus, any rollover estimates by KKR prior to Vista submitting an offer would not have altered the total mix of information.

The failure to disclose KKR's early rollover estimates did not render the stockholder vote uninformed.[140]

**d. Mitnick's Support Agreement**

Plaintiffs argue that the Proxy Statement was misleading because it labeled Mitnick as an "Unaffiliated Stockholder."[141] In Plaintiffs' view, this label suggested that Mitnick was independent. But in fact, he enjoyed a close relationship with Sjouwerman.[142] Plus, the Proxy Statement did not disclose the Special Committee's concern that Mitnick could dictate the outcome of an unaffiliated stockholder vote or that they tasked Sjouwerman with securing Mitnick's support for the Merger.[143]

---

139 Am. Compl. ¶ 237.

140 *See Adolf*, 2025 WL 1000153, at *25 (finding a proxy statement's disclosure sufficient when it described the evolution of a private equity firm's rollover financing to another private equity firm); *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*, C.A. No. 2022-0698-KSJM, at 44:21–45:5 (Del. Ch. July 31, 2023) (TRANSCRIPT), *rev'd on other grounds*, 319 A.3d 271 (Del. 2024) (finding no disclosure violation because defendant's proposed rollover amount "says nothing" about his purported belief about the company's value).

141 Pls.' Ans. Br. at 107–09.

142 According to the Amended Complaint, Mitnick was an inside KnowBe4 director from 2016 to 2021, had a consulting arrangement with the Company, received $150 million for selling some of his KnowBe4 shares, and licensed to KnowBe4 the right to use his name as a brand. Am. Compl. ¶¶ 41, 46–49, 60. Mitnick and Sjouwerman "partnered in November 2011 and built KnowBe4 together." *Id.* ¶ 316. Sjouwerman publicly referred to Mitnick not only as his "business partner," but also as a "close friend" and a "dear friend." *Id.* ¶ 11.

143 *Id.* ¶¶ 249, 268, 319.

Plaintiffs argue that the Proxy Statement "traveled down the road" of portraying Mitnick as independent to solicit the unaffiliated vote.[144]

Plaintiffs' partial-disclosure argument rests on the false premise that the Proxy Statement described Mitnick as independent. It did not. Rather, it disclosed that Mitnick was counted as an "Unaffiliated Stockholder" for purposes of the stockholder vote.[145] The Proxy Statement defines "Unaffiliated Stockholders" as "the holders of KnowBe4 common stock" excluding shares held on behalf of Vista, KKR, and Elephant and their affiliates as well as "any person that KnowBe4 has determined to be an 'officer' of KnowBe4 within the meaning of Rule 16a-1(f) of the Exchange Act."[146] Mitnick received the same consideration as other stockholders and qualifies as an "Unaffiliated Stockholder" under this definition. The Proxy Statement's reference to Mitnick as an "Unaffiliated Stockholder" was thus true and complete. His former employment at KnowBe4 and alleged friendship with Sjouwerman do not change that.

Moreover, the Proxy Statement disclosed Mitnick's support agreement.[147] Mitnick received the same consideration as the minority stockholders. Mitnick

---

[144] Pls.' Ans. Br. at 109 (quoting *In re Mindbody, Inc. S'holder Litig.*, 332 A.3d 349, 387 (Del. 2024)).

[145] *See* Proxy Statement at 4.

[146] Proxy Statement at vi–vii.

[147] *Id.* at 3 ("Kevin Mitnick . . . who beneficially owned approximately 9 percent of the voting power of the outstanding shares of KnowBe4 common stock as of the Record Date, entered into the Mitnick Support Agreement, pursuant to which he agreed . . . to vote all of the Mitnick Shares in favor of the Merger Proposal.")

played no role in negotiating the Merger. And Plaintiffs do not argue that the Proxy Statement should have disclosed Mitnick's subjective reasons for entering into the Support Agreement—be it friendship or otherwise.[148] The Special Committee approved the Merger. And the Proxy Statement framed the Merger to solicit stockholder support. All of this was known, and none of it unseemly. It is unclear, therefore, how the Special Committee's efforts to secure the support of a large, unaffiliated stockholder thus would alter the total mix of information.

The Proxy Statement's disclosures regarding Mitnick were not materially misleading.

#### e. The Special Committee's Alleged Favoritism of Vista

Plaintiffs argue that the stockholder vote was uninformed because it did not disclose that the Special Committee favored Vista. If the Special Committee improperly favored one bidder over another for reasons unconnected to maximizing stockholder value, that might warrant disclosure. But Plaintiffs have not adequately alleged that the Special Committee favored Vista. Plaintiffs seek that inference based on two allegations.

---

[148] *See generally In re MONY Gp., Inc. S'holder Litig.*, 853 A.2d 661, 683 (Del. Ch. 2004) (explaining that "[s]tockholders of Delaware corporations have the right to vote their shares in their own interest" and their "personal interests . . . are irrelevant"); *see also Beam*, 845 A.2d at 1050 ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."); *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980 (Del. Ch. 2000) (finding that a "long-standing 15–year professional and personal relationship" fails to raise a reasonable doubt about a director's independence).

First, on August 17, Morgan Stanley "reported on Vista's due diligence progress, the due diligence progress of the other potential bidders and the status of Vista's due diligence progress relative to other potential bidders."[149] It further disclosed that the Special Committee determined to "allow each potential bidder to proceed at its own pace."[150] According to Plaintiffs, the Proxy Statement should have said this differently, stating that the Special Committee declined to "pause Vista's due diligence to permit other potential bidders to catch up."[151] This is weak, and nothing more than the "tell me more" variety of disclosure complaints.[152]

Second, the Proxy Statement disclosed that, according to Morgan Stanley, "no other potential bidder had expressed as much interest, or had been as active, as Vista."[153] Plaintiffs point to Morgan Stanley's August 26 representation that just "one other potential bidder had begun additional due diligence and management meetings were being scheduled with others."[154] Given this, Plaintiffs contend that

---

[149] Proxy Statement at 36.

[150] *Id.* at 32–38.

[151] Am. Compl. ¶ 188.

[152] *See In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *18 (Del. Ch. Mar. 6, 2012); *In re Lukens Inc. S'holder Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999) ("Of course, requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless.").

[153] Am. Compl. ¶ 309.

[154] *Id.*

the Proxy Statement "downplay[ed] the level of interest potential alternate bidders had in the Company."[155]

But the Proxy Statement was not required to disclose any preliminary, speculative indications of interest that were allegedly expressed by other parties who never actually bid. "In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required."[156] Plaintiffs do not allege that any other potential bidder ever reached the point of formal negotiations, let alone making a bid. The Proxy Statement accurately disclosed the Special Committee's determination that "none of the possible alternatives . . . including continuing to operate KnowBe4 as an independent company or pursuing a different transaction . . . was reasonably likely to present superior opportunities for KnowBe4[.]"[157] Plaintiffs cannot plead a disclosure claim because they disagree with the Special Committee's assessment of indications of interest.[158]

---

[155] *Id.* ¶¶ 306, 308.

[156] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008); *State of Wis. Inv. Bd. v. Bartlett*, 2000 WL 238026, at *8 (Del. Ch. Feb. 24, 2000) (finding "alleged omission regarding indications of interest from other potential suitors need not be disclosed as those discussions were preliminary in order to explore the possibility of a business combination that might lead to a merger agreement, and little more").

[157] Proxy Statement at 46.

[158] *City of Miami Gen. Empls. v. Comstock*, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016) (explaining that Delaware law "does not require disclosing details about offers that directors conclude are not worth pursuing" even when plaintiffs disagree with a Special Committee's evaluation).

In the end, Delaware law "does not require a play-by-play description of every consideration or action taken by a Board[.]"[159] There is no obligation "to disclose the details of the various discussions and deliberation of the various board members[.]"[160] All that is required is an "accurate, full, and fair characterization of the events[.]"[161] The Proxy Statement meets that standard. Plaintiffs have not pled facts demonstrating that the stockholder vote was uninformed.

## III. CONCLUSION

Plaintiffs concede that Count II fails to state a claim if the business judgment standard applies, and it does. Count II is dismissed. To recap the rest, Count I is dismissed because the Amended Complaint fails to allege the existence of a control group. Count III is dismissed because Plaintiffs abandoned it. Because the Amended Complaint fails to state a claim for these reasons, this decision does not reach Defendants' other arguments. Defendants' motions to dismiss are granted.

---

[159] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511–12 (Del. Ch. 2010).

[160] *Newman v. Warren*, 684 A.2d 1239, 1246 (Del. Ch. 1996).

[161] *Cogent*, 7 A.3d at 511.